QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Claude M. Stern (Bar No. 96737)
  claudestern@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

  Ryan S. Landes (Bar No. 252642)
  ryanlandes@quinnemanuel.com
865 S Figueroa Street
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

*Attorneys for Plaintiffs WeRide Corp. and
WeRide Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| WERIDE CORP. f/k/a JingChi Corp.; WERIDE INC. f/k/a JingChi Inc., <br><br> Plaintiffs, <br><br> vs. <br><br> JING WANG, an individual, KUN HUANG, an individual, ALLRIDE.AI INC., <br><br> Defendants. | CASE NO. 5:18-cv-7233 <br><br> **COMPLAINT OF WERIDE CORP. AND WERIDE, INC., FOR** <br> 1. **MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. § 1836** <br> 2. **MISAPPROPRIATION OF TRADE SECRETS UNDER CALIFORNIA CIVIL CODE § 3426, ET SEQ.** <br> 3. **DEFAMATION** <br> 4. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** <br> 5. **BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY** <br> 6. **BREACH OF WRITTEN CONTRACT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs WeRide Corp. and WeRide Inc. (collectively "WeRide") complain against Jing Wang, Kun Huang, and AllRide.AI Inc. ("AllRide") as follows:

**INTRODUCTION**

1.     WeRide brings this action to remedy and prevent two former employees – former CEO Jing Wang and former Head of Hardware Technology Kun Huang – and their new company, AllRide, from using confidential, proprietary, and trade secret information stolen from WeRide ("Confidential Information"). WeRide also seeks to prevent Wang from intentionally interfering with its investment prospects by making false statements to investors in violation of his separation agreement, and to prevent Wang and Huang from soliciting WeRide employees in violation of their contractual obligations.

2.     WeRide is a leader in the race to develop self-driving cars for the Chinese market, and has invested $45 million over the past eighteen months to develop proprietary software capable of guiding driverless cars on public roads.

3.     WeRide's former CEO, Jing Wang, resigned on January 31, 2018. In connection with his departure, he signed a separation agreement providing, among other things, that he would not disparage WeRide and he would continue to honor the provisions of his employment agreement. His employment agreement provided in relevant part that he would not disclose any information he learned while at WeRide and that he would not solicit WeRide employees for one year after his separation from WeRide.

4.     Shortly after leaving WeRide, Wang founded AllRide, a competing self-driving car company aimed at the Chinese market that Chinese media outlets have described as "basically copying" WeRide.[1]  In violation of his employment agreement, Wang began recruiting WeRide employees to join him at AllRide. And in violation of his separation agreement and other duties, he also contacted WeRide's investors and made a number of false statements about WeRide in an effort to prevent them from closing agreements to invest in WeRide. Wang told some investors that WeRide had stolen Waymo's technology, and that Waymo was about to sue. He told other investors that

---

[1]  *See* Che Zhi (Car Wisdom), *Jingchi Technology's Triplets: WeRide, AllRide, and MoonX*, Zhihu Column (Oct. 31, 2018), https://zhuanlan.zhihu.com/p/48170899.

WeRide's technology did not work, its demonstration videos were faked, and its cars had been involved in an accident that WeRide was trying to cover up. These statements were false. Nevertheless, Wang was successful in his attempts to interfere with WeRide's investments, and many investors pulled their funding as a result of Wang's false statements—WeRide lost over $75 million of committed investments in its critical Series A investment round. This has caused irreparable harm to WeRide. The loss of investment has delayed WeRide's development plan by months and threatens to destroy WeRide's ability to attract investment and talent in the future.

5.      One of the WeRide employees Wang recruited was Kun Huang, who at the time was WeRide's Head of Hardware Technology. Huang in turn began recruiting his coworkers to join "Jing Wang's new company" while still employed at WeRide, in violation of his own employment agreement and duties he owed to WeRide. WeRide found out and terminated Huang's employment.

6.      In the week before Huang left WeRide, he downloaded over eight gigabytes of data through WeRide's protected virtual private network ("VPN")—more than his typical usage. This data included WeRide's Confidential Information, which Huang copied onto personal USB devices using his company-issued laptops. He then deleted a large number of files on both laptops in an attempt to cover his tracks before returning them to WeRide, but, notably, Huang *did not* return the USB devices or his own personal laptop. Huang is thus likely still in possession of WeRide's Confidential Information.

7.      In October 2018, WeRide learned that AllRide was using its Confidential Information. Although AllRide had existed for less than three months, AllRide publicly posted a video demonstrating self-driving capabilities that it had taken WeRide several months to develop, and that as a technical matter could not be achieved by AllRide without using stolen technology.

8.      Huang has not substantively responded to demands to return WeRide's Confidential Information, which he is likely using and disclosing to perform his duties at AllRide. As a result, WeRide's Confidential Information may and likely does exist on an unknown number of devices controlled by all three defendants, as well as potentially in the hands of an unknown number of third parties.

9.     Wang's disparagement of WeRide to investors, Huang's and AllRide's theft of WeRide's Confidential Information, and Wang and Huang's wrongful solicitation of WeRide employees threatens to cause and is causing irreparable harm to WeRide that necessitates equitable relief and damages according to proof and as noted below.

## THE PARTIES

10.     Plaintiff WeRide Corp. f/k/a JingChi Corp. is a leading smart mobility company developing self-driving cars for the Chinese market. WeRide Corp. is a Delaware corporation that was founded in Sunnyvale, CA, where WeRide Corp. still maintains its primary research and development office. WeRide Corp. also has offices at Building C1, Bio Island International Apartment, No. 86, Xingdao South Road, Haizhu District, Guangzhou, China.

11.     Plaintiff WeRide Inc. f/k/a JingChi Inc. is incorporated in the Cayman Islands. WeRide Inc. owns 100% of the shares of WeRide Corp.

12.     On information and belief, Defendant Jing Wang is an individual residing at 4003 Marcelli Circle, Los Altos, CA 94022.

13.     On information and belief, Defendant Kun Huang is an individual residing at 555 Pine Avenue, Sunnyvale, CA 94085.

14.     On information and belief, Defendant AllRide.AI Inc. is a Delaware corporation with its principal place of business at 2nd Floor, Building A3, Hongfeng Science and Technology Park, Qixia District, Nanjing, China. According to its website, AllRide has established a research and development office in Silicon Valley, and it promotes a cultural exchange program for Chinese recruits to work alongside their American counterparts.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over the claims asserted herein under 28 U.S.C. §§ 1331 & 1367, and 18 U.S.C. § 1836(c). This Court has supplemental jurisdiction over the state law claims asserted herein because they are related to, arise from a common nucleus of operative facts as, and are part of the same case and controversy as WeRide's federal claim.

16.     Venue is proper in this District under the provisions of 28 U.S.C. § 1391(b), because a substantial portion of the events or omissions giving rise to the claims occurred in this judicial district,

the intellectual property that is the subject of this suit is situated in this judicial district, and all Defendants reside in this District for the purposes of 28 U.S.C. § 1391.

17.     This Court has personal jurisdiction over Defendant Wang because he maintains a house, and is essentially at home, in this district. Moreover, at all relevant times Wang knew that WeRide's business was carried out in Sunnyvale, California, and thus his decisions to misappropriate WeRide's technology and disparage WeRide to its investors, constitute intentional acts aimed at parties located within this district. Additionally, Wang has breached two contracts with WeRide that were negotiated, executed, and substantially performed within this district.

18.     This Court has personal jurisdiction over Defendant Huang because he maintains a house, and is essentially at home, in this district. Moreover, at all relevant times Huang knew that WeRide's business was carried out in Sunnyvale, California, and thus his decisions to misappropriate WeRide's technology, and solicit WeRide employees in violation of his contractual obligations, constitute intentional acts aimed at parties located within this district. Additionally, Huang has breached a contract with WeRide that was negotiated, executed, and substantially performed within this district.

19.     This Court has personal jurisdiction over Defendant AllRide because AllRide has intentionally targeted and misappropriated WeRide's technology, and in the process AllRide has directed its tortious behavior at this district. Additionally, AllRide has publicly stated that it is opening an office in Silicon Valley where it intends to continue exploiting the technology it wrongly acquired from WeRide, further demonstrating that AllRide is seeking to avail itself of the laws of this district, is essentially at home in this district, and is intentionally directing its wrongful conduct at this district.

## INTRADISTRICT ASSIGNMENT

20.     Because this action is an Intellectual Property Action within the meaning of Civil Local Rule 3-2(c), the action is to be assigned on a district-wide basis.

## FACTS COMMON TO ALL CLAIMS

### WeRide Is a Leader in the Emerging Chinese Self-Driving Car Industry

21.     WeRide is the successor to, and rebranding of, JingChi Corporation, a startup corporation incorporated on February 23, 2017 to develop and commercialize self-driving cars with a

focus on the Chinese market. WeRide was founded by five highly experienced and qualified individuals: Jing Wang, Tony Han, Sining ("Ashley") Pan, Qing Lu, and Yan Li.

22.     From the beginning, WeRide sought to differentiate itself from its competition by focusing on its software to deliver a smoother, higher-quality ride than its competitors. The focus on developing robust software paid off in performance. WeRide completed its first public road test—demonstrating certain limited self-driving tasks—in June 2017, becoming the fastest company to reach that milestone. In January 2018, WeRide launched China's first long-term trial operation of self-driving cars in Guangzhou. In March 2018, WeRide became the first company in China to perform an autonomous long-distance tunnel crossing, and in June 2018 it repeated the feat during a heavy rainstorm.

**WeRide Develops Proprietary Software to Guide Its Self-Driving Cars**

23.     Self-driving cars require software capable of navigating in a dynamic world based on input from a variety of car-mounted sensors. All industry players are simultaneously attempting to invent the solution to this problem, and so to protect their competitive advantage WeRide and other self-driving car companies closely guard their respective developments. WeRide's approach has been to build up each necessary component functionality from the ground up, using code that WeRide develops entirely in-house.[2]

24.     From a high level, WeRide's software can be divided into four basic functions: perception, prediction, decision, and control. Perception combines the input from the sensors—including cameras, radar, and Light Detection and Ranging (LIDAR)—with previously known geographical data to create a high-definition electronic map of the area surrounding the car, referred to in the industry as an "HD map." Prediction engines, perhaps the most complicated component of self-driving car software, try to anticipate the future paths of each object the car encounters. Decision engines then determine the car's next move to reach the car's planned destination, taking into account infrastructure, traffic laws, and other objects. Finally, the control module translates the decision into

---

[2]  In the first half of 2018, WeRide formed a cooperative partnership with Baidu's open-source Apollo program for self-driving cars; however, WeRide ultimately decided not to use the code from that program in its autonomous vehicle development. WeRide's program does not incorporate open-source code.

the actions necessary to control the car, such as the angle of the steering wheel, the amount of gas to apply, and when to apply the brake (and how hard).

25.     Each of the modules is made up of multiple subparts that interact with each other. For example, the decision engines depend on the creation of a "map" of the local area, while the map itself is generated by the perception module. The development of each of these modules, as well as their subparts, was a time consuming process – not only because the modules present complex technical challenges to code, but also because the system can only improve through iterative real-world testing. As one illustration, Tesla CEO Elon Musk has publicly predicted that it will require around six billion test miles for a company to achieve worldwide acceptance of self-driving cars.[3]

26.     WeRide has developed proprietary code to control all aspects of its autonomous vehicles. Based on an examination of Defendant AllRide's marketing materials, WeRide believes that at least three portions of its code base (and possibly many other portions as well) are particularly relevant to this litigation: WeRide's proprietary code implementing (i) mapping, (ii) sensor fusion and localization, and (iii) state machines.

27.     **Mapping.** In order for an autonomous vehicle to navigate from one location to another, the vehicle must have an accurate map of the roadways between the two points. Autonomous vehicle developers can provide basic map information using commercially available sources. However, commercially available roadmaps are insufficient to provide a smooth and efficient ride in an autonomous vehicle; moreover, commercial maps will not show the road the same way the autonomous vehicle "sees" it, because commercial maps are based on human eyesight, and not LiDAR, radar, or other common autonomous vehicle sensors. Accordingly, autonomous vehicle developers must build their own maps of the regions their cars travel through.

28.     As part of its autonomous vehicle development, WeRide was able to use its vehicles' "view" of the outside world to compile a high-definition ("HD") map of the area that the vehicles operate in. The maps are built up over time, in an offline mapping process that compiles the data collected after every autonomous vehicle trip. This mapping process is controlled by proprietary code

---

[3]  Elon Musk, *Master Plan, Part Deux*, Tesla.com (July 20, 2016), https://www.tesla.com/blog/master-plan-part-deux

that WeRide developed entirely in-house, and that WeRide has refined over time. While the high-level idea of creating a map by compiling autonomous vehicle sensor data was not invented by WeRide, the specific mapping algorithms used by WeRide to create HD maps were developed by, and are proprietary to, WeRide.

29.   **Sensor Fusion and Localization.** Before a self-driving car can make use of a map of the world around it, the computer on board the car must be able to accurately determine the car's current location. The process of using sensor input to determine the current location of the car is referred to as "localization."  To develop localization capabilities, WeRide installed a suite of sensors, including LIDAR, radar, cameras, GPS, and other sensor types, onto a fleet of cars. The cars were then repeatedly driven around a set course to collect data with the sensors. After analyzing the data, WeRide refined the sensor configurations over time—both the location of the individual sensors on the car and the software controlling each sensor. The sensors do not all collect the same type of data, and each one may have its own blind spots, so it is necessary to aggregate the data from all of the sensors into a single unified "view" of the world outside of the car. This is referred to as "sensor fusion," because the input from several sensors is "fused" together, and WeRide has written proprietary code to handle the sensor fusion for its autonomous vehicles. While the high-level ideas of "sensor fusion" and "localization" were not invented by WeRide, the specific implementation of sensor fusion and localization on WeRide's autonomous vehicles was developed by, and is proprietary to, WeRide.

30.   From the time that WeRide first installed sensors on a car, it took approximately six months to develop the sensor fusion, localization, and mapping systems described above. Moreover, based on WeRide's experience, this process is iterative and depends on constantly gathering new data by having cars operating on the road, so there is no way to effectively speed up the process. Put differently, on information and belief, it is not possible to develop efficient sensor fusion localization and mapping in a shorter period of time (*e.g.* weeks instead of months) because the development speed is simply a function of the number of hours that the fleet of cars with sensor-mounts has spent driving the roads.

31.     **State Machines.** As mentioned above, WeRide's autonomous vehicle system includes a decision model that determines what immediate actions the car should take at a given moment (i.e. turn left, turn right, brake, reverse, etc.). While the model is complex and consists of multiple interconnected parts, one aspect, referred to as "state machines," is particularly relevant here. State machines are code modules that instruct the car about what actions to take in particular situations (or "states") encountered on the road, such as a traffic light, a cross walk, a slow moving vehicle, etc. State machines are more complex than a simple set of rules, because state machines must control for uncertainty; for example, the rules for a flashing red traffic light and a solid red traffic light are different, so the state machine must be able to dynamically check and re-verify that the appropriate state machine is being used.

32.     WeRide has developed its own set of state machines from the ground up. The set of state machines used by WeRide's autonomous vehicle program is proprietary to WeRide. The number of state machines and the set of states covered were determined by WeRide's in-house development team. While other autonomous driving programs, including open-source programs, may include certain common states (e.g. "what to do at a stop sign"), WeRide's program includes a vast number of states well beyond what can be found in open-source programs. The selection of which states to use was created by, and is proprietary to, WeRide.

33.     Additionally, WeRide has developed the code for each individual state machine in-house, including proprietary code controlling for uncertainty. Accordingly, in addition to the set of state machines, the code making up each individual state machine is also WeRide's proprietary information.

34.     WeRide's success in this field is the result of a high level of sustained investment in a large team of employees. WeRide has spent tens of millions of dollars developing its autonomous driving program over the past eighteen months. WeRide's program includes approximately 700,000 lines of code, and was developed by dozens of engineers—many with highly sought-after PhDs.

## WeRide Takes Significant Steps to Protect Its Proprietary Data

35.     Given its value, WeRide takes extensive measures to ensure the secrecy and security of its Confidential Information, including the code used by its autonomous vehicle program. WeRide's

security measures include four separate categories: physical security, network security, mandatory non-disclosure agreements, and company policies and procedures.

36.     **Physical Security.**  At the most basic level, WeRide controls physical access to its offices using a variety of security measures. The doors to the offices are always locked, and can only be opened using unique employee badges that contain Radio-Frequency Identification ("RFID") chips. The badges only temporarily unlock the doors, and once the employee enters the building, the doors automatically re-lock upon closure. Visitors must be admitted to WeRide's offices by a WeRide employee in possession of a badge, and a log is kept which includes visitor names, time of entry, and the purpose of each visit. Additionally, even within the offices, certain sensitive areas may only be accessed by badges belonging to a small group of trusted employees—for example, the room where the autonomous vehicle sensors are stored is kept locked, and can only be opened by the badges of trusted employees who need to access the sensors; badges belonging to all other employees cannot open that room. WeRide also uses closed-circuit television cameras that record activity both inside and outside of its offices.

37.     **Network Security.** WeRide uses multi-layered network security in order to protect its valuable source code. WeRide's code is stored in a repository located on Amazon Web Services ("AWS") servers. The AWS servers can only be accessed by WeRide employees who have ***both*** (i) a username and password that grants access to the servers, and (ii) a file called a "token" that is unique to the employee username and necessary to decrypt information received from WeRide's code repository. Even then, WeRide's code repository cannot be accessed using any internet or network connection; instead, a user must connect from one of WeRide's "whitelisted" network locations. Attempts to connect from all other locations will be rejected. Thus, when employees work remotely, they must first connect to WeRide's offices through a virtual private network ("VPN") using a username and password that is unique to each employee. Moreover, all of these security layers operate in tandem, so an intruder cannot access the code without somehow obtaining (i) VPN credentials, (ii) credentials to log into the code repository, and (iii) a copy of the token file that matches those credentials—simply stealing a single password would not work.

38.     **Mandatory Non-Disclosure Agreements.** WeRide's information is also protected by contracts that all employees must sign. WeRide requires all of its employees to sign its Proprietary Information and Inventions Agreement ("PIIA"). A true and correct copy of the PIIA is attached to this Complaint as **Exhibit A**, and is hereby incorporated by reference into this Complaint. Under the PIIA, WeRide "shall own all right, title and interest" to any ideas or information conceived by employees during their employment. *See* Exhibit A ¶¶ 2-3. The PIIA also provides that employees "will hold in confidence and not disclose" any information employees develop, learn, or obtain during the term of their employment, and prohibits employees from using such information "except within the scope of [their] employment." *Id*. ¶ 4. The PIIA further prohibits employees from soliciting employees to leave WeRide, both during the term of employment and for one year after termination. *Id.* ¶ 6. The PIIA also prohibits employees from engaging in any activity that is competitive with WeRide. *Id*. Anticipating a potential breach, the PIIA provides that "any breach of the agreement will cause irreparable harm to [WeRide] for which damages would not be an adequate remedy, and, therefore, [WeRide] will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond." *Id*. ¶ 9.[4]

39.     **Company Policies and Procedures.** WeRide's company policies also require employees to protect its Confidential Information. The Employee Handbook distributed to all new employees contains a section titled "Trade Secrets and Confidential Information."  In relevant part, that section provides:

"A[s] part of the consideration employees provide to our Company in exchange for their employment and continued employment with our Company is their agreement and acknowledgement that all Trade Secrets/Confidential Information developed, created or maintained by them shall remain at all times the sole property of our Company, and that if our Company's Trade Secrets/Confidential Information were disclosed to a competing business or otherwise used in an unauthorized manner, such disclosure or use would cause immediate and

---

[4]   As noted above, WeRide formerly operated under the name "JingChi Corp.," which is the name used in the PIIA. *See* Exhibit A.

irreparable harm to our Company and would give a competing business an unfair business advantage against our Company.

"Employees will not, except as required in the conduct of our Company's business or as authorized in writing by our Company, disclose or use during their term of employment or subsequent thereto any Trade Secrets/Confidential Information. Furthermore, all records, files, plans, documents and the like relating to the business of our Company which employees prepare, use or come in contact with shall be and shall remain the sole property of our Company and shall not be copied without written permission of our Company and shall be returned to our Company on termination or cessation of employment, or at our Company's request at any time."

40.    The Employee Handbook further prohibits employees from using WeRide's network or computer resources for soliciting personal business opportunities, conducting personal advertising, and "any purpose that does not advance the employer's legitimate business interests."

41.    Upon termination, the Handbook provides that employees "are responsible for returning Company property" in their possession. Employees shall not "remove any software or data from" devices owned by WeRide. At the same time, employees must "completely remove all data collected, downloaded and/or created on non-Company computers used for Company business that relate in any manner to our Company's business" upon termination.

42.    WeRide makes regular announcements reminding employees of the requirement to maintain the secrecy of WeRide's information, including by email and verbally at weekly "all hands" meetings. WeRide requires all employees to acknowledge that they have read the Handbook and will comply with all its provisions.

## WeRide Is Forced to Fire Its CEO Jing Wang

43.    In December of 2017, WeRide's first CEO, Jing Wang, was sued by his former employer, the large and well-known Chinese internet company, Baidu, Inc. In its lawsuit, Baidu alleged that Wang failed to return a laptop belonging to Baidu, stole Baidu's trade secrets, and was poaching Baidu's employees.  In support of its allegations, Baidu produced a redacted copy of a

March 31, 2017, letter signed by Wang, in which he stated that he lost a Macbook Air laptop belonging to Baidu and therefore would not be returning that laptop to Baidu.

44.     Baidu also filed suit directly against WeRide, again citing Wang's actions.

45.     WeRide's management found Baidu's lawsuit to be harmful to the company, and an unnecessary distraction. In January of 2018, WeRide's shareholders met and voted to remove Wang as CEO.

46.     In recognition of the work that Wang performed during WeRide's first year, WeRide offered Wang an opportunity to voluntarily resign and receive a severance package that was contingent upon his execution of a final separation agreement (the "Separation Agreement").

47.     Wang agreed to the Separation Agreement, which contains a nondisparagement clause providing that Jing Wang shall "never make any negative or disparaging statements (orally or in writing) about the Company or its stockholders, directors, officers, employees, products, services or business practices."  The Separation Agreement also explicitly reaffirmed that the terms of the PIIA remained in full effect and continued to bind Wang. Moreover, as a former employee, Wang himself had signed a copy of the PIIA on March 31, 2017.

48.     Wang's employment relationship with WeRide ended on January 31, 2018, though he remained a significant shareholder.

49.     In March 2018, just two months after Wang was removed, WeRide was able to resolve the lawsuit filed by Baidu.

50.     Unfortunately, Wang was unwilling to move on.

51.     On information and belief, Wang still believed that he could succeed by building an autonomous vehicle startup, even though Wang lacked the necessary skills to develop and program an autonomous vehicle himself.  However, on information and belief, Wang was concerned that if he openly founded a new autonomous vehicle company, he could face additional legal action, including from Baidu.

52.     Accordingly, on information and belief, Wang did, in fact, found a new autonomous vehicle company called AllRide.AI ("AllRide"), but Wang took steps—such as founding shell companies controlled using variable investment entities ("VIEs") or other special purpose entities to

obscure the fact that he had control over AllRide.

53.     Despite Wang's attempts to hide his relationship with AllRide, media reports published in the past two months have indicated that Wang controls AllRide.[5]  Moreover, at least one former WeRide employee—Kun Huang—stated to other WeRide employees that he was "going to join Wang's new company," shortly before Huang joined AllRide. And, as discussed at length below, Wang began interfering with WeRide's investors by disparaging WeRide and attempting to convince the investors to take their money to AllRide instead. Based on these facts, and on information and belief, Wang appears to be the founder and controller of AllRide.

54.     According to its website, and materials that it uses to recruit employees on college campuses, AllRide seeks to develop self-driving vehicles for the Chinese market that work by fusing together the inputs from several sensors, including LIDAR, radar, and cameras. *See* http://www.allride.ai/. In other words, AllRide is attempting to compete directly with WeRide by emulating WeRide's business model.

**Jing Wang Disparages WeRide to Investors In Violation of His Separation Agreement**

55.     On information and belief, shortly after AllRide was founded, Wang attempted to finance AllRide by redirecting investment away from WeRide using a campaign of disparagement based on outright falsehoods.

56.     Beginning in December 2017—when Wang was still CEO—WeRide sought to raise $100 million through an initial Series A investment round. In order to achieve this goal, WeRide engaged Morgan Stanley to help organize and solicit investments during the spring and summer of 2018.

57.     WeRide and Morgan Stanley's efforts were initially successful, and between June and July of 2018, a group of five investors executed term sheets committing to invest a total of $64 million as part of WeRide's Series A investment (the "Term Sheet Investors"). These investors included

---

[5] *See, e.g.*, Yi'ou (Equal Ocean), *After Being "Hunted" by Baidu, Jing Wang Has Started a New Business; Would The Copied Version of JingChi Grow Steadily?*, Sina Financial News (Oct. 12, 2018), https://t.cj.sina.com.cn/articles/view/2540408364/976b8e2c00100tl9g; Zichun Pan, Yi'ou (Equal Ocean), *He Temporarily Succeeded in Starting a New Business for the Second Time, But How Much Time Have Baidu and the Capital Market Left for Jing Wang?*, Gasgoo News (Oct. 12, 2018), http://auto.gasgoo.com/News/2018/10/120731333133I70066968C601.shtml.

Goldstone Investment Company, Lenovo, Bojang Capital, Xinding Capital, and Oriza Prior Equity Investment Fund. A second group of investors led by Hanfor Capital Management committed to invest an additional $38.1 million as part of WeRide's Series A investment (the "Hanfor Investors"), and exchanged the first draft of a Stock Purchase Agreement. Several other potential investors also expressed interest.

58.     By July of 2018, it appeared that WeRide's Series A investment round would not only be a success, but would be oversubscribed, with total investments coming in at between $100 million and $160 million.

59.     However, this success came to a sudden halt in August 2018.

60.     On August 8, 2018, WeRide's advisors at Morgan Stanley stated that they were having difficulty continuing to solicit and negotiate investments because Wang was directly contacting investors to spread falsehoods about WeRide, and Wang was then encouraging those same investors to invest in AllRide. The specific falsehoods Wang was spreading included:

- That Google-affiliate Waymo was going to file a lawsuit against WeRide because WeRide had allegedly stolen code from Waymo (a claim that is completely untrue, given that WeRide does not even employ any former Waymo engineers);

- That the success of WeRide's self-driving car program was a lie, because WeRide's experiments had been "staged" (which is also untrue); and

- That WeRide planned to purposefully and maliciously dilute the shares of anyone who invested in WeRide (again, untrue).

61.     In September 2018, one of WeRide's officers was informed by an executive at Hanfor Capital Management that Wang had contacted Hanfor directly and discouraged Hanfor from investing in WeRide by making several false statements, including: (i) WeRide's self-driving technology did not work, (ii) the videos WeRide created to demonstrate its self-driving technology had been faked, (iii) WeRide's self-driving cars had been involved in a traffic accident that WeRide was attempting to cover up, and (iv) WeRide had purposefully and maliciously diluted the shares of prior investors. All of those claims are (and were) false.

62.     The executive at Hanfor further reported that Wang then encouraged Hanfor to invest in AllRide as an alternative to WeRide.

63.     As a direct and proximate result of Wang's statements, WeRide's investors began delaying—or even outright cancelling—their investments, despite the fact that the terms had already been agreed to, and in many instances term sheets had already been signed.

64.     WeRide originally had plans to close its Series A investment in August 2018. However, as investors reacted to Wang's false and disparaging statements, WeRide was forced to delay closing of the Series A investment, and ultimately break the Series A into three sub-rounds: A-1, A-2, and A-3. A-1 closed in September, A-2 closed in October, and A-3 is expected to close in early December.

65.     As a result of the delays in investment caused by Wang, WeRide was forced to request a bridge loan of $5 million from Qiming, an existing investor, to cover ongoing company expenses such as rent, equipment, and salaries. Qiming granted the loan, but on less favorable terms than WeRide would have accepted otherwise, including a provision allowing Qiming to convert the loan into equity.

66.     Meanwhile, in response to Wang's false and disparaging statements, several of the Series A investors canceled, including all five Term Sheet Investors. Others simply reduced or delayed their commitments; for example, Hanfor reduced its commitment from $20 million to $11.5 million days before closing, and then delayed most of its remaining investment by funding only $4.5 million at the time of investment, with the rest to come at some undetermined point in the future.

67.     In total, WeRide has lost over $75 million in expected investment. Even after making efforts to find additional investment, WeRide expects to raise only $83 million in its Series A investment – far below the $100 million to $160 million offered by investors before Jing Wang's interference.

68.     The loss of this capital, along with the delay of investment from the summer of 2018 to the fall of 2018 has had a significant impact on WeRide's development. WeRide initially planned to have a fleet of 50 cars by the second quarter of 2018, and 250 cars by the fourth quarter of 2018. However, due to the extensive delays and diminished investments, WeRide now only has about 25 cars, and will only be able to purchase an additional 100 cars in the first quarter of 2019. Even if

WeRide were to receive supplemental investments today that made up for the investment shortfalls to date, WeRide would still not be able to recover the months of lost development and road-testing time. Further, the reputational injury Jing Wang has caused to WeRide, coupled with the fact that WeRide's Series A was undersubscribed, will harm WeRide's ability to attract investors and talent in the future.

## Jing Wang Convinces Kun Huang to Breach His Obligations to WeRide

69.     Several of WeRide's employees previously worked at Baidu with Wang, including WeRide's former Director of Hardware, Defendant Kun Huang.

70.     Huang joined WeRide in April of 2017, and based on his background and qualifications, Huang was put in charge of WeRide's hardware development. In this role, Huang had discretion over WeRide's hardware budget, and was responsible for a team that eventually grew to ten employees. Huang reported directly to WeRide's Chief Technology Officer ("CTO").

71.     During his first year at WeRide, Huang appeared content with his work, and was trusted with the supervision of an increasing budget and growing group of employees.

72.     However, by April of 2018, all of that changed.

73.     Around that time, Huang became dissatisfied with his work at WeRide, and repeatedly complained to at least one coworker that WeRide was allegedly "not taking hardware development seriously."  Huang's coworker reported this as a shock, because Huang was not previously known to complain about WeRide or WeRide's management.

74.     Huang also stated—without explanation—that he believed he could achieve the "same level of technology" WeRide had already developed "very quickly" at a "new company."

75.     On information and belief, Huang simply wanted more pay and more power, and he was willing to break both his contracts with WeRide and the law to get what he wanted.

76.     Over the next three months, Huang repeatedly schemed to become the head of his own Silicon-Valley-based autonomous vehicle research group. Worse, Huang attempted to recruit at least one WeRide coworker to join him, including through a July 2018 offer to work at AllRide for salary and benefits commensurate with what WeRide offered. Throughout this time, Huang was apparently unconcerned by the fact that he still worked for—and owed a duty of loyalty to—WeRide.

77.     For example, on May 3, 2018, Huang orchestrated a meeting with AIWays—a well-known Chinese electric vehicle manufacturer—for the purpose of trying to convince AIWays to set up an autonomous vehicle research program that Huang would lead.

78.     While Huang was, of course, free to prepare to compete with WeRide, Huang attempted to recruit his WeRide coworkers to join him at AIWays—going to far as to invite one coworker to join him on the initial "pitch" call to AIWays, and attempting to use their mutual success at WeRide as a "selling point."

79.     This was a breach of the non-solicitation provision contained in the PIIA (*see* Exhibit A)—which Huang signed in March 2017—and a breach of the duty of loyalty that Huang owed to WeRide.

80.     The AIWays plan never materialized. But that did not stop Huang.

81.     About a month after the May 3 pitch to AIWays, Huang again approached a WeRide coworker and stated that he was "seriously considering going to Jing Wang's company."  During that conversation, Huang described the roadmap of Wang's new company for the first year. Huang said that Wang had already secured funding from the Chinese government, and rented office space in China. Huang stated that this new venture would focus on mass production of self-driving cars for consumers – meaning hardware would be more important to the company than to a company that uses off-the-shelf hardware components. On information and belief, Wang's "new company" was AllRide.

82.     Huang also revealed why he found AllRide so alluring: Wang promised that AllRide would have its own, independent, Silicon Valley-based research team that Huang would run. On information and belief, this had been Huang's goal all along: running his own research team rather than working for others.

83.     Over the course of the next month, Huang attempted to recruit his WeRide coworkers to join him at AllRide. Huang's efforts included extending at least one formal job offer to a coworker in July 2018, which offer contained both the promise of a specific salary and benefits comparable to those currently offered by WeRide. Again, this offer was made while Huang was still employed at WeRide.

84.     By late July, WeRide's leadership had learned about Huang's efforts to openly recruit WeRide employees for Wang's AllRide. On July 31, 2018, WeRide CEO Tony Han met with Huang in China and asked him to resign. Huang agreed to resign effective August 13, 2018.

85.     Following his resignation, Huang was prominently featured in an AllRide recruiting video shown at recruiting events on Chinese university campuses. The recruiting video identifies Huang as "Tech Lead of AllRide's Silicon Valley Office, Self-driving Software & Hardware Specialist, Architect of self-driving vehicles." In October 2018, WeRide representatives attended two recruiting events held by AllRide at universities in Nanjing. Huang attended the event and spoke on behalf of AllRide about AllRide's technology and business plan.

In November 2018, Huang visited California to look at office space. Ashley Pan, another associate of Wang's, also visited California and looked at office space. On information and belief, both Huang and Pan were looking for office space in California so that AllRide could open a Silicon Valley office. As of the date of this filing, AllRide's website now advertises that it has established a research and development office in Silicon Valley, and states that promising recruits can visit the office to work and study as part of a cultural exchange program.

**In His Final Days at WeRide, Kun Huang Exfiltrates WeRide's Confidential Information and Attempts to Cover His Tracks**

86.     After his departure, WeRide learned how Huang planned to "quickly" achieve the same level of technology as WeRide: on information and belief, Huang simply intended to misappropriate WeRide's technology.

87.     As discussed above, WeRide employees can only access WeRide's source code repository from outside of WeRide's physical offices by logging into a VPN. The volume of traffic travelling over the VPN is recorded.

88.     In June and July 2018—after Huang told his coworkers that he intended to join AllRide—Huang's VPN credentials were used on several occasions to download larger amounts of data than Huang had previously downloaded in the course of his work for WeRide. Between June 25,

2018 and July 24, 2018, Huang downloaded over eight gigabytes of data—an amount of data larger than WeRide's entire code base.[6]

89. But Huang's VPN activity was not the only cause for concern. WeRide has also uncovered evidence suggesting Huang separately exfiltrated files using a USB flash drive.

90. As an employee of WeRide, Huang was issued two laptops, a Lenovo ThinkPad 470p bearing serial number PF-0QPPQA, and a MacBook Pro 13.2 bearing serial number C02TH2APGTDX. Both devices were owned by WeRide.

91. After he resigned, WeRide's HR group requested that Huang immediately return both devices, as required by the PIIA and company policy. However, Huang delayed returning the laptops until August 15, two days after his employment officially ended. He returned his Lenovo laptop to WeRide's Guangzhou office, and his wife returned his MacBook to WeRide's Sunnyvale office. Upon receiving the laptops, WeRide discovered that a large number of files and folders on the Lenovo's desktop had been deleted, and the browser history had been cleared. In addition, all files on the MacBook had been completely deleted and the operating system reinstalled, making it impossible to recover any deleted data, or even to determine what had been deleted.

92. Because of the red flags surrounding Huang's departure, WeRide engaged a computer forensics firm, Kivu Consulting, to analyze Huang's devices to determine whether he had taken any of WeRide's Confidential Information. Kivu found that Huang connected three separate USB devices to his Lenovo laptop in June and July 2018—again during the time period after Huang decided to join Wang's AllRide.

93. Kivu further discovered that, on August 7, 2018, Huang created a series of folders on at least one of the USB devices, which folders appear to correspond to folders on the Lenovo laptop— giving rise to an inference that Huang was directly copying files from the Lenovo laptop to the USB drive. Huang's decision to wipe the laptop clean prevented Kivu (and thus WeRide) from determining precisely which files were copied.

---

[6] WeRide's code base is comprised primarily of lines of text without graphics; thus it takes up relatively little space on a computer hard drive, despite containing over a million lines of code.

**AllRide Appears To Be Using WeRide's Confidential Information**

94.     On or about October 9 2018, AllRide posted a video to Chinese social media platform WeChat. The video depicted a car driving on its own, without anyone sitting in the driver's seat. The car pulled up to the curb directly in front of a passenger, who then boarded the car on the passenger's side, and pressed a button on the center console. After the button was pressed, the car appeared to take the passenger on a fully automated ride—again without any person in the driver's seat. Additionally, Huang was featured prominently in the video. Huang is introduced as "Brother Kun, Tech Lead of AllRide's Silicon Valley Office, Self-driving Software & Hardware Specialist, Architect of Self-driving Vehicles."  The video has since been deleted from AllRide's WeChat account.

95.     WeRide was very concerned by this video. Developing a fully automated car, which can be operated without a safety "backup" driver in the driver's seat, takes a great deal of time. As explained above, certain necessary aspects of developing an autonomous car cannot be "sped up," because they depend on extensive data collection and iterative development.

96.     Despite these realities of developing self-driving cars, AllRide appeared to be claiming that it possessed a fully autonomous car less than three months after Huang had attempted to recruit WeRide employees for a company that—at that time—had no research and development program.

97.     On October 19 and October 22, WeRide sent an investigator to a public recruiting event hosted by AllRide on a college campus in Nanjing, China. The investigator observed that Kun Huang gave a presentation on AllRide's technology. During the events, AllRide also played a longer version of the video that had been posted to WeChat, which again appeared to depict a fully autonomous vehicle, which vehicle had at least the following specific capabilities:

- The vehicle was able to fuse input from multiple sensors to create an HD map, which map was depicted in the video;

- The vehicle was able to come to a complete stop directly in front of a passenger so that the passenger could climb into the vehicle;

- The vehicle was able to respond to certain traffic signals (e.g. a stop sign); and

- The vehicle was able to execute a "double-lane change," wherein it overtook a slower car by changing lanes, safely passed the slower car, and then returned to its original lane.

98.     WeRide was particularly concerned by the double-lane change, which is a complicated capability that, for the reasons described above, could not have been developed by a company that had no research program less than three months before the video was released.

99.     And, once again, Huang was prominently featured in the longer video, which specifically stated that Huang was the head of AllRide's development team.

100.     Additionally, on closer inspection, WeRide found striking similarities between the HD map generated by AllRide's program (and shown in the video) and the HD maps generated by WeRide—both of which are shown below. *Compare* Figure 1 (AllRide HD Map) *with* Figure 2 (WeRide HD Map). Both show objects with similar levels of detail and style.

**Figure 1:AllRide HD Map**



**Figure 2: WeRide HD Map**



101.    Finally, while WeRide has not had an opportunity to examine AllRide's autonomous vehicles closely, it appears that AllRide's hardware configurations also bear a striking similarity to WeRide's. Specifically, both companies place their radar sensors in the front center position of the car's roof—even though other companies place the radar along the front bumper. Likewise, AllRide appears to use the same configuration of wires on the back of the car as WeRide does (specifically running wiring through the rear-window weather stripping).

102.    On October 26, AllRide hosted an open-house at their Nanjing campus and invited several people to test one of its self-driving cars on a public road. AllRide filmed the reactions to the car's performance and, on October 31, posted the video of those reactions to WeChat. The individuals featured on the video report that the car "is very smooth with good speed and sensitivity," "the sensor has a very high precision," and the car smoothly changed lanes when the car encountered a pedestrian.

103.    Taken together, Huang's statements that he could "quickly" re-create the same technology achieved by WeRide, combined with evidence of his exfiltration of data from WeRide's networks, and AllRide's sudden, inexplicable display of technological capabilities just weeks after its founding all strongly suggest that Huang absconded with WeRide's technology, and AllRide is now exploiting that technology.

**WeRide Asks Huang for an Explanation and Receives No Substantive Response**

104.    On November 15, 2018, WeRide sent a cease and desist letter to Huang informing him that his solicitation of WeRide employees and continued retention, use, and disclosure of WeRide's Confidential Information violated the PIIA he signed with WeRide as well as state and federal law. WeRide instructed Huang to immediately cease any use or disclosure of WeRide's Confidential Information, to cease soliciting WeRide's employees, to provide WeRide with assurances that WeRide's Confidential Information no longer exists on any other devices, and not to destroy evidence. The letter requested a response by November 20, 2018. On that date, WeRide received a response from Huang's counsel, which did not respond to WeRide's substantive allegations, but instead asked for more time to "investigate."  To date, WeRide has not received a substantive response.

**FIRST CAUSE OF ACTION**

**Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836**

105.    WeRide incorporates all of the above paragraphs as though fully set forth herein.

106.    The information Defendants misappropriated constitutes protectable trade secrets owned by WeRide, as set forth in 18 U.S.C. § 1839(3). Based on an examination of AllRide's marketing materials, and on information and belief, Defendants have misappropriated at least the following trade secrets from WeRide:

- The specific implementation of sensor-fusion and localization developed in-house by WeRide;

- The mapping algorithms used by WeRide to convert data received from the sensor fusion and localization process into an HD Map;

- The ability to generate an HD Map using a combination of both WeRide's sensor fusion and localization and mapping modules;

- The set of state machines used in WeRide's code; and

- The code, developed by WeRide, that makes up each of the individual state machines used in WeRide's decision module.

107.    On information and belief, the Defendants' theft of WeRide's trade secrets goes well beyond the specific examples of trade secrets identified here, as will be demonstrated after WeRide receives discovery in this litigation.

108.    WeRide has taken reasonable measures to protect the confidentiality of its trade secrets, including through the measures alleged above. WeRide does not and did not consent to the use of any of its trade secrets by anyone other than authorized employees using them for within the scope of their duties for WeRide.

109.    WeRide's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

110.    Defendants misappropriated WeRide's trade secrets in the improper and unlawful manner alleged herein. Defendants' misappropriation was intentional, knowing, willful, malicious,

fraudulent, and oppressive. Defendants have attempted and continue to attempt to conceal their misappropriation and to obstruct WeRide's efforts to remedy their misappropriation.

111.     On information and belief, if Defendants are not enjoined, they will continue to misappropriate and use WeRide's trade secret information for their own benefit and to WeRide's detriment, and may disseminate those trade secrets to potential investors, the Chinese government, or other third parties.

112.     As the direct and proximate result of Defendants' conduct, WeRide has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because WeRide's remedy at law is inadequate, WeRide seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

113.     An injunction is necessary to prevent Defendants' actual and threatened misappropriation of WeRide's trade secrets. WeRide requests that the Court take affirmative steps to protect those trade secrets, including by ordering the surrender of all Kun Huang's computers, USB drives, email accounts, cloud storage accounts and other sources and equipment, as well as any other of Defendants' devices as are found to have contained any of WeRide's trade secrets, for examination by a forensics expert to determine whether the trade secrets were wrongfully taken and/or disseminated to others, and to ensure that no WeRide trade secrets remain saved on those systems; issuing a writ of possession, a preliminary injunction, and a permanent injunction ordering the return of the trade secret information and prohibiting Defendants from continuing their unlawful actions; and ordering Defendants to stand down from any further actions that could harm WeRide's business through improper misappropriation or use of the trade secrets.

114.     In addition to equitable relief, WeRide demands (i) monetary damages in an amount of no less than $45 million, (ii) exemplary damages in an amount two times the amount of its compensatory damages (i.e., no less than $90 million) pursuant to 18 U.S.C. § 1836(b)(3)(C) because

WeRide's misappropriation was willful and malicious, and (iii) attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) because Defendants' misappropriation was willful and malicious.

**SECOND CAUSE OF ACTION**

**Violation of California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426 *et seq.***

115.     WeRide incorporates all of the above paragraphs as though fully set forth herein.

116.     The trade secrets that Defendants misappropriated constitute protectable trade secrets owned by WeRide, as set forth in Cal. Civ. Code § 3426.1(d). Based on an examination of AllRide's marketing materials, and on information and belief, Defendants have misappropriated at least the following trade secrets from WeRide:

- The specific implementation of sensor-fusion and localization developed in-house by WeRide;
- The mapping algorithms used by WeRide to convert data received from the sensor fusion and localization process into an HD Map;
- The ability to generate an HD Map using a combination of both WeRide's sensor fusion and localization and mapping modules;
- The set of state machines used in WeRide's code; and
- The code, developed by WeRide, that makes up each of the individual state machines used in WeRide's decision module.

117.     On information and belief, the Defendants' theft of WeRide's trade secrets goes well beyond the specific examples of trade secrets identified here, as will be demonstrated after WeRide receives discovery in this litigation.

118.     WeRide's trade secrets derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use as set forth in Cal. Civ. Code § 3426.1(d)(1).

119.     WeRide has taken reasonable measures to keep such information secret, including through the measures alleged above. WeRide does not and did not consent to the use of any of its trade secrets by anyone other than authorized employees using them for within the scope of their duties for WeRide.

120.     Defendants misappropriated WeRide's trade secrets in the improper and unlawful manner alleged herein. Defendants knew or should have known under the circumstances that the information they misappropriated included trade secrets. Defendants' misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive. Defendants have attempted and continue to attempt to conceal their misappropriation and to obstruct WeRide's efforts to remedy their misappropriation.

121.     On information and belief, if Defendants are not enjoined, they will continue to misappropriate and use WeRide's trade secret information for their own benefit and to WeRide's detriment, and may disseminate those trade secrets to potential investors, the Chinese government, or other third parties.

122.     As the direct and proximate result of Defendants' conduct, WeRide has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because WeRide's remedy at law is inadequate, WeRide seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

123.     An injunction is necessary to prevent Defendants' actual and threatened misappropriation of WeRide's trade secrets. WeRide requests that the Court take affirmative steps to protect those trade secrets, including by ordering the return of all Kun Huang's computers, USB drives, email accounts, cloud storage accounts and other sources and equipment, as well as any other of Defendants' devices as are found to have contained any of WeRide's trade secrets, for examination by a forensics expert to determine whether the trade secrets were wrongfully taken and/or disseminated to others, and to ensure that no WeRide trade secrets remain saved on those systems; issuing a writ of possession, a preliminary injunction, and a permanent injunction ordering the return of the trade secret information and prohibiting Defendants from continuing their unlawful actions; and ordering Defendants to stand down from any further actions that could harm WeRide's business through improper misappropriation or use of the trade secrets.

124.   In addition to equitable relief, WeRide demands (i) monetary damages in an amount of no less than $45 million, (ii) exemplary damages in an amount two times the amount of its compensatory damages (i.e., no less than $90 million) pursuant to 18 U.S.C. § 1836(b)(3)(C) because WeRide's misappropriation was willful and malicious, and (iii) attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) because Defendants' misappropriation was willful and malicious.

## THIRD CAUSE OF ACTION

### Defamation (Jing Wang)

125.   WeRide incorporates all of the above paragraphs as though fully set forth herein.

126.   Jing Wang made multiple false and defamatory statements concerning WeRide. As discussed in more detail above, these false and defamatory statements included that (i) Waymo was going to bring a lawsuit against WeRide for stealing Waymo's source code, (ii) WeRide's self-driving technology did not work, (iii) the videos WeRide created to demonstrate its self-driving technology had been "faked," (iv) WeRide's self-driving cars had been involved in a traffic accident that WeRide was attempting to "cover up," and (v) WeRide had purposefully and maliciously diluted Jing Wang's shares in WeRide.

127.   On information and belief, these false and defamatory statements were published to investors and potential investors of WeRide, including representatives of Hanfor, Goldstone Investment Company, Lenovo, Bojang Capital, Xinding Capital, and Oriza Prior Equity Investment Fund.

128.   The statements are defamatory *per se*. Wang's false statements tended to, and in fact did, injure WeRide's business by causing investors to withdraw, reduce, or delay their investments.

129.   Wang's false and defamatory statements caused and continue to cause damage to WeRide. Several investors withdrew, reduced, or delayed their planned investments based on Wang's false statements. All five Term Sheet Investors backed out of their commitments and Hanfor has only funded $4.5 million of its $20 million commitment. In total, WeRide has lost over $75 million in expected investment. Even after making efforts to find additional investment, WeRide expects to raise only $83 million in its Series A-1 investment – far below the $100 million to $160 million offered by investors before Jing Wang's interference.

130.     These statements hurt WeRide's reputation, both because the recipients believed the statements, and because the lost investment caused by the statements resulted in WeRide failing to achieve its investment objective for its Series A.

131.     The publications of these false and defamatory statements was not privileged.

132.     Wang knew that each of these statements was false at the time he made them, or made these statements with reckless disregard of their truth or falsity.

133.     As a direct and proximate result of Wang's defamation of WeRide, WeRide has been and continues to be harmed. WeRide is entitled to its damages, in an amount to be determined at trial but not less than $79.5 million.

134.     WeRide is further entitled to injunctive relief against Wang and all those acting in concert or participation with him, remedying their past improper conduct, and preventing such conduct in the future.

135.     Wang acted in a wanton, willful and outrageous manner in defaming WeRide. Wang's conduct as alleged above was outrageous, demonstrating an evil motive and a reckless indifference to WeRide's rights, entitling WeRide to enhanced and/or punitive damages in an amount to be proven at trial, but no less than $159 million.

136.     WeRide's remedy at law is inadequate to compensate it for the harm Wang has done. WeRide therefore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

137.     Unless restrained, Wang will continue to inflict irreparable injury upon WeRide through continued defamation of WeRide. Accordingly, WeRide is entitled to preliminary injunctive and injunctive relief preventing Wang from continuing to defame WeRide.

## **FOURTH CAUSE OF ACTION**

### **Intentional Interference with Prospective Economic Advantage**

138.     WeRide incorporates all of the above paragraphs as though fully set forth herein.

139.     WeRide had an economic relationship with several prospective investors, from which WeRide reasonably expected them to make investments into WeRide. The Term Sheet Investors had signed term sheets with WeRide committing to invest $64 million, and Hanfor committed to invest an additional $20 million. WeRide had also engaged in extensive discussions with other investors, leading WeRide to reasonably believe that they would make investments in WeRide.

140.     Jing Wang knew of the relationship between WeRide and its investors from his position at WeRide, and, on information and belief, from industry reports and from his conversations with the investors and other third parties.

141.     Wang contacted WeRide's investors and made false and defamatory statements to them concerning WeRide's business. Specifically, Wang told investors that (i) Waymo was going to bring a lawsuit against WeRide for stealing Waymo's source code, (ii) WeRide's self-driving technology did not work, (iii) the videos WeRide created to demonstrate its self-driving technology had been "faked" (iv) WeRide's self-driving cars had been involved in a traffic accident that WeRide was attempting to "cover up," and (v) WeRide had purposefully and maliciously diluted Jing Wang's shares in WeRide. These statements were false, and Jing Wang knew that they were false at the time he made them.

142.     Wang knew that his false and defamatory statements were likely to cause WeRide's investors to withdraw, reduce, or delay their planned investments in WeRide. Indeed, in making these statements, Wang intended to cause the investors to withdraw, reduce, or delay their planned investments in WeRide.

143.     Wang's false statements to investors constituted libel and/or slander, as set forth more fully above.

144.     By making false statements to investors, Wang breached the non-disparagement clause contained in the Separation Agreement, which he entered into with WeRide on December 31, 2018.

145.     Several investors withdrew, reduced, or delayed their planned investments based on Wang's false statements. All five Term Sheet Investors backed out of their commitments and Hanfor has only funded $4.5 million of its $20 million commitment. In total, WeRide has lost over $75 million in expected investment. Even after making efforts to find additional investment, WeRide

expects to raise only $83 million in its Series A-1 investment – far below the $100 million to $160 million offered by investors before Jing Wang's interference.

146.    In addition, Wang solicited WeRide employees to leave their employment to join AllRide, in violation of the PIIA's non-solicitation clause.

147.    On information and belief, Wang knew that each employee had a relationship with WeRide, and WeRide expected them to contribute to the development of WeRide's product. Wang also know that WeRide would incur costs to replace the employees who left.

148.    Wang's solicitation in fact caused employees to leave WeRide, causing WeRide loss of development time and recruitment costs above those it would have normally incurred.

149.    Wang's disparagement and solicitation further damaged WeRide's reputation, harmed WeRide's ability to attract investment and talent in the future, and caused WeRide to lose valuable development time.

150.    As a direct and proximate result of Wang's interference, WeRide has been and continues to be harmed. WeRide is entitled to its damages, in an amount to be determined at trial but not less than $79.5 million.

151.    WeRide is further entitled to injunctive relief against Wang and all those acting in concert or participation with him, remedying their past improper conduct, and preventing such conduct in the future.

152.    Wang acted in a wanton, willful and outrageous manner in interfering with WeRide's investment opportunities. Wang's conduct as alleged above was outrageous, demonstrating an evil motive and a reckless indifference to WeRide's rights, entitling WeRide to enhanced and/or punitive damages in an amount to be proven at trial, but no less than $159 million.

153.    WeRide's remedy at law is inadequate to compensate it for the harm Wang has done. WeRide therefore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

Unless restrained, Wang will continue to inflict irreparable injury upon WeRide through continued interference with WeRide's economic opportunities. Accordingly, WeRide is entitled to preliminary injunctive and injunctive relief preventing Wang from continuing to defame WeRide.

## FIFTH CAUSE OF ACTION

### Breach of Fiduciary Duty and Duty of Loyalty (Kun Huang)

154.   WeRide incorporates all of the above paragraphs as though fully set forth herein.

155.   As Director of Hardware of WeRide, and given the duties and obligations he had accepted toward WeRide, and in light of the trust that WeRide had placed in him, Kun Huang owed WeRide an undivided loyalty and was obligated to act as its fiduciary with the utmost good faith, and in the best interests of WeRide. Huang supervised a team of ten engineers, had input in hiring and firing, and was responsible for the hardware budget.

156.   WeRide was entitled to place its trust and confidence in Huang and to expect him to act with the utmost good faith toward it in carrying out WeRide's business. WeRide did rely on Huang's loyalty and integrity and his faithful performance of his duties and responsibilities.

157.   Huang took advantage of WeRide's faith in him by not performing the duties he owed to WeRide, by acting in conflict of interest, by engaging in business for his own account, and by concealing his improper conduct.

158.   Huang knowingly and willingly breached his fiduciary duty and duty of loyalty to WeRide by seeking to sell his skills and experience to the highest-bidding competitor, soliciting WeRide employees to join him, misappropriating WeRide's trade secrets, making efforts to cover up that conduct, and by obstructing and failing to be fully forthcoming or otherwise cooperative in WeRide's efforts to investigate and remedy Huang's misconduct. WeRide did not consent to Huang's conduct described herein.

159.   As a direct and proximate result of Huang's disloyalty to WeRide and breach of his duties, WeRide has been and continues to be harmed. WeRide is entitled to its damages, in an amount to be determined at trial but not less than $45 million, as well as disgorgement from Huang, and the forfeiture and return of all monies and compensation paid to him during his period of disloyalty, the exact amount to be determined at trial.

160.     WeRide is further entitled to injunctive relief against Huang and all those acting in concert or participation with him, remedying their past improper conduct, and preventing such conduct in the future.

161.     Huang acted in a wanton, willful and outrageous manner in breaching his fiduciary duties and duty of loyalty to WeRide. Huang's conduct as alleged above was outrageous, demonstrating an evil motive and a reckless indifference to WeRide's rights, entitling WeRide to enhanced and/or punitive damages in an amount to be proven at trial, but no less than $90 Million.

162.     WeRide's remedy at law is inadequate to compensate it for the harm Huang has done. WeRide therefore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

163.     Unless restrained, Huang will continue to inflict irreparable injury upon WeRide through his violations of his fiduciary duties and duty of loyalty to WeRide. Accordingly, WeRide is entitled to preliminary injunctive and injunctive relief preventing Huang from continuing to misuse and/or misappropriate WeRide's property or from otherwise engaging in acts detrimental to WeRide.

### SIXTH CAUSE OF ACTION

**Breach of Written Contracts (Jing Wang)**

164.     WeRide incorporates all of the above paragraphs as though fully set forth herein.

165.     As alleged above, WeRide and Jing Wang entered into the written Proprietary Information and Inventions Agreement on March 31, 2017.

166.     Under the PIIA, Wang agreed to "hold in confidence and not disclose" any information he developed, learned, or obtained during the term of his employment. Wang also agreed not to use such information "except within the scope of [his] employment."

167.     Wang also agreed in the PIIA to a non-solicitation clause providing that "[u]ntil one year after the term of my employment, I will not encourage or solicit any employee or consultant of [WeRide] to leave [WeRide] for any reason." The term of Wang's employment ended on January 31, 2018. Under the terms of the PIIA, the non-solicitation clause remains in effect until January 31, 2019.

Further, Wang agreed in the PIIA that "during the term of my employment with [WeRide] (whether or not during business hours), I will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of [WeRide], and I will not assist any other person or organization in competing with or preparing to compete with any business or demonstrably anticipated business of [WERide]."

168.    In connection with Wang's resignation from WeRide, Wang and WeRide entered into the written Separation Agreement, dated January 31, 2018. Under the Separation Agreement, Wang agreed to a non-disparagement clause providing that he "will never make any negative or disparaging statements (orally or in writing) about the Company or its stockholders, directors, officers, employees, products, services or business practices." Wang also explicitly agreed in the Separation Agreement to remain bound by the terms of the PIIA "at all times in the future."

169.    WeRide has fully performed all of its obligations under the agreements, including paying Wang nearly a million dollars in compensation.

170.    Wang has breached and threatens to continue to breach the PIIA and the Termination Agreement in at least the following ways:

    a.   Disparaging WeRide to third parties, including investors and potential investors of WeRide;

    b.   Soliciting and encouraging WeRide employees to leave WeRide to join AllRide, a competing company;

    c.   Using WeRide Confidential Information outside the scope of his employment for WeRide, and in furtherance of AllRide, a competing company;

171.    Wang's breaches of his agreements with WeRide have caused foreseeable damage to WeRide, including the loss of investment, loss of value of its trade secrets, and loss of future investment opportunities. As a result, WeRide is entitled to damages in an amount to be determined at trial, but no less than $124.5 million.

172.    As Wang agreed in the PIIA, "any breach of the agreement will cause irreparable harm to [WeRide] for which damages would not be an adequate remedy, and, therefore, [WeRide] will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any

requirement to post bond." As a result of any one of these breaches of its agreements, WeRide has been injured and faces irreparable injury. WeRide is threatened with losing investment, employees, its competitive advantage, and its trade secrets in amounts which may be not be possible to determine, unless Defendants and each of them is enjoined and restrained by order of this Court.

## SEVENTH CAUSE OF ACTION

### Breach of Written Contract (Kun Huang)

173.    WeRide incorporates all of the above paragraphs as though fully set forth herein.

174.    As alleged above, WeRide and Kun Huang entered into the written Proprietary Information and Inventions Agreement on March 22, 2017.

175.    Under the Proprietary Information and Inventions Agreement, Huang agreed to "hold in confidence and not disclose" any information he developed, learned, or obtained during the term of his employment. Huang also agreed not to use such information "except within the scope of [his] employment," and to "promptly return to [WeRide] all items containing or embodying" such information upon his termination.

176.    Huang also agreed in the PIIA to a non-solicitation clause providing that "[u]ntil one year after the term of my employment, I will not encourage or solicit any employee or consultant of [WeRide] to leave [WeRide] for any reason." The term of Huang's employment ended on August 13, 2018. Under the terms of the PIIA, the non-solicitation clause remains in effect until August 13, 2019.

177.    Finally, Huang agreed in the PIIA that "during the term of my employment with [WeRide] (whether or not during business hours), I will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of [WeRide], and I will not assist any other person or organization in competing with or preparing to compete with any business or demonstrably anticipated business of [WeRide]."

178.    WeRide has fully performed all of its obligations under the agreements, including paying Huang hundreds of thousands of dollars in compensation.

179.    Huang has breached and threatens to continue to breach the PIIA in at least the following ways:

a.    Stealing WeRide's Proprietary Information, including Proprietary Information not

necessary to use within the scope of his employment for WeRide;

b.  Failing to return WeRide's Proprietary Information to WeRide upon his termination;

c.  Deleting Proprietary Information on his company-issued laptops prior to his departure;

d.  Disclosing WeRide Confidential Information to third parties, including AllRide, a competitor of WeRide.

e.  Using WeRide Confidential Information outside the scope of his employment for WeRide, and in furtherance of AllRide;

f.  Soliciting and encouraging WeRide employees to leave WeRide to join AllRide, both during and after the term of his employment; and

g.  Engaging in business activities in competition with WeRide during the term of his employment, namely assisting at least two competing companies by providing advice and information relating to their business, and helping them recruit employees from WeRide; and

180.  Huang's breaches of his agreements with WeRide have caused foreseeable damage to WeRide, including the loss of investment, loss of value of its trade secrets, and loss of future investment opportunities. As a result, WeRide is entitled to damages in an amount to be determined at trial, but no less than $45 million.

181.  As Huang agreed in the PIIA, "any breach of the agreement will cause irreparable harm to [WeRide] for which damages would not be an adequate remedy, and, therefore, [WeRide] will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond."  As a result of any one of these breaches of its agreements, WeRide has been injured and faces irreparable injury. WeRide is threatened with losing investment, employees, its competitive advantage, and its trade secrets in amounts which may be not be possible to determine, unless Defendants and each of them is enjoined and restrained by order of this Court.

**PRAYER FOR RELIEF**

182.  Judgment in favor of WeRide and against Defendants on all of WeRide's claims

1   asserted in its Complaint;

2   183.   That the Court grant WeRide damages as described in each of the above claims, in

3   favor of WeRide and against Defendants in amounts to be determined at trial, but not less than $124.5

4   million, and further directing forfeiture and disgorgement of all amounts paid by WeRide to

5   Defendants during the period of disloyalty;

6   184.   Establishment of a constructive trust ordering Defendants to transfer legal title and

7   possession to WeRide of any devices containing WeRide's trade secrets and other Confidential

8   Information, including any Proprietary Information under the PIIA;

9   185.   The issuance of a preliminary injunction and final, permanent injunction against

10   Defendants as follows:

11   A.   That Defendants, and all those acting in concert with any of them, be preliminarily

12        and permanently enjoined from disclosing or utilizing for any purpose WeRide's

13        Confidential Information;

14   B.   That Defendants, and all those acting in concert with any of them, be directed

15        immediately to return to WeRide any and all of WeRide's Confidential Information

16        in their possession, custody, or control;

17   C.   That Defendants deliver, or that WeRide may seize, Defendants' home and

18        business computers (including laptops and desktops), memory devices, electronic

19        data storage media, "cloud"-based file storage accounts and hardcopy documents to

20        search, at Defendants' expense, for WeRide's Confidential Information and other

21        property belonging or relating to WeRide and to arrange for the deletion of any and

22        all such Confidential Information from those computers, media, devices and

23        accounts;

24   D.   That pending delivery to WeRide of the materials described in the two preceding

25        sub-paragraphs, Defendants be enjoined and restrained from destroying: (i) any

26        electronic or hard copy document, file, record, information or other property

27        containing any of WeRide's Confidential Information; (ii) any electronic or hard

28        copy document, file, record, information or other property referring or relating in

1        any way to any of WeRide's Confidential Information; and (iii) any data contained

2        on any of his home and business computers (including laptops and desktops),

3        memory devices, mobile telephones and other wireless communication devices, any

4        other electronic data storage media and/or "cloud"-based storage accounts;

5    E.    That Defendants identify, under oath, the identity of the individuals, groups and

6        companies, if any, to whom any Defendant has disclosed WeRide's Confidential

7        Information;

8    186.    That the Court grant WeRide pre-judgment and post-judgment interest on all such

9  damages;

10    187.    That the Court grant WeRide an award for reasonable attorneys' fees and costs of suit

11  incurred herein;

12    188.    That the Court grant WeRide an award for punitive damages in amount to be

13  determined at trial, but not less than $249 million;

14    189.    That the Court award WeRide such other and further relief as the Court deems just and

15  proper.

16               **JURY DEMAND**

17    190.    Pursuant to Federal Rule of Civil Procedure 38(b), WeRide hereby demands trial by

18  jury of all issues properly triable thereby.

19

20  DATED:  November 29, 2018        Respectfully submitted,

21                    QUINN EMANUEL URQUHART &

22                    SULLIVAN, LLP

23

24               By  */s/ Claude M. Stern*

25                    Claude M. Stern

26                    Ryan S. Landes
                      Attorneys for Plaintiffs WeRide Corp. and
                    WeRide Inc.

27

28