1 | QUINN EMANUEL URQUHART & SULLIVAN, LLP
Claude M. Stern (Bar No. 96737)
2 | claudestern@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
3 | Redwood Shores, California 94065-2139
Telephone:      (650) 801-5000
4 | Facsimile:      (650) 801-5100

5 | Ryan Landes (Bar No. 252642)
ryanlandes@quinnemanuel.com
6 | 865 South Figueroa Street
Los Angeles, California 90017
7 | Telephone:      (213) 443-3000
Facsimile:      (213) 443-3100
8 |
*Attorneys for Plaintiff WeRide Corp. and*
9 | *WeRide Inc.*

10 |

11 | UNITED STATES DISTRICT COURT

12 | NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

13 |

14 | WERIDE CORP. f/k/a JingChi Corp,;
WERIDE INC. f/k/a JingChi Inc.,

CASE NO. 5:18-cv-07233-NC

15 | **PLAINTIFFS' NOTICE OF MOTION
AND MOTION FOR PRELIMINARY
16 | INJUNCTION**

Plaintiff,

vs.

17 | Date:      January 30, 2018
Time:      1:00 P.M.
18 | JING WANG, an individual, KUN HUANG,
an individual, ZHONG ZHI XING
Ctrm:      5, 4th Floor
19 | TECHNOLOGY CO. LTD.. d/b/a
ALLRIDE.AI, ALLRIDE.AI INC.,

The Hon. Nathanael M. Cousins

20 | Defendant.

Action Filed:      November 29, 2018
Trial Date:      None Set

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

TO DEFENDANTS JING WANG, KUN HUANG, ZHONG ZHI XING TECHNOLOGY CO. LTD.. d/b/a ALLRIDE.AI, AND ALLRIDE.AI INC., AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on January 30, 2018 at 1:00 PM, or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Nathanael M. Cousins at the United States District Court District Court for the Northern District of California, 280 South 1st Street, San Jose, California, Plaintiffs WeRide Corp. and WeRide Inc. (collectively "WeRide") shall move and hereby do move the Court for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65.

WeRide's motion seeks the following forms of injunctive relief, pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rule 65-2, as set forth more completely in the [Proposed] Order submitted with this motion:

- An order prohibiting any Defendant from using or disclosing WeRide's confidential information;
- An order prohibiting any Defendant from destroying, deleting, or concealing evidence;
- An order directing the Defendants to identify all persons or entities to whom any of them have disclosed WeRide's confidential information;
- An order directing the Defendants to permit WeRide's counsel to inspect and image any computers, USB flash drives, or other electronic storage devices that have previously contained WeRide's confidential information, and are within any Defendants' possession, custody, or control;
- An order directing the Defendants to permit WeRide's counsel to inspect and copy (or image) any documents or other materials that are derived from WeRide's confidential information, or contain WeRide's confidential information, and are within any Defendants' possession, custody, or control;
- An order directing the Defendants to produce a copy of the source code used to operate the autonomous vehicle(s) depicted in the video attached as Exhibit H to the Declaration of Bijun Zhang submitted herewith;
- An order prohibiting Jing Wang from further soliciting WeRide employees for employment prior to January 31, 2019;

- An order prohibiting Kun Huang from further soliciting WeRide employees for employment prior to August 13, 2019; and
- An order prohibiting Jing Wang from making further libelous or defamatory statements about WeRide;

In addition to the foregoing injunctive relief, WeRide's motion also seeks an order permitting early discovery from all Defendants pursuant to Federal Rule of Civil Procedure 26(d)(1).

WeRide's motion is based on this notice of motion and motion, the following memorandum of points and authorities; the supporting declarations of Qing Lu, Yan Li, Paul Liu, Bijun Zhang, Liren (Leo) Xu, Matthew Gayford, Matthew R. Walter, and Ryan Landes, with accompanying exhibits to each declaration; all matters of which the Court may take judicial notice; other pleadings on file in this action; and other written or oral argument that WeRide may present to the Court.

DATED:  December 26, 2018                    QUINN EMANUEL URQUHART & SULLIVAN, LLP


By  /s/ Claude M. Stern
    Claude M. Stern
    Ryan S. Landes
    Attorneys for Plaintiffs WeRide Corp. and
    WeRide Inc.

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ISSUE TO BE DECIDED ...........................................................................................................2

FACTUAL BACKGROUND ......................................................................................................2

LEGAL STANDARD .................................................................................................................12

ARGUMENT ..............................................................................................................................12

I.     WERIDE IS LIKELY TO SUCCEED ON THE MERITS.................................................12

       A.     WeRide Is Likely to Succeed on Its Trade Secret Claims ......................................13

              1.     Defendants Appropriated WeRide Trade Secrets ..........................................13

              2.     Defendants Knowingly Acquired Trade Secrets Through Improper
                     Means ..............................................................................................................14

       B.     WeRide Is Likely to Succeed on Its Defamation Claim ..........................................17

       C.     WeRide Is Likely to Succeed on Its Intentional Interference Claim........................18

       D.     WeRide Is Likely to Succeed on Its Breach of Contract Claims .............................19

       E.     WeRide Is Likely to Succeed on Its Breach of Fiduciary Duty Claim ...................20

II.    WERIDE HAS SUFFERED AND WILL CONTINUE TO SUFFER
       IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF ..............................................21

III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR
       INJUNCTIVE RELIEF WITHOUT THE NEED FOR A BOND .......................................23

IV.    THE COURT SHOULD GRANT EXPEDITED DISCOVERY .........................................25

CONCLUSION ...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*2Die4Kourt v. Hillair Capital Mgmt., LLC*,
    2016 WL 4487895 (C.D. Cal. Aug. 23, 2016),
    *aff'd*, 692 F. App'x 366 (9th Cir. 2017) ........................................................ 24

*Ajaxo Inc. v. E*Trade Grp. Inc.*,
    135 Cal. App. 4th 21 (2005) ............................................................................ 15

*Alliant Ins. Servs., Inc. v. Gaddy*,
    159 Cal. App. 4th 1292 (2008) ........................................................................ 19

*Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*,
    226 Cal. App. 4th 26 (2014) ............................................................................ 14

*AUA Private Equity Partners, LLC v. Soto*,
    2018 WL 1684339 (S.D.N.Y. Apr. 5, 2018) .................................................... 16

*Bakst v. Cmty. Mem'l Health Sys., Inc.*,
    2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) ................................................. 19

*Bank of Am., N.A. v. Lee*,
    2008 WL 4351348 (C.D. Cal. Sept. 22, 2008) ................................................ 13

*Baral v. Schnitt*,
    1 Cal.5th 376 (2016) ........................................................................................ 18

*Barker v. Insight Glob., LLC*,
    2018 WL 3548911 (N.D. Cal. July 24, 2018) ................................................. 19

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*,
    331 F. Supp. 3d 977 (N.D. Cal. 2018) ............................................................ 15

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
    873 F. Supp. 2d 1192 (N.D. Cal. 2012) .......................................................... 15

*Buschman v. Anesthesia Bus. Consultants LLC*,
    42 F. Supp. 3d 1244 (N.D. Cal. 2014) ............................................................ 19

*C2 Educ. Sys., Inc. v. Lee*,
    2018 WL 3328143 (N.D. Cal. July 6, 2018) ................................................... 25

*Comet Techs. United States of Am. Inc. v. Beuerman*,
    2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ......................... 14, 21, 23, 24, 25

*In re Countrywide Fin. Corp. Derivative Litig.*,
    542 F. Supp. 2d 1160 (C.D. Cal. 2008) ........................................................... 25

*Dish Network L.L.C. v. Ramirez*,
    2016 WL 3092184 (N.D. Cal. June 2, 2016) ................................................... 23

*DVD Copy Control Assn., Inc. v. Bunner*,
    31 Cal. 4th 864 (2003) ................................................................................................. 13

*GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*,
    83 Cal. App. 4th 409 (2000) ................................................................................. 20, 21

*GTAT Corp. v. Fero*,
    2017 WL 7035655 (D. Mont. May 3, 2017) ................................................................ 15

*Henry Schein, Inc. v. Cook*,
    191 F. Supp. 3d 1072 (N.D. Cal. 2016) ........................................... 12, 16, 21, 22, 23

*Hilderman v. Enea TekSci, Inc.*,
    551 F. Supp. 2d 1183 (S.D. Cal. 2008) ....................................................................... 14

*Huong Que, Inc. v. Luu*,
    150 Cal. App. 4th 400 (2007) ......................................................................... 18, 20, 21

*Iconix, Inc. v. Tokuda*,
    457 F. Supp. 2d 969 (N.D. Cal. 2006) ........................................................................ 20

*Integral Dev. Corp. v. Tolat*,
    675 F. App'x 700 (9th Cir. 2017) ........................................................................ 14, 15

*Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*,
    66 F. Supp. 2d 1117 (C.D. Cal. 1999) ....................................................................... 17

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ................................................................................... 24

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ............................................................................................ 18

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) .............................................................................. 21, 25

*LeJeune v. Coin Acceptors, Inc.*,
    849 A.2d 451 (Md. 2004) .......................................................................................... 15

*Loop AI Labs Inc v. Gatti*,
    2015 WL 5158639 (N.D. Cal. Sept. 2, 2015) ...................................................... 18, 19

*Loral Corp. v. Moyes*,
    174 Cal. App. 3d 268 (1985) ..................................................................................... 19

*Lothschuetz v. Carpenter*,
    898 F.2d 1200 (6th Cir. 1990) ................................................................................... 17

*Luxpro Corp. v. Apple Inc.*,
    2011 WL 1086027 (N.D. Cal. Mar. 24, 2011) ........................................................... 17

*Mann v. Quality Old Time Serv., Inc.*,
    120 Cal. App. 4th 90 (2004) ............................................................................... 18, 19

*NAC Found., LLC v. Jodoin,*
    2016 WL 3769348 (D. Nev. July 14, 2016) ..................................................... 23

*Natomas Gardens Inv. Grp. v. Sinadinos,*
    2010 WL 1659195 (E.D. Cal. Apr. 22, 2010) ................................................. 19

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.,*
    602 F. App'x 669 (9th Cir. 2015)..................................................................... 12

*Overstock.com, Inc. v. Gradient Analytics, Inc.,*
    151 Cal. App. 4th 688 (2007) ......................................................................... 18

*Pierce v. Lyman,*
    1 Cal. App. 4th 1093 (1991) ........................................................................... 20

*Pinnacle Sys., Inc. v. XOS Techs., Inc.,*
    2003 WL 21397845 (N.D. Cal. May 19, 2003) .............................................. 17

*PSC Indus. Outsourcing, LP v. Kodysz,*
    2013 WL 3354452 (E.D. Cal. July 3, 2013) ................................................... 16

*Pyro Spectaculars N., Inc. v. Souza,*
    861 F. Supp. 2d 1079 (E.D. Cal. 2012) ..................................................... 14, 16

*Rausch v. Blair,*
    2015 WL 13283839 (C.D. Cal. Oct. 1, 2015) ........................................... 17, 19

*Reeves v. Hanlon,*
    33 Cal. 4th 1140 (2004).................................................................................. 20

*San Antonio Cmty. Hosp. v. S. California Dist. Council of Carpenters,*
    125 F.3d 1230 (9th Cir. 1997) ........................................................................ 17

*Sci. Games Int'l, Inc. v. Cash,*
    2017 WL 542034 (N.D. Ga. Jan. 25, 2017) ................................................... 16

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
    240 F.3d 832 (9th Cir. 2001) .......................................................................... 23

*Thomas Weisel Partners LLC v. BNP Parabas,*
    2010 WL 1267744 (N.D. Cal. Apr. 1, 2010) ................................................. 21

*Vegod Corp. v. Am. Broad. Companies, Inc.,*
    25 Cal. 3d 763 (1979) .................................................................................... 17

*W. Directories, Inc. v. Golden Guide Directories, Inc.,*
    2009 WL 1625945, at *7 (N.D. Cal. June 8, 2009) ........................................ 23

*Waymo LLC v. Uber Techs., Inc.,*
    2017 WL 2123560 (N.D. Cal. May 15, 2017) ........................ 2, 12, 13, 16, 22, 24

*Wetzel's Pretzels, LLC v. Johnson,*
    797 F. Supp. 2d 1020 (C.D. Cal. 2011) ......................................................... 23

**Statutory Authorities**

18 U.S.C. § 1836 ............................................................................................................. 12

18 U.S.C. § 1836(b)(3)(A) ......................................................................................... 12, 22

18 U.S.C. § 1839 ............................................................................................................. 12

18 U.S.C. § 1839(3)(A) ................................................................................................... 14

18 U.S.C. § 1839(5) ........................................................................................................ 14

18 U.S.C. § 1839(6) ................................................................................................... 13, 14

18 U.S.C.A. § 1835 ......................................................................................................... 13

Cal. Civ. Code §§45-46 ................................................................................................... 17

Cal. Civ. Code § 3426.1 ............................................................................................. 12, 14

Cal. Civ. Code § 3426.1(a) .............................................................................................. 14

Cal. Civ. Code § 3426.1(b)(1) ......................................................................................... 14

Cal. Civ. Code § 3426.1(b)(2) ......................................................................................... 14

Cal. Civ. Code § 3426.1(d) .............................................................................................. 13

Cal. Civ. Code § 3426.1(d)(2) ......................................................................................... 14

Cal. Civ. Code § 3426.2 ................................................................................................... 12

Cal. Civ. Code § 3426.5 ................................................................................................... 13

Cal. Civ. Proc. Code § 2019.210 ................................................................................... 5, 13

**Rules and Regulations**

Fed. R. Civ. P. 26(d) ....................................................................................................... 25

**Additional Authorities**

Che Zhi (Car Wisdom), *Jingchi Technology's Triplets: WeRide, AllRide, and MoonX, Zhihu Column*, https://zhuanlan.zhihu.com/p/48170899 (Oct. 31, 2018) ......................... 7

Roger Lanctot, *Accelerating the Future: The Economic Impact of the Emerging Passenger Economy*, available at https://newsroom.intel.com/newsroom/wp-content/uploads/sites/11/2017/05/passenger-economy.pdf. (2017) ................................ 2, 21

Sina Financial News, *After Being "Hunted" by Baidu, Jing Wang Has Started a New Business; Would The Copied Version of JingChi Grow Steadily?*, (Oct. 12, 2018), https://t.cj.sina.com.cn/articles/view/2540408364/976b8e2c00100tl9g ............................ 7

1

**PRELIMINARY STATEMENT**

2      WeRide[1] is a California-based, heavily-financed start up with world class technical talents and

3  ability that stands to become a leader in the emerging Chinese self-driving car industry.  It has invested

4  at least $45 million over the past eighteen months to develop proprietary software capable of guiding

5  driverless cars on public roads.

6      On January 31, 2018, WeRide parted ways with its former CEO, Jing Wang.  Wang

7  subsequently founded a competing self-driving car company, AllRide, that, once it became public, a

8  Chinese media outlet described as "basically copying" WeRide.  Then, beginning in mid-2018, Wang

9  contacted WeRide's investors and made a number of false statements about WeRide, including that

10  WeRide had stolen another self-driving car company's technology, that WeRide's technology did not

11  work, and that its cars had been involved in an accident that WeRide was trying to cover up.  These

12  statements were false, defamatory, and violated the nondisparagement clause in Wang's separation

13  agreement with WeRide.  Several would-be WeRide investors withdrew their written commitments to

14  fund WeRide as a direct result of Wang's interference.  In total, WeRide lost over $75 million of

15  investments in its critical Series A investment round.  (WeRide was able to replace some, but not all, of

16  this lost investment with alternative funding.)

17      Wang also began poaching WeRide employees to join AllRide, in violation of his employment

18  agreement with WeRide.  One of the WeRide employees Wang recruited was Kun Huang, WeRide's

19  Head of Technology.  Huang in turn began recruiting his coworkers to join "Jing Wang's new

20  company" while still employed at WeRide, in violation of his own employment agreement and

21  obligations to WeRide as its officer.  WeRide found out and terminated Huang's employment.  But as

22  WeRide later learned, in the weeks before Huang left WeRide, he downloaded over eight gigabytes of

23  confidential, proprietary, and trade secret information from WeRide ("Confidential Information"), and

24  copied files onto at least three personal USB devices using his company-issued laptops, again in

25  violation of his contractual and fiduciary duties.  Huang then wiped both laptops clean in an attempt to

26  cover his tracks before returning them to WeRide.  Huang offered to return one of the three USB drives

27  on December 20, less than a week before the filing of this motion, but weeks after WeRide first

28

---

[1]   WeRide refers to both Plaintiff WeRide Corp. and its parent company, Plaintiff WeRide Inc.

1   requested them back.  To date he has not offered to return any of the other devices, and has not denied

2   taking WeRide Confidential Information.  Both Wang and Huang's agreements with WeRide expressly

3   permit injunctive relief in these circumstances.

4        In October 2018, AllRide posted a demonstration video of its self-driving car on a Chinese

5   social media site.  At the time, AllRide had been in existence for less than three months, and had barely

6   any employees, test cars, or funding.  Yet its marketing video showed self-driving functionality that

7   requires many months of work and iterative testing to develop.  As WeRide's expert has testified in

8   support of this motion, AllRide could not have developed this functionality on its own in this timeline;

9   rather, all indications are that it used the WeRide Confidential Information that Huang stole before he

10  left the company.  This threatens to irreparably deprive WeRide of the fruits of its eighteen months of

11  labor – the competitive advantage of early success in the emerging self-driving car market.

12       Defendants' improper solicitation of WeRide employees, disparagement to WeRide's investors,

13  and misappropriation of WeRide Confidential Information has irreparably harmed WeRide in the form

14  of lost talent, lost time, lost investment, and lost competitive advantage at a critical time in an emerging

15  market.  This irreparable harm will continue absent the preliminary injunctive sought in this motion.

16  <u>**ISSUE TO BE DECIDED**</u>

17       Whether WeRide is entitled to injunctive relief against Jing Wang, Kun Huang, and AllRide.

18  <u>**FACTUAL BACKGROUND**</u>

19  <u>**WeRide Is an Upcoming Player in the Nascent Self-Driving Car Industry.**</u>  WeRide (f/k/a

20  JingChi) was founded in April 2017 by a group of experienced, highly qualified engineers to develop a

21  fleet of self-driving cars in the United States and China.  (Lu Decl. ¶ 7.)  Self-driving car technology,

22  though still relatively nascent, is widely expected to be the next disruptive industry giant to come out of

23  Silicon Valley.  *See Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *11 (N.D. Cal. May 15,

24  2017) ("It would likely be futile to attempt, after the fact, to estimate the monetary value of injury

25  suffered from either the loss of Waymo's competitive position in this nascent industry or the destruction

26  of its trade secrets pertaining to the same.") Roger Lanctot, Strategy Analytics, *Accelerating the Future:*

27  *The   Economic   Impact   of   the   Emerging   Passenger   Economy*   5   (2017),   *available   at*

28

1   https://newsroom.intel.com/newsroom/wp-content/uploads/sites/11/2017/05/passenger-economy.pdf

2   (estimating self-driving car industry will be worth $7 trillion by 2050).

3        WeRide employs a team of world class scientists who are at the forefront of the self-driving car

4   industry.  For example, Yan Li, one of the founders of WeRide, holds a PhD in Electrical and Computer

5   Engineering from Carnegie Mellon, and has ten years of experience as a software engineer at Microsoft

6   and Facebook.  (Landes Decl. Ex. L.)  Albert Wu, who works on WeRide's motion planning and control

7   systems, holds a PhD in Robotics from Carnegie Mellon, a Master's degree in Aerospace, Aeronautical,

8   and Astronautical Engineering from MIT, and a Bachelor's degree in Mechanical Engineering from

9   Caltech.  (Landes Decl. Ex. M.)  Software engineer Qi Ge holds a PhD in Physics and a Masters in

10  Computational Science and Engineering from Georgia Tech.  (Landes Decl. Ex. N.)  Another software

11  engineer, Xiang Guo, holds a PhD in Physics from Yale.  (Landes Decl. Ex. O.)

12       WeRide moved quickly to fill a gap in the Chinese self-driving market, seeking to differentiate

13  itself by focusing on its software capabilities.  (Li Decl. ¶ 11.)  That focus made WeRide the fastest

14  company to complete its first public road test.  (*Id.* ¶ 4.)  In early 2018, WeRide's future looked bright.

15  WeRide launched China's first long-term trial operation of self-driving cars in Guangzhou in January

16  2018.  (*Id.*)  In March 2018, WeRide became the first company in China to perform an autonomous

17  long-distance tunnel crossing, and in June 2018 it repeated the feat during a heavy rainstorm.  (*Id.*)

18  WeRide operated a fleet of approximately twenty-five cars, with plans to have 250 cars by the end of

19  2018 funded by multiple interested investors.  (*Id.*; Lu Decl. ¶ 24.)

20       **WeRide Develops Proprietary Self-Driving Software.**  Self-driving cars require software

21  capable of navigating in a dynamic world based on input from a variety of car-mounted sensors.

22  (Walter Decl. ¶ 16.)  All industry players are simultaneously attempting to invent the solution to this

23  problem, and so to protect their competitive advantage WeRide and other self-driving car companies

24  closely guard their respective developments.  (Li Decl. ¶¶ 7, 11; Liu Decl. ¶¶ 4-16.)

25       From a high level, self-driving car software can be divided into four basic functions: perception,

26  prediction, decision, and control.  (Walter Decl. ¶ 11.)  Perception is the processing of input from the

27  car's sensors, including cameras, radar, and Light Detection and Ranging (LIDAR).  (*Id.* ¶ 12.)

28  Prediction modules, perhaps the most complicated component, try to anticipate the future paths of each

object the car encounters.  (*Id.* ¶ 13.)  Decision modules then determine the car's next move to reach the car's planned destination, taking into account infrastructure, traffic laws, and other objects.  (*Id.* ¶ 14.)  Finally, the control module translates the decision into the mechanical actions necessary to control the car, such as steering the wheel or pressing the pedals.  (*Id.* ¶ 15.)

Developing a self-driving car is necessarily a time-consuming process, especially to get cars to the point where they can operate without a safety driver.  Simply writing basic modules can take weeks before the first road tests with operators behind the wheel can begin.  (*Id.* ¶¶ 39, 58, 62-63.)  Once basic functions have been developed, the program must then use "deep learning," an iterative, time-consuming process of feeding a diverse set of images into an algorithm, so as to "teach" the system to react to new, unforeseen events.  (*Id.* ¶¶ 28-34.)  Even the largest, best-resourced companies in the United States have been unable to speed up this process.  General Motors took eight months to develop a fleet of 20 test vehicles, and after 14 months it still cannot safely operate without a test driver, or at speeds faster than 25 miles per hour on public roads.  (*Id.* ¶ 42.)  Google's driverless car company, Waymo, one of the best-resourced companies in this field, needed seven months of development and testing in a new environment before it began to test self-driving cars without safety drivers.  (*Id.* ¶ 18.)

To date, WeRide has invested around $45 million to develop its self-driving car program (not including other business expenses).  (Li Decl. ¶ 9.)  WeRide's code base constitutes several hundred thousand lines of code—roughly 770 megabytes in disk space—that was developed by approximately 120 engineers over a period of 18 months.  (*Id.* ¶¶ 7-8.)  For purposes of this action, WeRide focuses on a set of specific modules in its code base, which as discussed below constitute trade secrets.

**Mapping.**  The starting point for an autonomous vehicle to navigate from one location to another is a map.  (*Id.* ¶ 20.)  Commercially available map information does not provide enough detail for autonomous vehicles, so developers must build their own maps (often called HD maps) of any regions their cars travel through.  (*Id.*)  HD maps are developed using sensor data collected from WeRide's test cars and compiled using proprietary code.  (*Id.* ¶ 58.)

**Sensor Fusion-Based Localization.** Before a self-driving car can make use of an HD map, the car must be able to accurately determine its current location in a process called "localization."  (*Id.* ¶

16).  Localization in turn requires the perception function to be able to process input from the car's multiple sensors, which is referred to in the industry as "sensor fusion."  (*Id.* ¶ 54.)

**State Machines.**  WeRide's system includes a decision model that guides the car's actions in real time.  (*Id.* ¶ 66.)  The model is complex and consists of multiple interconnected parts, but one aspect, called "state machines," is particularly relevant here.  State machines are code modules that instruct the car how to act in particular situations (or "states"), such as a traffic light, a cross walk, or a slow moving vehicle.  (*Id.*)  State machines are complex because they must control for uncertainty; for example, the rules for a flashing red light and a solid red light are different, so the state machine must be able to dynamically re-verify that the appropriate state machine is being used.  (*Id.* ¶ 66.)

WeRide developed all of its code, including the mapping, sensor fusion and localization, and state machines, from the ground up, with some of the top technical scientists in the field.  (Li Decl. ¶ 7; Landes Decl. Exs. L-O.)  While WeRide did not invent the general concepts of HD mapping, sensor fusion and localization, or state machines, the specific algorithms and set of state machines chosen are proprietary to WeRide.  (Walter Decl. ¶¶ 68-109.)  As detailed in WeRide's statement pursuant to Code of Civil Procedure Section 2019.210, WeRide claims aspects of the above proprietary algorithms as its trade secrets.  (*Id.* Ex. B (filed under seal).)

WeRide's proprietary code is extremely valuable.  It is the product of thousands of hours of development, hundreds of thousands of test miles, and tens of millions of dollars of investment.  (Li. Decl. ¶ 7.)  Moreover, WeRide's code—which is not known by its competitors and thus gives WeRide its competitive advantage over others in the industry—operates more efficiently and provides passengers with a smoother ride than WeRide's competitors.  (*Id.* ¶ 10.)

**WeRide's Efforts to Maintain Secrecy.**  Given its value, WeRide takes extensive measures to ensure the secrecy and security of its Confidential Information.  WeRide requires its employees to sign a Proprietary Information and Inventions Agreement ("PIIA") containing confidentiality and non-disclosure agreements.  (Zhang Decl ¶ 4 and Exs. A-B; Lu Decl. Exs. A-B.)  Specifically, Wang and Huang (like all WeRide employees) agreed in the PIIA to "hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information."  (Zhang Decl Ex. B ¶ 4; Lu Decl. Ex. B ¶ 4.)  Proprietary Information is defined in the PIIA as "all . . . business, technical and

financial information . . . I develop, learn or obtain during the term of my employment that relate to [WeRide] or the business or demonstrably anticipated business of [WeRide] or that are received by or for [WeRide]." (*Id.*).  As relevant below, Wang and Huang also agreed in the PIIA that "Until one year after the term of my employment, I will not encourage or solicit any employee or consultant of [WeRide] to leave [WeRide] for any reason." (Zhang Decl Ex. B ¶ 5; Lu Decl. Ex. B ¶ 5.)  **Critically, Wang and Huang agreed that "any breach of this [PIIA] will cause irreparable harm to [WeRide] for which damages would not be an adequate remedy, and, therefore, [WeRide] will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond."**  (Zhang Decl Ex. B ¶ 9; Lu Decl. Ex. B ¶ 9.)

WeRide's company policies also require employees to protect Confidential Information.  (Zhang Decl. ¶ 8 and Ex. C.)  Among other security measures, WeRide controls physical access to its offices with unique door badges and security cameras.  (Liu Decl. ¶¶ 11, 14.)  WeRide only allows access to its source code from company network locations, meaning that employees outside of the office must connect to the office network through a company VPN.  (*Id.* ¶ 9.)  VPNs are in turn protected with user names and passwords unique to each employee.  (*Id.*)  WeRide's source code is separately encrypted and can only be accessed by providing both (1) a valid username and password, and (2) a file called a "token," which is uniquely generated based on the employee's username.  (*Id.* ¶¶ 6-8.)  Accordingly, an intruder seeking to access WeRide's code would need (i) VPN credentials, (ii) an employee's username and password, *and* (iii) the token file matching those credentials.  (*Id.*)

**WeRide's CEO, Jing Wang, Resigns from WeRide and Creates Competitor AllRide.**  Defendant Jing Wang served as WeRide's CEO starting in April 2017.  (Lu Decl. ¶ 5.)  As CEO, Wang primarily served in a business role and had no direct involvement in the technical development of WeRide's self-driving cars.  (*Id.* ¶ 13.)

In December 2017, Wang's former employer, Chinese internet giant Baidu, brought a lawsuit against Wang in China, alleging that he failed to return a laptop belonging to Baidu, stole Baidu's trade secrets, and was poaching Baidu's employees; Baidu also named WeRide in the lawsuit.  (*Id.* ¶ 10.)  Even though the alleged laptop theft occurred close to a year earlier, and Wang was clearly aware of the allegations (as evidenced by an earlier letter to Baidu from Wang claiming he "lost" the laptop), Wang

1  had not told WeRide's shareholders about Baidu's allegations.  (*Id.* ¶¶ 11-12.)  WeRide's management

2  felt that even though Wang was not involved in software development, Wang's undisclosed conduct

3  threatened to cast a shadow over WeRide's unique and novel code, which was developed entirely in-

4  house and independently of Baidu's work.  (*Id.* ¶ 13.)  Accordingly, in January 2018, WeRide's

5  shareholders voted to remove Wang as CEO.  (*Id.*)

6  Wang was allowed to voluntarily resign and receive a severance package.  (*Id.* ¶ 15-16.)  Wang

7  resigned effective January 31, 2018, and signed a Separation Agreement providing, among other things,

8  that he shall "never make any negative or disparaging statements (orally or in writing) about the

9  Company or its stockholders, directors, officers, employees, products, services or business practices."

10  (*Id.* ¶ 16 and Ex. C.)  The Separation Agreement also explicitly reaffirmed that the terms of the PIIA

11  remained in full effect and continued to bind Wang.  (*Id.* ¶ 17)

12  Following his departure, Wang founded a competing self-driving car company called Zhong Zhi

13  Xing ("ZZX"), which has been described in Chinese media as "basically copying" WeRide.[2]  ZZX

14  owns and operates the website located at www.allride.ai (Dkt. 18-1), and holds itself out as

15  "AllRide.AI" on social media. (Zhang Decl. ¶¶ 22-23.) AllRide.AI Inc. was incorporated in Delaware

16  on July 19, 2018—one day before the www.allride.ai website was registered by ZZX, suggesting the

17  companies are closely affiliated if not one and the same.  (Landes Decl. Exs. A-B.)  AllRide's website

18  and material it has posted to social media show that AllRide's business model is similar to WeRide's.

19  Like WeRide, AllRide seeks to develop a ride-hailing service (akin to Uber or Lyft) but with self-

20  driving cars for the Chinese market.  *See* http://www.allride.ai/en/technology.php.

21  When WeRide sought the Court's approval to serve Wang and AllRide through alternative

22  means, Defendant Kun Huang submitted a sworn declaration in "non-opposition" to the court claiming

23  that "[a]s far as I know, ZZX does not have an English business name" and "[t]o the best of my

24  knowledge, Mr. Jing Wang does not hold any formal position at ZZX or AllRide.ai Inc."  (Dkt. 18-1.)

25  Huang's denials are not credible in light of the Chinese media reports and the above website timing that

26  _____
[2]  *See, e.g.,* Che Zhi (Car Wisdom), *Jingchi Technology's Triplets: WeRide, AllRide, and MoonX, Zhihu Column* (Oct. 31, 2018), https://zhuanlan.zhihu.com/p/48170899; Sina Financial News, *After Being "Hunted" by Baidu, Jing Wang Has Started a New Business; Would The Copied Version of JingChi Grow Steadily?*, (Oct. 12, 2018), https://t.cj.sina.com.cn/articles/view/2540408364/976b8e2c00100tl9g.

all link Wang, ZZX, and AllRide.AI Inc.  Further, as detailed below, Huang told coworkers that he was planning to go to "Jing Wang's new company" shortly before he left WeRide, and he posted to social media that he was looking for office space in Silicon Valley with Ashley Pan, another one of Wang's close associates.  (Liu Decl. ¶ 28; Lu Decl. ¶¶ 15, 18.)  In addition, www.allride.ai, which is owned by ZZX, is available in English, contains a large logo with the English words "AllRide.AI," and states that it has a Silicon Valley office.  *See* http://www.allride.ai/en/campus.php (advertising that employees "who have excellent performance will be invited to join our team at Silicon Valley R&D center [sic]").

**Jing Wang Disparages WeRide to Investors and Attempts to Recruit WeRide Employees, Causing Irreparable Harm to WeRide.**  In the first half of 2018, WeRide began working with investment advisors to prepare its Series A investment round.  (Lu Decl. ¶ 22.)  WeRide sought to raise $100 million in its Series A, which would enable it to expand its fleet to 50 self-driving cars by the end of 2018, and 250 cars by the end of 2019.  (*Id.* ¶ 24.)  Progress looked to be on track (or even ahead of expectations) in June and early July of 2018, with numerous investors signing term sheets to invest at or above WeRide's target.  (*Id.* ¶ 27.)  But by late July 2018, investment had suddenly slowed.  (*Id.* ¶ 28.)

In August 2018, WeRide learned the cause of the slow down—Jing Wang had been making false and defamatory statements about WeRide to its potential investors.  (Lu Decl. ¶ 30.)  Specifically, Wang told potential investors that (i) Waymo was going to bring a lawsuit against WeRide for stealing Waymo's source code; (ii) WeRide's self-driving technology did not work, (iii) the videos WeRide created to demonstrate its self-driving technology had been "faked" (iv) WeRide's self-driving cars had been involved in a traffic accident that WeRide was attempting to "cover up," and (v) WeRide had purposefully and maliciously diluted Jing Wang's shares in WeRide.  (*Id.* ¶¶ 30, 32.)  These statements were false and defamatory on their face.  (*Id.* ¶ 33.)

As a result of Wang's false statements and deliberate interference, several investors reduced, delayed, or withdrew their commitments.[3]  (*Id.* ¶¶ 36-38.)  Specifically, a group of five investors who had executed term sheets to invest a total of $64 million (the "Term Sheet Investors") all suddenly

---

[3]  These investors signed term sheets after WeRide was already a party to Baidu's case against Jing Wang (which WeRide settled in March 2018), and a separate dispute between WeRide and a former shareholder, Ashley Pan, regarding her ownership interest.  (Lu Decl. ¶ 19, 26-27.)  Despite these suits, numerous investors were prepared to invest in WeRide until Wang's disparagement.  (*Id.*)

1    backed out of discussions.  (*Id.* ¶ 38.)  Another group of investors, led by Hanfor Capital Management

2    ("Hanfor"), had committed to invest an additional $38.1 million (the "Hanfor Investors").  (*Id.* ¶ 26.)

3    But after Wang contacted some of them, the lead investor reduced its commitment from $20 million to

4    $11.5 million, which was further adjusted down to $4.5 million—this despite the fact that the $20

5    million amount was approved by Hanfor's investment committee and final paperwork had been drawn

6    up for signature before Wang made his disparaging remarks.  (*Id.* ¶ 36.)  Other investors delayed or

7    backed out completely after Wang's disparagement.  (*Id.* ¶¶ 34, 37)

8         Wang's deliberate disparagement had serious, widespread, and long-lasting effects.  WeRide

9    was forced to split its Series A investment into three sub-rounds, the last of which did not close until

10   December 20, 2018.  (*Id.* ¶ 39.)  In total, WeRide lost over $75 million in expected investment.  (*Id.*

11   ¶¶ 36-38.)  To ensure it could continue operations without the planned investment, WeRide was forced

12   to accept a bridge loan of $5 million on less favorable terms than it otherwise would have taken, and it

13   had to expend additional time and effort to find new investors.  (*Id.* ¶ 28.)  Even after finding new

14   investors, WeRide raised only $83 million in its series A investment; far below the planned $100

15   million (and the potential for as much as $170 million) before Wang's interference.  (*Id.* ¶ 40.)

16        The negative impact on WeRide extended beyond the direct financial loss.  (*Id.* ¶ 41.)  WeRide's

17   plan for expanding its car fleet has been downsized and delayed (which, given the iterative nature of

18   development has its own ripple effects); WeRide lost out on hiring important talent; WeRide's future

19   ability to raise successive rounds of funding will be negatively impacted (especially if the

20   disparagement continues); and WeRide was forced to change the name of its company to distance itself

21   from the disparagement, rendering its prior trademarks valueless.  (*Id.* ¶¶ 41-47.)

22        **WeRide Terminates Kun Huang for Soliciting His Coworkers to Join "Jing Wang's New**

23   **Company."**  In addition to his wrongful defamation, Wang also attempted to solicit several WeRide

24   employees to join AllRide.  (Xu Decl. ¶¶ 33-34.)  One of the employees he successfully recruited was

25   WeRide's then-Head of Technology, Kun Huang, who had previously worked with Wang at Baidu.

26   (Zhang Decl. ¶ 12; Xu Decl. ¶¶ 20, 34-39.)  At WeRide, Huang led the hardware group, where he

27   supervised a team of approximately ten employees and had responsibility for WeRide's hardware

28   budget.  (Lu Decl. ¶ 48.)

1      While still employed at WeRide, Huang began to express dissatisfaction with WeRide and

2  sought to recruit at least one coworker for other opportunities.  (Xu Decl. ¶¶ 17-20.)  Beginning in April

3  2018, Huang encouraged WeRide employee Liren Xu (a senior engineer who reported to Huang) to

4  leave WeRide and join Huang at a competing company that he described as "Jing Wang's new

5  company," going so far as to make a specific compensation offer.  (*Id.* ¶ 42.)  In the course of his

6  solicitation, Huang stated that it would be "not very hard" for him to achieve "the same level of

7  technology" WeRide had already developed at a "new company."  (*Id.* ¶ 23.)  Xu reported this

8  solicitation to WeRide CEO Tony Han (*Id.* ¶ 40), and as a result on July 31, 2018, WeRide asked

9  Huang to resign.  (*Id.* ¶ 41; Zhang Decl. ¶ 13.)  Huang agreed to resign effective August 13.  (Zhang

10  Decl. ¶ 14.)

11      **WeRide Discovers that AllRide May Be Using WeRide's Confidential Information.**  In

12  early October 2018, WeRide learned that Huang had joined AllRide through several posts on WeChat, a

13  prominent Chinese social media platform.  (Zhang Decl. ¶ 23.)  WeRide's Head of HR became

14  suspicious because Huang's LinkedIn page stated that he was working for a "Stealth Mode Startup"

15  even though his participation in AllRide appeared to be very public. (*Id.*)  Further, AllRide described its

16  business model exactly like WeRide's; developing a mobility service (essentially a ride-hailing service

17  with self-driving cars) for the Chinese market using a similar configuration of on-car sensors that

18  WeRide uses.  *See* www.allride.ai.

19      To investigate and learn more about Huang's connection with AllRide, WeRide sent an

20  employee to public recruiting events hosted by AllRide at a university in Nanjing, China on October 22,

21  2018. (*Id.* ¶ 25.)  Huang appeared at this event and gave a presentation on AllRide's technology; during

22  the presentation, AllRide's representatives claimed that AllRide's code base was entirely proprietary

23  and did not include any open source code.  (*Id.* ¶¶ 30-32.)  AllRide representatives also told recruits that

24  AllRide had set a goal to hire 100 engineers and purchase 20 cars by the end of 2018.  (*Id.* ¶ 29.)

25      The WeRide employee also recorded a video that AllRide showed to the recruits.  (*Id*. ¶ 25 and

26  Ex. H.)  The video introduced Huang as "Brother Kun, Tech Lead of AllRide's Silicon Valley Office,

27  Self-driving Software & Hardware Specialist, Architect of Self-driving Vehicles."  (*Id.* ¶ 27.)  The

28  video also showed a car smoothly operating without anyone in the driver's seat, and executing a number

1    of complicated maneuvers, such as detecting and stopping for pedestrians in crosswalks, and changing

2    lanes to pass a slower moving vehicle.  (*Id.* Ex. H; Walter Decl. ¶ 17.)

3        An expert in the field of autonomous driving, Dr. Matthew R. Walter, has analyzed the video

4    and concluded that, unless AllRide is outright lying to the public about its technical capabilities, the

5    technology displayed in the video could not have been independently developed in the time between

6    AllRide's creation and its release of the video—approximately ten weeks. (*Id.* ¶ 20.)  Rather, for a

7    number of reasons, AllRide's claimed capabilities are more consistent with it using WeRide

8    Confidential Information to get a head start on development.  (*Id.* ¶ 118.)

9        **WeRide Investigates and Discovers That Kun Huang Exfiltrated WeRide's Confidential**

10   **Information and Attempted to Covers His Tracks.**  In light of the mounting red flags, WeRide

11   analyzed records of Huang's use of WeRide's computer systems in his final weeks at the company.

12   (Liu Decl. ¶ 21.)  This analysis revealed that, entirely unknown to WeRide, on May 6—just days after

13   Huang's first direct solicitation to one of his coworkers to leave WeRide, and his statement that it would

14   be "not very hard" to reproduce WeRide's technology at a new company—Huang downloaded over 1.1

15   gigabytes of data from WeRide's system in a single session, an amount of data larger than WeRide's

16   entire code base. (*Id.* ¶¶ 23, 26.)  Huang's unusual and excessive VPN activity continued through May,

17   June, and July, with data transfers in this time totaling more than eight gigabytes.[4] (*Id.* ¶ 24 and Ex. A.)

18       After the downloads, but just before Huang returned his company-issued laptops to WeRide

19   upon his departure, Huang inserted at least three USB drives into his company-issued Lenovo laptop

20   and copied several file folders. (Gayford Decl. ¶¶ 14-15.)  The names of the files and folders included

21   the phrase "景驰程序," which translates as "JingChi Program," referencing the former name of

22   WeRide. (Gayford Decl. ¶ 15.)  After the transfer, Huang deleted all the files from the Lenovo laptop

23   and cleared the browser history.  (*Id.* ¶ 12-13.)  Huang also deleted all the files from his company-

24   issued MacBook and reinstalled the operating system before returning it to WeRide, making it

25   impossible to determine what files were copied to or from the computer before it was returned.  (*Id.* ¶¶

26

27   ─────────────────
     [4]  WeRide's management did not know that Huang was joining a competitor until he appeared on
28   AllRide's WeChat posts (Zhang Decl. ¶ 23), and did not begin reviewing Huang's VPN logs until
     late October 2018 (Liu Decl ¶ 31).

8-9.)  Kun returned the (wiped) Lenovo and MacBook laptops to WeRide, but not the USB drives, which remain outstanding to this day.  (Zhang Decl. ¶ 14; Landes Decl. Exs. F, G, I, K.)

**Huang Fails to Respond to Demands to Return WeRide's Confidential Information.**  On October 1, 2018, WeRide engaged forensic experts to analyze the extent to which Huang or Wang may have stolen WeRide Confidential Information.  (Gayford Decl. ¶ 5).  By November 8, 2018, that analysis had revealed some of the activity described above, though analysis was still ongoing.  (Landes Decl. ¶ 17.)  After some additional follow up work, WeRide sent a cease and desist letter to Huang on November 15, 2018, informing him that his solicitation of WeRide employees and his continued retention, use, and disclosure of WeRide Confidential Information violated the PIIA as well as state and federal law.  (Landes Decl. Ex F.)  WeRide demanded, among other things, that Huang immediately return any devices containing WeRide Confidential Information, including three specifically identified USB devices.  (*Id.*)  Having not received any substantive response, WeRide filed its complaint on November 29 (Dkt. 1), and obtained an order approving alternative service on December 13 (Dkt. 23).  On December 20, Huang's counsel agreed to return one of the devices identified in the cease and desist letter, but made no mention of any of the other devices or issues.  (Landes Decl. Ex. K.)

## LEGAL STANDARD

A party can obtain a preliminary injunction by showing "(1) that [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [its] favor, and (4) that an injunction is in the public interest." *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 602 F. App'x 669, 671 (9th Cir. 2015) (quotations omitted); *see also Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1076 (N.D. Cal. 2016) (granting injunctive relief on claims of trade secret misappropriation, breach of contract, and breach of fiduciary duty); Cal. Civ. Code § 3426.2 (court may issue injunctive relief to prevent actual or threatened trade secret misappropriation); 18 U.S.C. § 1836(b)(3)(A) (same).

## ARGUMENT

**I.    WERIDE IS LIKELY TO SUCCEED ON THE MERITS**

A.   <u>**WeRide Is Likely to Succeed on Its Trade Secret Claims**</u>

To prevail on its trade secret claims, WeRide must show that Defendants acquired WeRide's trade secrets with reason to know the trade secrets were acquired by improper means.  Cal. Civ. Code § 3426.1 (CUTSA);18 U.S.C. §§ 1836, 1839 (DTSA); *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017) (granting preliminary injunction under CUTSA); *Bank of Am., N.A. v. Lee*, 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008) (same).  Both CUTSA and DTSA require courts to take action to preserve the confidentiality of trade secrets during trade secret proceedings.  Cal. Civ. Code § 3426.5 ("In any prosecution or other proceeding under this chapter, the court shall enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets . . . .");  18 U.S.C.A. § 1835 ("In an action under this title, a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include . . . ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval.").  Preliminary injunctions are often granted in trade secret cases because a trade secret loses its value once it is disclosed.  *DVD Copy Control Assn., Inc. v. Bunner*, 31 Cal. 4th 864, 880 (2003).

1.   <u>Defendants Appropriated WeRide Trade Secrets</u>

Under both the CUTSA and DTSA, a "trade secret" is information that (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of reasonable efforts to maintain secrecy.  Cal. Civ. Code § 3426.1(d); 18 U.S.C.A. § 1839(6).  WeRide's source code contains at least ten trade secrets, as outlined in WeRide's 2019.210 Statement.[5]  (Walter Decl. Ex. B (filed under seal).)  Those trade secrets generally include:  the specific implementation of sensor-fusion and localization developed in-house by WeRide; WeRide's mapping algorithms to convert data received from the sensor fusion and localization processes into an HD Map; ████████████ ████████████████████████████████████████████████████████████ the set of

---

[5]  WeRide is keenly aware of Code of Civil Procedure section 2019.210, and the requirements under California law for at least the UTSA claim that WeRide identify its trade secrets with reasonable particularity before conducting discovery.  WeRide has provided its 2019.210 statement as part of this motion, even before Defendants have asked for one, as an indication of its good faith in bringing this action.  Although courts may not have conclusively determined whether section 2019.210 is applicable in federal DTSA suits, that issue is moot because WeRide provided a 2019.210 statement.

1   state machines used in WeRide's code; and the code making up each of those state machines.  (*Id.*;

2   Walter Decl. ¶¶ 68-109).  These features of WeRide's code satisfy the "trade secret" definition.

3          Under the first prong, WeRide's code is not generally known to the public (*id.*), and it derives

4   significant economic value from not being known (Li Decl. ¶ 11.)  Indeed, WeRide's code was

5   developed through an iterative process over eighteen months by 120 engineers at a cost of

6   approximately $45 million.  (*Id.* ¶ 8, 11.)  This iterative process involved analysis of over 50 *terabytes*

7   of test data generated by WeRide's fleet of self-driving cars.  (Li Decl. ¶ 8.)  Given the enormous

8   amount of work that went in to developing this code, the code's primary value comes from it being

9   secret and proprietary to WeRide, so that WeRide has a competitive advantage over its competitors.

10  (*Id.* ¶ 11.)  Because source code often has these general characteristics, courts routinely grant it trade

11  secret protection.  *See Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*, 226 Cal. App. 4th 26, 64 (2014)

12  (software was a protectable trade secret where eight to ten software engineers developed it over a period

13  of four to five months); *Integral Dev. Corp. v. Tolat*, 675 F. App'x 700, 703 (9th Cir. 2017) (similar).

14         The second prong (reasonable efforts to maintain secrecy) is easily met here as well.  *See* 18

15  U.S.C. § 1839(3)(A); Cal. Civ. Code § 3426.1(d)(2) (efforts must be "reasonable under the

16  circumstances"). As summarized above and described in the accompanying declarations, WeRide

17  employs a number of security measures ranging from physical locks, cameras, employment policies,

18  confidentiality agreements, and a host of network and electronic protections including passwords,

19  network authentication, and device authentication.  (Zhang Decl. ¶¶ 4-5; Liu Decl. ¶¶ 4-16.)  Courts

20  consistently find even lesser measures to be reasonable.  *See, e.g.*, *Comet Techs. United States of Am.*

21  *Inc. v. Beuerman*, 2018 WL 1990226, at *3 (N.D. Cal. Mar. 15, 2018) (reasonable efforts included

22  confidentiality agreements, use of passwords, and limits to access based on need); *Pyro Spectaculars*

23  *N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1091 (E.D. Cal. 2012) (same); *Hilderman v. Enea TekSci, Inc.*,

24  551 F. Supp. 2d 1183, 1201 (S.D. Cal. 2008) (verbally telling employees of secrecy was sufficient).

25              2.   <u>Defendants Knowingly Acquired Trade Secrets Through Improper Means</u>

26         "Misappropriation" of a trade secret includes acquiring another's trade secret "by a person who

27  knows or has reason to know that the trade secret was acquired by improper means." Cal. Civ. Code

28  § 3426.1(b)(1); 18 U.S.C. § 1839(5).  Third parties who use trade secrets are also liable for

misappropriation if they know or have reason to know that "the trade secret was derived from or through a person who had utilized improper means to acquire it." Cal. Civ. Code § 3426.1(b)(2); 18 U.S.C. § 1839(5). "Improper means" includes "theft" and "breach of a duty to maintain secrecy." Cal. Civ. Code § 3426.1(a); 18 U.S.C. § 1839(6). "Misappropriation and misuse can rarely be proved by convincing direct evidence." *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977 (N.D. Cal. 2018). "In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place." *Id.*

There is strong evidence here that Huang knowingly misappropriated WeRide's trade secrets by improper means, and that Defendants are now using those trade secrets at AllRide. *First*, after just 10 weeks of existence and with minimal resources, AllRide advertised advanced autonomous driving capabilities that would not have been possible if AllRide were independently developing its own code, as it claims. (Walter Decl. ¶ 20.) As detailed in the accompanying declaration of industry expert Matthew Walter, developing a working self-driving car requires iterative improvement based on data that cannot be compiled in 10 weeks. (*Id.*) The best explanation for AllRide's rapid development is the improper use of WeRide's trade secrets (*id.* ¶ 118.) *See Ajaxo Inc. v. E*Trade Grp. Inc.*, 135 Cal. App. 4th 21, 53 (2005) (affirming finding of misappropriation where defendant "developed the same technology in too short a time for independent development"); *GTAT Corp. v. Fero*, 2017 WL 7035655, at *1-3 (D. Mont. May 3, 2017) (granting preliminary injunction where plaintiff's former employee and his new company had "detailed . . . engineering information which [defendant] could not have developed on his own in a matter of months without using [plaintiff's] proprietary technology").

*Second*, WeRide's network records show that shortly before leaving WeRide to join AllRide, Huang downloaded large amounts of WeRide data, in violation of his contractual and fiduciary duties, and then deleted data to erase any trace of his recent activity. (Liu Decl. ¶¶ 21-26; Gayford Decl. ¶¶ 8-13.) Courts routinely hold that attempts to cover up file transfers are evidence of misappropriation. *See, e.g.*, *Integral Dev. Corp. v. Tolat*, 675 F. App'x 700, 703 (9th Cir. 2017) (reversing grant of summary judgment based in part on evidence defendant "tried to cover up the evidence that he had transferred the files to his personal device"); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F.

Supp. 2d 1192, 1216 (N.D. Cal. 2012) (denying motion for summary judgment where defendants "copied or emailed [plaintiff's] materials shortly before leaving . . . and deleted related files in a manner consistent with an effort to cover their tracks"); *LeJeune v. Coin Acceptors, Inc.*, 849 A.2d 451, 467 (Md. 2004) (in UTSA jurisdiction, fact that defendant "erased over four hundred files from the laptop" suggested that defendant "was attempting to hide his conduct and was aware that transferring the files was improper"). Even by itself, the fact that Huang engaged in the improper downloading on his way out the door, then began working at AllRide immediately, strongly suggests that Defendants are using the information Huang took. *See Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *6 (N.D. Cal. May 15, 2017) ("[I]t would strain credulity to imagine that [Defendant] plundered [Plaintiff's] vault the way he did with no intent to make use of the downloaded trove.").

*Third*, even when Defendants were confronted with cease and desist letters, they did not deny that they had possession of WeRide Confidential Information or return the requested materials, nor did they acknowledge their association with each other—even though Wang and Huang almost certainly are officers, or at least have practical control, of the corporate defendants.[6] *See PSC Indus. Outsourcing, LP v. Kodysz*, 2013 WL 3354452, at *1 (E.D. Cal. July 3, 2013) (granting temporary restraining order where "Defendant has not responded to demands for return of Plaintiff's property nor acknowledged his obligations under the non-compete and trade secret agreements"); *Sci. Games Int'l, Inc. v. Cash*, 2017 WL 542034, at *3-6 (N.D. Ga. Jan. 25, 2017) (granting preliminary injunction where defendant "acted in good faith since returning the files," but did not adequately segregate personal information and was not forthcoming about an opportunity with a competitor when leaving the company).

In sum, all reasonable inferences lead to the conclusion that Defendants' misappropriation was through "improper means," primarily because Huang accessed the data in violation of his contractual and fiduciary duties to maintain the secrecy and highly restricted use of information he obtained from his employment at WeRide. *See, e.g.*, *Henry Schein*, 191 F. Supp. 3d at 1077 (employer was likely to succeed on trade secret claims against former employee who downloaded and emailed confidential data in violation of employment agreements); *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079,

---

[6]   *See* Landes Decl. Exs. D, E, G-K (Defendants' responses to letters); Zhang Decl. Ex. H (promotional video); *see also supra* at 7-8 (describing connections between Defendants).

1   1087 (E.D. Cal. 2012) (similar); *AUA Private Equity Partners, LLC v. Soto*, 2018 WL 1684339, at *7

2   (S.D.N.Y. Apr. 5, 2018) (similar).  WeRide is likely to succeed on its trade secret claims.

3              **B.      WeRide Is Likely to Succeed on Its Defamation Claim**

4              WeRide will be able to prove that Jing Wang's statements to investors constituted defamation.

5   "Statements that tend to directly injure one 'in respect to his office, profession, trade or business' are

6   slander and libel per se in California."  *Rausch v. Blair*, 2015 WL 13283839, at *2 (C.D. Cal. Oct. 1,

7   2015) (quoting Cal. Civ. Code §§45-46).  Corporations can recover for defamation as readily as

8   individuals.  *Vegod Corp. v. Am. Broad. Companies, Inc.*, 25 Cal. 3d 763, 771 (1979).  Because

9   defamatory speech is not protected by the First Amendment, courts may issue appropriately tailored

10  preliminary injunctions to prohibit a defendant from repeating defamatory statements.  *San Antonio*

11  *Cmty. Hosp. v. S. California Dist. Council of Carpenters*, 125 F.3d 1230, 1239 (9th Cir. 1997).  Courts

12  have recognized injunctive relief can be necessary to prevent defendants from continuing to make

13  defamatory statements.  *See, e.g.*, *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1209 (6th Cir. 1990).

14             Wang's disparaging statements to investors included (i) Waymo was going to bring a lawsuit

15  against WeRide for stealing Waymo's source code; (ii) WeRide's self-driving technology did not work,

16  (iii) the videos WeRide created to demonstrate its self-driving technology had been "faked"

17  (iv) WeRide's self-driving cars had been involved in a traffic accident that WeRide was attempting to

18  "cover up," and (v) WeRide had purposefully and maliciously diluted Jing Wang's shares in WeRide.

19  (Lu Decl. ¶¶ 30, 32.)  All of these statements tended to (and in fact did) harm WeRide's business.  (*Id.*

20  ¶¶ 33; 36-47); *see Pinnacle Sys., Inc. v. XOS Techs., Inc.*, 2003 WL 21397845, at *7 (N.D. Cal. May 19,

21  2003) (statements about the future viability of plaintiff's business constituted defamation); *Luxpro*

22  *Corp. v. Apple Inc.*, 2011 WL 1086027, at *13 (N.D. Cal. Mar. 24, 2011) (statements that plaintiff's

23  products were "cheap knock-offs," "cheap copies," and "illegal copies" of competitor's product

24  supported defamation claim); *see Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 66 F. Supp. 2d

25  1117, 1127 (C.D. Cal. 1999) (statement that plaintiff failed to adequately protect customers was

26  defamatory).  Further, all of these statements were false, (Lu Decl. ¶ 33.), and accordingly constitute

27  libel and/or slander per se.  *Rausch*, 2015 WL 13283839, at *2.

28

1    WeRide does not need to establish actual malice to succeed on its defamation claim or to obtain

2    injunctive relief because WeRide is not a "public figure." *See Vegod*, 25 Cal. 3d at 770 ("Criticism of

3    commercial conduct does not deserve the special protection of the actual malice test.").  In any event,

4    Wang almost certainly knew his statements were false given his prior status as WeRide's former CEO,

5    and his current status as its competitor. *See Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90,

6    109 (2004), *disapproved of on other grounds by Baral v. Schnitt*, 1 Cal.5th 376 (2016) ("Because

7    defendants and WSSI are business competitors, it is not reasonable to assume that the motive of the

8    communication was innocent; rather, it appears defendants' only interest was to gain WSSI's customers

9    as their own.").  WeRide is likely to succeed on its defamation claim.

10    **C.**    **WeRide Is Likely to Succeed on Its Intentional Interference Claim**

11    Intentional interference with prospective economic advantage has five elements: "(1) an

12    economic relationship between the plaintiff and some third party, with the probability of future

13    economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts

14    on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship;

15    and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply*

16    *Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 950 (2003).  Injunctive relief is appropriate to remedy

17    intentional interference claims, especially when future harm is difficult to quantify. *Huong Que, Inc. v.*

18    *Luu*, 150 Cal. App. 4th 400, 418 (2007).

19    Wang's intentional interference with WeRide's investors satisfies each of these elements.  As to

20    the first element, WeRide had a reasonable expectation of future economic benefit from its relationship

21    with its investors.  WeRide had signed term sheets with five investors worth $64 million, and had

22    discussions with other investors that "had long passed the hypothetical stage," such as SenseTime's

23    contemplated $15 million investment (Lu Decl. ¶¶ 27, 34.). *Loop AI Labs Inc v. Gatti*, 2015 WL

24    5158639, at *5 (N.D. Cal. Sept. 2, 2015).  Indeed, Hanfor had proverbially "crossed the t's and dotted

25    the i's" on its contractual arrangement, which was delayed and altered to WeRide's detriment only after

26    Wang's disparagement. (Lu Decl ¶ 31); *Loop AI*, 2015 WL 5158639, at *5 (plaintiff "is only required

27    to allege that future economic benefit arising from that relationship is a probability, not a certainty").

28    As to the second and third elements, the fact that Wang made false statements directed to specific

1  investors, attempting to undermine WeRide's business and divert its investments, shows that Wang both

2  knew of the relationships and intended to interfere with them.  (Lu Decl. ¶¶ 32-35); *Overstock.com, Inc.*

3  *v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 713 (2007) (reasonable likelihood of success on

4  intentional interference claim even where defendant distributed negative reports about the plaintiff to

5  investors *generally*).  And as to the final two elements, as a direct result of Wang's statements, WeRide

6  lost $75 million in committed investments, which further led to a $5 million loan obtained on less than

7  favorable terms, as well as loss of development time, and harm to WeRide's reputation.  (Lu Decl. ¶ 28,

8  36-47); *Natomas Gardens Inv. Grp. v. Sinadinos*, 2010 WL 1659195, at *4 (E.D. Cal. Apr. 22, 2010)

9  (intentional interference where defendant "interfered with subsequent investors' attempts to save the

10  LLC projects after the developers' departure").

11      Wang's interference by way of defamatory statements to WeRide's would-be investors was

12  "independently wrongful conduct that can support an action for interference with prospective economic

13  advantage." *Rausch*, 2015 WL 13283839, at *2 (principals of another company made false statements

14  about defendant's ability to run his company).  False statements to investors commonly support

15  intentional interference claims.  *See Natomas Gardens*, 2010 WL 1659195, at *4 (defendant's act of

16  "defaming the members of [the plaintiff] to various possible investors and to the public at large" could

17  support a claim for intentional interference); *Loop AI*, 2015 WL 5158639, at *4 (defendant CEO's

18  misrepresentation to her own company (the plaintiff) about a potential investment could support

19  intentional interference claim where those statements "sabotaged the deal" that had advanced to a stage

20  of a term sheet).  WeRide is likely to succeed on its intentional interference claim.

21      **D.    WeRide Is Likely to Succeed on Its Breach of Contract Claims**

22      The elements for a breach of contract action are: (1) the existence of a contract, (2) plaintiff's

23  performance or excuse for nonperformance, (3) defendant's breach, and (4) damages to plaintiff as a

24  result of the breach.  *Buschman v. Anesthesia Bus. Consultants LLC*, 42 F. Supp. 3d 1244 (N.D. Cal.

25  2014).  Agreements not to solicit employees from a former employer are valid and enforceable.  *See,*

26  *e.g.*, *Barker v. Insight Glob., LLC*, 2018 WL 3548911, at *9 (N.D. Cal. July 24, 2018) (citing *Loral*

27  *Corp. v. Moyes*, 174 Cal. App. 3d 268 (1985)).  So are nondisparagement agreements.  *See, e.g.*, *Bakst*

28  *v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, at *40 (C.D. Cal. Mar. 7, 2011).  A preliminary

1   injunction enforcing these agreements is important to preserve the status quo during these proceedings.

2   *See Alliant Ins. Servs., Inc. v. Gaddy*, 159 Cal. App. 4th 1292, 1307 (2008) (granting preliminary

3   injunction enforcing noncompete and nonsolicitation covenants).

4       As to the first element, contracts exist between the parties.  Both Wang and Huang signed

5   agreements prohibiting them from soliciting employees to leave WeRide for one year following their

6   employment with WeRide, and from ever misappropriating or misusing WeRide's Confidential

7   Information.  (Zhang Ex. B; Lu Ex. B.)  Wang and Huang both left WeRide less than one year ago, so

8   these provisions remain in force.  In addition, Wang agreed in his Separation Agreement never to "make

9   any negative or disparaging statements (orally or in writing)" about WeRide, its "products, services or

10  business practices." (Lu Ex. C.)  As to the second element, WeRide performed its duties under each

11  agreement, including by employing and paying Huang and Wang.

12      As to the third element, Huang breached multiple provisions of the PIIA, including by

13  (i) misappropriating WeRide Confidential Information, (ii) failing to return that information upon his

14  resignation from WeRide, (iii) copying WeRide Confidential Information to personal devices,

15  (iv) providing access to devices and databases containing that information to AllRide without

16  authorization, and (v) soliciting employees of WeRide.  Wang also breached his obligation not to solicit

17  WeRide's employees under the PIIA, and breached the nondisparagement clause of his Separation

18  Agreement by making numerous false statements about WeRide to investors.

19      As outlined above, WeRide has suffered extensive damage (much of it irreparable) as a result of

20  these breaches, including loss of investors, reputational injury, and increased time to market.  WeRide is

21  likely to succeed on its breach of contract claims.

22      **E.    <u>WeRide Is Likely to Succeed on Its Breach of Fiduciary Duty Claim</u>**

23      To establish its breach of fiduciary duty or duty of loyalty claim, WeRide must demonstrate

24  (1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty;

25  and (3) damage proximately caused by that breach. *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101

26  (1991); *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 417 (2007) (granting preliminary injunction).

27      Huang owed a fiduciary duty and duty of loyalty to WeRide as its employee and officer.  "Under

28  California law, an officer who participates in management of the corporation, exercising some

discretionary authority, is a fiduciary of the corporation as a matter of law." *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 981 (N.D. Cal. 2006).  Participation in management is a "low standard," and "in most cases this test will be easily met." *GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App. 4th 409, 422 (2000), *overruled on other grounds by Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004).  Huang easily meets this standard.  As Head of Hardware Development, he was responsible for WeRide's hardware budget, supervised a team of ten employees, and had full access to WeRide's confidential information.  (Lu Decl. ¶ 48); *see GAB Bus. Servs.*, 83 Cal. App. 4th at 422 (director of engineering department of sixteen employees owed fiduciary duties, despite requiring approval of his supervisors for any hiring, firing, or budget decisions); *Thomas Weisel Partners LLC v. BNP Parabas*, 2010 WL 1267744, at \*6 (N.D. Cal. Apr. 1, 2010) (supervisor was a fiduciary because "he exercised at least some control, if not direct authority, over whom to hire and how much to pay them").

Huang breached that duty by recruiting employees to work for a competitor and by taking and using WeRide Confidential Information in his final days of employment and thereafter.  *See Huong Que*, 150 Cal. App. 4th at 416 (employee's misuse of employer's confidential information likely constituted breach of fiduciary duty warranting injunctive relief); *Henry Schein*, 191 F. Supp. 3d at 1077 (employer likely to succeed on merits of claims including breach of fiduciary duty where employee "e-mailed and downloaded, to her personal devices, confidential information from [the employer] before leaving her employment").  And these breaches harmed and will continue to harm WeRide, including by depriving WeRide of the value of its confidential information, and by harming its ability to attract talent and investors.  *See id*.

## II.   WERIDE HAS SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

WeRide has suffered, and is likely to continue suffering, irreparable harm as a result of Defendants' wrongful conduct outlined above.

Use of trade secret information by a former employee to compete with a former employer constitutes irreparable harm.  *See Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at \*5 (N.D. Cal. Mar. 15, 2018) (recognizing presumption of irreparable harm in trade secret cases).  AllRide is using WeRide's Confidential Information to gain an unfair edge in the race to

commercialize self-driving cars, an industry that, though in its infancy, has already been pegged as one likely to be truly transformative and enormously lucrative for first-movers.[7] *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained."). AllRide's ill-gotten momentum could "accelerate [AllRide's] own progress," which "would improve [its] ability to attract investors and talented engineers away from competitors— including [WeRide] itself." *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017) (granting preliminary injunction). "It would likely be futile to attempt, after the fact, to estimate the monetary value of injury suffered from either the loss of [WeRide's] competitive position in this nascent industry [of autonomous driving] or the destruction of its trade secrets pertaining to the same." *Id.* AllRide's continued use of WeRide's Confidential Information would deprive WeRide of the benefits of its costly research and investment into self-driving cars. Critically, Huang and Wang agreed in the PIIA that misuse of the Confidential Information would cause irreparable harm warranting injunctive relief *without a bond*. (Zhang Decl. Ex. B ¶ 9; Lu Decl. Ex. B ¶ 9); *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016) (granting preliminary injunction without a bond where defendant "agreed, in her employment agreements with [plaintiff], that [plaintiff] may seek injunctive relief without a bond").

Further, Defendants' continued possession of WeRide's Confidential Information increases the risk of further disclosure. *See* 18 U.S.C. § 1836(b)(3)(A) (authorizing district courts to issue injunctions to prevent "threatened misappropriation"). AllRide claimed that it plans to hire 100 engineers by the end of 2018. (Zhang Decl. ¶ 29.) All of these new employees would potentially have access to WeRide Confidential Information, to the extent Defendants retain access of it either in its original form or as adapted to be included in Defendants' own systems. Even beyond AllRide's workforce, given that self-driving cars will require regulatory approvals before they can be commercialized, there is a possibility that AllRide could make public disclosure of WeRide's Confidential Information. *See Waymo* , 2017

---

[7]   A recent study estimates the self-driving car market will be worth $7 trillion by the year 2050. Roger Lanctot, *Accelerating the Future: The Economic Impact of the Emerging Passenger Economy* (2017), *available at* https://newsroom.intel.com/newsroom/wp-content/uploads/sites/11/2017/05/passenger-economy.pdf.

1  WL 2123560, at *11.  This Court's prompt intervention is necessary to protect WeRide before its

2  Confidential Information is further distributed.

3       Finally, as Defendants agreed in the PIIA, any further employment solicitation or disparagement

4  is equally likely to cause irreparable harm, in addition to the irreparable harm this conduct already has

5  caused.  (Zhang Decl. Ex. B ¶ 9; Lu Decl. Ex. B ¶ 9.)  As described above, Defendants' wrongful

6  solicitation and disparagement diminished WeRide's ability to raise millions of dollars of Series A

7  funding, which directly led to a loss of engineering talent, a delay in development timelines, and a loss

8  of value in the trademarks for JingChi (which was WeRide's former name before a necessary

9  rebranding).  (Lu Decl. ¶¶ 42-47). This is clearly irreparable injury under well-established authority.

10  *See Comet Techs.*, 2018 WL 1990226, at *5 (irreparable harm from plaintiff's loss of competitive

11  position); *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1029 (C.D. Cal. 2011) (irreparable

12  harm from loss of goodwill and trademark value).  It could also cause further disruption to WeRide's

13  future attempts to raise funds in subsequent investment rounds, which also constitutes irreparable

14  injury.  *See Henry Schein*, 191 F. Supp. 3d at 1077 ("Evidence of threatened loss of . . . goodwill

15  certainly supports a finding of the possibility of irreparable harm."); *NAC Found., LLC v. Jodoin*, 2016

16  WL 3769348, at *2 (D. Nev. July 14, 2016) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,

17  240 F.3d 832, 841 (9th Cir. 2001)) ("Defendant's continued disparagement of Plaintiff and use of

18  Plaintiff's Confidential Information will cause immediate and irreparable harm to Plaintiff resulting in

19  the loss of investors at "a critical threshold . . . in development and financing.").  An injunction is

20  necessary to put a stop to the existing irreparable harm and prevent it from compounding in the future.

21  **III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR**

22  **INJUNCTIVE RELIEF WITHOUT THE NEED FOR A BOND**

23       The balance of equities favors issuing a preliminary injunction because WeRide's proposed

24  injunction "would do no more than require Defendant to comply with federal and state laws." *Henry*

25  *Schein*, 191 F. Supp. 3d at 1077 (quoting *Dish Network L.L.C. v. Ramirez*, 2016 WL 3092184, at *7

26  (N.D. Cal. June 2, 2016)).  There is no legitimate hardship Defendants would suffer by being ordered to

27  do what they should have already done: return any WeRide Confidential Information, confirm that such

28  Information is not in their hands or third parties' hands, provide WeRide the means to verify as much,

1    and cease any improper disparagement and solicitation.

2         As outlined above, the hardship WeRide would suffer absent relief greatly outweighs any

3    alleged burden Defendants might claim. *See W. Directories, Inc. v. Golden Guide Directories, Inc.*,

4    2009 WL 1625945, at *7 (N.D. Cal. June 8, 2009) ("Defendants would not suffer hardship if the Court

5    entered a narrowly tailored injunction prohibiting them from employing unlawful means to compete

6    against Plaintiff.").  WeRide has moved promptly to protect its rights, filing a complaint a matter of

7    weeks after discovering evidence of Huang's misappropriation, and seeking injunctive relief just days

8    after the Court granted WeRide's motion for alternative service and it became apparent that neither

9    Wang nor Huang would be fully cooperative in ensuring Defendants did not have or use WeRide

10   Confidential Information. *See, e.g.*, *Waymo*, 2017 WL 2123560, at *11 (granting preliminary injunction

11   over a year after misappropriation of trade secrets); *2Die4Kourt v. Hillair Capital Mgmt., LLC*, 2016

12   WL 4487895, at *7 (C.D. Cal. Aug. 23, 2016) (granting preliminary injunction after five-month delay

13   in seeking relief).

14        The public interest is best served when a "defendant is asked to do no more than abide by trade

15   laws and the obligations of contractual agreements signed with her employer." *Comet Techs. United*

16   *States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018).  The public interest

17   is also served by "vindicating intellectual property rights, and in prohibiting unfair competition."

18   *Waymo*,  2017 WL 2123560, at *11.  The relief WeRide seeks is consistent with these public interest

19   goals.

20        Finally, WeRide should not be required to post a bond for preliminary injunctive relief that

21   "simply enjoin[s] Defendant from doing something Defendant never had a right to do in the first place."

22   *Comet Techs.*, 2018 WL 1990226, at *6; *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)

23   ("The district court may dispense with the filing of a bond when it concludes there is no realistic

24   likelihood of harm to the defendant from enjoining his or her conduct.").  A bond is especially

25   unnecessary where, as here, Defendants expressly agreed that a bond would not be necessary for

26   injunctive relief upon Defendants' breach of the PIIA. (Zhang Decl. Ex. B ¶ 9 ("I also understand that

27   any breach of this Agreement will cause irreparable harm to [WeRide] for which damages would not be

28   an adequate remedy, and, therefore, [WeRide] will be entitled to injunctive relief with respect thereto in

1  addition to any other remedies *and without any requirement to post bond.*" (emphasis added)); Lu Decl.

2  Ex. B ¶ 9 (same)); *see 2Die4Kourt*, 2016 WL 4487895, at *11 (no bond required because "the parties

3  here have expressly agreed to waive bond" and because plaintiffs "established a strong likelihood of

4  success on the merits").

5  **IV.     THE COURT SHOULD GRANT EXPEDITED DISCOVERY**

6          Federal Rule of Civil Procedure 26(d) authorizes the Court to grant expedited discovery before a

7  Rule 26(f) conference upon a showing of "good cause."  *In re Countrywide Fin. Corp. Derivative Litig.*,

8  542 F. Supp. 2d 1160, 1179 (C.D. Cal. 2008).   Good cause exists "where the need for expedited

9  discovery, in consideration of the administration of justice, outweighs the prejudice to the responding

10  party."  *Id.*  In cases where preliminary injunction motions are pending, courts often permit expedited

11  discovery designed to obtain information required for the preliminary injunction. *See, e.g.*, *C2 Educ.*

12  *Sys., Inc. v. Lee*, 2018 WL 3328143, at *6 (N.D. Cal. July 6, 2018); *Comet Techs. United States of Am.*

13  *Inc. v. Beuerman,* 2018 WL 1990226, at *7 (N.D. Cal. Mar. 15, 2018).

14          Expedited discovery is especially important here to determine the full extent to which

15  Defendants still are using or disseminating or in possession of WeRide Confidential Information.  Such

16  discovery would include, most notably, an analysis of Huang's devices to attempt to determine the

17  nature and extent of his downloads in his final weeks at WeRide, and an analysis of the relevant

18  portions of AllRide's source code to determine whether it uses any of WeRide's trade secrets.  The need

19  to examine Huang's devices promptly is heightened because he has already destroyed evidence of his

20  misappropriation. *See C2*, 2018 WL 3328143, at *6 (N.D. Cal. July 6, 2018) (granting expedited

21  discovery where defendants "deleted all of their work emails and work product on their final day of

22  employment").  The imposition on Defendants from this discovery will be minimal (because WeRide

23  would be doing the analysis), and the discovery that WeRide seeks to expedite is the same discovery

24  that inevitably would occur in the litigation regardless.  Good cause exists to expedite discovery.

25                                          **CONCLUSION**

26          For the foregoing reasons, WeRide respectfully requests that the Court grant WeRide's Motion

27  for a Preliminary Injunction against Defendants, and allow WeRide to conduct expedited discovery in

28  advance of a Rule 26(f) conference.

1  DATED:  December 26, 2018          QUINN EMANUEL URQUHART & SULLIVAN, LLP

2

3

4          By   /s/ Claude M. Stern

5              Claude M. Stern
              Ryan S. Landes

6              Attorneys for Plaintiffs WeRide Corp. and WeRide Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28