United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

WERIDE CORP., et al.,

          Plaintiffs,

    v.

KUN HUANG, et al.,

          Defendants.

Case No. 5:18-cv-07233-EJD

**ORDER GRANTING IN PART AND DENYING IN PART WERIDE'S MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 34

       Autonomous vehicle companies WeRide Corp. and WeRide, Inc. (collectively "WeRide") have filed suit against Zhong Zhi Xing Technology Co. Ltd. ("ZZX"), AllRide.AI, Inc. ("AllRide" unless otherwise noted), former WeRide CEO Jing Wang, and former WeRide Director of Hardware Kun Huang (collectively "Defendants"). WeRide brings claims against all Defendants under the federal Defend Trade Secrets Act and California's Uniform Trade Secrets Act, against Wang and Huang for breach of contract, against Huang for breach of fiduciary duty, and against Wang for defamation and intentional interference with prospective economic advantage. This Court has jurisdiction through the Defend Trade Secrets Act claim and 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

       Currently before the Court is WeRide's Motion for Preliminary Injunction and Expedited Discovery. Wang and Huang each filed an opposition. ZZX and AllRide filed a single opposition.[1] WeRide filed a reply. With leave from the Court, Huang filed a sur-reply. Three

---

[1] For the sake of simplicity, this Order cites to the papers filed by AllRide and ZZX only using AllRide's name. *E.g.*, "AllRide O'ppn," or "AllRide RJN."

days before the hearing, ZZX and AllRide moved for leave to file supplemental briefing. The next

day, WeRide filed objections to the ZZX and AllRide's motion for leave. In addition, the parties

have filed numerous declarations and exhibits. Having heard oral argument and considered the

timely-filed papers, the Court grants the Motion in part and denies it in part.[2]

## I.  Background

In the past number of years, each of the parties has worked to develop autonomous

vehicles for the Chinese market. Autonomous vehicle technology is still young, but it could well

be the next disruptive technology worth *trillions* of dollars over the coming decades. Roger

Lanctot, Strategy Analytics, *Accelerating the Future: The Economic Impact of the Emerging*

*Passenger Economy* 5 (2017), *available at* https://newsroom.intel.com/newsroom/wp-

content/uploads/sites/11/2017/05/passenger-economy.pdf. It has the potential to remake the

industry and market for both vehicles and ride-hailing services. *See generally id.* Unsurprisingly,

the autonomous vehicle industry is crowded with competitors. *See* Huang Decl. ¶ 6. WeRide

claims to have invested at least $45 million to develop its code base alone. Li Decl. ¶¶ 10-11.

Last year, AllRide and/or ZZX announced plans to hire 100 engineers before the end of 2018.

Zhang Decl. ¶ 29.

Autonomous vehicles are based on complex technology that requires significant time and

resources to develop. It may take weeks to develop basic computer modules before starting road

tests *with* a safety driver at the steering wheel. Walter Decl. ¶¶ 58, 62. Developers use a process

called "deep learning" to teach the autonomous vehicle systems how to respond to new or

unexpected events by entering large amounts of exemplary data into the systems' algorithms. *Id.*

¶ 10. Development is an iterative process that cannot be accelerated without hiring a "very large

number" of employees. *Id.* ¶¶ 27-33.

---

[2] The Court has filed this Order under seal because it contains material subject to sealing orders. Within seven days of the filing date of this Order, the parties shall provide the Court a stipulated redacted version of this Order, redacting only those portions of the Order containing or referring to material for which the Court has granted a motion to seal and for which the parties still request the material be sealed. The Court will then issue a redacted version of the Order.

United States District Court
Northern District of California

Wang and Huang have worked in this competitive and demanding industry since 2012 and 2016 respectively when they were employed by Baidu—a Chinese technology company. Wang. Decl. ¶ 9; Huang Decl. ¶ 2. Huang worked as a Senior Software Architect in Baidu USA's autonomous driving unit. Huang Decl. ¶ 2. Wang was an executive overseeing various divisions before joining Baidu's autonomous vehicle project. Wang Decl. ¶¶ 7-11.

Wang left Baidu to form WeRide, originally called JingChi Corp., with four others in early 2017. Wang Decl. ¶¶ 11-12. Wang began serving as CEO in April 2017. Lu Decl. ¶ 7. Around that time, WeRide co-founders Tony Han and Yan Li recruited Huang to join as the Director of Hardware Engineering. *Id.*

WeRide has developed modules in its code base related to three areas relevant here: HD mapping, sensor fusion-based localization, and state machines. Autonomous vehicles require special maps, called HD maps, which are constructed by test vehicles repeatedly driving through a certain area while collecting data with multiple sensors. Walter Decl. ¶¶ 23-25. Sensor fusion-based localization is the process of combining data collected by the various sensors on a vehicle (the "sensor-fusion") and then using that data to pinpoint the vehicle's location in a mapped area (the "localization"). *Id.* ¶ 68. State machines are decision models that decide how an autonomous vehicle will act or preform in different scenarios or "states." *Id.* ¶ 80. WeRide did not invent these concepts, but it claims the source code and algorithms it developed to implement them are its trade secrets. Walter Ex. B.

WeRide takes steps to maintain the secrecy of its proprietary code. WeRide employees, including Wang and Huang, are required to sign its Proprietary Information and Inventions Agreement ("PIIA"). Zhang Decl. ¶ 4; Zhang Ex. B; Lu Ex. B. The PIIA provides that WeRide employees will "hold in confidence and not disclose or, except within the scope of [their] employment, use any Proprietary Information." Zhang Ex. B ¶ 4. The PIIA defines "Proprietary Information" as "all . . . business, technical and financial information . . . [the employee] develop[s], learn[s], or obtain[s] during the term of [their] employment that relate to Company or

Case No.: 5:18-cv-07233-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION

3

the business or demonstrably anticipated business of Company or that are received by or for Company." *Id.* The PIIA includes a provision prohibiting the solicitation of WeRide employees away from WeRide for one year following the end of an individual's employment with WeRide. *Id.* ¶ 5. WeRide controls physical access to its offices; restricts access to its source code to WeRide network locations so off-site employees must use a VPN—with a unique username and password—to connect to the WeRide network; and encrypts its source code so that it can only be accessed by providing a valid username and password, as well as a special file called a "token." Liu Decl. ¶¶ 6-8, 9, 11, 14.

In 2017, WeRide grew quickly and aggressively recruited engineers. Huang Decl. ¶ 5. On May 12, 2017, it completed its first driverless test on a closed track. AllRide RJN Ex. 1 at 9. And it completed its first public road test on June 24, 2017, making it the fastest autonomous vehicle company to complete such a test. *Id.*; Li Decl. ¶ 4. In December 2017, Baidu sued Wang—who was still the CEO of WeRide at the time—and WeRide in China for trade secret theft. Lu Decl. ¶10; Wang Decl. ¶ 18. On January 31, 2018, the WeRide Board voted to remove Wang as CEO. Lu Decl. ¶ 13; Wang Decl. ¶ 19. Wang signed a separation agreement that included a non-disparagement clause. Lu Decl. ¶ 16; Lu Ex. C at ¶ 12. WeRide and Baidu subsequently reached a settlement agreement. Lu Decl. ¶ 14.

Wang and WeRide dispute his actions after they parted ways. WeRide contends that Wang founded a competing autonomous vehicle company, Defendant ZZX. Mot. at 7. WeRide sets this belief on reports from Chinese media (*id.* n.2) and Huang's alleged statements that he planned to join "Jing Wang's new company." (Xu Decl. ¶¶ 34-42). Wang, though, states that WeRide is mistaken and that he is not—and never has been—an employee of ZZX, that he was not one of ZZX's founders, that he is neither an officer nor a board member of ZZX, that he does not own stock in ZZX nor in any entity that has stock or a financial interest in ZZX, and that he has not received consulting payments from ZZX. Wang Decl. ¶ 27. Wang further states that he refuted the "assumptions" of the reporter who wrote the original Chinese media report, but the reporter ran

the story regardless. Wang Decl. ¶¶ 28-29. Huang—a current employee of ZZX—has represented to this Court, "To the best of my knowledge, Mr. Jin Wang does not hold any formal position at ZZX or AllRide.ai, Inc." Dkt. No. 18-1 at 3. Wang, though, concedes that the founders of ZZX approached him about joining ZZX, that he has "generally discuss[ed]" the autonomous vehicle industry with them, and that he has referred investors to ZZX even though he has not received financial gain for doing so. Wang Decl. ¶¶ 26, 29. Wang says that during 2018 he founded a venture capital fund called Nanjing Intelligent Travel Industry Fund that focuses on innovation in artificial intelligence. *Id.* ¶ 32.

The precise connection between AllRide and ZZX is a bit unclear. WeRide contends that Defendants AllRide and ZZX are "closely affiliated if not one and the same." Mot. at 7. AllRide and ZZX do not dispute that characterization. *See generally* AllRide O'ppn. AllRide.AI, Inc. was incorporated in Delaware on July 19, 2018, which is the day before ZZX registered the website www.allride.ai. Landes Ex. A; Landes Ex. B. That website states that "ALLRIDE.AI" has a research and development center in Silicon Valley. Mot. at 8; AllRide, Campus-AllRide, http://allride.ai/en/campus.php (last visited March 21, 2019). In the fall of 2018, Huang posted on social media that he was looking for office space in Silicon Valley. Liu Decl. ¶¶ 27-28. Huang has told the Court that he works for ZZX, not AllRide. Dkt. No. 18-1.

After Wang left WeRide, WeRide alleges that he disparaged the company to investors leading to a loss of over $75 million in expected investment during its Series A round of funding. Lu Decl. ¶¶ 36-38. In July 2018, WeRide noticed that its investments were slowing down. *Id.* ¶¶ 28-29. WeRide's CFO Qing Lu represents that on August 9, 2018 WeRide's outside advisors informed him that Wang had told potential investors that Waymo intended to sue WeRide. Lu Decl. ¶ 30. About a month later, Lu claims that an executive for Hanfor Capital Management informed him that Wang had messaged this executive claiming that (1) WeRide's self-driving technology did not work, (2) the videos WeRide created to demonstrate its autonomous-driving technology had been "faked" (3) WeRide's autonomous-driving cars had been involved in a traffic

accident that WeRide was attempting to "cover up," (4) some of WeRide's core engineers were leaving the company, and (5) WeRide had purposefully diluted Wang's stock. *Id.* ¶ 32. Lu further claims that later in September 2018 someone from SenseTime—a company that had signed a term sheet to invest $15 million—communicated that Wang had contacted this person to make substantially the same statements. *Id.* ¶ 34. WeRide claims that after Wang contacted Hanfor, it reduced its planned investment from $20 million to $4.5 million. *Id.* ¶ 36. Around that time, five investors who had signed term sheets (not including SenseTime) pulled their combined potential $64 million investments. *Id.* ¶¶ 27, 38. Wang denies making the claims WeRide attributes to him. Wang Decl. ¶¶ 33-34. Wang argues that WeRide's difficulties securing investments in 2017 were likely caused by the disclosure of other litigation in which it is involved. *Id.* ¶ 34; Wang Ex. 6 at 7-8.

Over the course of 2018, Huang claims that he became unhappy with his employment at WeRide due to the instability caused by the Baidu lawsuit, Wang's ouster as CEO, and the slowdown in investment. Huang Decl. ¶ 9. He began considering different employment in April or May. *Id.* ¶ 11. Around that time, he discussed this dissatisfaction with co-worker Liren Xu. *Id.*; Xu Decl. ¶¶ 34-39. Xu claims that Huang talked about taking a job at "Jing Wang's new company," and that Huang said Xu should to join him there. Xu Decl. ¶¶ 34, 39. Xu reported these conversations to WeRide's CEO Tony Han. *Id.* ¶ 40. Around this time, WeRide claims that Huang began downloading more data through his VPN than normal. Liu Decl. ¶¶ 21-24. Huang met with Han on July 31, 2019 during which it was decided that Huang's employment with WeRide would terminate on August 13, 2018. Huang Decl. ¶ 13; Zhang Decl. ¶ 14.

WeRide had issued Huang two laptops: a MacBook that only he used, and a Lenovo laptop that was shared by the hardware team. Huang Decl. ¶¶ 14-15. On August 7, 2018, Huang connected a USB device with the serial number 44817566 (the " '566 Device") to the Lenovo laptop. Gayford Decl. ¶ 14. He copied 1,192 files from the Lenovo laptop to the '566 Device. Kunkel Decl. ¶ 8. Several hundred of these files were accessed after Huang's employment with

WeRide ended on August 13, 2018. *Id.* WeRide identifies at least five categories of files are confidential or proprietary to WeRide. In his sur-reply, Huang notes that none of the files in the five categories had been accessed after Huang's employment with WeRide ended and that WeRide has not identified any of its alleged trade secrets on the '566 Device. Sur-Reply at 4. On the same day that he transferred the files to the '566 Device, Huang deleted numerous files from the Lenovo laptop and cleared the web-browsing history. Huang Decl. ¶ 14; Gayford Decl. ¶¶ 11-16. He also completely erased the MacBook's hard drive and reinstalled its operating system. Huang Decl. ¶ 15; Gayford Decl. ¶ 10. He returned both laptops when his resignation became effective. Huang Decl. ¶¶ 14-15.

On October 22, 2018, Huang appeared at a recruiting event for ZZX in Nanjing, China. Zhang Decl. ¶ 30; Dkt. 18-1 ¶ 5. At the event, ZZX presented a two minute and fifty second video of one its cars performing five functions that WeRide's expert, Dr. Matthew R. Walter—a professor at the Toyota Technological Institute at Chicago, calls "Advanced Capabilities." Walter Decl. ¶ 17. These Advanced Capabilities the vehicle performed are (1) operating without anyone in the driver's seat, (2) steering, accelerating, and braking smoothly, (3) using an HD map of the area in which they operate, (4) detecting and stopping for pedestrians, and (5) changing lanes to pass slower vehicles. *Id.*

## II.     AllRide and ZZX's Untimely Filing

On March 18, 2019—just three days before the scheduled hearing on this Motion—ZZX and AllRide moved for leave to file supplemental briefing and attached a proposed supplemental brief. Dkt. 112. The factual basis for the proposed brief rests entirely on the document for which Huang requested judicial notice on March 14, 2019, and their argument in the proposed brief largely tracks an argument made Huang makes in his Motion to Dismiss. Dkt. 105. AllRide and ZZX state that the document became public after February 6, 2019, but they do not explain why they waited five weeks before moving for leave to file supplemental briefing. The Court DENIES AllRide and ZZX's Request for Judicial Notice and Motion for Leave to File Supplemental

Briefing and will not consider the arguments contained therein as to this Motion. The Court similarly DENIES Wang's request for judicial notice of the same document as to this Motion. Dkt. 113.

### III.     Legal Standard

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The Ninth Circuit has held that courts may "balance" "the elements of the preliminary injunction test . . . so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, a court may issue a preliminary injunction where the plaintiff raises "serious questions going to the merits and the balance of hardships tilts sharply" in the plaintiff's favor, assuming the other two elements have been met. *Id.* at 1131-32. The Court does not accept Wang's argument that the "serious question" was overruled by the Supreme Court in *Winter*. Wang O'ppn at 8 n.1. The Ninth Circuit has expressly held that "the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test." *Cottrell*, 632 F.3d 1127 at 1131-32.

AllRide and ZZX raise many objections to the evidence offered by WeRide. District courts, though, "may give . . . inadmissible evidence some weight . . . [to] prevent[] irreparable harm before trial." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). For example, district courts may consider hearsay on a motion for a preliminary injunction. *Id.* However, the Court does not suggest that evidentiary issues should have no bearing on its consideration of the Motion. Rather, evidentiary issues "properly go to weight rather than admissibility." *Go Daddy Operating Co., LLC v. Ghaznavi*, 2018 WL 1091257, at *14 (N.D. Cal. Feb. 28, 2018). The Court takes the objections under advisement in considering the Motion.

# IV.    Success on the Merits

## A.    Trade Secret Misappropriation

WeRide brings trade secret misappropriation claims against all Defendants under the federal Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1836) and California Uniform Trade Secrets Act ("CUTSA") (Cal. Civ. Code § 3426.1).  To commence discovery and to obtain a preliminary injunction, a plaintiff must first identify its alleged trade secrets with "reasonable particularity."  Cal. Civ. Proc. Code § 2019.210; *Action Learning Sys., Inc. v. Crowe*, 2014 WL 12564011, at *4 (C.D. Cal. Aug. 11, 2014).  Both laws require a plaintiff to show that it possessed a trade secret, that the defendant misappropriated the trade secret, and that the defendant's conduct damaged the plaintiff.[3]  *Space Data Corp. v. X*, 2017 WL 5013363, at *1 (N.D. Cal. Feb. 16, 2017) (citing 18 U.S.C. § 1839(5) and Cal. Civ. Code § 3426.1(b)).  A "trade secret" is information that (1) derives independent economic value, actual or potential, from not being generally known to, or readily ascertainable by other people who can obtain economic value from its disclosure or use and (2) is subject to reasonable efforts to maintain its secrecy.  18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d).  "Misappropriation" means acquisition of a trade secret through means that the party knew or should have known were improper, such as theft or breach of a duty to maintain secrecy.  18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b).  A party may be liable for misappropriation if they knew or had reason to know that a trade secret it uses was derived from a person who acquired it through improper means. 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b).

### 1.    Reasonable Particularity

Section 2019.210 of the California Code of Civil Procedure requires plaintiffs to identify their alleged trade secrets with reasonable particularity "to limit the permissible scope of discovery by distinguishing the trade secrets from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade."  *Advanced Modular Sputtering, Inc. v. Superior*

---

[3] Damages are discussed in the section on irreparable harm.

*Court*, 132 Cal. App. 4th 826, 835 (2005). The plaintiff "need not spell out the details" of the alleged trade secrets, but instead provide sufficient identification so that the court and the defendant may "ascertain at least the boundaries within which the secret lies." *Space Data Corp.*, 2017 WL 5013363, at *2.

WeRide filed its identification of 10 trade secrets concurrently with the Motion. Walter Ex. B. The alleged trade secrets are source code for certain of WeRide's HD mapping, fusion sensor-based localization, and state machines capabilities. Across the 20-page filing, WeRide describes the functionality of each trade secret. *Id.* WeRide also names numerous files in its code base, such as ███████████████████████████ or ████████████████████████████, that reflect the source code specific to each alleged trade secret. *E.g.*, *Id.* at 6, 19.

ZZX, AllRide and Huang argue that WeRide's identification is insufficient. First, they argue that when the alleged trade secret is source code, the plaintiff must identify the specific code. But this argument is wrong on the law. ZZX and AllRide rely on *Integral Dev. Corp. v. Tolat* for the proposition that "[l]isting hundred of file names without identifying the trade secret information [*i.e.*, source code] contained within the files is insufficient." 2015 WL 674425, at *1 (N.D. Cal. Feb. 12, 2015). But their reliance is based on reasoning that was expressly refuted by the Ninth Circuit on appeal: "Integral has . . . identified specific key aspects of its source code that it claims Tolat misappropriated. Thus, Integral sufficiently identified the information it alleges is a trade secret." *Integral Dev. Corp. v. Tolat*, 675 F. App'x 700, 703 (9th Cir. 2017) ("*Tolat II*"). Another case they cite, *Social Apps, LLC v. Zynga, Inc.*, contradicts their position. 2012 WL 2203063, at *4 (N.D. Cal. June 14, 2012). In *Social Apps*, the court ruled that "identifying specific lines of code *or* file names [was] sufficiently detailed to identify" the alleged trade secret. *Id.* (emphasis added). WeRide is not required to identify the specific source code to meet the reasonable particularity standard. *See also Citcon USA, LLC v. RiverPay Inc.*, 2018 WL 6813211, at *4 (N.D. Cal. Dec. 27, 2018).

ZZX, AllRide and Huang also complain that WeRide's identification is too generic. The Court disagrees. As an example, WeRide identifies its HD mapping algorithms as its second trade secret. WeRide specifies that it is not referring to HD mapping algorithms generally, but to "the unique algorithms used by WeRide's autonomous vehicles to create HD Maps." Walter Ex. B at 5-6. WeRide then provides the factors a developer must consider in generating such maps, and describes the process WeRide uses to create the algorithms. The Court finds that WeRide has identified its alleged trade secrets with reasonable particularity. Because WeRide has met this requirement, the Court does not consider whether section 2019.210 applies to claims under the DTSA.

### 2. The Existence of the Trade Secrets

To show that the identified source code meets the definition of a trade secret, WeRide must show that it derives value from not being generally known and that it took reasonable efforts to maintain its secrecy. Courts have found that source code can receive trade secret protection. *See, e.g.*, *Tolat II*, 675 F. App'x at 703; *Altavion, Inc. v. Konica Minolta Sys. Lab., Inc*., 226 Cal. App. 4th 26, 60 (2014). WeRide represents that many engineers developed the source code over 18 months with investments of over $45 million. Li Decl. ¶ 11. The investment and development make the source code confidential and proprietary to WeRide, giving it an advantage over competitors. The source code has value. Huang asserts during WeRide's "earlier startup days," it derived much of its source code from open source code, but this does not mean that the source code allegedly misappropriated a year later was not confidential. Huang Decl. ¶¶ 5-8.

Huang cites several articles that describe the general functionality WeRide references to its alleged trade secrets to argue that the alleged trade secrets are readily available in the public. Similarly, ZZX and AllRide argue that third parties have developed code that performs the same function as WeRide's alleged trade secrets. Both arguments miss the mark. WeRide is not claiming that the functionalities of its code are trade secret, but that the source code itself comprises its trade secrets. ZZX and AllRide assert that WeRide made no effort to show that its

source code would not be readily available to others. But this argument overlooks that Walter opines that WeRide's specific trade secrets are "are neither common knowledge in the industry, nor reflected in publicly available code." *See, e.g.*, Walter Decl. ¶¶ 68, 72. The fact that the alleged trade secrets are not generally known gives them value because WeRide's "competitive advantage would evaporate if the public or its competitors could easily recreate" them. *Comet Technologies USA, Inc. v. Beuerman*, 2018 WL 1990226, at *3 (N.D. Cal. Mar. 15, 2018).

WeRide must next show that it made reasonable efforts to protect the secrecy of its source code. *Citcon*, 2018 WL 6813211, at *5. WeRide employs various measures to maintain the confidentiality of its alleged trade secrets. WeRide restricts access to its code base to employees who are either on-site or have logged into the WeRide network through a VPN—which requires a unique username and password. Liu Decl. ¶ 9. The source code itself is encrypted, and decryption requires a unique username, password, and token. *Id.* ¶¶ 7-8. Finally, WeRide requires all of its employees to sign the PIIA, which includes provisions protecting WeRide's confidential information. Zhang Ex. B. ¶ 4. The Court finds that WeRide is likely to succeed at showing the alleged trade secrets meet the definition of "trade secrets."

### 3. The Copyright Act

In just two sentences, ZZX and AllRide assert with no argument that the federal Copyright Act pre-empts the claim under the CUTSA and refer the Court to its Motion to Dismiss for the actual argument. Their request violates the page limitations imposed on opposition briefs by Civil Local Rule 7-3(a). Because this argument is not properly before the Court, the Court declines to consider it.

### 4. Trade Secret Misappropriation Claims Against Huang

WeRide has shown that it is likely to succeed on the merits of its trade secret misappropriation claims against Huang. To begin, Huang understood that he was under a duty to maintain the secrecy of WeRide's confidential information. He signed the PIIA and told Han that taking WeRide's confidential information would be "unethical." Zhang Ex. B; Huang Decl. ¶ 13.

Case No.: 5:18-cv-07233-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION

While he argues in his brief (Huang O'ppn. at 19)—and his attorney represented at oral argument—that he denies misusing WeRide's confidential information or trade secrets, these arguments misconstrue his declarations. Huang's original declaration merely describes his comments to Han. Huang Decl. ¶ 13. In the declaration to his sur-reply, he states that he did not use the specific confidential information or trade secrets identified in Yan Li's reply declaration, and that he did not consider using the '566 Device to misappropriate trade secrets. Huang Suppl. Decl. ¶¶ 2, 7. He never actually denies taking or using WeRide's identified trade secrets.

Second, he began downloading increased amounts of data around the same time that he began considering other employment. Liu Decl. ¶ 22; Huang Decl. ¶ 11. During the four months prior to May 6, 2018, Huang downloaded more than 400 MB on only a single day. Liu Decl. ¶ 22; Liu Ex. A. But in the three months from May to July, he downloaded more than 400 MB on at least four separate days. Liu Decl. ¶ 24; Liu Ex. A. Huang had access to WeRide's source code as part of his job and he freely admits that he has downloaded WeRide's source code. Huang Decl. ¶¶ 13, 18.

Third, Huang does not dispute that he copied WeRide's confidential information to the '566 Device after he decided to leave WeRide. Kunkel Decl. ¶ 8; Li Reply Decl. ¶¶ 20-27. Huang contests the value of some of these files, and states that to the best of his recollection he did not access any of the identified files after leaving WeRide. Huang Sur-Reply. Decl. ¶¶ 3-6. He points out that WeRide's analysis of the '566 Device has not revealed any of the identified trade secrets. Sur-Reply at 3. But he does not dispute that the files are confidential to WeRide or that he copied them to a personal storage device. Courts have recognized that similar behavior can be evidence of trade secret misappropriation supporting injunctive relief. *See, e.g.*, *Comet Techs.*, 2018 WL 1990226, at *4; *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016); *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1087 (E.D. Cal. 2012).

Finally, on the same day that he copied the files from the Lenovo laptop to the '566 Device, he deleted several files from the Lenovo laptop, cleared its web browsing history, and

erased the hard dive on his WeRide-issued personal MacBook. Courts have found that in similar circumstances, deleting files from the computers allegedly used to misappropriate trade secrets is evidence of the alleged misappropriation. *See, e.g.*, *Tolat III*, 675 F. App'x at 703; *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc*., 873 F. Supp. 2d 1192, 1216 (N.D. Cal. 2012), *on reconsideration in part,* 2012 WL 12925716 (N.D. Cal. July 8, 2012).

Taken together, these facts show that WeRide is likely to succeed on its trade secret misappropriation claims against Huang. While Huang maintains that WeRide has not directly shown that he copied and took away any of the identified trade secrets, "direct evidence of misappropriation is rare." *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977, 984 (N.D. Cal. 2018). At the preliminary injunction stage, WeRide must meet the high standard of showing it is likely to succeed on the merits, but it is not required to prove its case. WeRide has met the first prong of the preliminary injunction test as to its trade secret misappropriation claims against Huang.

### 5. Trade Secret Misappropriation Claims Against ZZX and AllRide

WeRide has also shown it is likely to succeed on the merits of its trade secret misappropriation claims against ZZX and AllRide. As an initial matter, the Court examines the relationship between ZZX and AllRide. WeRide contends that the two companies are closely related if they are not, in fact, the same company. Mot. at 7. ZZX and AllRide do not deny it. Huang has noted that his current employer is ZZX, not AllRide. Dkt. 18-1. But given ZZX's ownership of www.allride.ai and the date of AllRide.AI, Inc.'s incorporation, the Court finds that for the purposes of this Motion, WeRide has shown a sufficient nexus between the entities to treat them as closely related for this motion.

Four pieces of evidence taken together show that that WeRide has, at least, met the substantial questions requirement regarding ZZX and AllRide. First, Huang plays a senior role in the development of ZZX and AllRide's autonomous vehicle technology. His title at ZZX is the Vice President of Technology. Dkt. No. 18-1 ¶ 1. At the October 22, 2018 recruiting event, he

United States District Court
Northern District of California

was identified as the "Tech Lead of AllRide's Silicon Valley Office, Self-driving Software & Hardware Specialist, Architect of Self-driving Vehicles." Zhang Decl. ¶ 27.

Second, the video shown at that event depicts an autonomous car performing Advanced Capabilities, such as detecting a pedestrian about to cross the street at a cross walk and passing a slower vehicle. Walter Decl. ¶ 27-62. Walter opines that it would have been impossible to independently develop the technology for those capabilities in the 10 weeks between Huang's last day at WeRide and the recruitment event. *Id.* ¶ 20. The implausibly fast development of technology can contribute to finding misappropriation. *See, e.g.*, *GTAT Corp. v. Fero*, 2017 WL 7035655, at *1-3 (D. Mont. May 3, 2017); *Ajaxo Inc. v. E*Trade Grp. Inc.*, 135 Cal. App. 4th 21, 53 (2005). ZZX and AllRide contest this point, arguing that WeRide does not know when such development began and that it *may* have started some 19 weeks prior to the recruitment event. AllRide and ZZX presumably know when they began developing autonomous vehicle technology, but they offer no evidence in support of their argument. So, the Court is not persuaded. *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 992 at nn.6, 8 (N.D. Cal. 2010). They then argue that WeRide's website indicates that it performed driverless testing just five to six weeks after its founding. But, WeRide submits evidence that the testing referenced on its website was not comparable to the Advanced Capabilities. Li Reply Decl. ¶¶ 17-19. Huang argues that at ZZX he joined an existing team of engineers who were already working on the technology. But, he also does not provide any further evidence—such as the number of other engineers or how long they had been working on the technology. Moreover, Walter accounted for the possibility that Huang was joining a "fully equipped research staff" when he offered this opinion. Walter Decl. ¶ 47.

Third, AllRide and ZZX place the radar component on the front center of the roofs of its vehicles—just like WeRide. Walter Decl. ¶¶ 4, 115-18; Zhang Ex. J. Walter opines that this placement is not typical, as most designs for autonomous cars place the radar at the front bumper and/or the rearview mirror. Walter Decl. ¶ 115. Walter notes that that this placement is consistent with the use of WeRide's source code—WeRide's perception-related code would only be useful if

the radar component was located in that same location. Walter Decl. ¶ 117. Walter further opines that there is nothing inherently beneficial about that placement of the radar component. *Id.* ¶ 116. AllRide and ZZX respond by filing a depiction of one of Waymo's autonomous vehicles that places the radar component in the center of the roof. AllRide RJN Ex. 2 at 3. But, Waymo does not place its radar component in the same location as WeRide. Waymo locates its further back from the front than WeRide. Walter Reply Decl. ¶¶ 33-36. AllRide and ZZX's placement of the radar component in the same location as WeRide is evidence of misappropriation. *See Waymo, LLC v. Uber Technologies, Inc.*, 2017 WL 21223560, at *9 (N.D. Cal. May 15, 2017).

Finally, Huang's senior role in ZZX and AllRide's technology development and the team of engineers predating his start make it likely that WeRide will be able to show that ZZX and AllRide knew, or had reason to know, that Huang misappropriated WeRide's trade secrets. *See Extreme Reach, Inc. v. Spotgenie Partners, LLC*, 2013 WL 12081182, at *7 (C.D. Cal. Nov. 22, 2013). Walter opines that AllRide and ZZX would not have been able to develop the Advanced Capabilities in just 10 weeks (Walter Decl. ¶ 121), so ZZX and AllRide's other engineers should have realized that Huang had brought outside technology with him when he started. Taken together, this evidence is sufficient to show that WeRide is likely to succeed on its trade secret misappropriation claims against ZZX and AllRide.

### 6. Trade Secret Misappropriation Claims Against Wang

The Court finds that WeRide has not shown that it is likely to succeed on the merits of its trade secret misappropriation claims against Wang. WeRide does not allege that Wang himself improperly took any of the trade secrets when he left WeRide, so it must show that he is liable through some connection to AllRide and ZZX. It has not done so. WeRide contends that Huang recruited a WeRide employee to Wang's "new company," that Chinese media have reported Wang controls AllRide and ZZX, that Wang now runs a venture fund that invests in autonomous vehicles, and that Wang admits to advising the founders of ZZX. Wang, though, denies receiving any payment for his consulting with ZZX or AllRide (Wang Decl. ¶ 27), denies having anything to

do ZZX's product development or technical work (*id.* ¶ 29), or denies calls media reports that he controls ZZX "inaccurate" (*Id.* ¶ 37), and he denies encouraging Huang to leave WeRide for ZZX (*id.* ¶ 24).

**B.  Defamation and Intentional Interference with Prospective Economic Advantage Claims Against Wang**

The Court declines to find that WeRide is likely to succeed on the merits of its defamation claim against Wang.  Defamation is "the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Ringler Assocs. Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1179 (2000).  WeRide relies on second or third-hand reports of Wang making the allegedly disparaging statements.  Wang, though, denies making the statements.  Wang Decl. ¶¶ 33-24.  WeRide correctly notes that the Court may rely on hearsay at the preliminary injunction phase, but even so, the Court finds that these accounts—without more—are insufficient to satisfy the first of the *Winter* factors.

To succeed on a claim for intentional interference with prospective economic advantage, a plaintiff must show "intentional acts on the part of the defendant designed to disrupt" the economically advantageous relationship between the plaintiff and a third party.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).  The Motion bases this claim on the same alleged statements as the defamation claim.  Mot. at 18-19.  Accordingly, the Court finds that WeRide ride has not carried its burden on its intentional interference claim.

**C.  Breach of Contract**

The elements for breach of contract under California law are (1) the existence of a contract, (2) the plaintiff's performance, (3) defendant's breach, and (4) damages to plaintiff as a result of the breach.  *Buschman v. Anesthesia Bus. Consultants LLC*, 42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014).

**1.  Breach of Contract Claim Against Wang**

WeRide contends that Wang breached Paragraph 5 of the PIIA, which prohibited him from

soliciting current employees to leave the company for one year after his employment ended; Paragraph 4 of the PIIA, which prohibits him from disclosing or using WeRide's confidential information outside the scope of his employment; and Paragraph 12 of his separation agreement, which prohibits him from ever making negative or disparaging statements about WeRide. Mot. at 20; Lu Ex. B ¶¶ 4, 5; Lu Ex. C ¶ 12. For the same reasons that the Court finds that WeRide has not adequately shown Wang made the allegedly defamatory statements, the Court finds that WeRide has not adequately shown that Wang breached Paragraph 12 of the separation agreement. During oral argument, WeRide's counsel argued that Wang admitted to breaching Paragraph 12 by conceding that he discouraged potential investors away from WeRide. The Motion, though, relies on the alleged defamation to support the claim for breach of Paragraph 12. Mot. at 20; *see also* Reply at 13-17. The Court declines to consider this argument because it was raised for the first time at the hearing. *Bishop v. Foster*, 371 F. App'x 738, 739 (9th Cir. 2010). For the same reasons that the Court finds that WeRide has not sufficiently shown that Wang misappropriated WeRide's trade secrets, the Court finds that WeRide has not adequately shown that Wang breached Paragraph 4 the PIIA. Lastly, the non-solicitation provision of the PIIA expired on January 31, 2019. *See* Lu Ex. B ¶ 5. WeRide concedes that the Motion is now moot as to this theory of breach of contract. Reply at 19. The Court finds that WeRide has not carried its burden on the breach of contract claim against Wang.

### 2. Breach of Contract Claim Against Huang

WeRide argues that Huang breached Paragraph 4 by misappropriating and using WeRide's confidential information outside of the scope of his employment; Paragraph 5 by soliciting Xu to join him at his new company after it was decided that he would leave WeRide; and Paragraph 6 by encouraging Xu to leave WeRide while he was still employed by WeRide. Mot. at 20; Zhang Ex. B ¶¶ 4-6.

The Court finds that WeRide is likely to succeed on the merits of its claim against Huang for breach of Paragraph 4. As discussed above, WeRide is likely to succeed on its trade secret

misappropriation claims against Huang, and so, the Court finds that WeRide is likely to succeed on its claim against Huang for breach of Paragraph 4.

The Court finds WeRide cannot show it is likely to succeed on its claim for breach of Paragraph 5 because the clause is void under California law. Cal. Bus. & Prof. Code § 16600. Paragraph 5 provides, "Until one year after the term of my employment, I will not encourage or solicit any employee or consultant of Company to leave Company for any reason (except for the bona fide firing of Company personnel within the scope of my employment)." Zhang Ex. B ¶ 5. California Business and Professions Code section 16600 states that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Following the California Supreme Court's decision in *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937 (2008), and the California Court of Appeal's decision in *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc*., 28 Cal. App. 5th 923 (Ct. App. 2018), another Northern District court held that "California law is properly interpreted post-*Edwards* to invalidate employee non-solicitation provisions." *Barker v. Insight Glob., LLC*, 2019 WL 176260, at *3 (N.D. Cal. Jan. 11, 2019). The court in *Barker* reasoned that "the plain language" of section 16600 "prevents a former employer from restraining a former employee from engaging in his or her 'lawful profession, trade, or business *of any kind*.'" 2019 WL 176260, at *2 (quoting *AMN*, 28 Cal. App. 5th at 938 (quoting *Edwards*, 44 Cal. 4th at 945) (emphasis in original)). The Court finds the reasoning of *Barker* and *AMN*, including their application of *Edwards*, to be persuasive. Paragraph 5, as a restraint on employment, is invalid. *Barker* 2019 WL 176260 at *2-3; *AMN*, 28 Cal. App. 5th at 929, 936.

WeRide's arguments to the contrary are not persuasive. First, WeRide argues that the *AMN* Court departed from prior authority in *Loral Corp. v. Moyes*, 174 Cal. App. 3d 268 (1985), which validated non-solicitation agreements, based on different factual circumstances. Reply at 20. But the *AMN* Court stated that those factual differences were a separate basis for its holding. *AMN*, 28 Cal. App. 5th at 939. The *Barker* Court recognized this nuance: "[T]he Court is not

persuaded that the secondary ruling in *AMN* finding the non-solicitation provision invalid under *Loral* based upon those employees' particular job duties abrogates or limits the primary holding." *Barker*, 2019 WL 176260, at *3. Next, WeRide contends that Ninth Circuit precedent requires the Court to uphold Paragraph 5. WeRide cites a single unpublished Ninth Circuit opinion from 1997 for this proposition. Unpublished Ninth Circuit opinions are "not precedent," and do not bind this Court. 9th Cir. R. 36-3; Civil L.R. 3-4(e). Accordingly, the Court does not find that WeRide is likely to succeed on its claim for breach of Paragraph 5.

Finally, the Court declines to assess whether WeRide is likely to succeed on the merits as to its theory that Huang breached Paragraph 6. Paragraph 6 only applied "during the term of [Huang's] employment," but Huang no longer works for WeRide. Zhang Ex. B ¶ 6. WeRide has not proposed, and the Court cannot construct, injunctive relief would preserve the status quo as to Paragraph 6.

### D. Breach of Fiduciary Duty Claim Against Huang

A claim for breach of fiduciary duty requires "the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach." *Yamauchi v. Cotterman*, 84 F. Supp. 3d 993, 1016 (N.D. Cal. 2015). Under California law, a fiduciary duty exists where an employee participates in the management of a corporation and exercises discretionary authority, while an employee who exercises no management authority is not a fiduciary. *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 981 (N.D. Cal. 2006). The evidence shows that Huang exercised discretionary. management authority over the hardware group at WeRide. He described his role as "leading a team of 10-12 engineers." Huang Decl. ¶ 4. He had responsibility for and controlled the team's budget. Lu Decl. ¶ 48. This is sufficient to show that Huang was a fiduciary of WeRide while he was employed there. *GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App. 4th 409, 422 (2000), *overruled on other grounds by Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004).

WeRide argues that Huang breached his fiduciary duty by recruiting Xu to leave WeRide. Mot. at 21; Xu Decl. ¶¶ 39-42. To the extent that WeRide's claim is based on Huang's alleged

recruitment of Xu while he was employed by WeRide, the Court again finds that WeRide has not proposed—and that it cannot craft—an injunctive order that can maintain the status quo. To the extent that WeRide's claim is based on Huang's alleged recruitment of Xu *after* he resigned, the Court finds that Huang was not bound by a fiduciary duty prohibiting such action. *See GAB Bus. Servs.*, 83 Cal. App. 4th at 421. WeRide has not provided any authority that this fiduciary duty remained past his termination.

However, to the extent that the claim for breach of fiduciary duty is based on Huang's taking and use of confidential information, the Court finds that WeRide is likely to succeed. It is well-established that an officer's fiduciary duty to maintain the confidences and protect the trade secrets of their employer extends beyond the term of employment. *Sonoma Pharm., Inc. v. Collidion Inc.*, 2018 WL 3398940, at *7 (N.D. Cal. June 1, 2018) (collecting cases). For the reasons discussed above, the Court finds that WeRide has met its burden as to Huang's alleged breach of his fiduciary duty to protect WeRide's confidential information.

## V.    Irreparable Harm

WeRide has shown that it is likely to suffer irreparable harm from Huang, ZZX, and AllRide's misappropriation of its trade secrets. First, AllRide and ZZX's use of WeRide's trade secrets gives them an unfair advantage in the nascent autonomous vehicle industry. *Waymo*, 2017 WL 2123560, at *11; Walter Decl. ¶ 21. Even before the technology has been fully realized, the industry is crowded with competitors. Huang Decl. ¶ 6. Thus ZZX and AllRide's use of the trade secrets "to accelerate their own progress . . . would improve their ability to attract investors and talented engineers away from competitors—including [WeRide] itself." *Waymo*, 2017 WL 2123560, at *11. Without an injunction, WeRide is likely to have its market position set back as AllRide and ZZX receive an unfair boost. In trade secret cases, injunctions are appropriate to prevent this sort of unfair advantage. *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

Second, disclosure of the trade secrets among Huang, AllRide, and ZZX increases the risk

of their broader disclosure. Huang represented to the Court that he works with a team of engineers at ZZX and AllRide has represented that it planned to hire 100 engineers in 2018. Huang Decl. ¶ 25; Zhang Decl. ¶ 29. Without an injunction, WeRide's trade secrets could be widely disclosed. "A trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984).

WeRide's claimed harms are neither speculative nor conclusory. It is well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm. *See, e.g. Comet Techs*, 2018 WL 1990226, at *5; *Waymo*, 2017 WL 2123560, at *11. WeRide has shown that it will suffer irreparable harm without an injunction.

**VI.     The Balance of Hardships**

The Court finds that that the balance of hardships weighs heavily in WeRide's favor. WeRide has demonstrated that it faces serious harms absent an injunction. WeRide argues that an injunction preventing ZZX, AllRide, and Huang from using its trade secrets would not impose any hardship on them. It is no burden for them to do what the law already requires. *Henry Schein*, 191, F. Supp. 3d at 1077; *Pyro*, 861 F. Supp. 2d at 1092. In their briefing, ZZX, AllRide, and Huang fail to identify any burden than an injunction would cause.

Huang repeats his arguments as to trade secret misappropriation, the specificity of WeRide's trade secret identification, and the secrecy of the trade. The Court has already considered and disposed these arguments.

AllRide and ZZX first argue that compelling them to produce their source code would not preserve the status quo but would affirmatively alter it. Not so. The production of source code to WeRide's outside counsel and experts—pursuant to the Protective Order (Dkt. No. 54)—is essentially an early discovery request. The Protective Order allows the parties to designate source code so that it is subject to stringent protection. *Id.* §§ 7.3-7.4, 9. Their source code would not be revealed to WeRide and it would not alter the status quo. Next, they argue that being forced to produce its source code would force ZZX to violate Chinese secrecy laws. The Court is mindful

that foreign companies may face some burden arising from discovery in U.S. litigation, but ZZX and AllRide have not explained why an injunction requiring ZZX to produce source code on an expedited timeline would impose a greater burden than they would face fulfilling their discovery obligations at a later date. *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992). Nonetheless, the Court can address this concern by narrowly tailoring the injunctive relief to be granted. "When deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009).

## VII. The Public Interest

The Court agrees with WeRide that an injunction would be in the public interest. Courts often find that the public has a strong interest in protecting intellectual property rights. *See, e.g.*, *Comet Techs.*, 2018 WL 1990226, at *5; *Waymo*, 2017 WL 2123560, at *11-12. Relatedly, an injunction would also promote fair and lawful competition in an emerging market. *See Waymo*, 2017 WL 2123560, at *12.

## VIII. Expedited Discovery

Courts may order expedited discovery on a showing of good cause. *Comet Techs.*, 2018 WL 1990226, at *7. "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.* The Court finds that WeRide has shown good cause for expedited discovery. It will help to minimize harm to WeRide's competitive position and to protect WeRide's trade secrets from disclosure. *Id.* Moreover, Huang has already deleted computer files on at least two relevant devices, further increasing the need for early discovery. ZZX again raises concerns about obtaining discovery from China, but the Court can address those concerns in its order. They do not show a prejudice to ZZX that outweighs the need for the discovery.

## IX. Conclusion and Order

The Court concludes that WeRide has shown (1) that it is likely to succeed on the merits of

its claims for trade secret misappropriation, breach of contract, and breach of fiduciary duty as to Huang, and on to the merits of its trade secret misappropriation claims against ZZX and AllRide; (2) that WeRide will suffer harm in the absence of an injunction; (3) that the balance of hardships weighs heavily in WeRide's favor, and (4) that the public interest will be served by an injunction. Accordingly, the Court GRANTS the Motion as to Huang, AllRide, and ZZX (hereinafter "Enjoined Defendants").

The Court further finds that WeRide has shown good cause for expedited discovery, so the Court GRANTS limited, expedited discovery as described below.

The Court ORDERS as follows:

A. Enjoined Defendants and all persons acting under, in concert with, or for any one of them, whether or not in the United States, are hereby restrained and enjoined from each and all of the following:

   1. Any and all use, disclosure, providing third parties access to, transferring, copying, duplication, reproduction, publication, distribution, broadcasting or marketing of any version of WeRide Confidential Information. Confidential Information includes, but is not limited to, trade secrets (as defined in WeRide's statement pursuant to Code of Civil Procedure Section 2019.210) and other proprietary information from all WeRide products and projects, such as (but not limited to) source code, schematics, and other business, technical, and financial information developed, learned, or obtained by a WeRide employee.

   2. Destroying, concealing, disposing, deleting, removing or altering any and all documentation of any kind, whether paper or electronic (including but not limited to computer files, emails, hard drives, disk drives, USB drives, zip drives, cloud-based storage accounts), data, drafts or other things or materials:

      a. obtained from or belonging to WeRide, or containing or derived from WeRide Confidential Information, including but not limited to modified

versions of WeRide documentation or data;

    b.  relating in any way to WeRide or WeRide Confidential Information, including any use, disclosure, possession and/or transfer of WeRide Confidential Information, including but not limited to modified versions of, copies of and/or references thereto;

    c.  relating in any way to the creation, copying, duplication, development, production, distribution, publication and/or broadcast of any version of WeRide Confidential Information or any derivative, copy, or reproduction thereof;

    d.  relating in any way to instructions, requests, directives, or agreements with or by any third party concerning the use or disclosure of WeRide Confidential Information, specifically but not limited to instructions, requests, directives or agreements made by and between any Defendant and any new or potential employer and/or partner; and/or

    e.  relating in any way to source code written, developed, edited, reviewed, or used by Defendants and all persons acting under, in concert with, or for any one of them, including (but not limited to) any source code relating to the operation of the autonomous vehicle depicted in the video attached as Exhibit H to the Declaration of Bijun Zhang.

B.  All discovery disputes arising from this Order are referred to the assigned magistrate judge.

C.  Enjoined Defendants shall, within four days of the issuance of this Order, identify to WeRide's counsel of record, in writing and under oath, the identity and last-known contact information, including the title, email address, physical address, telephone number, employer and other identifying information in any Enjoined Defendant's possession, custody or control, of the individuals, groups, companies, governmental

entities, or other persons or entities, if any, to whom any Enjoined Defendant and, as applicable, any Enjoined Defendant's agents and all of those acting in active concert or participation with any Enjoined Defendant, have disclosed, transferred, published, distributed, broadcasted, or marketed any WeRide Confidential Information.

D. Huang and AllRide and their agents and all of those acting in active concert or participation with Huang or AllRide shall, within four days of the issuance of this Order, make the following items in their possession, custody, or control (and not previously returned to WeRide's counsel of record) available to WeRide's counsel of record for full-disk forensic imaging and data preservation by WeRide, for WeRide's counsel's review on an Attorney's Eyes Only basis:

1. Any computer (laptop and/or desktop) and every form of media, including but not limited to electronic storage devices, external hard drives, zip drives, memory sticks, jump drives, USB/flash drive devices, CDs, DVDs, floppy disks, email accounts or other cloud storage services, Blackberries, other PDAs, cell phones, and/or tablets with text messaging or electronic mail capabilities, including logon credentials necessary to access such media, which contain or have ever contained WeRide's trade secrets as identified in WeRide's statement pursuant to Code of Civil Procedure Section 2019.210, whether original or derivative, and/or any copies and/or references thereto, including any mirror images of any media, whether or not previously sent by Huang or AllRide to WeRide and/or its counsel; specific devices include, but are not limited to:

   a. USB Device with serial number 6&2a218f49&0&_;

   b. USB Device with serial number 44817566;

   c. USB Device with serial number 4C530001090127115393;

2. All documents and things, or other materials containing or derived from WeRide Confidential Information.

E. Pursuant to Federal Rule of Civil Procedure 26(d)(1), the following discovery is authorized:

    a. The parties may take discovery of each other's source code. To the extent that discovery of ZZX's source code is complicated by Chinese laws, the assigned magistrate judge shall consider briefing on the matter. The Court directs the assigned magistrate judge that, for the reasons discussed in this Order, the Court finds the importance of ZZX's source code weighs heavily in favor of authorizing the discovery. *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992).

    b. WeRide is granted leave to take written discovery of any research and development of products or technology related to autonomous vehicles by Enjoined Defendants. To the extend discovery of ZZX is complicated by Chinese law, the assigned magistrate judge shall consider briefing on the matter. The Court directs the assigned magistrate judge that, for the reasons discussed in this Order, the Court finds the importance of this discovery weighs heavily in favor of authorizing the discovery. *Richmark*, 959 F.2d at 1475.

    c. WeRide is granted leave to take seven-hour, oral depositions of Huang and of designated representatives for AllRide and ZZX. Each Enjoined Defendants shall appear for deposition within 14 days of the deposition notice. These depositions shall not count against any deposition limitations otherwise imposed by the Federal Rules. The Court hereby grants WeRide leave to depose each Enjoined Defendant a second time at later date.

    d. WeRide may issue discovery requests under Federal Rule of Civil Procedure 34 to Huang's personal devices, computers, files or documents, email accounts, Dropbox or other cloud storage accounts, and any backups of the Apple MacBook that Huang traded in with the Apple Store on or around October 2,

2018.  Huang shall maintain an Attorneys' Eyes Only log of files, documents, and things not produced based on objections.  The assigned magistrate shall resolve any disputes that arise.

F.  This Preliminary Injunction is issued without prejudice to WeRide or Enjoined Defendants seeking further additional discovery or other relief as appropriate, including further equitable or legal relief.

G.  WeRide shall post a bond of $25,000 within seven days of the entry of the Preliminary Injunction.

H.  This Preliminary Injunction shall become immediately effective upon its entry.

I.  This Preliminary Injunction shall remain in full force and effect through the date on which judgment as to each Enjoined Defendant is entered in this matter.

**IT IS SO ORDERED.**

Dated: March 22, 2019

EDWARD J. DAVILA
United States District Judge