1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Claude M. Stern (Bar No. 96737)
2    claudestern@quinnemanuel.com
    William T. Pilon (Bar No. 326487)
3    williampilon@quinnemanuel.com
    Michael F. LaFond (Bar No. 303131)
4    michaellafond@quinnemanuel.com
   555 Twin Dolphin Drive, 5th Floor
5  Redwood Shores, California 94065-2139
   Telephone:    (650) 801-5000
6  Facsimile:    (650) 801-5100

7    Ryan S. Landes (Bar No. 252642)
    ryanlandes@quinnemanuel.com
8  865 S Figueroa Street
   Los Angeles, California 90017
9  Telephone:    (213) 443-3000
   Facsimile:    (213) 443-3100

10
   *Attorneys for Plaintiffs WeRide Corp. and*
11 *WeRide Inc.*

12                 UNITED STATES DISTRICT COURT

13        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

14 WERIDE CORP. f/k/a JingChi Corp.;          CASE NO. 5:18-cv-7233
   WERIDE INC. f/k/a JingChi Inc.,            **SECOND AMENDED COMPLAINT OF**
15                                            **WERIDE CORP. AND WERIDE, INC., FOR**
                Plaintiffs,                   **1.  MISAPPROPRIATION OF TRADE**
16                                            **     SECRETS UNDER 18 U.S.C. § 1836**
        vs.                                   **2.  MISAPPROPRIATION OF TRADE**
17                                            **     SECRETS UNDER CALIFORNIA**
   JING WANG, an individual, KUN HUANG,       **     CIVIL CODE § 3426, ET SEQ.**
18 an individual, ZHONG ZHI XING              **3.  DEFAMATION**
   TECHNOLOGY CO. LTD.. d/b/a                 **4.  INTENTIONAL INTERFERENCE**
19 ALLRIDE.AI, ALLRIDE.AI INC., KAIZR,        **     WITH PROSPECTIVE ECONOMIC**
   INC., ZKA INC., DOES 1-10                  **     ADVANTAGE**
20                                            **5.  BREACH OF FIDUCIARY DUTY AND**
                Defendants.                   **     DUTY OF LOYALTY**
21                                            **6.  BREACH OF WRITTEN CONTRACT**
                                              **7.  BREACH OF WRITTEN CONTRACT**
22                                            **8.  INTENTIONAL INTERFERENCE**
                                              **     WITH CONTRACT**
23                                            **9.  ACTUAL FRAUDULENT TRANSFER**
                                              **     UNDER CALIFORNIA CIVIL CODE §**
24                                            **     3439.04(a)(1)**
                                              **10. CONSTRUCTIVE FRAUDULENT**
25                                            **     TRANSFER UNDER CALIFORNIA**
                                              **     CIVIL CODE §§ 3439.04(a)(2) and**
26                                            **     3439.05**
                                              **11. COMMON LAW FRAUDULENT**
27                                            **     CONVEYANCE**

28                                            **DEMAND FOR JURY TRIAL**

Plaintiffs WeRide Corp. and WeRide Inc. (collectively "WeRide") complain against Jing Wang, Kun Huang, ZKA Inc., Zhong Zhi Xing Technology Co. Ltd., AllRide.AI Inc., Kaizr, Inc., and DOES 1-10 as follows:

**INTRODUCTION**

1.     WeRide brings this action to remedy and prevent two former employees – former CEO Jing Wang and former Head of Hardware Technology Kun Huang – their new companies, Zhong Zhi Xing Technology Co. Ltd. ("ZZX"), AllRide.AI Inc. ("AllRide.AI"), Kaizr, Inc. ("Kaizr," and together with ZZX and AllRide.AI, the "AllRide Enterprise"), ZKA Inc. ("ZKA"), and those they are acting in concert with, DOES 1-10 (and collectively with the other defendants, "Defendants"), from using confidential, proprietary, and trade secret information stolen from WeRide ("Confidential Information").  WeRide also seeks to prevent Wang from intentionally interfering with WeRide's investment prospects by making false statements to investors in violation of his separation agreement, to prevent Wang and Huang from soliciting WeRide employees in violation of their contractual obligations, to recover for Wang and Huang's breaches of their written agreements with WeRide, and to prevent all of the Defendants from creating or misusing additional corporations for the purpose of fraudulently transferring business operations, assets, and intellectual property so as to evade this lawsuit and any other enforcement actions brought by WeRide.

2.     WeRide is a leader in the race to develop self-driving cars for the Chinese market, and has invested over $45 million to develop proprietary software capable of guiding driverless cars on public roads.

3.     WeRide's former CEO, Jing Wang, resigned on January 31, 2018.  In connection with his departure, he signed a separation agreement providing, among other things, that he would not disparage WeRide and he would continue to honor the provisions of his employment agreement. His employment agreement provided in relevant part that he would not disclose any information he learned while at WeRide and that he would not solicit WeRide employees for one year after his separation from WeRide.

4.     Shortly after leaving WeRide, Wang founded the first companies in the AllRide Enterprise, ZZX and AllRide.AI, which operate as a single self-driving car company aimed at

competing with WeRide the Chinese market, and which Chinese media outlets have described as "basically copying" WeRide.[1]  In violation of his employment agreement, Wang began recruiting WeRide employees to join him at the AllRide Enterprise.  And in violation of his separation agreement and other duties, he also contacted WeRide's investors and made a number of false statements about WeRide in an effort to prevent them from closing agreements to invest in WeRide. Wang told some investors that WeRide had stolen Waymo's technology, and that Waymo was about to sue. He told other investors that WeRide's technology did not work, its demonstration videos were faked, and its cars had been involved in an accident that WeRide was trying to cover up. These statements were false. Nevertheless, Wang was successful in his attempts to interfere with WeRide's investments, and many investors pulled their funding as a result of Wang's false statements—WeRide lost over $75 million of committed investments in its critical Series A investment round. This has caused irreparable harm to WeRide. The loss of investment has delayed WeRide's development plan by months and threatens to destroy WeRide's ability to attract investment and talent in the future.

5.    One of the WeRide employees Wang recruited was Kun Huang, who at the time was WeRide's Head of Hardware Technology.  Huang in turn began recruiting his coworkers to join "Jing Wang's new company" while still employed at WeRide, in violation of his own employment agreement and duties he owed to WeRide.  WeRide found out and demanded Huang's resignation.

6.    In the three months before Huang left WeRide, he downloaded over eight gigabytes of data through WeRide's protected virtual private network ("VPN")—well more than his typical usage in the four months preceding his disloyalty.  This data included confidential information belonging to WeRide, which Huang copied onto personal USB devices using his company-issued laptops.  Huang then deleted a large number of files on both laptops in an attempt to cover his tracks before returning the laptops to WeRide.  Importantly, even though Huang returned the laptops, he ***did not*** return the USB devices.  Huang later destroyed a personal laptop that he was known to use in connection with his work at WeRide, claiming that he returned it to the Apple store because it was not operating

---

[1]    *See* Che Zhi (Car Wisdom), *Jingchi Technology's Triplets: WeRide, AllRide, and MoonX*, Zhihu Column (Oct. 31, 2018), https://zhuanlan.zhihu.com/p/48170899.

1    correctly—but the return receipt for the laptop showed that it was in working condition; Huang was

2    simply disposing of more evidence.

3        7.      Worse, Huang did not keep WeRide's confidential information to himself.  In October

4    2018, Huang and Wang's new business, the AllRide Enterprise, began publicly screening a video

5    demonstrating advanced self-driving capabilities that had taken WeRide several months to develop.

6    This was shocking because, at that time, the AllRide Enterprise had only been working on self-driving

7    technology for just a few weeks.  Moreover, at the time that the AllRide Enterprise released this video,

8    they were still hiring engineers and had just ███████████  As a technical matter, it was simply not

9    possible for the AllRide Enterprise to have independently developed those capabilities that quickly,

10   with just a handful of engineers and only ███████████

11       8.      WeRide immediately understood that its proprietary technology was at risk, and

12   promptly sent Huang a letter demanding that he turn over the stolen information stored on his three

13   USB devices and personal laptop.  But Huang never provided a substantive response to that letter, so

14   on November 29, 2019, WeRide filed suit against Huang, Wang, and AllRide.AI, so as to safeguard

15   the confidentiality of WeRide's proprietary technology, and enforce the contracts that WeRide entered

16   into with Huang and Wang.

17       9.      But just as the Huang and Wang did not respect their contracts with WeRide, none of

18   the Defendants would respect the authority and the jurisdiction of the District Court.  Just three weeks

19   after WeRide filed suit, ZZX and AllRide.AI (the first two companies in AllRide Enterprise), and

20   those acting in concert with them, incorporated a brand new company, Kaizr, Inc., and began

21   transferring AllRide.AI's United States-based operations and assets to Kaizr.  Two months after that,

22   Huang formed yet another company, ZKA, Inc., and ZKA immediately entered into a ███████████

23   ███████████ with ZZX, calling for ZZX to ███████████████████████████  On

24   information and belief, both Kaizr and ZKA were formed by the Defendants in an attempt to hide their

25   wrongdoing: the AllRide Enterprise formed Kaizr in an attempt to hide their United States based

26   operations, meanwhile Huang formed ZKA to try and mask ███████████ he was receiving

27   from the AllRide Enterprise—particularly since ██████ of that sort tend to be evidence of trade

28   secret misappropriation.

10.     Wang's disparagement of WeRide to investors, Huang's and the AllRide Enterprise's theft of WeRide's confidential information, Wang and Huang's wrongful solicitation of WeRide employees, and the Defendants' corporate shell game, including the formation of numerous shell companies and rapid shifting of operations and assets, threatens to cause, and is causing, irreparable harm to WeRide that necessitates equitable relief and damages according to proof and as noted below.

**THE PARTIES**

11.     Plaintiff WeRide Corp., formerly known as ("f/k/a") JingChi Corp., is a leading smart mobility company developing self-driving cars for the Chinese market.  WeRide Corp. is a Delaware corporation that was founded in Sunnyvale, CA, where WeRide Corp. still maintains its primary research and development office. WeRide Corp. also has offices at Building C1, Bio Island International Apartment, No. 86, Xingdao South Road, Haizhu District, Guangzhou, China.

12.     Plaintiff WeRide Inc., f/k/a JingChi Inc., is WeRide Corp.'s parent company; WeRide Inc. is incorporated in the Cayman Islands.  WeRide Inc. owns 100% of the shares of WeRide Corp.

13.     On information and belief, Defendant Jing Wang is an individual residing at 4003 Marcelli Circle, Los Altos, CA 94022.

14.     On information and belief, Defendant Kun Huang is an individual residing at 555 Pine Avenue, Sunnyvale, CA 94085.

15.     On information and belief, Defendant Zhong Zhi Xing Technology Co. Ltd. ("中智行科技有限公司" in Chinese) ("ZZX") is a company that does business under the name AllRide.AI—including through the use of a logo that says "AllRide.AI," maintaining offices with a sign reading "AllRide.AI," distributing business cards to employees that read "AllRide.AI," ███████████████████████████████████████████ and maintaining employee email addresses that end in "@allride.ai".  ZZX maintains the website located at http://allride.ai/, and has its principal place of business at 2nd Floor, Building A3, Hongfeng Science and Technology Park, Qixia District, Nanjing, China.  According to its website, ZZX has established a research and development office in Silicon Valley, and it promotes a cultural exchange program for Chinese recruits to work alongside their American counterparts. On information and belief, ZZX does not, and has never, maintained corporate formalities in its dealings with other companies in the

AllRide Enterprise, including but not limited to AllRide.AI Inc. and Kaizr, Inc. ZZX's ownership is obscured through a series of shell-companies, beginning with its immediate parent, Hong Kong SmartCar.ai Technology Limited,[2] which is in turn owned by a Cayman Islands holding company called SmartCar.Ai Holdings Limited. The Chinese media has reported that this ownership structure is intended to obscure Defendant Wang's ultimate control over ZZX and its operations.

16.     Defendant AllRide.AI Inc. ("AllRide.AI") is a Delaware corporation with a registered office at 850 New Burton Road, Suite 201, Dover, Delaware, 19904. ZZX created AllRide.AI for the sole purpose of potentially being a partner or subsidiary of ZZX in the United States. AllRide.AI's certificate of incorporation was filed with the Delaware Secretary of State on July 19, 2018, which was, on information and belief, just one day before ZZX registered the website http://allride.ai/. AllRide.AI's articles of incorporation list its incorporator as Vivian Hua, and its registered agent for service of process in California is Jerry Mok. AllRide.AI has identified its principle place of business in California as 181 2nd Avenue, Suite 688, San Mateo, CA 94401. The Defendants claim that AllRide.AI has ceased doing business; but, on information and belief, this is only because all of AllRide.AI's operations have been transferred to a different United States-based company, called Kaizr, Inc., which operates as a single business indistinguishable from the other companies in the AllRide Enterprise.

17.     Defendant Kaizr, Inc. ("Kaizr") is a California corporation that was formed just three weeks *after* WeRide initiated this litigation. Kaizr's articles of incorporation were signed by Vivian Hua, and its registered agent in California is Jerry Mok: the same two individuals who incorporated AllRide.AI and act as AllRide.AI's registered agent, respectively. Kaizr's filings with the California secretary of state list a registered office at 181 2nd Avenue, Suite 688, San Mateo, CA 94401 – the same address identified by AllRide.AI as its principle place of business in California. However, Kaizr's website, Kaizhe.ai, lists an office located at 4701 Patrick Henry Drive #25, Santa Clara, California, 95054. Kaizr has taken over certain business operations that were formerly performed by

---

[2]   ZZX's shell-company parent is incorporated in Hong Kong, and its incorporation documents list its English name as "Hong Kong SmartCar.ai Technology Limited," but its Chinese name as "香港中智行科技有限公司" which may also be translated as "Hong Kong Zhong Zhi Xing Technology Limited".

AllRide.AI, and employees who previously held themselves out as working for AllRide.AI now hold themselves out as working for Kaizr.  Additionally, Kaizr employees use email addresses that either end in "@allride.ai" or "@kaizhe.ai", and the companies are so thoroughly integrated that employees of the AllRide Enterprise can be unaware of who works for each company.

18.     DOES 1-10, inclusive, are the Defendants' unknown corporate affiliates, and the individuals who control the morass of corporate entities that includes AllRide.AI, Kaizr, ZZX, Hong Kong SmartCar.AI Technology Limited, and SmartCar.Ai Holdings Limited.  The Defendants have gone to some lengths to preclude WeRide from discovering the identities of these individuals: during a deposition held pursuant to Federal Rule of Civil Procedure 30(b)(6), ZZX's corporate representative claimed to be completely ignorant as to the identities of these individuals, and ZZX has refused to answer interrogatories or respond to document requests seeking the identities of these individuals.  To be clear: this is information that is within ZZX's control, but that ZZX is hiding from WeRide. Filings with the government of Hong Kong reveal that one of ZZX's executives, Johnny Chen, is both the sole director of Hong Kong SmartCar.AI Technology Limited, and an authorized signatory for SmartCar.Ai Holdings Limited; accordingly, Chen must know who controls those entities, and because Chen is an employee of ZZX, Chen's knowledge is within ZZX's control and imputed to it. Nonetheless, ZZX has refused to provide this information, so WeRide remains ignorant of the identities of the individuals who control these corporations—though once WeRide learns the truth in discovery, WeRide will seek leave to amend the complaint further to include the proper names of these individuals.  As the individuals who ultimately control and direct AllRide.AI, Kaizr, ZZX, Hong Kong SmartCar.AI Technology Limited, and SmartCar.Ai Holdings Limited, each of the DOE defendants are responsible for directing those entities to misappropriate WeRide's trade secrets, and are additionally responsible for executing the fraudulent transfers described below.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over the claims asserted herein under 28 U.S.C. §§ 1331 & 1367, and 18 U.S.C. § 1836(c). This Court has supplemental jurisdiction over the state law claims asserted herein because they are related to, arise from a common nucleus of operative facts as, and are part of the same case and controversy as WeRide's federal claim.

20.     Venue is proper in this District under the provisions of 28 U.S.C. § 1391(b), because a substantial portion of the events or omissions giving rise to the claims occurred in this judicial district, the intellectual property that is the subject of this suit is situated in this judicial district, and all Defendants reside in this District for the purposes of 28 U.S.C. § 1391.

21.     This Court has personal jurisdiction over Defendant Wang because he maintains a house, and is essentially at home, in this district. Moreover, at all relevant times Wang knew that WeRide's business was carried out in Sunnyvale, California, and thus his decisions to misappropriate WeRide's technology and disparage WeRide to its investors, constitute intentional acts aimed at parties located within this district. Additionally, Wang has breached two contracts with WeRide that were negotiated, executed, and substantially performed within this district.

22.     This Court has personal jurisdiction over Defendant Huang because he maintains a house, and is essentially at home, in this district. Moreover, at all relevant times Huang knew that WeRide's business was carried out in Sunnyvale, California, and thus his decisions to misappropriate WeRide's technology, and solicit WeRide employees in violation of his contractual obligations, constitute intentional acts aimed at parties located within this district. Additionally, Huang has breached a contract with WeRide that was negotiated, executed, and substantially performed within this district.

23.     This Court has personal jurisdiction over Defendant AllRide.AI because AllRide.AI has intentionally targeted and misappropriated WeRide's technology, and in the process AllRide.AI has directed its tortious behavior at this district.  Additionally, AllRide.AI has transacted business in this district through its use of the address 181 Second Avenue, Suite 688, San Mateo, California, 94401; the business that was transacted at that address involved the development of autonomous driving technology, which is the subject of WeRide's trade secret misappropriation claims. Additionally, and as set forth more fully below, AllRide.AI, ZZX, and Kaizr are all alter egos of each other, and thus AllRide.AI is subject to personal jurisdiction in this district as an alter ego of Kaizr, which is a California corporation.

22.     This Court has personal jurisdiction over Defendant Kaizr because Kaizr is a California corporation, and thus subject to personal jurisdiction within the State of California.

1   Additionally, Kaizr's website reports that its principle place of business is 4701 Patrick Henry

2   Drive #25, Santa Clara, California, 95054, and Kaizr's public filings with the California secretary

3   of state identify its principle place of business as 181 Second Avenue, Suite 688, San Mateo,

4   California, 94401.  As both of those locations may be found within this district, Kaizr is properly

5   subject to the personal jurisdiction of this Court.

6   **INTRADISTRICT ASSIGNMENT**

7   24.     Because this action is an Intellectual Property Action within the meaning of Civil

8   Local Rule 3-2(c), the action is to be assigned on a district-wide basis.

9   **FACTS COMMON TO ALL CLAIMS**

10  **WeRide Is a Leader in the Emerging Chinese Self-Driving Car Industry**

11  25.     WeRide is the successor to, and rebranding of, JingChi Corporation, a startup

12  corporation incorporated on February 23, 2017 to develop and commercialize self-driving cars with a

13  focus on the Chinese market.  WeRide was founded by five highly experienced and qualified

14  individuals: Jing Wang, Tony Han, Sining ("Ashley") Pan, Qing Lu, and Yan Li.

15  26.     WeRide's first (and still largest) office is located in Sunnyvale, California.  WeRide's

16  Sunnyvale office remains the center of its research and development activities, including activities that

17  resulted in WeRide's development of the trade secret technology at issue in this litigation.

18  27.     From the beginning, WeRide sought to differentiate itself from its competition by

19  focusing its development efforts on writing software that delivers a smoother, higher-quality

20  autonomous vehicle ride than its competitors. The focus on developing robust software paid off in

21  performance.  WeRide completed its first public road test—demonstrating certain limited self-driving

22  tasks—in June 2017, becoming the fastest company to reach that milestone. In January 2018, WeRide

23  launched China's first long-term trial operation of self-driving cars in Guangzhou. In March 2018,

24  WeRide became the first company in China to perform an autonomous long-distance tunnel crossing,

25  and in June 2018 it repeated the feat during a heavy rainstorm.

26  **WeRide Develops Proprietary Software to Guide Its Self-Driving Cars**

27  28.     Self-driving cars require software capable of navigating in a dynamic world based on

28  input from a variety of car-mounted sensors. All players in the autonomous vehicle industry are

simultaneously attempting to invent the solution to this problem, and so to protect their competitive advantage(s) WeRide and other self-driving car companies closely guard their respective developments.  WeRide's approach has been to build up each necessary component functionality from the ground up, using code that WeRide develops entirely in-house.[3]

29.     From a high level, WeRide's software can be divided into four basic functions: perception, prediction, decision, and control. Perception combines the input from the sensors— including cameras, radar, and Light Detection and Ranging (LIDAR)—with previously known geographical data to create a high-definition electronic map of the area surrounding the car, referred to in the industry as an "HD map."  Prediction engines, perhaps the most complicated component of self-driving car software, try to anticipate the future paths of each object the car encounters. Decision engines then determine the car's next move to reach the car's planned destination, taking into account infrastructure, traffic laws, and other objects. Finally, the control module translates the decision into the actions necessary to control the car, such as the angle of the steering wheel, the amount of gas to apply, and when to apply the brake (and how hard).

30.     Each of the modules is made up of multiple subparts that interact with each other. For example, the decision engines depend on the creation of a "map" of the local area, while the map itself is generated by the perception module. The development of each of these modules, as well as their subparts, was a time consuming process – not only because the modules present complex technical challenges to code, but also because the system can only improve through iterative real-world testing. As one illustration, Tesla CEO Elon Musk has publicly predicted that it will require around six billion test miles for a company to achieve worldwide acceptance of self-driving cars.[4]

31.     WeRide has developed proprietary code to control all aspects of its autonomous vehicles. Based on an examination of the marketing materials publicly released by the AllRide Enterprise, WeRide believes that at least three portions of its code base (and possibly many other

---

[3]   In the first half of 2018, WeRide formed a cooperative partnership with Baidu's open-source Apollo program for self-driving cars; however, WeRide ultimately decided not to use the code from that program in its autonomous vehicle development. WeRide's program does not incorporate open-source code.

[4]   Elon Musk, *Master Plan, Part Deux*, Tesla.com (July 20, 2016), https://www.tesla.com/blog/master-plan-part-deux

portions as well) are particularly relevant to this litigation: WeRide's proprietary code implementing (i) mapping, (ii) sensor fusion and localization, and (iii) state machines.

32.    **Mapping.** In order for an autonomous vehicle to navigate from one location to another, the vehicle must have an accurate map of the roadways between the two points. Autonomous vehicle developers can provide basic map information using commercially available sources. However, commercially available roadmaps are insufficient to provide a smooth and efficient ride in an autonomous vehicle; moreover, commercial maps will not show the road the same way the autonomous vehicle "sees" it, because commercial maps are based on human eyesight, and not LiDAR, radar, or other common autonomous vehicle sensors. Accordingly, autonomous vehicle developers must build their own maps of the regions their cars travel through.

33.    As part of its autonomous vehicle development, WeRide was able to use its vehicles' "view" of the outside world to compile a high-definition ("HD") map of the area that the vehicles operate in. The maps are built up over time, in an offline mapping process that compiles the data collected after every autonomous vehicle trip. This mapping process is controlled by proprietary code that WeRide developed entirely in-house, and that WeRide has refined over time. While the high-level idea of creating a map by compiling autonomous vehicle sensor data was not invented by WeRide, the specific mapping algorithms used by WeRide to create HD maps were developed by, and are proprietary to, WeRide.

34.    **Sensor Fusion and Localization.** Before a self-driving car can make use of a map of the world around it, the computer on board the car must be able to accurately determine the car's current location. The process of using sensor input to determine the current location of the car is referred to as "localization." To develop localization capabilities, WeRide installed a suite of sensors, including LIDAR, radar, cameras, GPS, and other sensor types, onto a fleet of cars. The cars were then repeatedly driven around a set course to collect data with the sensors. After analyzing the data, WeRide refined the sensor configurations over time—both the location of the individual sensors on the car and the software controlling each sensor. The sensors do not all collect the same type of data, and each one may have its own blind spots, so it is necessary to aggregate the data from all of the sensors into a single unified "view" of the world outside of the car. This is referred to as "sensor

fusion," because the input from several sensors is "fused" together, and WeRide has written proprietary code to handle the sensor fusion for its autonomous vehicles. While the high-level ideas of "sensor fusion" and "localization" were not invented by WeRide, the specific implementation of sensor fusion and localization on WeRide's autonomous vehicles was developed by, and is proprietary to, WeRide.

35.     From the time that WeRide first installed sensors on a car, it took approximately six months to develop the sensor fusion, localization, and mapping systems described above. Moreover, based on WeRide's experience, this process is iterative and depends on constantly gathering new data by having cars operating on the road, so there is no way to effectively speed up the process. Put differently, on information and belief, it is not possible to develop efficient sensor fusion localization and mapping in a shorter period of time (*e.g.* weeks instead of months) because the development speed is simply a function of the number of hours that the fleet of cars with sensor-mounts has spent driving the roads.

36.     **State Machines.** As mentioned above, WeRide's autonomous vehicle system includes a decision model that determines what immediate actions the car should take at a given moment (i.e. turn left, turn right, brake, reverse, etc.). While the model is complex and consists of multiple interconnected parts, one aspect, referred to as "state machines," is particularly relevant here. State machines are code modules that instruct the car about what actions to take in particular situations (or "states") encountered on the road, such as a traffic light, a cross walk, a slow moving vehicle, etc. State machines are more complex than a simple set of rules, because state machines must control for uncertainty; for example, the rules for a flashing red traffic light and a solid red traffic light are different, so the state machine must be able to dynamically check and re-verify that the appropriate state machine is being used.

37.     WeRide has developed its own set of state machines from the ground up. The set of state machines used by WeRide's autonomous vehicle program is proprietary to WeRide. The number of state machines and the set of states covered were determined by WeRide's in-house development team. While other autonomous driving programs, including open-source programs, may include certain common states (e.g. "what to do at a stop sign"), WeRide's program includes a vast number of

states well beyond what can be found in open-source programs. The selection of which states to use was created by, and is proprietary to, WeRide.

38.     Additionally, WeRide has developed the code for each individual state machine in-house, including proprietary code controlling for uncertainty. Accordingly, in addition to the set of state machines, the code making up each individual state machine is also WeRide's proprietary information.

39.     WeRide's success in this field is the result of a high level of sustained investment in a large team of employees.  At the time Huang left, WeRide had spent tens of millions of dollars developing its autonomous driving program over a period of eighteen months. WeRide's program includes approximately 700,000 lines of code, and was developed by dozens of engineers—many with highly sought-after PhDs.

### WeRide Takes Significant Steps to Protect Its Proprietary Data

40.     Given its value, WeRide takes extensive measures to ensure the secrecy and security of its Confidential Information, including the code used by its autonomous vehicle program. WeRide's security measures include four separate categories: physical security, network security, mandatory non-disclosure agreements, and company policies and procedures.

41.     **Physical Security.**  At the most basic level, WeRide controls physical access to its offices using a variety of security measures. The doors to the offices are always locked, and can only be opened using unique employee badges that contain Radio-Frequency Identification ("RFID") chips. The badges only temporarily unlock the doors, and once the employee enters the building, the doors automatically re-lock upon closure. Visitors must be admitted to WeRide's offices by a WeRide employee in possession of a badge, and a log is kept which includes visitor names, time of entry, and the purpose of each visit. Additionally, even within the offices, certain sensitive areas may only be accessed by badges belonging to a small group of trusted employees—for example, the room where the autonomous vehicle sensors are stored is kept locked, and can only be opened by the badges of trusted employees who need to access the sensors; badges belonging to all other employees cannot open that room. WeRide also uses closed-circuit television cameras that record activity both inside and outside of its offices.

42.     **Network Security.** WeRide uses multi-layered network security in order to protect its valuable source code. WeRide's code is stored in a repository located on Amazon Web Services ("AWS") servers. The AWS servers can only be accessed by WeRide employees who have **both** (i) a username and password that grants access to the servers, and (ii) a file called a "token" that is unique to the employee username and necessary to decrypt information received from WeRide's code repository. Even then, WeRide's code repository cannot be accessed using normal internet or network connections; instead, a user must connect from one of WeRide's "whitelisted" network locations. Attempts to connect from all other locations will be rejected. Thus, when employees work remotely, they must first connect to WeRide's offices through a virtual private network ("VPN") using a username and password that is unique to each employee. Moreover, all of these security layers operate in tandem, so an intruder cannot access the code without somehow obtaining (i) VPN credentials, (ii) credentials to log into the code repository, and (iii) a copy of the token file that matches those credentials—simply stealing a single password would not work.

43.     **Mandatory Non-Disclosure Agreements.** WeRide's information is also protected by contracts that all employees must sign. WeRide requires all of its employees to sign its Proprietary Information and Inventions Agreement ("PIIA"). A true and correct copy of the PIIA is attached to this Complaint as **Exhibit A**, and is hereby incorporated by reference into this Complaint. Under the PIIA, WeRide "shall own all right, title and interest" to any ideas or information conceived by employees during their employment. *See* Exhibit A ¶¶ 2-3. The PIIA also provides that employees "will hold in confidence and not disclose" any information employees develop, learn, or obtain during the term of their employment, and prohibits employees from using such information "except within the scope of [their] employment." *Id*. ¶ 4. The PIIA further prohibits employees from soliciting employees to leave WeRide, both during the term of employment and for one year after termination. *Id.* ¶ 6. The PIIA also prohibits employees from engaging in any activity that is competitive with WeRide. *Id*. Anticipating a potential breach, the PIIA provides that "any breach of the agreement will cause irreparable harm to [WeRide] for which damages would not be an adequate remedy, and,

therefore, [WeRide] will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond." *Id*. ¶ 9.[5]

44.     **Company Policies and Procedures.** WeRide's company policies also require employees to protect its Confidential Information. The Employee Handbook distributed to all new employees contains a section titled "Trade Secrets and Confidential Information."  In relevant part, that section provides:

"A[s] part of the consideration employees provide to our Company in exchange for their employment and continued employment with our Company is their agreement and acknowledgement that all Trade Secrets/Confidential Information developed, created or maintained by them shall remain at all times the sole property of our Company, and that if our Company's Trade Secrets/Confidential Information were disclosed to a competing business or otherwise used in an unauthorized manner, such disclosure or use would cause immediate and irreparable harm to our Company and would give a competing business an unfair business advantage against our Company.

"Employees will not, except as required in the conduct of our Company's business or as authorized in writing by our Company, disclose or use during their term of employment or subsequent thereto any Trade Secrets/Confidential Information. Furthermore, all records, files, plans, documents and the like relating to the business of our Company which employees prepare, use or come in contact with shall be and shall remain the sole property of our Company and shall not be copied without written permission of our Company and shall be returned to our Company on termination or cessation of employment, or at our Company's request at any time."

45.     The Employee Handbook further prohibits employees from using WeRide's network or computer resources for soliciting personal business opportunities, conducting personal advertising, and "any purpose that does not advance the employer's legitimate business interests."

---

[5]   As noted above, WeRide formerly operated under the name "JingChi Corp.," which is the name used in the PIIA. *See* Exhibit A.

46.     Upon termination, the Handbook provides that employees "are responsible for returning Company property" in their possession. Employees shall not "remove any software or data from" devices owned by WeRide. At the same time, employees must "completely remove all data collected, downloaded and/or created on non-Company computers used for Company business that relate in any manner to our Company's business" upon termination.

47.     WeRide makes regular announcements reminding employees of the requirement to maintain the secrecy of WeRide's information, including by email and verbally at weekly "all hands" meetings. WeRide requires all employees to acknowledge that they have read the Handbook and will comply with all its provisions.

## **WeRide Is Forced to Fire Its CEO Jing Wang**

48.     In December of 2017, WeRide's first CEO, Jing Wang, was sued by his former employer, the large and well-known Chinese internet company, Baidu, Inc. In its lawsuit, Baidu alleged that Wang failed to return a laptop belonging to Baidu, stole Baidu's trade secrets, and was poaching Baidu's employees.  In support of its allegations, Baidu produced a redacted copy of a March 31, 2017, letter signed by Wang, in which he stated that he lost a Macbook Air laptop belonging to Baidu and therefore would not be returning that laptop to Baidu.

49.     Baidu also filed suit directly against WeRide, again citing Wang's actions.

50.     WeRide's management found Baidu's lawsuit to be harmful to the company, and an unnecessary distraction. In January of 2018, WeRide's shareholders met and voted to remove Wang as CEO.

51.     In recognition of the work that Wang performed during WeRide's first year, WeRide offered Wang an opportunity to voluntarily resign and receive a severance package that was contingent upon his execution of a final separation agreement (the "Separation Agreement").

52.     Wang agreed to the Separation Agreement, which contains a nondisparagement clause providing that Wang shall "never make any negative or disparaging statements (orally or in writing) about the Company or its stockholders, directors, officers, employees, products, services or business practices." The Separation Agreement also explicitly reaffirmed that the terms of the PIIA remained

1   in full effect and continued to bind Wang. Moreover, as a former employee, Wang himself had signed

2   a copy of the PIIA on March 31, 2017.

3          53.     Wang's employment relationship with WeRide ended on January 31, 2018, though he

4   remained a significant shareholder.

5          54.     In March 2018, just two months after Wang was removed, WeRide was able to resolve

6   the lawsuit filed by Baidu.

7          55.     Unfortunately, Wang was unwilling to move on.

8                  **Wang Helps to Create and Leads the AllRide Enterprise**

9          56.     On information and belief, Wang still believed that he could succeed by building an

10  autonomous vehicle startup, even though Wang lacked the necessary skills to develop and program an

11  autonomous vehicle himself.  However, on information and belief, Wang was concerned that if he

12  openly founded a new autonomous vehicle company, he could face additional legal action, including

13  from Baidu.

14         57.     Accordingly, on information and belief, Wang did, in fact, found the AllRide

15  Enterprise (including both ZZX and AllRide.AI) as a new autonomous driving enterprise, but Wang

16  took steps—such as founding shell companies controlled using variable investment entities ("VIEs")

17  or other special purpose entities—to obscure the fact that he is the leader of, and has control over, the

18  AllRide Enterprise.

19         58.     As WeRide has confronted Wang about his control of the AllRide Enterprise, Wang

20  has denied his role, but WeRide has come into possession of the following evidence demonstrating

21  Wang's relationship with the AllRide Enterprise:

22         A.      Published media reports have indicated that Wang controls ZZX and AllRide.AI;[6]

23

24

25

---

26         [6] *See, e.g.*, Yi'ou (Equal Ocean), *After Being "Hunted" by Baidu, Jing Wang Has Started a New Business; Would The Copied Version of JingChi Grow Steadily?*, Sina Financial News (Oct.

27  12, 2018), https://t.cj.sina.com.cn/articles/view/2540408364/976b8e2c00100tl9g; Zichun Pan, Yi'ou (Equal Ocean), *He Temporarily Succeeded in Starting a New Business for the Second Time,*

28  *But How Much Time Have Baidu and the Capital Market Left for Jing Wang?*, Gasgoo News (Oct. 12, 2018), http://auto.gasgoo.com/News/2018/10/120731333133170066968C601.shtml.

B.   At least one former WeRide employee—Kun Huang—stated to other WeRide employees that he was "going to join Wang's new company," shortly before Huang joined ZZX;

C.   ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████

D.   For a period of at least three months (and likely much longer) ██████████
████████████████████████████████████████████████████████
████████████████████ indicating that Wang has a supervisory function over the AllRide Enterprise's technological development (and, on information and belief, the AllRide Enterprise's misappropriation of WeRide's technology); ██████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████ at the same time the AllRide Enterprise was developing an autonomous vehicle at an impossible pace (on information and belief, by using technology misappropriated from WeRide), giving Wang actual knowledge or reason to know of the misappropriation;

E.   ████████████████████████████████████████████████████████
██████████████████████████████████

F.   ████████████████████████████████████████████████████
██████████

G.   ████████████████████████████████████████████████████
██████████████████████████████

H.   ████████████████████████████████████████████████████████
██████████████████; and

I.   ████████████████████████████████████, Wang has been held out to be either an official representative and/or leader of the AllRide Enterprise, and other companies have believed him to be the same—which is critical because, as discussed at length

1  below, Wang began interfering with WeRide's investors by disparaging WeRide

2  and attempting to convince the investors to take their money to the AllRide

3  Enterprise instead.

4       59.    According to their websites, and materials used to recruit employees on college

5  campuses, the AllRide Enterprise seeks to develop self-driving vehicles for the Chinese market that

6  work by fusing together the inputs from several sensors, including LIDAR, radar, and cameras. *See*

7  http://www.allride.ai/ & https://www.kaizhe.ai/.  In other words, the AllRide Enterprise is attempting

8  to compete directly with WeRide by emulating WeRide's business model.

9  **<u>Jing Wang Disparages WeRide to Investors In Violation of His Separation Agreement</u>**

10       60.    On information and belief, shortly after the first AllRide Enterprise was founded, Wang

11  attempted to finance their efforts by redirecting investment away from WeRide, and using a campaign

12  of disparagement based on outright falsehoods.

13       61.    Beginning in December 2017—when Wang was still CEO—WeRide sought to raise

14  $100 million through an initial Series A investment round. In order to achieve this goal, WeRide

15  engaged Morgan Stanley to help organize and solicit investments during the spring and summer of

16  2018.

17       62.    WeRide and Morgan Stanley's efforts were initially successful, and between June and

18  July of 2018, a group of five investors executed term sheets committing to invest a total of $64 million

19  as part of WeRide's Series A investment (the "Term Sheet Investors"). These investors included

20  Goldstone Investment Company, Lenovo, Bojang Capital, Xinding Capital, and Oriza Prior Equity

21  Investment Fund. A second group of investors led by Hanfor Capital Management committed to invest

22  an additional $38.1 million as part of WeRide's Series A investment (the "Hanfor Investors"), and

23  exchanged the first draft of a Stock Purchase Agreement. Several other potential investors also

24  expressed interest.

25       63.    By July of 2018, it appeared that WeRide's Series A investment round would not only

26  be a success, but would be oversubscribed, with total investments coming in at between $100 million

27  and $160 million.

28       64.    However, this success came to a sudden halt in August 2018.

65.     On August 8, 2018, WeRide's advisors at Morgan Stanley stated that they were having difficulty continuing to solicit and negotiate investments because Wang was directly contacting investors to spread falsehoods about WeRide, and Wang was then encouraging those same investors to invest in the AllRide Enterprise. The specific falsehoods Wang was spreading included:

- That Google-affiliate Waymo was going to file a lawsuit against WeRide because WeRide had allegedly stolen code from Waymo (a claim that is completely untrue, given that WeRide does not even employ any former Waymo engineers);

- That the success of WeRide's self-driving car program was a lie, because WeRide's experiments had been "staged" (which is also untrue); and

- That WeRide planned to purposefully and maliciously dilute the shares of anyone who invested in WeRide (again, untrue).

66.     In September 2018, one of WeRide's officers was informed by an executive at Hanfor Capital Management that Wang had contacted Hanfor directly and discouraged Hanfor from investing in WeRide by making several false statements, including: (i) WeRide's self-driving technology did not work, (ii) the videos WeRide created to demonstrate its self-driving technology had been faked, (iii) WeRide's self-driving cars had been involved in a traffic accident that WeRide was attempting to cover up, and (iv) WeRide had purposefully and maliciously diluted the shares of prior investors.  All of those claims are (and were) false.

67.     The executive at Hanfor further reported that Wang then encouraged Hanfor to invest in the AllRide Enterprise as an alternative to WeRide.

68.     As a direct and proximate result of Wang's statements, WeRide's investors began delaying—or even outright cancelling—their investments, despite the fact that the terms had already been agreed to, and in many instances term sheets had already been signed.

69.     WeRide originally had plans to close its Series A investment in August 2018. However, as investors reacted to Wang's false and disparaging statements, WeRide was forced to delay closing of the Series A investment, and ultimately break the Series A into three sub-rounds: A-1, A-2, and A-3. A-1 closed in September, A-2 closed in October, and A-3 which closed in December 2018.

70.     As a result of the delays in investment caused by Wang, WeRide was forced to request a bridge loan of $5 million from Qiming, an existing investor, to cover ongoing company expenses such as rent, equipment, and salaries. Qiming granted the loan, but on less favorable terms than WeRide would have accepted otherwise, including a provision allowing Qiming to convert the loan into equity.

71.     Meanwhile, in response to Wang's false and disparaging statements, several of the Series A investors canceled, including all five Term Sheet Investors. Others simply reduced or delayed their commitments; for example, Hanfor reduced its commitment from $20 million to $11.5 million days before closing, and then delayed most of its remaining investment by funding only $4.5 million at the time of investment, with the rest to come at some undetermined point in the future.

72.     In total, WeRide has lost over $75 million in expected investment.

73.     The loss of this capital, along with the delay of investment from the summer of 2018 to the end of 2018, had a significant impact on WeRide's development. WeRide initially planned to have a fleet of 50 cars by the second quarter of 2018, and 250 cars by the fourth quarter of 2018. However, due to the extensive delays and diminished investments, WeRide only acquired 25 cars through the end of 2018, and was only able to purchase an additional 100 cars in the first quarter of 2019.  Even if WeRide were to receive supplemental investments today that made up for the investment shortfalls to date, WeRide would still not be able to recover the months of lost development and road-testing time. Further, the reputational injury Jing Wang has caused to WeRide will harm WeRide's ability to attract investors and talent in the future.

### Jing Wang Convinces Kun Huang to Breach His Obligations to WeRide

74.     Several of WeRide's employees previously worked at Baidu with Wang, including WeRide's former Director of Hardware, Defendant Kun Huang.

75.     Huang joined WeRide in April of 2017, and based on his background and qualifications, Huang was put in charge of WeRide's hardware development. In this role, Huang had discretion over WeRide's hardware budget, and was responsible for a team that eventually grew to ten employees. Huang reported directly to WeRide's Chief Technology Officer ("CTO").

76.     During his first year at WeRide, Huang appeared content with his work, and was trusted with the supervision of an increasing budget and growing group of employees.

77.     However, by April of 2018, all of that changed.

78.     Around that time, Huang became dissatisfied with his work at WeRide, and repeatedly complained to at least one coworker that WeRide was allegedly "not taking hardware development seriously." Huang's coworker reported this as a shock, because Huang was not previously known to complain about WeRide or WeRide's management.

79.     Huang also stated—without explanation—that he believed he could achieve the "same level of technology" WeRide had already developed "very quickly" at a "new company."

80.     On information and belief, Huang simply wanted more pay and more power, and he was willing to break both his contracts with WeRide and the law to get what he wanted.

81.     Over the next three months, Huang repeatedly schemed to become the head of his own Silicon-Valley-based autonomous vehicle research group. Worse, Huang attempted to recruit at least one WeRide coworker to join him, including through a July 2018 offer to work at the AllRide Enterprise for salary and benefits commensurate with what WeRide offered. Throughout these months, Huang was apparently unconcerned by the fact that he still worked for—and owed a duty of loyalty to—WeRide.

82.     For example, on May 3, 2018, Huang orchestrated a meeting with AIWays—a well-known Chinese electric vehicle manufacturer—for the purpose of trying to convince AIWays to set up an autonomous vehicle research program that Huang would lead.

83.     While Huang was, of course, free to prepare to compete with WeRide, Huang attempted to recruit his WeRide coworkers to join him at AIWays—going to far as to invite one coworker to join him on the initial "pitch" call to AIWays, and attempting to use their mutual success at WeRide as a "selling point."

84.     This was a breach of the non-solicitation provision contained in the PIIA (*see* Exhibit A)—which Huang signed in March 2017—and a breach of the duty of loyalty that Huang owed to WeRide.

85.     The AIWays plan never materialized. But that did not stop Huang.

86.     About a month after the May 3 pitch to AIWays, Huang again approached a WeRide coworker and stated that he was "seriously considering going to Jing Wang's company." During that conversation, Huang described the roadmap of Wang's new company for the first year. Huang said that Wang had already secured funding from the Chinese government, and rented office space in China. Huang stated that this new venture would focus on mass production of self-driving cars for consumers – meaning hardware would be more important to the company than to a company that uses off-the-shelf hardware components. On information and belief, Wang's "new company" referred to the AllRide Enterprise.

87.     Huang also revealed why he found the AllRide Enterprise so alluring: Wang promised that the AllRide Enterprise would have its own, independent, Silicon Valley-based research team that Huang would run. On information and belief, this had been Huang's goal all along: running his own research team rather than working for others.

88.     Over the course of the next month, Huang attempted to recruit his WeRide coworkers to join him at the AllRide Enterprise. Huang's efforts included extending at least one formal job offer to a coworker in July 2018, which offer contained both the promise of a specific salary and benefits comparable to those currently offered by WeRide.  Again, this offer was made *while Huang was still employed at WeRide*.

89.     By late July,  WeRide's leadership had learned about Huang's efforts to openly recruit WeRide employees for Wang's AllRide Enterprise.  On July 31, 2018, WeRide CEO Tony Han met with Huang in China and asked him to resign.  Huang agreed to resign effective August 13, 2018.

90.     Following his resignation, Huang was prominently featured in a recruiting video for the AllRide Enterprise that was shown at recruiting events on Chinese university campuses. The recruiting video identifies Huang as "Tech Lead of AllRide's Silicon Valley Office, Self-driving Software & Hardware Specialist, Architect of self-driving vehicles." In October 2018, WeRide representatives attended two recruiting events held by the AllRide Enterprise at universities in Nanjing.  Huang attended the events and spoke on behalf of the AllRide Enterprise, including providing details about their technology and business plan.

**ZZX Begins Operations in China and the United States and Does Business Under the Name "AllRide"**

91.     On information and belief, and according to records from the Industry and Commercial Bureau of the People's Republic of China, the first company in the AllRide Enterprise, Zhong Zhi Xing Technology Co. Ltd. ("ZZX") was established on June 6, 2018. On information and belief, around July 20, 2018, ZZX registered the website http://allride.ai.

92.     ZZX also began doing business using the name "AllRide.AI".

93.     For example, even though the http://allride.ai website belongs to ZZX, and contains ZZX's webpage, it prominently displays a link to the popular business networking site LinkedIn.com for a company referred to simply as AllRide.AI, which webpage can be found at: https://www.linkedin.com/company/allride-ai/about/. The LinkedIn webpage for AllRide.AI contains the following text description of the company: "AllRide.ai is a new generation intelligent mobility company with Artificial Intelligence (AI) as core technology, targeting at providing the safest fully autonomous driving (L4) mobility services to Chinese market." Thus ZZX appears to be holding itself out on social media as "AllRide.AI".

94.     Additionally, ZZX's website at http://allride.ai repeatedly features a logo that contains the text "AllRide.AI," including in the following images, each of which was captured on http://allride.ai:

  

95.     Nor is ZZX's use of the "AllRide" name limited to its web presence: ZZX operates vehicles that say "AllRide.AI" on their sides; ZZX's employees wear T-Shirts emblazoned with "AllRide.AI"; at least some ZZX's employees have business cards that read "AllRide.AI"; many of ZZX's employees use email addresses that end in "@allride.ai"; and ██████████████████ ███████████████████████████████████████████

96.     Separately, and as set forth in a sworn declaration submitted by the sole officer of AllRide.AI Inc., persons in control of ZZX (whose identities ZZX continues to hide) elected to incorporate AllRide.AI Inc. in the United States "with the possibility in mind that [ZZX] might one

day in the future need a subsidiary or partner in the USA, and [AllRide.AI Inc.] has loaned money to [ZZX] so that the latter, a Chinese company, can pay certain debts in the USA." ███████

███████████████████████████████████████████████

███████████████

97.     Accordingly, the persons in control of ZZX caused AllRide.AI Inc. to incorporate, and have further caused AllRide.AI Inc. to pay debts on behalf of ZZX—a process that must have also involved capitalizing AllRide.AI, since AllRide.AI claims to have no employees, no operations, and no independent source of funds.

98.     In sum, ZZX and AllRide.AI operate as a single commercial enterprise, as evinced by ZZX's extensive, pervasive use of the "AllRide.AI" name in public, ZZX's complete control over AllRide.AI's incorporation and finances, and the lack of corporate formalities (███████████

███████████████) governing the financial relationship between ZZX and AllRide.AI.

**In His Final Days at WeRide, Kun Huang Exfiltrates WeRide's Confidential Information and Attempts to Cover His Tracks**

99.     With the first companies in the AllRide Enterprise established, and at least some investment successfully diverted away from WeRide in an effort to direct it to the AllRide Enterprise, Wang's plan really began coming together once he was able to recruit Defendant Huang from WeRide.

100.     As noted above, prior to leaving WeRide, Huang claimed to his coworkers that he could "quickly" recreate WeRide's technology at another company, if he wanted to—WeRide's employees did not believe this was possible.  However, after his departure, WeRide learned how Huang planned to "quickly" recreate WeRide's technology: on information and belief, Huang simply misappropriated WeRide's software.

101.     As discussed above, WeRide employees can only access WeRide's source code repository from outside of WeRide's physical offices by logging into a VPN. The volume of traffic travelling over the VPN is recorded.

102.     On or around May 6, 2018—the very same week that Huang began meeting with other companies to discuss leaving WeRide—Huang's credentials were used to log into WeRide's VPN

from a location in Northern California and to download over 1.1 gigabytes of data in a single session. That is an amount of data larger than WeRide's entire source code base.[7] This was an unusual amount of data for Huang to download: in the three months prior to May 6, Huang did not download even half of this amount of data during any one session.

103.   Moreover, that was just the beginning of Huang's suspicious VPN activity. Throughout late May and into July 2018, Huang's VPN credentials were used on several occasions to download additional amounts of data that were, again, larger than what Huang typically downloaded in the months prior to May 2018. Between May 24, 2018 and July 24, 2018, Huang downloaded an amount of data that was larger than WeRide's entire code base several times over.

104.   But Huang's VPN activity was not the only cause for concern. WeRide has also uncovered evidence suggesting Huang separately exfiltrated files using USB flash drives.

105.   As an employee of WeRide, Huang was issued two laptops, a Lenovo ThinkPad 470p bearing serial number PF-0QPPQA, and a MacBook Pro 13.2 bearing serial number C02TH2APGTDX. Both devices were owned by WeRide.

106.   After he resigned, WeRide's HR group requested that Huang immediately return both devices, as required by the PIIA and company policy. However, Huang delayed returning the laptops until August 15, two days after his employment officially ended.  He returned his Lenovo laptop to WeRide's Guangzhou office, and his wife returned his MacBook to WeRide's Sunnyvale office. Upon receiving the laptops, WeRide discovered that a large number of files and folders on the Lenovo's desktop had been deleted, and the browser history had been cleared.  In addition, all files on the MacBook had been completely deleted and the operating system reinstalled, making it impossible to recover any deleted data, or even to determine what had been deleted.

107.   Because of the red flags surrounding Huang's departure, WeRide engaged a computer forensics firm, Kivu Consulting, to analyze Huang's devices to determine whether he had taken any of WeRide's Confidential Information.  Kivu found that Huang connected three separate USB devices to

---

[7]   WeRide's code base is comprised primarily of lines of text without graphics; thus it takes up relatively little space on a computer hard drive, despite containing over a million lines of code.

his Lenovo laptop in June and July 2018—again during the time period after Huang decided to join Wang's AllRide Enterprise.

108.    Kivu further discovered that, on August 7, 2018, Huang created a series of folders on at least one of the USB devices, which folders appear to correspond to folders on the Lenovo laptop—giving rise to an inference that Huang was directly copying files from the Lenovo laptop to the USB drive. Huang's decision to wipe the laptop clean prevented Kivu (and thus WeRide) from determining precisely which files were copied.

**The AllRide Enterprise Appears To Be Using WeRide's Confidential Information**

109.    On or about October 9, 2018, the AllRide Enterprise posted a video to the Chinese social media platform WeChat. The video depicted a car driving on its own, without anyone sitting in the driver's seat. The car pulled up to the curb directly in front of a passenger, who then boarded the car on the passenger's side, and pressed a button on the center console. After the button was pressed, the car appeared to take the passenger on a fully automated ride—again without any person in the driver's seat. Additionally, Huang was featured prominently in the video. Huang is introduced as "Brother Kun, Tech Lead of AllRide's Silicon Valley Office, Self-driving Software & Hardware Specialist, Architect of Self-driving Vehicles." The video has since been deleted from the AllRide Enterprise's WeChat account.

110.    WeRide was very concerned by this video. Developing a fully automated car, which can be operated without a safety "backup" driver in the driver's seat, takes a great deal of time. As explained above, certain necessary aspects of developing an autonomous car cannot be "sped up," because they depend on extensive data collection and iterative development.

111.    Despite these realities of developing self-driving cars, the AllRide Enterprise appeared to be claiming that it possessed a fully autonomous car less than three months after Huang had attempted to recruit WeRide employees for a company that—at that time—had no research and development program.

112.    On October 19 and October 22, WeRide sent an investigator to public recruiting events hosted by the AllRide Enterprise on a college campus in Nanjing, China. The investigator observed that Kun Huang gave presentations on the AllRide Enterprise's technology. During the events, a

longer version of the video that had been posted to WeChat was played for the audience.  Again this video appeared to depict a fully autonomous vehicle, which vehicle had at least the following specific capabilities:

- The vehicle was able to fuse input from multiple sensors to create an HD map, which map was depicted in the video;
- The vehicle was able to come to a complete stop directly in front of a passenger so that the passenger could climb into the vehicle;
- The vehicle was able to respond to certain traffic signals (e.g. a stop sign); and
- The vehicle was able to execute a "lane change manuever" wherein it overtook a slower car by changing lanes, and then safely passed the slower car.

113.    WeRide was particularly concerned by the lane change maneuver, which is a complicated capability that, for the reasons described above, could not have been developed by a company that had no research program less than three months before the video was released.

114.    And, once again, Huang was prominently featured in the longer video, which specifically stated that Huang was the head of the AllRide Enterprise's development team.

115.    Additionally, on closer inspection, WeRide found striking similarities between the HD map shown in the video and the HD maps generated by WeRide—both of which are shown below. *Compare* Figure 1 (AllRide HD Map) *with* Figure 2 (WeRide HD Map). Both show objects with similar levels of detail and style.




***Figure 1: AllRide HD Map***              ***Figure 2: WeRide HD Map***

116.    Finally, while WeRide has not had an opportunity to examine the AllRide Enterprise's autonomous vehicles closely, it appears that their hardware configurations also bear a striking similarity to WeRide's. Specifically, both companies place their radar sensors in the front center position of the car's roof—even though other companies place the radar along the front bumper. Likewise, the AllRide Enterprise appears to use the same configuration of wires on the back of the car as WeRide does (specifically running wiring through the rear-window weather stripping).

117.    On October 26, the AllRide Enterprise hosted an open-house at their Nanjing campus and invited several people to test one of its self-driving cars on a public road. They filmed the reactions to the car's performance and, on October 31, posted the video of those reactions to WeChat. The individuals featured on the video report that the car "is very smooth with good speed and sensitivity," "the sensor has a very high precision," and the car smoothly changed lanes when the car encountered a pedestrian.

118.    Taken together, Huang's statements that he could "quickly" re-create the same technology achieved by WeRide, combined with evidence of his exfiltration of data from WeRide's networks, and the AllRide Enterprise's sudden, inexplicable display of technological capabilities just weeks after its founding all strongly suggest that Huang absconded with WeRide's technology, and the AllRide Enterprise is now exploiting that technology.

### WeRide Asks Huang for an Explanation and Receives No Substantive Response

119.    On November 15, 2018, WeRide sent a cease and desist letter to Huang informing him that his solicitation of WeRide employees and continued retention, use, and disclosure of WeRide's Confidential Information violated the PIIA he signed with WeRide as well as state and federal law. WeRide instructed Huang to immediately cease any use or disclosure of WeRide's Confidential Information, to cease soliciting WeRide's employees, to provide WeRide with assurances that WeRide's Confidential Information no longer exists on any other devices, and not to destroy evidence. The letter requested a response by November 20, 2018. On that date, WeRide received a response from Huang's counsel, which did not respond to WeRide's substantive allegations, but instead asked for more time to "investigate."

## **In An Attempt to Evade this Lawsuit, the AllRide Enterprise Creates Kaizr, Inc.**

120.    On December 19, 2019, a little over a month after WeRide sent its cease and desist letter to Huang and three weeks after WeRide filed its original complaint against Huang, Wang, AllRide.AI, Inc., the same two individuals who originally incorporated AllRide.AI Inc.—Vivian Hua and Jerry Mok—incorporated a brand new company in California called Kaizr, Inc. ("Kaizr"). According to filings with the California Secretary of State, Kaizr, Inc. does business at the address 181 2nd Avenue, Suite 688, San Mateo, CA 94401, which is the same address where AllRide.AI Inc. does business in California.  Moreover, Kaizr's own website reports that Kaizr is in the business of developing self-driving cars—the same field of endeavor as the other companies in the AllRide Enterprise, ZZX and AllRide.AI Inc., and the very same technology that is the subject matter of the trade secrets in this litigation.

121.    On information and belief, Kaizr was incorporated at the direction of the individuals who control the AllRide Enterprise, and was incorporated for the purpose of hiding its United States based development efforts from WeRide.  In effect, it appears that Kaizr was incorporated *after* WeRide filed suit in order to avoid this very lawsuit.

122.    WeRide has uncovered extensive evidence that Kaizr is controlled by, and indistinguishable from the other corporate members of, the AllRide Enterprise, including at least the following:

A.    Kaizr has taken over payment of bills that were previously paid by AllRide.AI Inc.,



B.    ZZX employees—　　　　　　　　—have been held out as employees of Kaizr

C.     As set forth above, Kaizr was incorporated by the same individuals who originally incorporated AllRide.AI;

D.     ███████████████████████████████████ ███████████████████████████████ and

E.     ██████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████ ██████████████████████████

123.    On information and belief, assets have been transferred from AllRide.AI Inc. to Kaizr. That transfer of assets is how Kaizr—a company that did not exist before December 2018—was able to suddenly afford ██████████████████████████, expensive Silicon Valley office space, and luxurious employee perks listed on Kaizr's website.

124.    On information and belief, AllRide.AI Inc. and ZZX have transferred intellectual property from AllRide.AI Inc. to Kaizr, which explains how Kaizr's employees were able to begin immediately ████████████████████████████████████████.

125.    Furthermore, on information and belief, assets and intellectual properties were transferred to Kaizr for the express purpose of avoiding this lawsuit.  Kaizr was formed promptly after WeRide filed suit and sent cease-and-desist letters to Huang, and Wang.  Moreover, once fact discovery opened in the litigation, WeRide served extensive discovery on ZZX, Huang, Wang, and AllRide.AI Inc., including discovery that asked them to identify all companies that ZZX and AllRide.AI Inc. worked with—but none of the Defendants ever identified Kaizr.  In fact, ZZX's corporate representative claimed ignorance as to what Kaizr even was—an incredible claim, ████████ ████████████████████████████████████████████████████!

126.    WeRide is informed and believes that the Defendants formed Kaizr after the lawsuit began and jointly undertook to hide Kaizr's existence in discovery so that they could continue to exploit WeRide's trade secrets, and hide their assets from any judgment obtained by WeRide, regardless of the outcome of this lawsuit.

**In Anticipation of the Forthcoming Consequences of this Lawsuit, Huang Creates ZKA Inc.**

127.    On February 19, 2019—three months *after* WeRide initiated this litigation—Huang filed papers with the California Secretary of State incorporating a company called ZKA Inc. ("ZKA"). Accordingly to ZKA's corporate filings, its principle place of business is 555 Pine Avenue, Sunnyvale, CA 94085—which is the same address as Huang's place of residence.  Moreover, ZKA's filings identify Huang as the sole officer, agent, and director of ZKA.  On information and belief, ZKA has no employees aside from Huang.

128.    Within a month of ZKA's formation, ZZX (part of the AllRide Enterprise) entered into a ██████████████ with ZKA, ███████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

129.    But that was just the beginning: █████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████

130.    On information and belief, ZKA is an alter ego of Huang, because it is wholly controlled by Huang, who is its only employee, and all of the monies paid to ZKA ███████████ ████████ are passed through to Huang.

131.    Additionally, on information and belief, ZKA was created by Huang for the fraudulent purpose of ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

**ZZX, AllRide, and Kaizr Are Alter-Egos of Each Other**

132.    On information and belief, the AllRide Enterprise, including ZZX, AllRide.AI Inc., and Kaizr, are all controlled by a common set of individuals who operate the businesses as a single enterprise.

133.   As set forth above, AllRide.AI Inc. was incorporated, and capitalized, by the persons in control of ZZX, who also directed AllRide.AI Inc.'s spending for the benefit of ZZX. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

134.   ZZX and AllRide.AI Inc. did not maintain any corporate formalities.  Hiu Ling Lam, who is the only listed officer, director, or employee of AllRide.AI Inc., is also an employee of ZZX. According to a sworn statement submitted by Hiu Ling Lam, even though ZZX exerted complete and total financial control over AllRide.AI Inc., the entities had no formal corporate relationship: AllRide.AI Inc. never issued any stock, and ZZX did not have formal ownership over AllRide.AI Inc. Nonetheless, AllRide.AI Inc. apparently loaned money to ZZX at the direction of ZZX (which money it must have also received at the direction of ZZX, having no operations of its own), and for the purpose of paying debts on behalf of ZZX.  And of course, ZZX routinely does business under the name AllRide.AI, as alleged above.  In sum, ZZX and AllRide.AI operated as a single corporation, with AllRide.AI Inc. maintaining no corporate separateness, and no independent operations.

135.   Likewise, ZZX (and AllRide.AI Inc.) and Kaizr operate as a single enterprise.  ZZX's employees are held out as employees of Kaizr, and perform necessary functions for Kaizr—████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

And, of course, ████████████████████████████████████████

████—moreover, because AllRide.AI Inc. professes to have no operations and no employees, ████

████████████████████████████████████, meaning that Kaizr has taken over making payments for services provided to ZZX.

136.     In sum, ZZX, Kaizr, and AllRide are all operating as a single enterprise, so devoid of corporate formalities that their own employees are confused as to who works for whom, what legal entity does what, and what records (if any) exist to document or formalize the separation.  The three corporations are alter egos of each other and should be treated as such under the law.

## FIRST CAUSE OF ACTION

### Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836

### (All Defendants)

137.     WeRide incorporates all of the above paragraphs as though fully set forth herein.

138.     The information Defendants misappropriated constitutes protectable trade secrets owned by WeRide, as set forth in 18 U.S.C. § 1839(3). Based on an examination of the AllRide Enterprise's marketing materials, and on information and belief, Defendants have misappropriated at least the following trade secrets from WeRide:

- The specific implementation of sensor-fusion and localization developed in-house by WeRide;
- The mapping algorithms used by WeRide to convert data received from the sensor fusion and localization process into an HD Map;
- The ability to generate an HD Map using a combination of both WeRide's sensor fusion and localization and mapping modules;
- The set of state machines used in WeRide's code; and
- The code, developed by WeRide, that makes up each of the individual state machines used in WeRide's decision module.

139.     On information and belief, the Defendants' theft of WeRide's trade secrets goes well beyond the specific examples of trade secrets identified here, as will be demonstrated after WeRide receives discovery in this litigation.

140.     WeRide has taken reasonable measures to protect the confidentiality of its trade secrets, including through the measures alleged above. WeRide does not and did not consent to the use of any of its trade secrets by anyone other than authorized employees using them for within the scope of their duties for WeRide.

141.   WeRide's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

142.   Defendants misappropriated WeRide's trade secrets in the improper and unlawful manner alleged herein. Defendants' misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive. Defendants have attempted and continue to attempt to conceal their misappropriation and to obstruct WeRide's efforts to remedy their misappropriation.

143.   On information and belief, if Defendants are not enjoined, they will continue to misappropriate and use WeRide's trade secret information for their own benefit and to WeRide's detriment, and may disseminate those trade secrets to potential investors, the Chinese government, or other third parties.

144.   As the direct and proximate result of Defendants' conduct, WeRide has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because WeRide's remedy at law is inadequate, WeRide seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

145.   An injunction is necessary to prevent Defendants' actual and threatened misappropriation of WeRide's trade secrets. WeRide requests that the Court take affirmative steps to protect those trade secrets, including by ordering the surrender of all Kun Huang's computers, USB drives, email accounts, cloud storage accounts and other sources and equipment, as well as any other of Defendants' devices as are found to have contained any of WeRide's trade secrets, for examination by a forensics expert to determine whether the trade secrets were wrongfully taken and/or disseminated to others, and to ensure that no WeRide trade secrets remain saved on those systems; issuing a writ of possession, a preliminary injunction, and a permanent injunction ordering the return of the trade secret information and prohibiting Defendants from continuing their unlawful actions; and

ordering Defendants to stand down from any further actions that could harm WeRide's business through improper misappropriation or use of the trade secrets.

146. In addition to equitable relief, WeRide demands (i) monetary damages in an amount of no less than $45 million, (ii) exemplary damages in an amount two times the amount of its compensatory damages (i.e., no less than $90 million) pursuant to 18 U.S.C. § 1836(b)(3)(C) because WeRide's misappropriation was willful and malicious, and (iii) attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) because Defendants' misappropriation was willful and malicious.

147. Additionally, through alter ego liability, Wang, ZZX, AllRide.AI Inc., and Kaizr, Inc. are liable for misappropriating WeRide's trade secrets. The various companies in the AllRide Enterprise, including ZZX, AllRide.AI Inc., and Kaizr, are all alter egos of each other, because they (i) are controlled by a common group of individuals, (ii) share a common pool of employees who perform services for each other and act as a single team, (iii) pay for each other's expenses, (iii) fail to maintain corporate formalities, (iv) were incorporated by the same people, (v) are in the same line of business, and (vi) Kaizr was formed after this litigation was initiated.

148. Additionally, through successor liability, Kaizr, Inc. is liable for misappropriating WeRide's trade secrets. Kaizr is the successor-in-interest of AllRide.AI Inc. given that (i) AllRide formed Kaizr after this litigation was initiated, (ii) AllRide.AI Inc. has ceased doing business and is now defunct, (iii) Kaizr is now AllRide's United States-based entity, (iv) Kaizr has assumed AllRide.AI Inc.'s entire business and operations, and (v) Kaizr is in the same line of business as AllRide.AI Inc.

## SECOND CAUSE OF ACTION

### Violation of California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426 *et seq.*

### (All Defendants)

149. WeRide incorporates all of the above paragraphs as though fully set forth herein.

150. The trade secrets that Defendants misappropriated constitute protectable trade secrets owned by WeRide, as set forth in Cal. Civ. Code § 3426.1(d). Based on an examination of the AllRide Enterprise's marketing materials, and on information and belief, Defendants have misappropriated at least the following trade secrets from WeRide:

- The specific implementation of sensor-fusion and localization developed in-house by WeRide;

- The mapping algorithms used by WeRide to convert data received from the sensor fusion and localization process into an HD Map;

- The ability to generate an HD Map using a combination of both WeRide's sensor fusion and localization and mapping modules;

- The set of state machines used in WeRide's code; and

- The code, developed by WeRide, that makes up each of the individual state machines used in WeRide's decision module.

151.    On information and belief, the Defendants' theft of WeRide's trade secrets goes well beyond the specific examples of trade secrets identified here, as will be demonstrated after WeRide receives discovery in this litigation.

152.    WeRide's trade secrets derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use as set forth in Cal. Civ. Code § 3426.1(d)(1).

153.    WeRide has taken reasonable measures to keep such information secret, including through the measures alleged above. WeRide does not and did not consent to the use of any of its trade secrets by anyone other than authorized employees using them, within the scope of their duties for WeRide.

154.    Defendants misappropriated WeRide's trade secrets in the improper and unlawful manner alleged herein. Defendants knew or should have known under the circumstances that the information they misappropriated included trade secrets. Defendants' misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive. Defendants have attempted and continue to attempt to conceal their misappropriation and to obstruct WeRide's efforts to remedy their misappropriation.

155.    On information and belief, if Defendants are not enjoined, they will continue to misappropriate and use WeRide's trade secret information for their own benefit and to WeRide's

detriment, and may disseminate those trade secrets to potential investors, the Chinese government, or other third parties.

156.     As the direct and proximate result of Defendants' conduct, WeRide has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because WeRide's remedy at law is inadequate, WeRide seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

157.     An injunction is necessary to prevent Defendants' actual and threatened misappropriation of WeRide's trade secrets. WeRide requests that the Court take affirmative steps to protect those trade secrets, including by ordering the return of all Kun Huang's computers, USB drives, email accounts, cloud storage accounts and other sources and equipment, as well as any other of Defendants' devices as are found to have contained any of WeRide's trade secrets, for examination by a forensics expert to determine whether the trade secrets were wrongfully taken and/or disseminated to others, and to ensure that no WeRide trade secrets remain saved on those systems; issuing a writ of possession, a preliminary injunction, and a permanent injunction ordering the return of the trade secret information and prohibiting Defendants from continuing their unlawful actions; and ordering Defendants to stand down from any further actions that could harm WeRide's business through improper misappropriation or use of the trade secrets.

158.     In addition to equitable relief, WeRide demands (i) monetary damages in an amount of no less than $45 million, (ii) exemplary damages in an amount two times the amount of its compensatory damages (i.e., no less than $90 million) pursuant to 18 U.S.C. § 1836(b)(3)(C) because WeRide's misappropriation was willful and malicious, and (iii) attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) because Defendants' misappropriation was willful and malicious.

159.     Additionally, through alter ego liability, Wang, ZZX, AllRide.AI Inc., and Kaizr, Inc. are liable for misappropriating WeRide's trade secrets. The various companies in the AllRide Enterprise, including ZZX, AllRide.AI Inc., and Kaizr, are all alter egos of each other, because they (i)

are controlled by a common group of individuals, (ii) share a common pool of employees who perform services for each other and act as a single team, (iii) pay for each other's expenses, (iii) fail to maintain corporate formalities, (iv) were incorporated by the same people, (v) are in the same line of business, and (vi) Kaizr was formed after this litigation was initiated.

160.     Additionally, through successor liability, Kaizr, Inc. is liable for misappropriating WeRide's trade secrets.  Kaizr is the successor-in-interest of AllRide.AI Inc. given that (i) AllRide formed Kaizr after this litigation was initiated, (ii) AllRide.AI Inc. has ceased doing business and is now defunct, (iii) Kaizr is now AllRide's United States-based entity, (iv) Kaizr has assumed AllRide.AI Inc.'s entire business and operations, and (v) Kaizr is in the same line of business as AllRide.AI Inc.

## THIRD CAUSE OF ACTION

### Defamation (Jing Wang)

161.     WeRide incorporates all of the above paragraphs as though fully set forth herein.

162.     Jing Wang made multiple false and defamatory statements concerning WeRide. As discussed in more detail above, these false and defamatory statements included that (i) Waymo was going to bring a lawsuit against WeRide for stealing Waymo's source code, (ii) WeRide's self-driving technology did not work, (iii) the videos WeRide created to demonstrate its self-driving technology had been "faked," (iv) WeRide's self-driving cars had been involved in a traffic accident that WeRide was attempting to "cover up," and (v) WeRide had purposefully and maliciously diluted Jing Wang's shares in WeRide.

163.     On information and belief, these false and defamatory statements were published to investors and potential investors of WeRide, including representatives of Hanfor, Goldstone Investment Company, Lenovo, Bojang Capital, Xinding Capital, and Oriza Prior Equity Investment Fund.

164.     The statements are defamatory *per se*. Wang's false statements tended to, and in fact did, injure WeRide's business by causing investors to withdraw, reduce, or delay their investments.

165.     Wang's false and defamatory statements caused and continue to cause damage to WeRide. Several investors withdrew, reduced, or delayed their planned investments based on Wang's

false statements. All five Term Sheet Investors backed out of their commitments and Hanfor has only funded $4.5 million of its $20 million commitment. In total, WeRide has lost over $75 million in expected investment.

166. These statements hurt WeRide's reputation, both because the recipients believed the statements, and because the lost investment caused by the statements resulted in WeRide failing to achieve its investment objective for its Series A.

167. The publications of these false and defamatory statements was not privileged.

168. Wang knew that each of these statements was false at the time he made them, or made these statements with reckless disregard of their truth or falsity.

169. As a direct and proximate result of Wang's defamation of WeRide, WeRide has been and continues to be harmed. WeRide is entitled to its damages, in an amount to be determined at trial but not less than $75 million.

170. WeRide is further entitled to injunctive relief against Wang and all those acting in concert or participation with him, remedying their past improper conduct, and preventing such conduct in the future.

171. Wang acted in a wanton, willful and outrageous manner in defaming WeRide. Wang's conduct as alleged above was outrageous, demonstrating an evil motive and a reckless indifference to WeRide's rights, entitling WeRide to enhanced and/or punitive damages in an amount to be proven at trial, but no less than $150 million.

172. WeRide's remedy at law is inadequate to compensate it for the harm Wang has done. WeRide therefore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

173. Unless restrained, Wang will continue to inflict irreparable injury upon WeRide through continued defamation of WeRide. Accordingly, WeRide is entitled to preliminary injunctive and injunctive relief preventing Wang from continuing to defame WeRide.

# FOURTH CAUSE OF ACTION

## Intentional Interference with Prospective Economic Advantage (Jing Wang)

174.     WeRide incorporates all of the above paragraphs as though fully set forth herein.

175.     WeRide had an economic relationship with several prospective investors, from which WeRide reasonably expected them to make investments into WeRide. The Term Sheet Investors had signed term sheets with WeRide committing to invest $64 million, and Hanfor committed to invest an additional $20 million. WeRide had also engaged in extensive discussions with other investors, leading WeRide to reasonably believe that they would make investments in WeRide.

176.     Jing Wang knew of the relationship between WeRide and its investors from his position at WeRide, and, on information and belief, from industry reports and from his conversations with the investors and other third parties.

177.     Wang contacted WeRide's investors and made false and defamatory statements to them concerning WeRide's business. Specifically, Wang told investors that (i) Waymo was going to bring a lawsuit against WeRide for stealing Waymo's source code, (ii) WeRide's self-driving technology did not work, (iii) the videos WeRide created to demonstrate its self-driving technology had been "faked" (iv) WeRide's self-driving cars had been involved in a traffic accident that WeRide was attempting to "cover up," and (v) WeRide had purposefully and maliciously diluted Jing Wang's shares in WeRide. These statements were false, and Jing Wang knew that they were false at the time he made them.

178.     Wang knew that his false and defamatory statements were likely to cause WeRide's investors to withdraw, reduce, or delay their planned investments in WeRide. Indeed, in making these statements, Wang intended to cause the investors to withdraw, reduce, or delay their planned investments in WeRide.

179.     Wang's false statements to investors constituted libel and/or slander, as set forth more fully above.

180.     By making false statements to investors, Wang breached the non-disparagement clause contained in the Separation Agreement, which he entered into with WeRide on December 31, 2018.

181.     Several investors withdrew, reduced, or delayed their planned investments based on Wang's false statements. All five Term Sheet Investors backed out of their commitments and Hanfor

has only funded $4.5 million of its $20 million commitment. In total, WeRide has lost over $75 million in expected investment.

182.    In addition, Wang solicited WeRide employees to leave their employment to join AllRide, in violation of the PIIA's non-solicitation clause.

183.    On information and belief, Wang knew that each employee had a relationship with WeRide, and WeRide expected them to contribute to the development of WeRide's product. Wang also know that WeRide would incur costs to replace the employees who left.

184.    Wang's solicitation in fact caused employees to leave WeRide, causing WeRide loss of development time and recruitment costs above those it would have normally incurred.

185.    Wang's disparagement and solicitation further damaged WeRide's reputation, harmed WeRide's ability to attract investment and talent in the future, and caused WeRide to lose valuable development time.

186.    As a direct and proximate result of Wang's interference, WeRide has been and continues to be harmed. WeRide is entitled to its damages, in an amount to be determined at trial but not less than $75 million.

187.    WeRide is further entitled to injunctive relief against Wang and all those acting in concert or participation with him, remedying their past improper conduct, and preventing such conduct in the future.

188.    Wang acted in a wanton, willful and outrageous manner in interfering with WeRide's investment opportunities. Wang's conduct as alleged above was outrageous, demonstrating an evil motive and a reckless indifference to WeRide's rights, entitling WeRide to enhanced and/or punitive damages in an amount to be proven at trial, but no less than $150 million.

189.    WeRide's remedy at law is inadequate to compensate it for the harm Wang has done. WeRide therefore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

190.     Unless restrained, Wang will continue to inflict irreparable injury upon WeRide through continued interference with WeRide's economic opportunities. Accordingly, WeRide is entitled to preliminary injunctive and injunctive relief preventing Wang from continuing to defame WeRide.

## FIFTH CAUSE OF ACTION

### Breach of Fiduciary Duty and Duty of Loyalty (Kun Huang)

191.     WeRide incorporates all of the above paragraphs as though fully set forth herein.

192.     As Director of Hardware of WeRide, and given the duties and obligations he had accepted toward WeRide, and in light of the trust that WeRide had placed in him, Kun Huang owed WeRide an undivided loyalty and was obligated to act as its fiduciary with the utmost good faith, and in the best interests of WeRide. Huang supervised a team of ten engineers, had input in hiring and firing, and was responsible for the hardware budget.

193.     WeRide was entitled to place its trust and confidence in Huang and to expect him to act with the utmost good faith toward it in carrying out WeRide's business. WeRide did rely on Huang's loyalty and integrity and his faithful performance of his duties and responsibilities.

194.     Huang took advantage of WeRide's faith in him by not performing the duties he owed to WeRide, by acting in conflict of interest, by engaging in business for his own account, and by concealing his improper conduct.

195.     Huang knowingly and willingly breached his fiduciary duty and duty of loyalty to WeRide by seeking to sell his skills and experience to the highest-bidding competitor, soliciting WeRide employees to join him, misappropriating WeRide's trade secrets, making efforts to cover up that conduct, and by obstructing and failing to be fully forthcoming or otherwise cooperative in WeRide's efforts to investigate and remedy Huang's misconduct. WeRide did not consent to Huang's conduct described herein.

196.     As a direct and proximate result of Huang's disloyalty to WeRide and breach of his duties, WeRide has been and continues to be harmed. WeRide is entitled to its damages, in an amount to be determined at trial but not less than $45 million, as well as disgorgement from Huang, and the

forfeiture and return of all monies and compensation paid to him during his period of disloyalty, the exact amount to be determined at trial.

197.    WeRide is further entitled to injunctive relief against Huang and all those acting in concert or participation with him, remedying their past improper conduct, and preventing such conduct in the future.

198.    Huang acted in a wanton, willful and outrageous manner in breaching his fiduciary duties and duty of loyalty to WeRide. Huang's conduct as alleged above was outrageous, demonstrating an evil motive and a reckless indifference to WeRide's rights, entitling WeRide to enhanced and/or punitive damages in an amount to be proven at trial, but no less than $90 Million.

199.    WeRide's remedy at law is inadequate to compensate it for the harm Huang has done. WeRide therefore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

200.    Unless restrained, Huang will continue to inflict irreparable injury upon WeRide through his violations of his fiduciary duties and duty of loyalty to WeRide. Accordingly, WeRide is entitled to preliminary injunctive and injunctive relief preventing Huang from continuing to misuse and/or misappropriate WeRide's property or from otherwise engaging in acts detrimental to WeRide.

## SIXTH CAUSE OF ACTION

### Breach of Written Contracts (Jing Wang)

201.    WeRide incorporates all of the above paragraphs as though fully set forth herein.

202.    As alleged above, WeRide and Jing Wang entered into the written Proprietary Information and Inventions Agreement on March 31, 2017.

203.    Under the PIIA, Wang agreed to "hold in confidence and not disclose" any information he developed, learned, or obtained during the term of his employment. Wang also agreed not to use such information "except within the scope of [his] employment."

204.    Wang also agreed in the PIIA to a non-solicitation clause providing that "[u]ntil one year after the term of my employment, I will not encourage or solicit any employee or consultant of

[WeRide] to leave [WeRide] for any reason."  The term of Wang's employment ended on January 31, 2018. Under the terms of the PIIA, the non-solicitation clause remains in effect until January 31, 2019. Further, Wang agreed in the PIIA that "during the term of my employment with [WeRide] (whether or not during business hours), I will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of [WeRide], and I will not assist any other person or organization in competing with or preparing to compete with any business or demonstrably anticipated business of [WERide]."

205.    In connection with Wang's resignation from WeRide, Wang and WeRide entered into the written Separation Agreement, dated January 31, 2018. Under the Separation Agreement, Wang agreed to a non-disparagement clause providing that he "will never make any negative or disparaging statements (orally or in writing) about the Company or its stockholders, directors, officers, employees, products, services or business practices."  Wang also explicitly agreed in the Separation Agreement to remain bound by the terms of the PIIA "at all times in the future."

206.    WeRide has fully performed all of its obligations under the agreements, including paying Wang nearly a million dollars in compensation.

207.    Wang has breached and threatens to continue to breach the PIIA and the Termination Agreement in at least the following ways:

    a.  Disparaging WeRide to third parties, including investors and potential investors of WeRide;

    b.  Soliciting and encouraging WeRide employees to leave WeRide to join AllRide, a competing company;

    c.  Using WeRide Confidential Information outside the scope of his employment for WeRide, and in furtherance of the AllRide Enterprise, a competing business;

208.    Wang's breaches of his agreements with WeRide have caused foreseeable damage to WeRide, including the loss of investment, loss of value of its trade secrets, and loss of future investment opportunities. As a result, WeRide is entitled to damages in an amount to be determined at trial, but no less than $124.5 million.

209.    As Wang agreed in the PIIA, "any breach of the agreement will cause irreparable harm to [WeRide] for which damages would not be an adequate remedy, and, therefore, [WeRide] will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond."  As a result of any one of these breaches of its agreements, WeRide has been injured and faces irreparable injury. WeRide is threatened with losing investment, employees, its competitive advantage, and its trade secrets in amounts which may be not be possible to determine, unless Defendants and each of them is enjoined and restrained by order of this Court.

## SEVENTH CAUSE OF ACTION

### Breach of Written Contract (Kun Huang)

210.    WeRide incorporates all of the above paragraphs as though fully set forth herein.

211.    As alleged above, WeRide and Kun Huang entered into the written Proprietary Information and Inventions Agreement on March 22, 2017.

212.    Under the Proprietary Information and Inventions Agreement, Huang agreed to "hold in confidence and not disclose" any information he developed, learned, or obtained during the term of his employment. Huang also agreed not to use such information "except within the scope of [his] employment," and to "promptly return to [WeRide] all items containing or embodying" such information upon his termination.

213.    Huang also agreed in the PIIA to a non-solicitation clause providing that "[u]ntil one year after the term of my employment, I will not encourage or solicit any employee or consultant of [WeRide] to leave [WeRide] for any reason." The term of Huang's employment ended on August 13, 2018. Under the terms of the PIIA, the non-solicitation clause remains in effect until August 13, 2019.

214.    Finally, Huang agreed in the PIIA that "during the term of my employment with [WeRide] (whether or not during business hours), I will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of [WeRide], and I will not assist any other person or organization in competing with or preparing to compete with any business or demonstrably anticipated business of [WeRide]."

215.    WeRide has fully performed all of its obligations under the agreements, including paying Huang hundreds of thousands of dollars in compensation.

216.     Huang has breached and threatens to continue to breach the PIIA in at least the following ways:

a.   Stealing WeRide's Proprietary Information, including Proprietary Information not necessary to use within the scope of his employment for WeRide;

b.   Failing to return WeRide's Proprietary Information to WeRide upon his termination;

c.   Deleting Proprietary Information on his company-issued laptops prior to his departure;

d.   Disclosing WeRide Confidential Information to third parties, including the AllRide Enterprise, a competitor of WeRide.

e.   Using WeRide Confidential Information outside the scope of his employment for WeRide, and in furtherance of the AllRide Enterprise;

f.   Soliciting and encouraging WeRide employees to leave WeRide to join the AllRide Enterprise, both during and after the term of his employment; and

g.   Engaging in business activities in competition with WeRide during the term of his employment, namely assisting at least two competing companies by providing advice and information relating to their business, and helping them recruit employees from WeRide; and

217.     Huang's breaches of his agreements with WeRide have caused foreseeable damage to WeRide, including the loss of investment, loss of value of its trade secrets, and loss of future investment opportunities. As a result, WeRide is entitled to damages in an amount to be determined at trial, but no less than $45 million.

218.     As Huang agreed in the PIIA, "any breach of the agreement will cause irreparable harm to [WeRide] for which damages would not be an adequate remedy, and, therefore, [WeRide] will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond." As a result of any one of these breaches of its agreements, WeRide has been injured and faces irreparable injury. WeRide is threatened with losing investment, employees, its

competitive advantage, and its trade secrets in amounts which may be not be possible to determine, unless Defendants and each of them is enjoined and restrained by order of this Court.

## EIGHTH CAUSE OF ACTION

### Intentional Interference with Contract (Jing Wang)

219.    WeRide incorporates all of the above paragraphs as though fully set forth herein.

220.    As alleged above, the PIIA is a written contract that was entered into between Huang and WeRide, which contract required Huang to "hold in confidence and not disclose" any information he developed, learned, or obtained during the term of his employment.  The PIIA further required that Huang not use such information "except within the scope of [his] employment," and to "promptly return to [WeRide] all items containing or embodying" such information upon his termination.

221.    In addition, pursuant to the PIIA, Huang agreed that "during the term of my employment with [WeRide] (whether or not during business hours), I will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of [WeRide], and I will not assist any other person or organization in competing with or preparing to compete with any business or demonstrably anticipated business of [WeRide]."

222.    As the former CEO of WeRide, whose tenure as CEO included the period of time when Huang was hired and entered into the PIIA with WeRide, Wang was fully aware of that the PIIA was written contract between Huang and WeRide.  Wang was also fully aware of the terms of the PIIA and the obligations placed on Huang by the PIIA.

223.    Despite his knowledge of the PIIA, Wang interfered with Huang's performance of the PIIA in at least the following ways:

A.      On information and belief, after he solicited Huang to join the AllRide Enterprise, Wang encouraged Huang to solicit additional WeRide employees to join the AllRide Enterprise, during the period of time when Huang was still working for WeRide, effectively interfering with the PIIA's requirement that Huang not work for a competing company during the period of his employment with WeRide; and

B.      On information and belief, Wang instructed, directed, requested, or encouraged Huang to disclose WeRide's confidential and proprietary information to the

AllRide Enterprise, in violation of the PIIA's requirement that Huang keep such information in confidence.

224.   In the alternative, due to Wang's experience as CEO of WeRide, Wang knew ███ ████████████████████████████████████████████████████████████████ ██████████████, or should have known, that the technological development evinced by the AllRide Enterprise could not be attributed to independent development, and could only be explained by Huang breaching the PIIA.  Yet Wang, despite being the leader of the AllRide Enterprise, took no steps to prevent Huang from disclosing or using WeRide's confidential information.  Thus Wang knew that Huang would continue not to perform the PIIA insofar as Huang continued to work for the AllRide Enterprise, but Wang took no steps to stop it.

225.   As a direct and proximate result of Wang's interference with Huang's performance of the PIIA, or alternatively, Wang's knowledge of ongoing interference and failure to act, Huang failed to fulfill his obligations under the PIIA, causing harm to WeRide, including through the disclosure of WeRide's confidential and proprietary information to the AllRide Enterprise, and Huang's solicitation of WeRide employees to work for a competitor during a period of time when Huang still worked for WeRide and owed it contractual duties.

226.   Huang's non-performance of his obligations under the PIIA have caused foreseeable damage to WeRide, including the loss of investment, loss of value of its trade secrets, and loss of future investment opportunities. As a result, WeRide is entitled to damages in an amount to be determined at trial, but no less than $45 million.

227.   Wang interfered with Huang's performance of the PIIA acted in a wanton, willful and outrageous manner.  Wang's conduct as alleged above was outrageous, demonstrating an evil motive and a reckless indifference to WeRide's rights, entitling WeRide to enhanced and/or punitive damages in an amount to be proven at trial, but no less than $90 Million.

228.   WeRide's remedy at law is inadequate to compensate it for the harm Wang has caused by interfering with Huang's contract. WeRide therefore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect

1    other legitimate business interests. WeRide's business operates in a competitive market and will

2    continue suffering irreparable harm absent injunctive relief.

3        229.    Unless restrained, Wang will continue to interfere with Huang's contract, inflicting

4    irreparable injury upon WeRide. Accordingly, WeRide is entitled to preliminary injunctive and

5    injunctive relief preventing Wang from continuing to interfere with Huang's performance of the PIIA

6    or from otherwise engaging in acts detrimental to WeRide.

**NINTH CAUSE OF ACTION**

**Actual Fraudulent Transfer, Cal. Civ. Code § 3439.04(a)(1) (AllRide Enterprise)**

9        230.    WeRide incorporates all of the above paragraphs as though fully set forth herein.

10       231.    As alleged above, Kaizr, Inc. was incorporated on December 19, 2018. On information

11   and belief, AllRide.AI Inc. transferred to Kaizr its assets and business, including its vendor contracts,

12   employees, customers, intellectual property and know-how, and other related assets and goodwill

13   (collectively, the "Business").

14       232.    On information and belief, the abovementioned transfer of AllRide.AI Inc.'s Business

15   was done in anticipation of a possible adverse ruling in this action as part of a fraudulent scheme

16   whereby the AllRide Enterprise caused AllRide.AI Inc. to transfer its Business to Kaizr so that the

17   assets would be out of WeRide's reach, and discontinued AllRide.AI Inc.'s business and income-

18   producing activities that might have helped to satisfy WeRide's claims in this action.

19       233.    On information and belief, the AllRide Enterprise did so with the intent to hinder, delay

20   or defraud WeRide in collecting, and to prevent WeRide from recovering from AllRide.AI Inc., any

21   damages it may collect on its claims. In so acting, the AllRide Enterprise was attempting to enrich

22   themselves at WeRide's expense. Indeed, Kaizr seeks to make profits by conducting the same

23   business that AllRide.AI Inc. had previously conducted, in competition with WeRide, while

24   simultaneously shielding itself from liability for payment of WeRide's claims in this action.

25       234.    On information and belief, the AllRide Enterprise directed and controlled the

26   fraudulent scheme with the intent to hinder, delay or defraud WeRide in collecting, and to prevent

27   WeRide from recovering from AllRide.AI Inc., any damages WeRide are entitled to from this action.

28

235.     The AllRide Enterprise has made repeated representations to WeRide that are designed to mislead WeRide as to the true relationship of the companies in the AllRide Enterprise.  These representations include statements made at a deposition of ZZX's corporate representative that took place in Hong Kong on June 6 and June 7 of 2019, wherein ZZX's corporate representative repeatedly professed ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████  These representations were demonstrably false, and contradicted by (among other evidence discussed above) the testimony of Defendant Huang in this very litigation.  The AllRide Enterprise also made false statements in written discovery, including ████████████ ███████████████████████████—again a claim contradicted by documents and testimony produced in this litigation, including the testimony of Defendant Huang.

236.     On information and belief, the AllRide Enterprise made these repeated false statements to WeRide with an intent to induce WeRide to rely on those statements, and to further cause WeRide to cease investigating the relationships between companies in the AllRide Enterprise, so that the AllRide Enterprise could hinder, delay, or defraud WeRide's attempts to receive the compensation to which it is entitled for the AllRide Enterprise's wrongdoing.

237.     As a direct and proximate result of AllRide.AI Inc.'s transfer of its Business to Kaizr, WeRide has been and continues to be harmed.

238.     WeRide is further entitled to injunctive relief against the AllRide Enterprise and all those acting in concert or participation with it, remedying its past improper conduct, and preventing such conduct in the future.

239.     The AllRide Enterprise acted in a wanton, willful and outrageous manner in transferring its Business. The AllRide Enterprise's conduct as alleged above was outrageous, demonstrating an evil motive and a reckless indifference to WeRide's rights, entitling WeRide to enhanced and/or punitive damages in an amount to be proven at trial.

240.     WeRide's remedy at law is inadequate to compensate it for the harm the AllRide Enterprise has done.  WeRide therefore seeks, in addition to damages, temporary, preliminary, and

permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

241.     Unless restrained, the AllRide Enterprise will continue to inflict irreparable injury upon WeRide through continuing to transfer their Business to other companies within the AllRide Enterprise. Accordingly, WeRide is entitled to preliminary injunctive and injunctive relief preventing the AllRide Enterprise from transferring its Business.

## TENTH CAUSE OF ACTION

**Constructive Fraudulent Transfer, Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05**

**(AllRide Enterprise)**

242.     WeRide incorporates all of the above paragraphs as though fully set forth herein.

243.     On information and belief, AllRide.AI Inc. was insolvent when AllRide.AI Inc. transferred its assets and business, including its vendor contracts, employees, customers, intellectual property and know-how, and other related assets and goodwill (collectively, the "Business") to Kaizr, or was rendered insolvent by the transfer. Alternatively, on information and belief, at the time that the AllRide Enterprise caused AllRide.AI Inc. to transfer its Business and other assets to Kaizr, AllRide.AI Inc.: (a) was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (b) intended to incur, or reasonably should have believed that it would incur debts beyond its ability to pay as they came due.

244.     On information and belief, AllRide.AI Inc. did not receive reasonably equivalent consideration for the transfer of the Business to Kaizr.

245.     The AllRide Enterprise has made repeated representations to WeRide that are designed to mislead WeRide as to the true relationship of the companies in the AllRide Enterprise. These representations include statements made at a deposition of ZZX's corporate representative that took place in Hong Kong on June 6 and June 7 of 2019, wherein ZZX's corporate representative repeatedly professed ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████  These representations were demonstrably false, and contradicted by (among other evidence discussed above) the testimony of Defendant Huang in this very litigation.  The AllRide Enterprise also made false statements in written discovery, including ███████████ ███████████████████████—again a claim contradicted by documents and testimony produced in this litigation, including the testimony of Defendant Huang.

246.   On information and belief, the AllRide Enterprise made these repeated false statements to WeRide with an intent to induce WeRide to rely on those statements, and to further cause WeRide to cease investigating the relationships between companies in the AllRide Enterprise, so that the AllRide Enterprise could hinder, delay, or defraud WeRide's attempts to receive the compensation to which it is entitled for the AllRide Enterprise's wrongdoing.

247.   As a direct and proximate result of AllRide.AI Inc.'s transfer of its Business to Kaizr, WeRide has been and continues to be harmed. WeRide is entitled to its damages, in an amount to be determined at trial.

248.   WeRide is further entitled to injunctive relief against the AllRide Enterprise and all those acting in concert or participation with them, remedying its past improper conduct, and preventing such conduct in the future.

249.   The AllRide Enterprise acted in a wanton, willful and outrageous manner in transferring its Business. The AllRide Enterprise's conduct as alleged above was outrageous, demonstrating an evil motive and a reckless indifference to WeRide's rights, entitling WeRide to enhanced and/or punitive damages in an amount to be proven at trial.

250.   WeRide's remedy at law is inadequate to compensate it for the harm the AllRide Enterprise has done.  WeRide therefore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

251.   Unless restrained, the AllRide Enterprise will continue to inflict irreparable injury upon WeRide through continuing to transfer the Business to other companies within the AllRide Enterprise.

1   Accordingly, WeRide is entitled to preliminary injunctive and injunctive relief preventing the AllRide

2   Enterprise from transferring its Business to other entities.

3                          **ELEVENTH CAUSE OF ACTION**

4                   **Common Law Fraudulent Conveyance (AllRide Enterprise)**

5          252.    WeRide incorporates all of the above paragraphs as though fully set forth herein.

6          253.    The AllRide Enterprise is liable for common law fraudulent conveyance as to WeRide

7   by deliberately participating in a scheme to transfer AllRide.AI Inc.'s assets and business, including

8   its vendor contracts, employees, customers, intellectual property and know-how, and other related

9   assets and goodwill (collectively, the "Business"), to Kaizr so that Kaizr can make profits from

10  conducting the Business, while simultaneously shielding Kaizr from liability for AllRide.AI Inc.'s

11  debts, and preventing WeRide from enforcing its claims against AllRide.AI Inc. by dissipating

12  AllRide.AI Inc.'s assets and depriving AllRide.AI Inc. of its primary source of revenues.

13         254.    The AllRide Enterprise has made repeated representations to WeRide that are designed

14  to mislead WeRide as to the true relationship of the companies in the AllRide Enterprise.  These

15  representations include statements made at a deposition of ZZX's corporate representative that took

16  place in Hong Kong on June 6 and June 7 of 2019, wherein ZZX's corporate representative repeatedly

17  professed ████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████████████

20  ████████████   These representations were demonstrably false, and contradicted by (among

21  other evidence discussed above) the testimony of Defendant Huang in this very litigation.  The

22  AllRide Enterprise also made false statements in written discovery, including ████████████

23  ████████████████████████—again a claim contradicted by documents and testimony

24  produced in this litigation, including the testimony of Defendant Huang.

25         255.    On information and belief, the AllRide Enterprise made these repeated false statements

26  to WeRide with an intent to induce WeRide to rely on those statements, and to further cause WeRide

27  to cease investigating the relationships between companies in the AllRide Enterprise, so that the

28

AllRide Enterprise could hinder, delay, or defraud WeRide's attempts to receive the compensation to which it is entitled for the AllRide Enterprise's wrongdoing.

256.    As a direct and proximate result of AllRide.AI Inc.'s transfer of its Business to Kaizr, WeRide has been and continues to be harmed.  WeRide is entitled to its damages, in an amount to be determined at trial.

257.    WeRide is further entitled to injunctive relief against the AllRide Enterprise and all those acting in concert or participation with them, remedying their past improper conduct, and preventing such conduct in the future.

258.    The AllRide Enterprise acted in a wanton, willful and outrageous manner in transferring its Business. The AllRide Enterprise's conduct as alleged above was outrageous, demonstrating an evil motive and a reckless indifference to WeRide's rights, entitling WeRide to enhanced and/or punitive damages in an amount to be proven at trial.

259.    WeRide's remedy at law is inadequate to compensate it for the harm the AllRide Enterprise has done.  WeRide therefore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests. WeRide's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

260.    Unless restrained, the AllRide Enterprise will continue to inflict irreparable injury upon WeRide through continuing to transfer the Business to other companies in the AllRide Enterprise. Accordingly, WeRide is entitled to preliminary injunctive and injunctive relief preventing the AllRide Enterprise from transferring its Business to other entities.

**PRAYER FOR RELIEF**

261.    Judgment in favor of WeRide and against Defendants on all of WeRide's claims asserted in its Complaint;

262.    That the Court grant WeRide damages as described in each of the above claims, in favor of WeRide and against Defendants in amounts to be determined at trial, but not less than $124.5 million, and further directing forfeiture and disgorgement of all amounts paid by WeRide to Defendants during the period of disloyalty;

263.    Establishment of a constructive trust ordering Defendants to transfer legal title and possession to WeRide of any devices containing WeRide's trade secrets and other Confidential Information, including any Proprietary Information under the PIIA;

264.    The issuance of a preliminary injunction and final, permanent injunction against Defendants as follows:

A.    That Defendants, and all those acting in concert with any of them, be preliminarily and permanently enjoined from disclosing or utilizing for any purpose WeRide's Confidential Information;

B.    That Defendants, and all those acting in concert with any of them, be directed immediately to return to WeRide any and all of WeRide's Confidential Information in their possession, custody, or control;

C.    That Defendants deliver, or that WeRide may seize, Defendants' home and business computers (including laptops and desktops), memory devices, electronic data storage media, "cloud"-based file storage accounts and hardcopy documents to search, at Defendants' expense, for WeRide's Confidential Information and other property belonging or relating to WeRide and to arrange for the deletion of any and all such Confidential Information from those computers, media, devices and accounts;

D.    That pending delivery to WeRide of the materials described in the two preceding sub-paragraphs, Defendants be enjoined and restrained from destroying: (i) any electronic or hard copy document, file, record, information or other property containing any of WeRide's Confidential Information; (ii) any electronic or hard copy document, file, record, information or other property referring or relating in any way to any of WeRide's Confidential Information; and (iii) any data contained on any of his home and business computers (including laptops and desktops), memory devices, mobile telephones and other wireless communication devices, any other electronic data storage media and/or "cloud"-based storage accounts;

Case No. 5:18-cv-7233
SECOND AMENDED COMPLAINT

E.      That Defendants identify, under oath, the identity of the individuals, groups and companies, if any, to whom any Defendant has disclosed WeRide's Confidential Information;

265.    That the Court grant WeRide pre-judgment and post-judgment interest on all such damages;

266.    That the Court grant WeRide an award for reasonable attorneys' fees and costs of suit incurred herein;

267.    That the Court grant WeRide an award for punitive damages in amount to be determined at trial, but not less than $249 million;

268.    That the Court award WeRide such other and further relief as the Court deems just and proper.

<strong>JURY DEMAND</strong>

269.    Pursuant to Federal Rule of Civil Procedure 38(b), WeRide hereby demands trial by jury of all issues properly triable thereby.

DATED:  August 6, 2019                    Respectfully submitted,

                                          QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP

                                          By _____
                                             Claude M. Stern
                                             Ryan S. Landes
                                             Michael Kang
                                             Michael F. LaFond
                                             Attorneys for Plaintiffs WeRide Corp. and
                                             WeRide Inc.