1  Kurt A. Kappes (SBN 146384)
   kappesk@gtlaw.com
2  Todd A. Pickles (SBN 215629)
   picklest@gtlaw.com
3  Alicia Intriago (SBN 320102)
   intriagoa@gtlaw.com
4  GREENBERG TRAURIG, LLP
   1201 K Street, Suite 1100
5  Sacramento, CA 95814
   Telephone: (916) 442-1111
6  Facsimile: (916) 448-1709

7  Howard Holderness (SBN 169814)
   holdernessh@gtlaw.com
8  Michael D. Lane (SBN 239517)
   lanemd@gtlaw.com
9  GREENBERG TRAURIG, LLP
   Four Embarcadero Center, Suite 3000
10 San Francisco, California 94111
   Telephone: (415) 655-1300
11 Facsimile: (415) 707-2010

12 Attorneys for Defendants
   ALLRIDE.AI INC. and ZHONG ZHI
13 XING TECHNOLOGY CO. LTD.

14

15                **UNITED STATES DISTRICT COURT**

16                **NORTHERN DISTRICT OF CALIFORNIA**

17

| | |
|---|---|
| 18  WERIDE CORP. f/k/a JingChi Corp.;<br>WERIDE INC. f/k/a JingChi Inc., | Case No. 5:18-cv-07233-EJD-NMC |
| 19 | **DEFENDANTS ALLRIDE.AI INC.'S AND** |
| 20          Plaintiff, | **ZHONG ZHI XING TECHNOLOGY CO.**<br>**LTD.'S MEMORANDUM IN OPPOSITION** |
| 21   v. | **TO THE WERIDE PLAINTIFFS' MOTION**<br>**FOR SANCTIONS PURSUANT TO FED. R.**<br>**CIV. P. 37(B), 37(E)(1), 37(E)(2) AND THE** |
| 22  JING WANG, an individual, KUN HUANG,<br>and individual, ZHONG ZHI XING | **COURT'S INHERENT POWERS** |
| 23  TECHNOLOGY CO. LTD. d/b/a ALLRIDE, AI,<br>ALLRIDE.AI INC., KAIZR, INC., and ZKA | Date:        February 27, 2020<br>Time:        9:00 A.M. |
| 24  INC., | Courtroom:   4, 5th Floor |
| 25          Defendants. | The Hon. Edward J. Davila |
| 26 | |
| 27 | |

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................... 1

II.     FACTS RELEVANT TO THE MOTION ................................................................. 2

     A.      WeRide Asserts Claims And Obtains A Preliminary Injunction Against ZZX
         Based On Speculation That ZZX Obtained And Used WeRide's Code............................ 2

     B.      ZZX Stores Its Source Code In Systems That Log All Changes. ................................. 3

     C.      The October 2018 And July 2019 ZZX Code Were Previously Provided to
         WeRide. ........................................................................................................................... 4

     D.      ZZX Discovers And Self-Reports The Loss Of Some Emails And Email
         Accounts. ........................................................................................................................ 6

     E.      ZZX Produced A Significant Volume of Documents And WeRide Has Been
         Provided Written Discovery And The Opportunity To Depose Key Witnesses. ............... 7

     F.      ZZX Fully Cooperates In The Investigation, At Great Expense. ...................................... 7

     G.      ZZX Has Now Provided Direct Access To—And Confirmed The Integrity Of—
         Its Source Code Repositories. ........................................................................................ 8

III.    LEGAL STANDARD ............................................................................................... 10

IV.     ARGUMENT ............................................................................................................ 11

     A.      The Case-Dispositive Sanctions WeRide Seeks Must Be Denied Because ZZX's
         Loss Of Emails Has Not Prejudiced WeRide's Ability To Compare Code. .................... 11

     B.      WeRide Has Not Met Its Burden That Extreme Default Sanction Is Warranted. ........... 15

         1.      WeRide's preclusive sanctions conclusively establishing facts are
             inappropriate. ................................................................................................. 15

         2.      WeRide's mandatory adverse inference sanctions are inappropriate. ................... 16

     C.      The Extreme Sanctions WeRide Urges Are Not Justified. ............................................. 18

         3.      Information from pre-November 2, 2018 "weekly" reports remains
             available from an alternative source. ................................................................. 18

         4.      ZZX's failure to suspend its 90-day deletion email policy does not support
             the extreme sanctions that WeRide seeks. ......................................................... 19

         5.      The deletion of RG's snd JW's email accounts also does not support the
             drastic sanctions that WeRide proposes. ........................................................... 19

         6.      The original "kun.huang@allride.ai" email account was deleted before
             litigation. ........................................................................................................ 22

         7.      Failure to preserve Dingtalk messages does not prejudice WeRide either. .......... 23

         8.      ZZX's self-disclosed loss of emails, and its continuing remediation efforts
             and ZZX's scrupulous cooperation with the Neutral Examiner further
             defeat WeRide's request for drastic sanctions. ................................................. 23

     D.      The Court Should Not Base Any Conclusion On Claims That Are Patently False. ......... 24

V.      CONCLUSION ......................................................................................................... 25

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S AND
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

# TABLE OF AUTHORITIES

**Federal Cases**

*Advantacare Health Partners L.P. v. Access IV*,
  2004 WL 1837997 (S.D. Cal. Aug. 17, 2004) ............................................................10, 11, 15, 19, 24

*Apple Inc. v. Samsung Elec. Co., Ltd.*,
  888 F. Supp. 2d 976 (N.D. Cal. 2012) ...........................................................11, 15, 16, 17, 19

*Best Lockers, LLC v. American Locker Group, Inc.*,
  2013 WL 12131586 (C.D. Cal. Mar. 27, 2013) ...................................................................17

*Cardinal v. Lupo*,
  2019 WL 4450859 (N.D. Cal. Sept. 17, 2019) ...........................................................14, 22, 23

*Compass Bank v. Morris Cerullo World Evangelism*,
  104 F. Supp. 3d 1040 (S.D. Cal. 2015) ...............................................................................17

*Connecticut General Life Ins. Co. v. New Images of Beverly Hills*,
  482 F.3d 1091 (9th Cir. 2007) ...............................................................................................11

*Dong Ah Tire & Rubber Co., Ltd. v. Glasforms, Inc.*,
  2009 WL 1949124 (N.D. Cal. July 2, 2009) ........................................................................12

*In re Exxon Valdez*,
  102 F.3d 429 (9th Cir. 1996) ...........................................................................................2, 11

*First Financial Security, Inc. v. Freedom Equity Group, LLC*,
  2016 WL 6870218 (N.D. Cal. 2016) ...........................................................2, 18, 20, 22

*Fjelstad v. American Honda Motor Co.*,
  762 F.2d 1334 (9th Cir. 1985) ...........................................................................2, 10, 14

*Google Inc. v. American Blind & Wallpaper Factory, Inc.*,
  2007 WL 1848665 (N.D. Cal. Jun. 27, 2007) ...........................................................2, 16, 25

*Guidroz-Brault v. Missouri P. R. Co.*,
  254 F.3d 825 (9th Cir. 2001) ...............................................................................................13

*Halaco Engineering Co. v. Costle*,
  843 F.2d 276 (9th Cir. 1988) ...............................................................................................15

*Hugler v. Southwest Fuel Mgmt. Inc.*,
  2017 WL 8941163 (C.D. Cal. May 2, 2017) ........................................................................10

*Knupfer v. Lindblade (In re Dyer)*,
  322 F.3d 1178 (9th Cir. 2003) ...............................................................................................10

*Leon v. IDX Systems Corp.*,
  464 F.3d 951 (9th Cir. 2006) ...........................................................................................10, 15

*Medical Lab. Mgmt. Consultants v. American Broadcasting Companies, Inc.*,
  306 F.3d 806 (9th Cir. 2002) ...........................................................1, 14, 18, 24

*In re Napster, Inc. Copyright Litig.*,
  462 F. Supp. 2d 1060 (N.D. Cal. 2006) ...........................................................10, 14, 15, 16, 19

CASE NO. 5:18-cv-07233-EJD-NMC

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S AND
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

*Padgett v. City of Monte Sereno*,
   2007 WL 878575 (N.D. Cal. Mar. 20, 2007)....................................................................2, 11

*Rimkus Consulting Grp., Inc. v. Cammarata*,
   688 F. Supp. 2d 598 (S.D. Tex. 2010) .............................................................18, 24, 25

*Storz Management Co. v. Carey*,
   2019 WL 2615755 (E.D. Cal. June 26, 2019) ...............................................................19, 23

*The Sunrider Corp. v. Bountiful Biotech Corp.*,
   2010 WL 4589156 (C.D. Cal. Nov. 3, 2010).................................................................10

*United States. v. Kahaluu Constr.*,
   857 F.2d 600 (9th Cir. 1988) ......................................................................................12

**Rules**

Fed. R. Civ. P. 37............................................................................................................2, 10

Fed. R. Civ. P. 37(B).......................................................................................................1

Fed. R. Civ. P. 37(E)(1)..................................................................................................1

Fed. R. Civ. P. 37(e)(2)..................................................................................................10, 19

Fed. R. Civ. P. 37(E)(2)..................................................................................................1

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S AND
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

Defendants AllRide.AI, Inc. ("AllRide") and Zhong Zhi Xing Technology Co. Ltd. (collectively, with AllRide, "ZZX") respectfully submit this Memorandum of Law in Opposition to plaintiffs WeRide Corp. and WeRide Inc.'s (collectively "WeRide") Motion for Sanctions Pursuant to Fed. R. Civ. P. 37(B); 37(E)(1); 37(E)(2) and the Court's Inherent Powers (ECF No. 330) ("Motion").

## I.    INTRODUCTION

ZZX does not dispute that its imperfect preservation practices resulted in the loss of some documents. ZZX regrets not raising the issues to the Court sooner; what was intended to be a thorough investigation before raising alarm appeared, for good reason, to be delay. But WeRide's hyperbole and indiscriminate mudslinging bears no proportion to the facts. As the final report of the Court-appointed technical consultant shows, numerous materials were recovered, and there was no grand conspiracy.

Most importantly, however, the Court should not be distracted from the fact that all of WeRide's claims against ZZX effectively rise and fall on the comparison between WeRide's source code and ZZX's source code. On this dispositive issue, WeRide has had and continues to have access to ZZX's source code to litigate its trade secret claims, but to date it has found no instance of its code in ZZX's code base. WeRide's Motion should, therefore, be seen for what it is: an attempt by WeRide to relieve itself of the burden of proving the elements of its claims against ZZX on the merits and to deprive ZZX of any meaningful opportunity to defend itself against liability of "no less than" $90 million dollars in compensatory damages and $180 million in punitive damages. *See* SAC (ECF No. 210) at ¶¶ 146, 158. Indeed, WeRide seeks a default judgment or purportedly "lesser sanctions" that would "conclusively" establish dispositive "facts" or would impose mandatory adverse inference instructions against ZZX. *See* Notice of Motion for Sanctions (ECF No. 330) at i-ii. Regardless of its formation, WeRide's requested relief is out of all proportion to any prejudice allegedly suffered by WeRide.

Here, the evidence—ZZX's source code—necessary to litigate the merits of WeRide's trade secret misappropriation and fraudulent transfer claims against ZZX has been preserved and direct access has been made available to WeRide, notwithstanding any non-source code spoliation that in fact occurred. *See, e.g., Medical Lab. Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 825 (9th Cir. 2002) (availability of other sources of evidence compensating for the spoliated evidence lessens any risk of prejudice at trial). "Due process" therefore forecloses the "imposition of the severe sanctions

of dismissal or default" because the loss of documents for which ZZX is responsible does "not threaten to interfere with the rightful decision of the case." *Fjelstad v. American Honda Motor Co.*, 762 F.2d 1334, 1338 (9th Cir. 1985). In addition, because ZZX's source code is capable of being tested and compared against WeRide's code, WeRide cannot demonstrate "such unfair prejudice that no lesser remedy can cure the harm." *Padgett v. City of Monte Sereno*, 2007 WL 878575, at *2 (N.D. Cal. Mar. 20, 2007) (*citing In re Exxon Valdez*, 102 F.3d 429, 422-23 (9th Cir. 1996)). ZZX thus respectfully requests that the Court deny WeRide's Motion and the case-dispositive relief sought therein and otherwise "refrain from formulating a remedy out of all proportion to the actual harm wrought by the failure to meet those discovery obligations." *Google Inc. v. American Blind & Wallpaper Factory, Inc*., 2007 WL 1848665, at *6 (N.D. Cal. Jun. 27, 2007); *see also First Financial Security, Inc. v. Freedom Equity Group, LLC*, 2016 WL 6870218, at *3 (N.D. Cal. 2016) (any sanction under Fed. R. Civ. P. 37 "must be 'just' in light of the particular circumstances of the case").

## II.   FACTS RELEVANT TO THE MOTION

### A.   WeRide Asserts Claims And Obtains A Preliminary Injunction Against ZZX Based On Speculation That ZZX Obtained And Used WeRide's Code.

In December 2018, WeRide first asserted its claims against ZZX based on AllRide's alleged misappropriation of WeRide's proprietary code. (ECF No. 24.) Thereafter, WeRide successfully obtained a preliminary injunction against ZZX that was based on the circumstantial claims that Kun Huang ("KH"), a former employee from WeRide, had ostensibly downloaded a large volume of data late in his tenure at WeRide; that KH then joined ZZX; and that in the opinion of WeRide's retained expert, Dr. Matthew Walter, a three-minute marketing presentation by ZZX (surreptitiously recorded by WeRide) demonstrated that ZZX had achieved certain functionality in an unrealistically short timeline. (ECF No. 34, 121.)[1] This Court's order barred ZZX from using WeRide's trade secrets and confidential information,

---

[1] As it turns out, and WeRide did not disclose to the Court, it can determine what code KH checked in and out and when (raising the possibility he did not access "trade secret") but has not done so. WeRide can also do a comparison of KH's data usage to others (raising the possibility that there was nothing nefarious in KH's activities as a WeRide employee), but has not done so despite a court order. (ECF Nos. 298, 347). Further, video evidence in WeRide's possession, that it did not previously close to the Court, belies Dr. Walter's assumptions that ZZX's own video demonstrated an unreasonably short development

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

permitted each party discovery of the other's source code, and barred the destruction of WeRide's confidential information or information relating to ZZX's source code.  (ECF No. 121 at 25).

WeRide subsequently amended its claims against ZZX to include fraudulent conveyance as well as trade secrets claims, *see* SAC (ECF No. 210), ¶¶ 137-160, 230-260.  WeRide, however, continues to concede that each of its current claims against ZZX are based upon two common issues:  did ZZX (1) misappropriate and (2) utilize "confidential, proprietary, and trade secret information stolen from WeRide"?  *See* SAC (ECF No. 210), ¶¶ 1, 138, 150, 231, 243, 253; *see also* WeRide Motion (ECF No. 330) ("the key issues in this lawsuit are, and have always been: 1. Did the Defendants take WeRide's trade secrets? 2. Did the Defendants use WeRide's trade secrets?").  The evidence most critical to all of these claims is ZZX's source code.

## B.      ZZX Stores Its Source Code In Systems That Log All Changes.

ZZX originally stored its source code for autonomous driving functionality ("ZZX Code") in a repository housed on the Amazon Web Services (AWS) cloud.  (Declaration of Ryan Landes ("Landes Decl."), Ex. 47 ("Landes Ex. 47"), ¶¶ 2-3; Declaration of Matthew Ohlman ("Ohlman Decl."), ¶ 23.)  Beginning in August 2018, ZZX used Git to manage the ZZX Code.  (Landes Ex. 47, ¶ 3; Ohlman Decl., ¶ 23.)  ZZX's software engineers accessed the ZZX Code through Git.  (Landes Ex. 47, ¶ 3.)  Beginning in approximately October 2018, ZZX began using Phabricator, which is a web-based application that has features to help with review of software that is stored on the repository.  (Landes Ex. 47, ¶ 3; Ohlman Decl., ¶ 23.)  Thereafter, from October 2018, software engineers would access the ZZX Code through Phabricator, including making modifications to the ZZX Code.  (Landes Ex. 47, ¶ 3.)  ZZX's software engineers continued using Phabricator until around June 2019.  (Landes Ex. 47, ¶ 3.)

In June 2019, ZZX transitioned from Phabricator to another program called GitLab as the repository for the ZZX Code.  (Landes Ex. 47, ¶ 4.)  The data that was stored on Git/Phabricator was imported to GitLab.  (*See id.*)  Since June 1, 2019, ZZX's software engineers have accessed the ZZX Code through GitLab.  (*See id.*)  The data itself is housed on Aliyun, which is a Cloud-based server on Alibaba, with GitLab installed.  (Landes Ex. 47, ¶ 4; Ohlman Decl., n. 13.)

---

timeline as the WeRide video shows similar—if not more advanced—capabilities were achieved as rapidly by WeRide as by ZZX.  (Declaration of Todd Pickles ("Pickles Decl."), Ex. A (6.24.17 WeRide Video).)

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

The Phabricator and GitLab software programs interact with Git, which is a version control system that tracks all changes to the ZZX Code during development to ensure the integrity of the source code, including alterations or deletions. (Landes Ex. 47, ¶ 5; Ohlman Decl., ¶ 14.)  To access the Git version control, whether through Phabricator or through GitLab, the user must have credentials. (Landes Ex. 47, ¶ 6.)  ZZX limits credentials to engineers authorized to make changes to the ZZX Code. (*See id.*)  When an engineer makes a change to the ZZX Code, each of these changes is logged in Git. (*See id.*)  These changes are called "commits" that are automatically captured or logged by the Git system. (*See id.*, ¶ 5.)  The "git logs," also sometimes called "commit logs" or "commit files," show what modifications are made to which specific file, when the modifications were made, and by whom. (Landes Ex. 47, ¶ 5; Ohlman Decl., ¶ 11.)  These Git software, not the user, generates these logs. (Landes Ex. 47, ¶ 5; Ohlman Decl., ¶ 11.)  All of these steps that ZZX uses to protect its source code repository are industry standards that coders all over the world depend on to track the development of source code. (Ohlman Decl., ¶¶ 11-17.)

## C.      The October 2018 And July 2019 ZZX Code Were Previously Provided to WeRide.

On or about May 21, 2019, and well before being deposed in June, Dr. Yahui Liu, a ZZX software engineer who has been with ZZX since approximately July 2018 and whose responsibilities include assisting in the development of the ZZX Code, exported from Phabricator the ZZX Code that existed in October 2018 (the "October 2018 ZZX Code"). (Landes Ex. 47, ¶ 8.)  Dr. Liu did not make any alterations or deletions to the October 2018 ZZX Code that was exported from Phabricator. *See id*.  The October 2018 ZZX Code that Dr. Liu first exported in May 2019 was the version of the ZZX Code that existed on or around October 22, 2018, which was the code that existed at approximately the time that ZZX made the marketing video that was attached as Exhibit H to the Declaration of Bijun Zhang ("October 2018 Demo. Video"). (Landes Ex. 47, ¶ 8.; ECF No. 34-14.)  As detailed in his own previously filed declaration, Prof. Jeffrey Miller, Ph.D., ZZX's independent expert, compared this source code to the source code that WeRide claimed as its trade secrets and found no evidence of misappropriation of WeRide's trade secrets. (Landes Decl., Ex. 45 ("Landes Ex. 45"), ¶¶ 9-29.)

The October 2018 ZZX Code was then made available to WeRide's experts beginning in July 2019 after extensive meet and confer efforts relating to each parties' disclosure of relevant code and related information. (Landes Decl., Ex. 46, ¶ 7.)  Specifically, on or about July 2, 2019, at WeRide's request, Dr.

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

Liu exported git logs that tracked the modifications relating to the October 2018 ZZX Code from its parent directory.  (*See id.*, ¶ 9.)  Dr. Liu did not alter or delete any of the git logs and the same October 2018 ZZX Code previously reviewed by Prof. Miller was also made available to WeRide's expert.  (*See id.*, ¶ 9.)

Later, on or about August 19, 2019, Dr. Liu again exported the git logs along with other documents with respect to the October 2018 ZZX Code after WeRide's expert raised the issue of certain non-Code files in his declaration.  (Landes Ex. 47, ¶ 10.)  The git logs were the same that Dr. Liu exported on or about July 2, 2019, except that this version included ███████ nd ████████ and the folders in which the git logs were kept.  (*See id.*)  The ████████ and ███████ not source code, but rather instructions for the source code.[2]  (Landes Decl., Ex. 49 ("Landes Ex. 49"), ¶ 15.)  Dr. Liu did not alter or delete any of the git logs, ██████ documents, or █████████ that he exported and uploaded. (Landes Ex. 47, ¶ 10.)

Dr. Liu performed a similar procedure with respect to ZZX's more current version of the code. (Landes Ex. 47, ¶ 11.)  The presumption was that this would allow WeRide to determine if any source code constituting its trade secrets had been added to the ZZX code base since October 2018.  Dr. Liu exported from GitLab the complete version of ZZX's code as it existed on or about July 11, 2019 ("July 2019 ZZX Code").  (*See id.*)  On or about August 30, 2019, the git logs were exported from the July 2019 ZZX Code by using the command "git log" under certain folders.  (*See id.*)  Consistent with Judge Cousins's discovery order (ECF No. 252), ZZX's expert Prof. Miller culled out the portions of the July 2019 ZZX Code that related WeRide's claimed trade secrets and those portions were made available to WeRide's expert.  (Landes Ex. 49, ¶¶ 16-17.)  Dr. Liu did not alter or delete any of the files for the July 2019 ZZX Code or the git logs associated with the July 2019 ZZX Code.  (Landes Ex. 47, ¶ 11.)  Prof. Miller has also compared the July 2019 ZZX Code to WeRide's claimed trade secret code and has been

---

[2] ██████ files are essentially ████████  With respect to ██████ iles used during the demonstration drives shown in the October 2018 demonstration video, "they were not subsequently downloaded from the ████████████ r uploaded into ZZX's repository in October 2018 or at any other time." (Landes Ex. 47, ¶ 26.)  ZZX was under no obligation to preserve those files in October 2018, and the failure to download them then should not be a basis for finding spoliation.  However, Dr. Liu "exported from this git repository all of the ██████ files that were created in and before October 2018 that were stored in the ZZX repository" and which "may serve as exemplars for the ██████ that were used at that time of the demonstration drives shown in the October 2018 Demo Video."  (Landes Ex. 47, ¶ 27.)  These ██████ files have been made available to WeRide.

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

unable to identify any WeRide trade secrets in the July 2019 ZZX Code.  (Landes Ex. 49, ¶¶ 16-26.)
WeRide has been conspicuously silent on whether WeRide's trade secrets are in the July 2019 ZZX Code.

### D.    ZZX Discovers And Self-Reports The Loss Of Some Emails And Email Accounts.

In the midst of responding to discovery, and independent of its efforts to make available source code, ZZX discovered the loss of some emails and voluntarily disclosed this facts to the Court and to the parties.  (ECF No. 231.)  In particular, in July 2018 as ZZX was starting as a company, it evaluated how long it would need to retain email.  As a small startup, and with the objective of controlling costs subscribing to Microsoft Office 365 ("O365"), saving costs on equipment, and believing that old email was not important to their day-to-day business, ZZX made the decision to set a policy to delete email after 90 days.  (Pickles Decl., Ex. B (9.20.2019 Barce Depo.), at 249:6-16, 250:14-20, 251:19-23, 252:19-22; Ex. C (9.26.2019 Barce Depo.), at 12:6-17, 38:9-20, 41:14–42:2, 43:7-15; Ex. D (Lai Depo.), at 135:12-16, 135:23–136:13.)[3]  ZZX did not appreciate the impact of the 90-day retention policy on its preservation obligations with respect to this litigation until on or about June 17, 2019, when the IT administrator for ZZX suspended the 90-day retention policy and affirmatively selected the mailboxes in the O365 environment and applied a default messaging retention management ("MRM") policy, which moves emails to archive after 730 days.  (Pickles Decl., Ex. B, at 250:7-13, 253:20–24, 254:6-11, 257:5-15; Ex. C, at 43:7-18, 43:20–44: 12; Ex. D, at 134:15-25, 145:13-17.  Thereafter, ZZX worked with Microsoft to determine whether any emails that had been deleted due to ZZX's 90-day email retention policy could be recovered from Microsoft's cloud environment.  (Pickles Decl., Exs. E-F.)

Further, as discussed in detail below, ZZX also identified to the Court and WeRide the loss of certain email accounts relating to Jing Wang ("JW"), who is not an engineer and was at the time not an employee of ZZX, and later his wife Rongrong Guo ("RG"), who also was not an engineer but assisted with some human resources projects for ZZX and who owns ZZX's parent, parent company.  (ECF No. 231.)  Additionally, ZZX also discovered that, in accordance with ZZX's employee exit policy (since suspended), once an employee left ZZX's employment, the data of that employee (including email and data stored on their local devices) was manually deleted and was not recoverable after the expiration of

---

[3] ZZX made a business decision not to apply the 90-day deletion policy to the email account of Gordon Fang, who was at that time the head of the Information Technology department.  (Pickles Decl., Ex. C, at 51:13–52:3, 52:15-23, 52:25–53:3, 54:14-17.)

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

thirty days.  (Landes Decl., Ex. 16 ("Landes Ex. 16"), at 21-22.)  All of this information was self-reported by ZZX to WeRide.

### E.    ZZX Produced A Significant Volume of Documents And WeRide Has Been Provided Written Discovery And The Opportunity To Depose Key Witnesses.

Despite the loss of documents that did occur, ZZX undertook considerable efforts to identify and produce documents that it could recover.  In addition to gigabytes of source code, ZZX has now produced 163,035 documents, which are comprised of 1,407,794 pages and 2,455 native files with a Bates range of ALLRIDE0000001 through ALLRIDE1407794.  (Declaration of Thomas Barce ("Barce Decl."), ¶ 15.) The majority of those documents (101,011 and 101,963 including attachments) are dated March 17, 2019 or earlier.  (*See id.*, ¶ 16.)  Further, those documents include 3,876 emails (6,026 including attachments) dated March 17, 2019 or earlier (*i.e.*, from more than 90 days before ZZX deactivated its 90-day email retention policy on or about June 17, 2019).  (*See id.*, ¶ 17.)  This is in addition to the considerable volume of records obtained from KH's ZZX-issued computer.  (*See id.*, ¶ 13.)

### F.    ZZX Fully Cooperates In The Investigation, At Great Expense.

In addition to ZZX self-reporting the loss of emails and producing more than 1.4 million pages of materials, it has fully cooperated in the investigation conducted by FTI, the forensic neutral appointed by the Court.  In particular, the designee of FTI, Han Lai, testified repeatedly at his deposition that ZZX provided all information that was requested by FTI, made available every employee who was requested, resulting in approximately 26 interviews, and provided live access to ZZX's 0365 environment.  (Pickles Decl., Ex. D, at 108:7–109:12, 110:3–112:12, 125:17–126:3, 138:19–139:4, 198:8-18.)  Mr. Lai testified also, in response to direct questioning by the Special Master, that ZZX was cooperative and that the ZZX employees answered all questions asked and were not holding anything back.  (Pickles Decl., Ex. D, at 206:18–207:9.)  Further, FTI did not make any findings that ZZX deliberately destroyed documents in connection with the litigation and reached no conclusion as to the volume of lost data or its significance. Pickles Decl., Ex. D, at 93:10-20, 115:20-24, 121:8-14, 124:20-125:16, 133:16-21, 134:15-135:4, 150:3-9; Ex. K (10.20.2019 FTI Report); Ex. L (10.21.2019 FTI Report); Landes Decl., Ex. 84 (10.3.2019 FTI

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

1  Report).[4]  To date, ZZX has been charged by FTI over $390,000 for its investigation.  (Pickles Decl.,

2  ¶ 16.)

3  ### G.   ZZX Has Now Provided Direct Access To—And Confirmed The Integrity Of—Its Source Code Repositories.

4

5  On November 12, 2019, pursuant to the Court's October 28, 2019 Order (ECF No. 342) and the

6  agreement of the parties, WeRide's electronic vendor Transperfect was provided direct access to ZZX's

7  source code repositories on AWS, Phabricator, and through GitLab on Alibaba.  (Pickles Decl., ¶ 15.)

8  Further, in response to WeRide's accusations leading up to the Court's October 28, 2019 Order

9  that ZZX had not produced the limited source code previously agreed to and was hiding a different version,

10  ZZX retained Matthew Ohlman to engage in an independent analysis to test WeRide's speculation that

11  ZZX's code was somehow different than what was previously made available.  Mr. Ohlman, who has

12  extensive experience in software architecture and engineering, was given full access to all of ZZX's

13  repositories—*i.e.*, the AWS server on which the ZZX source code was originally stored using Git in

14  August 2018; Phabricator, which ZZX began to use in October 2018; and GitLab that ZZX began to use

15  in June 2019. (Ohlman Decl., ¶ 9.)  Mr. Ohlman reviewed the October 2018 Code that was made available

16  to WeRide in July 2019, and compared it to the ZZX Code that Mr. Ohlman had direct access to in ZZX's

17  repositories.  (*See id.*, ¶¶ 45-50.)  Mr. Ohlman concluded that the October 2018 Code was the same as in

18  the repositories.  (*See id.*, ¶¶ 51-52.)[5]

19  Mr. Ohlman then analyzed whether there was evidence that the ZZX Code, including both the

20  October 2018 Code and subsequent code, had been tampered.  (*See id.*, ¶¶ 53- 64.)  Mr. Ohlman found no

21  evidence that the ZZX Code had been tampered.  (*See id.*)  Mr. Ohlman was able to do this assessment

22
23  [4]  WeRide cites to FTI's initial report that stated there were "inconsistencies" because one person, Gordon Fang, did not recall the 90-day auto deletion being in place (likely because he was not the one who installed
24  it) and Mr. Fang's successor discovered the auto-deletion in June 2019.  (Pickles Decl., Ex. D, at 119:8-17.)  It is difficult to discern how this is an "inconsistency."  Regardless FTI drew no conclusion that it
25  was an attempt to obfuscate. (Pickles Decl., Ex. D, at 121:8-14.)  In fact, FTI made no findings that ZZX held back information or provided false information.

26  [5]  WeRide is certain to argue in reply that the Court has already found that the October 2018 Code was
27  incomplete in its order modifying the preliminary injunction.  This passage in the Court's order was based on a one-sided argument by WeRide made in a reply brief to which ZZX was unable to respond.  ZZX
28  has now had the opportunity to provide the Court with corroborative evidence from different sources demonstrating that the October 2018 Code is complete.

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

reliably because, Git automatically creates a unique "commit hash" for each change or "commit" to the code.  (*See id.*, ¶¶ 13, 26.)  Further, to maintain Git's integrity, if one were to modify or delete a commit from the git history, the system would regenerate new commit hashes for all commits after the modification or deletion.  (*See id.*, ¶¶ 13, 54.)  In other words, the commit hashes would all be changed after any attempts to tamper with the git history.  (See id., ¶ 55.)

Importantly (and contrary to WeRide's assertion), there are numerous contemporaneous emails automatically generated by Git at the time of various commits that have been recovered from various sources that include commit hashes, including during the critical period of October 2018 when WeRide claims that ZZX was using WeRide's code and alleges that ZZX has somehow tried to cover this up by producing the "wrong" code.  (Ohlman Decl., ¶¶ 57-62.)  Mr. Ohlman compared the commit hashes in the contemporaneous emails with those in the git history.  (*See id.*)  If the git history had been rewritten, the hash values in the git history in ZZX's repositories would not match up with the hash values in the contemporaneous emails.  (*See id.*, ¶ 56.)  In fact, in every instance in which Mr. Ohlman reviewed the contemporaneous emails, he found a corresponding match in the ZZX code.  (*See id.*, ¶¶ 57-62.)  Most critically, Mr. Ohlman is confident that the October 2018 Code is complete and unaltered.  Overall, based on his expertise and his extensive analysis, Mr. Ohlman has concluded that there is no evidence that ZZX has altered or changed the git history in its repositories, further supporting his conclusion that the ZZX source code in its repositories (to which WeRide was afforded complete access) is complete.  (*See id.*, ¶ 65.)

Although WeRide claims that ZZX and the other defendants set out immediately to violate the initial preliminary injunction in this matter, in truth, there is no evidence that ZZX used WeRide's trade secrets and confidential information, destroyed any WeRide's confidential information which would have been in the form of code, or spoliated any of its own source code.  (ECF No. 121 at 25.)  To the contrary, two experts have compared the source codes of the two companies and found no indication that ZZX used WeRide code and found no evidence that ZZX's source code repositories have been spoliated.  (Landes Ex. 45, ¶¶ 9-28; Landes Ex. 49, ¶¶ 16-26; Ohlman Decl., ¶¶ 22-65.)

That is not to say that ZZX denies that there was some spoliation.  There was, and ZZX acknowledges and regrets what happened.

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

### III.   <u>LEGAL STANDARD</u>

Under the amended Rule 37(e)(2), the Court must first find that any ESI spoliation occurred "with the intent to deprive another party of the information's use in the litigation may" before it can consider issuing terminating sanctions or an adverse jury instruction.  To the extent that WeRide argues contempt, it has the "burden of showing by clear and convincing evidence" a violation of an order from the court.  *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1191 (9th Cir. 2003).

Under either test, there are five factors that bear on the question of case-dispositive spoliation sanctions: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.  *Hugler v. Southwest Fuel Mgmt. Inc.*, 2017 WL 8941163, at *7 (C.D. Cal. May 2, 2017); *see also Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (same).[6]  As the *Hugler* court noted: "The first two of these factors favor the imposition of sanctions in most cases, while the fourth factor cuts against a default or dismissal sanction.  Thus, the key factors are prejudice and availability of lesser sanctions."  *Hugler*, 2017 WL 8941163, at *7; *see also The Sunrider Corp. v. Bountiful Biotech Corp.*, 2010 WL 4589156, at *6 (C.D. Cal. Nov. 3, 2010) (same).  The terminating sanctions sought by WeRide—an "order striking the answers" of and "entering a default judgment against" ZZX (*see* Motion (ECF No. 330), 1)—are drastic relief that is only appropriate in extreme circumstances.  *Fjelstad v. American Honda Motor Co.*, 762 F.2d 1334, 1338 (9th Cir. 1985).  "Due process" thus "limits the imposition of the severe sanctions of dismissal or default to 'extreme circumstances' in which 'the deception relates to the matters in controversy' and prevents their imposition 'merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case.'"  *Id.*

A court must, therefore, also consider less severe alternatives to dismissal.  *Leon*, 464 F.3d at 958; *Advantacare Health Partners L.P. v. Access IV*, 2004 WL 1837997, at *6 (S.D. Cal. Aug. 17, 2004).  If lesser sanctions would be effective, default is inappropriate.  *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1074 (N.D. Cal. 2006).  Instead, a court should determine appropriate spoliation sanctions

---

[6] To the extent applicable, the *Leon* court noted that while the five-factor test was usually applied in the context of Fed. R. Civ. P. 37 sanctions, it applies equally to sanctions under the court's inherent authority. *Leon*, 464 F.3d at 958 & n.4.

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

"on a case-by-case basis" and choose "the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Apple Inc. v. Samsung Elec. Co., Ltd.*, 888 F. Supp. 2d 976, 992 (N.D. Cal. 2012) (citations omitted).  A party's motive or degree of fault in failing to preserve evidence is relevant to what type of sanction is imposed.  *Advantacare,* 2004 WL 1837997, at *4 (S.D. Cal. Aug. 17, 2004); *Apple*, 888 F. Supp. 2d at 992.

Thus, "sanctions resulting in dismissal or entry of default judgments are authorized only in 'extreme circumstances' where the spoliation is due to 'willfulness, bad faith or fault' *and* results in such unfair prejudice that no lesser remedy can cure the harm." *Padgett v. City of Monte Sereno,* 2007 WL 878575, *2 (N.D. Cal. Mar. 20, 2007) (emphasis added) (*citing In re Exxon Valdez*, 102 F.3d 429, 422-23 (9th Cir. 1996)).  Those extreme circumstances and unfair prejudice are simply not present here, where the evidence essential to WeRide's claims against ZZX has been preserved.

## IV.   <u>ARGUMENT</u>

### A.   The Case-Dispositive Sanctions WeRide Seeks Must Be Denied Because ZZX's Loss Of Emails Has Not Prejudiced WeRide's Ability To Compare Code.

WeRide and ZZX agree that prejudice is the "most critical factor to be considered" where "case-dispositive sanctions" are sought.  *See* Motion (ECF No. 330), 19 (citing *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007)).  Yet, WeRide relies upon conjecture to broadly assert that ZZX "spoliated the most critical evidence relevant" to its claims against ZZX.  *See* Motion (ECF No. 330), 20-21.  In truth, the "most critical evidence" relevant to WeRide's claims against ZZX is ZZX's Code.  That has been preserved and has been made available to WeRide. (Landes Ex. 47; Ohlman Decl., ¶¶ 22-65; Pickles Decl., ¶ 15.)  Further, evidence that could be used to underscore (or refute) the circumstantial evidence of misappropriation is already in WeRide's possession, but has not yet been produced.  For example, WeRide can uniquely determine what code KH checked in and out of its own source code repository and when.  Additionally, while it has failed to do so to date despite a court order, it can also determine whether KH's use of WeRide's system was out of the ordinary. (ECF Nos. 298, 347.)

ZZX's failure to preserve some emails simply does not prevent the parties, the Court, or a jury from evaluating WeRide's trade secret claims and ZZX's defenses on the merits and reaching a verdict

based on the decisive evidence of ZZX's code and WeRide's own evidence, or lack thereof.  *See Dong Ah Tire & Rubber Co., Ltd. v. Glasforms, Inc.*, 2009 WL 1949124, at *4 (N.D. Cal. July 2, 2009) ("To warrant sanctions . . . the spoliation must prejudice the opposing party.") (citing *United States. v. Kahaluu Constr.*, 857 F.2d 600, 603 (9th Cir. 1988)).

Nevertheless, WeRide's tries to springboard from ZZX's self-disclosed loss of emails to claiming that ZZX has somehow spoliated its code.  This is simply not true.  The entirety of WeRide's argument about code spoliation rests on the speculation of their retained expert, Dr. Walter, and his interpretation of what another witness, Dr. Yahui Liu, meant in his deposition testimony concerning ZZX's autonomous driving program.  Specifically, Dr. Walter opines that there must be another version of ZZX's Code because he believes the ZZX October 2018 Code that he reviewed is inconsistent with what Dr. Walter assumed were the capabilities to which Dr. Liu was testifying.  In fact, Dr. Liu has provided two separate declarations in which he responded to each of Dr. Walter's criticisms.  (Landes Ex. 47; Landes Decl., Ex. 48 ("Landes Ex. 48").)  Therein, Dr. Liu pointed out the specific lines of the code or attached screenshots of ZZX's database that demonstrates precisely what capabilities Dr. Liu was describing in his testimony.  (Landes Ex. 47, ¶ 14, ¶ 22; Landes Ex. 48, ¶¶ 4-23.)  Dr. Liu also cited to articles and publicly available information demonstrating that the Autoware open-source code that ZZX was principally using in October 2018 could perform the functions he described.  (Landes Ex. 47, ¶¶ 17-19.)  Dr. Liu further identified all of the code that Dr. Walter claimed was missing.  (Landes Ex. 47, ¶ 24; Landes Ex. 48, ¶¶ 10-16.)

Dr. Walter barely acknowledges any of this in his latest installment of serial declarations.  Dr. Walter does not deny the authenticity of the screenshots nor the existence of the lines of code specified by Dr. Liu.  (Landes Ex. 47, ¶ 14, ¶ 22; Landes Ex. 48, ¶¶ 4-23.)  He also erroneously states that the ZZX Code, which was based primarily open source ███ code with some limited modifications, could not perform certain functions described by Dr. Liu, such as detecting pedestrians, changing lanes, smooth braking and acceleration or generating an HD map.  (10.21.2019 Declaration of Matthew Walter, Ph.D. ("10.21.19 Walter Decl.") (ECF No. 330-1).)  In fact, ███ could perform these functions with minor modifications.  (Landes Ex. 49, ¶¶ 7-12; Declaration of Daniel Watzenig, Ph.D., ¶¶ 15-23.)

Dr. Walter also ignores facts that are inconvenient.  For instance, he fails to mention that he missed files when he previously opined they did not exist.  (Landes Ex. 47, ¶ 24; Landes Ex. 48, ¶¶ 10-16.)

1   Similarly, Dr. Walter spends much of his declaration contending that ███████████ early

2   in its development is somehow inconsistent with the autonomous functions described by Dr. Lui, and thus

3   means there must be a hidden code.  Yet, as ZZX's expert recently uncovered in reviewing WeRide's own

4   git logs, WeRide also used ████████ and ███████ to conduct what it trumpeted as the "fastest

5   company" to conduct a "autonomous public road test" under a similar development timeline.  (11.22.19

6   Declaration of Jeffrey Miller, Ph.D., ¶¶ 5-8; ECF No. 66-2.)  This fact, which WeRide failed to disclose

7   to the Court when it sought its injunction, undermines Dr. Walter's overall contention that the use of

8   ████████ indicates that there must have been another code to achieve the capabilities depicted in the

9   October 2018 Demo.

10          Perhaps most telling, Dr. Walter even goes so far as to attempt to speculate about Dr. Liu's state

11   of mind.[7]  Dr. Walter's declaration does not read like the sober analysis of an independent expert but as

12   an advocate wedded to preconceived assumptions that Dr. Walter refuses to abandon regardless of the

13   evidence.  Dr. Liu's first-hand account of what he meant in his testimony, corroborated by documentary

14   evidence, defeats Dr. Walter's supposition that there must be another version of ZZX's code.

15          Yet the Court need not take only Dr. Liu's word that ZZX's Code is complete.  As discussed above,

16   Mr. Ohlman has performed an extensive analysis with respect to the integrity of the very code that Dr.

17   Walter examined and speculated is incomplete.  (Ohlman Decl., ¶¶ 22-65.)  Mr. Ohlman even indulged

18   WeRide's fantasy about re-writing git history, and found no such evidence.  (*See id.*)  Rather, Mr. Ohlman

19   concluded that there is no evidence that ZZX's Code stored in the repositories is incomplete or has been

20   tampered, further refuting the entire basis for WeRide's claim of code spoliation.  (*See id.*, ¶ id.)  The

21

22   [7]  This speculation goes so far as to warrant the Court striking paragraphs 24 through 31 of Dr. Walter's
     declaration.  The Federal Rules require "that expert testimony relate to scientific, technical, or other

23   specialized knowledge, which does not include unsupported speculation and subjective beliefs." *Guidroz-*
     *Brault v. Missouri P. R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001).  Dr. Walter indicates that WeRide asked

24   him to determine "whether the difference between Dr. Liu's June testimony and his September and
     October declarations can be attributed to inadvertence or mistake."  (10.21.2019 Walter Decl., ¶ 24.)

25   WeRide's assigned task calls for Dr. Walter to speculate because, of course, he cannot utilize any
     specialized knowledge as an autonomous vehicle expert to opine on Dr. Liu's state of mind when he made

26   certain statements during discovery.  Dr. Walter's inability to apply any specialized knowledge to his
     assigned task is underscored by his use of a strained analogy between autonomous vehicle development

27   and a five-course meal in a half-hearted effort to justify his unsupported, speculative conclusion that Dr.
     Liu could not have made any purported misstatement out of mistake or inadvertence.  (*See id.* at ¶¶ 28–

28   29.)  Thus, paragraphs 24 through 31 of Dr. Walter's declaration should be stricken and disregarded.

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

Special Master in this case has also ordered FTI, the Court-appointed Forensic Neutral, to "perform a neutral analysis of the data from [the AWS and Alibaba] servers in order to identify deletions and alternations to source code" and to "submit a written report of its findings to the Court upon the completion of this task." (ECF No. 363-64.)

Finally, in addition to this evidence, WeRide's speculation of spoliation of code collapses under the weight of simple logic. To accept WeRide's counterfactual of a secret code that ZZX has somehow deleted from its own git history would require the Court to accept the premise that, for over a year ZZX, has spent countless hours by engineers creating a fake code. Not only this, but the Court would also have to find that ZZX provided a fake code to its lawyers, its expert Dr. Jeffrey Miller, the Chinese courts, and WeRide. Then, within weeks of first providing the fake code, ZZX offered testimony about those functions that are not found in the fake code, thus immediately revealing the existence of the "actual code." WeRide's far-fetched tale is nonsense.

Taken together, the evidence and reasoned analysis demonstrates that ZZX's source code is complete and unaltered. Thus, the evidence necessary to litigate the merits of WeRide's trade secret misappropriation and fraudulent transfer claims against ZZX has been preserved and made available to WeRide, notwithstanding any email spoliation that did in fact occur as discussed next. *See Medical Lab. Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 825 (9th Cir. 2002) (availability of other sources of evidence compensating for the spoliated evidence lessens any risk of prejudice at trial and does not entitle the moving party to summary judgment on its claim); *see also Napster,* 462 F. Supp. 2d at 1070 (party's failure to preserve evidence relevant to potential action does not "warrant default or dismissal if these actions do not eclipse entirely the possibility of a just result."); *Cardinal v. Lupo*, 2019 WL 4450859, at *9 (N.D. Cal. Sept. 17, 2019) (party seeking sanctions did not show prejudice where "[t]here is no indication that data was in fact lost in the process" of replacing device). WeRide's requests to strike ZZX's answer and enter a default judgment should therefore be denied. *See Fjelstad*, 762 F.2d at 1338, 1342 ("Due process" mandates that "imposition of the severe sanctions of dismissal or default" be rejected because the loss of documents for which a party is responsible does "not threaten to interfere with the rightful decision of the case" or "give rise to a presumption that the denials in its answer to the complaint are untrue or that its defenses are meritless.");

*Advantacare*, 2004 WL 1837997, at \*5, 7 (holding that, although defendants "failed to preserve evidence that they knew or reasonably should have known would be relevant to a potential action and might be sought in discovery", these "actions do not eclipse entirely the possibility of a just result, suggesting that extraordinary circumstances do not exist", "do not warrant granting the sanction of default judgment", and that an "alternative sanction could be equally effective and yet less drastic.").

### B.    WeRide Has Not Met Its Burden That Extreme Default Sanction Is Warranted.

A district court must also consider "less drastic sanctions" before it enters a case-dispositive sanction, such as default judgment. *Advantacare,* 2004 WL 1837997, at \*5 (citing *Halaco Engineering Co. v. Costle,* 843 F.2d 276, 381 (9th Cir. 1988)); s*ee also Leon*, 464 F.3d at 958 (same).  A case-dispositive sanction is inappropriate if a lesser sanction would effectively ameliorate the harm caused by any spoliation. *Napster*, 462 F. Supp. 2d at 1074.  A court should therefore choose "the least onerous sanction corresponding to the willfulness of the destructive act *and* the prejudice suffered by the victim." *Apple Inc. v. Samsung Electronics Co., Ltd.*, 888 F. Supp. 2d 976, 992 (N.D. Cal. 2012) (emphasis added). As the party seeking sanctions, WeRide must justify a case-dispositive sanction by showing that a lesser sanction would be inadequate. *Napster,* 462 F. Supp. 2d at 1074.

### 1.    WeRide's preclusive sanctions conclusively establishing facts are inappropriate.

WeRide requests four purportedly "lesser sanctions" against ZZX, each of which would "conclusively establish" "for the purposes of trial" the following "facts" (in addition to an evidentiary sanction precluding ZZX from adducing any evidence or argument contrary to such "facts"):

- "[KH] downloaded WeRide's source code, shared that code with ZZX, and ZZX "used that code to develop its own source code and autonomous vehicle technology;"

- the "Defendants", including ZZX, "did not independently develop their own source code, products, or technology, at least through February 28, 2019;"

- the "waypoint files" Defendants, including ZZX, "are unable to recover never existed in the first instance;"

- "[JW] controlled" ZZX "at all times relevant during this lawsuit, and that [JW] knew of, and ratified," ZZX's "misappropriation of WeRide's code, and that [JW] recruited [KH] to work for" ZZX; and

- the "Defendants", including ZZX, "shall be precluded from adducing evidence or argument at trial contrary to any of the established facts listed here."

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

*See* Notice of Motion for Sanctions (ECF No. 330), i-ii.

The propriety of these requested sanctions must be determined in light of the requirement that the "least onerous sanction" be imposed given the extent of the offending party's fault and the prejudice to the opposing party. *Napster*, 462 F. Supp. 2d at 1077-1078. Obviously, the sanctions requested by WeRide "conclusively establishing" the "facts" set forth above would essentially function as terminating sanctions, and are out of all proportion to any harm allegedly suffered by WeRide. In this regard, it is worth considering the following admonition:

> In fashioning an appropriate sanctions order, the Court is mindful of the need to punish and deter intentional acts or omissions contrary to the rules of discovery, but at the same time to refrain from formulating a remedy out of all proportion to the actual harm wrought by the failure to meet those discovery obligations.

*Google*, 2007 WL 1848665, at *6. Here, the key evidence relevant to WeRide's claims against ZZX—the ZZX Code—has been preserved and provided to WeRide. WeRide thus wildly overreaches in requesting case-dispositive sanctions that are equivalent to a default judgment. *See Apple*, 888 F. Supp. 2d at 995 (holding that party had "not made a showing of prejudice sufficient to warrant a strong adverse inference instruction that permits the jury to find . . . spoliation 'determinative' of all issues in the case.").

### 2. WeRide's mandatory adverse inference sanctions are inappropriate.

WeRide also proposes the following four mandatory adverse inference instructions against ZZX:

- "that the contents of the four laptops and two USB drives spoliated by [KH] would have been unfavorable to the Defendants," including ZZX;

- "that the lost weekly engineering reports and Phabricator notice emails would have been unfavorable to the Defendants," including ZZX;

- "that the emails in [JW]'s various @allride.ai email accounts would have been unfavorable to the Defendants," including ZZX; and

- "that the emails in [KH]'s original@allride.ai email account would have been unfavorable to the Defendants," including ZZX.

*See* Notice of Motion for Sanctions (ECF No. 330), i-ii.

Although these are ostensibly "lesser sanctions" when compared to WeRide's case-dispositive requests for "default judgment" and "conclusively established facts," the Court should not gloss over the effect of WeRide's proposed mandatory adverse inference sanctions. As one District Court has observed,

1  although adverse inference instructions may be lesser sanctions, they are still harsh and should not be

2  imposed lightly:

3          Certainly, an adverse inference instruction is a "lesser" sanction than
        dismissal or default.   That it is a comparatively less severe sanction,
4        however, does not mean it should be imposed casually.   *See Rimkus
        Consulting Grp., Inc. v. Cammarata,* 688 F. Supp. 2d 598, 619 (S.D. Tex.
5        2010) (adverse inferences are "among the most severe sanctions a court can
        administer"); *Keithley v. Homestore.com, Inc.,* 2008 WL 4830752, at *10
6        (N.D. Cal. Nov. 6, 2008) ("[A]n adverse inference instruction is a harsh
        remedy."); *Consol. Aluminum Corp. v. Alcoa, Inc.,* 244 F.R.D. 335, 340
7        (M.D. La. 2006) (adverse inference sanctions are "drastic"); *Thompson v.
        U.S. Dep't of Housing & Urban Dev.,* 219 F.R.D. 93, 100-101 (D. Md.2003)
8        (adverse inference sanctions are "extreme" and "not to be given lightly");
        *Zubulake,* 220 F.R.D. at 219-220 ("In practice, an adverse inference
9        instruction often ends litigation – it is too difficult a hurdle for the spoliator
        to  overcome . . . .  Accordingly,  the  adverse  inference  instruction  is  an
10       extreme sanction and should not be given lightly.").

11 *Apple*, 888 F. Supp. 2d at 994.   Therefore, to "justify an adverse inference instruction, the spoliating

12 party's degree of fault *and the resulting prejudice to the other party must be significant*."   *Compass Bank

13 v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1054 (S.D. Cal. 2015) (emphasis added).

14

15        WeRide makes no effort to demonstrate that a less severe sanction would not be effective in

16 remedying its alleged prejudice from any spoliation.   Instead, WeRide broadly argues that it lacks the

17 ability to test the ZZX Code to determine whether misappropriation of its code occurred.   As demonstrated

18 above, this is false.   WeRide's argument that a "jury instruction cannot overcome unverifiable expert

19 testimony about unverifiable code" and that it is "'helpless' without terminating sanctions" (*see* Motion

20 (ECF No. 330), 23)—is based on the unproven supposition that the ZZX Code has been spoliated.   *See

21 Best Lockers, LLC v. American Locker Group, Inc.*, 2013 WL 12131586, at *5-6 (C.D. Cal. Mar. 27, 2013)

22 (plaintiffs' "request for highly disfavored spoliation sanctions" was "based upon speculative, unfounded

23 assertions" where plaintiff's expert averred that "portions are missing and no build files or other software

24 engineering files normally present exist" on the "source code" produced by defendant).   As proven again,

25 the ZZX Code has not been spoliated, is available for inspection by WeRide, and a comparison of the

26 parties' respective codes is not only a meaningful exercise, but demonstrates a lack of use of WeRide code

27 by ZZX.   The mandatory adverse inference instructions sought by WeRide are thus inappropriate.   *See

28

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

*First Financial*, 2016 WL 6870218, at \*6-7 ("it would be just to remedy" any prejudice "by giving a permissive adverse-inference jury instruction instead of a mandatory one.").

### C. The Extreme Sanctions WeRide Urges Are Not Justified.

#### 3. Information from pre-November 2, 2018 "weekly" reports remains available from an alternative source.

WeRide argues that "weekly" "reports dated before November 2, 2018" "identified the code the engineers worked on each week" and that the "reports were only saved to email . . . ." *See* Motion (ECF No. 330), 5.  WeRide, citing the testimony of KH, seeks to leave the impression that the only record of the work performed on the ZZX Code is found in such "weekly reports."  However, this is incorrect.  As the deposition testimony of KH makes clear in the context of the very same exhibit to the Motion that WeRide relies upon, any information relevant to WeRide's claims against ZZX contained in the "weekly reports" (*i.e.*, the history of the ZZX Code) is available from another source:

> Q:     Let me ask you one other question.  Aside from these weekly report e-mails, if I wanted to know what code engineers were writing on a weekly basis, is there any other kind of document I can look at, some kind of log or something?
>
> A:     Many.
>
> Q:     Can you give me some examples?
>
> A:      . . . the system would keep all the code checking.
>
>     This -- as you can see, almost none has mentioned particular code changes. At most, it's mentioning about module names or rougher areas of individual header file names.  Is that from this?  I can't recall, but maybe mention one or two file names.
>
>     *But the Git and Git lab keep all the logs.  That's checking and that's the official place to keep track of code changes.*

(Pickles Decl.*,* Ex. G (9.18.2019 Huang Decl.), at 556:23–557:1; 568:10–569:5 (emphasis added).)  The availability of the ZZX Code and its history means that WeRide's claims against ZZX can be tried on their merits, and case-dispositive sanctions are not justified.  *Medical Lab.*, 306 F.3d at 825; *Rimkus*, 688 F. Supp. 2d at 644.

### 4. ZZX's failure to suspend its 90-day deletion email policy does not support the extreme sanctions that WeRide seeks.

The Court should consider the context of the loss of emails. *See Advantacare,* 2004 WL 1837997, at *4 (S.D. Cal. Aug. 17, 2004); *Apple*, 888 F. Supp. 2d at 992. As discussed above, the original decision to automatically delete emails was made in July 2018, long before this lawsuit and even before KH joined ZZX. The auto-delete policy had nothing to do with WeRide's claims against ZZX, and WeRide does not appear to argue otherwise. FTI has made no finding that the failure to suspend it was purposeful. Moreover, the fact that, as discussed above and below, additional email has been recovered from sources such as employee's hard-drives or the email account of Gordon Fang helps demonstrate that there was no systematic intent to delete relevant emails.

To be clear, ZZX does not dispute that it should have suspended its auto-delete policy at the advent of the litigation, and certainly after the Court issued its preliminary injunction in late March 2019. It was a regrettable oversight, but one for which WeRide has failed to produce any evidence was an attempt to deprive it of evidence. Thus, extreme sanctions are unavailable whether under Rule 37(e)(2) or for contempt. *See* Fed. R. Civ P. 37(e)(2) ("only upon finding that the party acted with the intent to deprive another party of [ESI's] use in the litigation may" the Court issue terminating sanctions or an adverse jury instruction); *Storz Management Co. v. Carey*, 2019 WL 2615755, at *4 (E.D. Cal. June 26, 2019).

### 5. The deletion of RG's snd JW's email accounts also does not support the drastic sanctions that WeRide proposes.

The deletion of some, but not all of RG and JW's email accounts (nearly all of which predates the Court's preliminary injunction order) also does not prejudice WeRide's ability to adjudicate the core issues relevant to its claims against ZZX, namely, whether the ZZX Code contains WeRide's trade secrets. This includes because WeRide has a significant amount of data available from other sources, *see Napster*, 462 F. Supp. 2d at 1075 (the fact that spoliated evidence has "been obtained by plaintiffs from other sources . . . bears on the degree to which plaintiffs have been prejudiced"), and because, as discussed, it already has access to the ZZX Code.

In particular, RG explained that one of her two ZZX email accounts ("rongrong@allride.ai") was subject to a phishing attack and was deleted after she reported this issue. (Pickles Decl., Ex. H (Guo

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

Depo.), at 191:13-16, 192:12-13, 192:25–193:2, 222:2–223:20, 224:17–227:7, 228:4–229:7, 230:1-6, 231:13-19; Landes Ex. 16, at 6-7.)  Contrary to the impression WeRide seeks to leave, however, the deletion of the "rongrong@allride.ai" email account did not result in the loss of all email for that account. In fact, as the following table demonstrates, a significant number of emails for the "rongrong@allride.ai" email account were recoverable from alternative sources, including those already in WeRide's possession:

| July 2018 | Aug. 2018 | Sept. 2018 | Oct. 2018 | Nov. 2018 | Dec. 2018 | Jan. 2019 | Feb. 2019 | Mar. 2019 | Apr. 2019 | |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 655 | 559 | 891 | 765 | 321 | 156 | 83 | 181 | 9 | Total |
| 0 | 596 | 531 | 831 | 725 | 307 | 141 | 67 | 30 | 0 | WeRide |

(Barce Decl., ¶ 13(c) & Ex. B, at 1.)

Moreover, it is undisputed that none of the services RG provided to ZZX involved her writing or modifying the ZZX Code or communicating about code development.  (Pickles Decl., Ex. H at 102:13–103:7, 258:2-16.)  Rather, RG was involved in the purchasing of office supplies and computer equipment, making payments to vendors, or with assisting with human resources work.  (*See id.*, at 113:25–116:15; 116:20–118:3, 137:20–139:7, 143:3–144:9.)  The loss of certain emails from the deleted RG email account, therefore, does not prejudice the adjudication of WeRide's claims against ZZX to the extent that case-dispositive sanctions should be imposed.  *See First Financial*, 2016 WL 6870218, at *6-7 ("it would be just to remedy" any prejudice experienced by the party seeking sanctions "by giving a permissive adverse-inference jury instruction instead of a mandatory one.").

As for JW, he had two "allride.ai" email addresses that were deleted: (1) an original "jing@allride.ai" (active from July or August 2018 to on or before December 20, 2018),[8] and (2) "jack@allride.ai" (active from approximately November 2018 to February 2019).  (Pickles Decl., Ex. I (Wang Depo.) at 10:19–11:21, 11:23–12:3, 12:5–9, 12:11, 12:13-23, 13:8-21, 14:9–15:1, 15:13-25, 87:20–88:23, 89:23–90:3, 122:1–123:24, 124:1-10, 129:21–130:18); *see also* Landes Ex. 16, at 5.

JW testified that he informed Peijian Gu in December 2018 that he did not want to use the original "jing@allride.ai" email account any longer because, in October or November 2018, "there were news

---

[8] There is an active "jing@allride.ai" email address that was created on or about July 26, 2019.  *See* Ex. 16, at 5 & n.1.  The email address "jing.wang@allride.ai" is an alias associated with the "jing@allride.ai" email account.  (Pickles Decl., Ex. I, at 129:21 – 130:18.)

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

reports coming up" stating that he "was the manager or the people leading ZZX, which was not true" and that the email address would "mislead people." (Pickles Decl., Ex. I at 16:1-12, 16:15–17:18, 18:7–20:2, 24:2–25:9, 90:4–91:5, 101:14–102:9.)  On or before December 20, 2018, the original "jing@allride.ai" email account was deleted.  (*See id.* at 97:18 – 98:8; Landes Ex. 16, at 5.)

As for the "jack@allride.ai" email account, this was created in or about December 2018 at the request of Peijian Gu, who had the password and access to that account.  (Pickles Decl., Ex. I, at 122:12–123:24, 124:1-10.)  In late December 2018 or January 2019, JW told Peijian Gu to stop using the "jack@allride.ai" email account because he did not like the name "Jack."  (*See id.* at 128:13-25.)  On or before February 2, 2019, the "jack@allride.ai" email account was deleted.  (Landes Ex. 16, at 5.)

Contrary to WeRide's contentions, the deletion of the "jing@allride.ai" email account did not result in the loss of all email for that account.  In fact, as the following table demonstrates, a significant number of emails were recoverable from alternative sources and are associated with the "jing@allride.ai" email account (which was active from July or August 2018 to on or before December 20, 2018), including many that are already in WeRide's possession:

| July 2018 | Aug. 2018 | Sept. 2018 | Oct. 2018 | Nov. 2018 | Dec. 2018 | Jan. 2019 | |
|-----------|-----------|------------|-----------|-----------|-----------|-----------|--------|
| 0 | 791 | 472 | 346 | 727 | 78 | 14 | Total |
| 0 | 731 | 450 | 340 | 700 | 77 | 14 | WeRide |

(Barce Decl., ¶ 13(b) & Ex. B at 1.)[9]  Similarly, a number of emails were recovered from alternative sources that are associated with the "jack@allride.ai" email account (which was active from approximately December 2018 to February 2019), including in WeRide's possession:

| Nov. 2018 | Dec. 2018 | Jan. 2019 | Feb. 2019 | Mar. 2019 | Apr. 2019 | |
|-----------|-----------|-----------|-----------|-----------|-----------|--------|
| 2 | 356 | 169 | 23 | 56 | 7 | Total |
| 2 | 350 | 155 | 22 | 23 | 0 | WeRide |

(Barce Decl., ¶ 13(a) & Ex. B at 1.)[10]

[9] There were no retrieved or recovered emails sent from the original "jing@allride.ai" email account dated January 2019, although there were emails associated with the original "jing@allride.ai" email account dated January 2019 that were sent to that address.  (Barce Decl., ¶ 12(c) & Ex. B at 1, 6.)

[10] There were no retrieved or recovered emails sent from the "jack@allride.ai" email account between February 1, 2019 and June 30, 2019, although there were emails associated with the "jack@allride.ai"

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

Although, as the Court has noted, JW was "provided with high level reports on" ZZX's "technological capabilities," was provided ZZX "engineering reports," and was sent an email to schedule "weekly" one-on-one meetings with KH, he was not actually involved in writing or modifying the ZZX Code.  To the contrary, JW has not "written a single line of code for the past 18 years."  (Pickles Decl., Ex. I, at 56:16-21, 56:24–57:8.)  More importantly, WeRide still has access to the ZZX Code.  Thus, as with RG, the loss of certain emails from the deleted JW email accounts does not prejudice WeRide's ability to challenge ZZX's Code.  *See First Financial*, 2016 WL 6870218, at *6-7.

### 6.   The original "kun.huang@allride.ai" email account was deleted before litigation.

As for WeRide's allegation that KH's ZZX account was deleted, this is a red herring.  The original "kun.huang@allride.ai" email account was created on or about July 22, 2018.  *(Landes Decl.,* Ex. 41; *see also* Pickles Decl., Ex. J (Fang Depo.), at 34:20–36:19.)  However, as acknowledged by WeRide, this email account was deleted and recreated in August 2018, which was three months before WeRide filed its complaint initiating this action on November 29, 2018.  *See* Motion (ECF No. 330), 5; *see also* Complaint (ECF No. 1).  The momentary deletion of this email, months before any lawsuit, cannot be a basis for spoliation.  *Cardinal*, 2019 WL 4450859, at *6 ("In the absence of . . . a showing" that a party "had any duty to preserve" documents prior to litigation "or any evidence that the documents . . . were destroyed during the pendency of this case, Plaintiffs cannot establish spoliation.").[11]

---

email account dated between February 1, 2019 and June 2019 that were sent to that address.  (Barce Decl., ¶ 12(b) & Ex. B at 1-6.)

[11] Nor does the loss of any computers allegedly in the possession, custody, and control of JW or KH have any bearing on whether or what type of sanctions should be imposed on ZZX.  *Compare* Motion (ECF No. 330), 4 (alleging that "[JW] 'lost' or gave away his laptop . . . in June 2018") *with* Pickles Decl., Ex. I at 147:10–154:15 (discussing a Microsoft Surface laptop issued by WeRide and retained by JW); *compare* Motion (ECF No. 330), 4 (alleging that "[KH] *destroyed* files on two WeRide-issued laptops" and "also took with him three USB drives that had been connected to those laptops, and later claims to have lost two of them") *with* Ex. 82, ¶ 5 (distinguishing the WeRide-issued "MacBook Pro laptop" and "Lenovo laptop," as well as "three USB devices," from "ZZX-issued" devices).  There is no evidence that any of these devices were ever in the possession, custody, or control of ZZX, or that ZZX is responsible for their loss.  *See First Financial*, 2016 WL 5870218, at *4 (determining that it would not "be proper under either FRCP 37(e) or the inherent authority of this court to sanction" defendant "for the spoliation of" records in the possession of another party where it was "not persuaded" that defendant bore "fault for failing to realize" that the other party "would destroy" the records).

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS

### 7.   Failure to preserve Dingtalk messages does not prejudice WeRide either.

Lastly, WeRide's complaints about DingTalk messages also misses the mark.  In or about April 2019, some people at ZZX began using DingTalk based upon JW's recommendation.  (Pickles Decl., Ex. I, at 183:18–185:22.)  DingTalk was seen as a more secure messaging alternative to WeChat and had useful applications.  *(See id.*, at 183:18–185:22, 186:1-7, 198:20–199:11.)  Further, although JW testified that he understood that DingTalk has a "secret talk" function (which does automatically delete conversations), his expectation was that the "normal talk" function (which does not automatically delete conversations) would keep the messages.  (*See id.*, at 198:20–199:15, 199:18-20, 199:22–200:5.)  Fatal to its motion for extreme sanctions, WeRide has not established that DingTalk was utilized for any purpose relating to the key issues of its claims against ZZX—*i.e.*, writing or modifying the ZZX Code.  *(See id.*, at 183:18–185:22, 186:1-24, 187:3-4, 187:6-8, 187:11–188:1, 188:3, 188:5-6, 188:10–192:23, 193:2-3, 193:5–196:5, 202:7-11, 202:15-16, 202:18–204:11.)  WeRide's speculation about the contents of the DingTalk messages is not a substitute for evidence of prejudice, particularly given the drastic relief that WeRide seeks and the existence of the ZZX Code.  *See, e.g.*, *Storz*, 2019 WL 2615755, at *4 (determining that "aside from vague and conclusory assertions, plaintiffs' motion fails to establish that any evidence relevant to a claim or defense was in fact lost"); *see also Cardinal*, 2019 WL 4450859, at *8 ("Plaintiffs have not shown a likelihood that communications wrongfully withheld from production (to the extent any communications have been) would support the factual assertion of their proposed jury instruction").

### 8.   ZZX'S self-disclosed loss of emails, and its continuing remediation efforts and ZZX's scrupulous cooperation with the Neutral Examiner further defeat WeRide's request for drastic sanctions.

It cannot be lost on the Court that it was ZZX that voluntarily self-reported the loss of emails, and ZZX continues to fully acknowledge that mistakes were made and that, as a result of those mistakes, documents that should have been preserved were not.  (Landes Decl., Ex. 56.)  In addition, as discussed above, ZZX has engaged in remediation efforts to locate alternative sources of potentially relevant documents, including emails from the deleted emails accounts of JW and RG.  Moreover, as FTI has acknowledged, including in response to direct questioning by the Special Master, ZZX has fully cooperated with FTI in its investigation, including at great financial expense.  (Pickles Decl., Ex. D, at 108:7–109:12, 110:3–112:12, 125:17–126:3, 138:19–139:4, 198:8-18, 206:18–207:9.)  Therefore, the

"facts in the record do not demonstrate that" ZZX's "behavior will continue in a way that will meaningfully affect the Court's ability to decide or try the case on the merits." *Advantacare*, 2004 WL 1837997, at *6.[12]

### D. The Court Should Not Base Any Conclusion On Claims That Are Patently False.

In their zeal to paint ZZX in the worst possible light, WeRide makes broad, sweeping statements that misrepresent to the Court the state of ZZX's document production. Such statements cannot and should not justify any sanction.

For example, WeRide asserts that ZZX "began using code repository software called 'Phabricator' in October 2018" which "generates automated emails documenting revisions as they are made" but have "not produced *any* such emails pre-dating March 2019." *See* Motion (ECF No. 330), 5 (emphasis added). This is simply untrue. ZZX has produced certain Phabricator emails that pre-date March 2019. (Pickles Decl., Ex. M). In addition, WeRide itself has access to numerous Phabricator emails that pre-date March 2019 by virtue of its possession of documents (that do not bear bates-labels) stored on devices associated with KH. (Barce Decl., ¶ 14 & Exs. C-L.)

Most significantly, however, the information concerning the history of the ZZX Code is still available from an alternative source—*i.e.*, the logs associated with the ZZX Code. (Pickles Decl., Ex. G, at 556:23-557:1; 568:10-569:5; Ohlman Decl., ¶¶ 24-65.) WeRide's ability to litigate its claims against ZZX has, therefore, not been prejudiced and case-dispositive sanctions are unwarranted. *See Medical Lab.*, 306 F.3d at 825 (availability of other sources of evidence compensating for the spoliated evidence lessens any risk of prejudice at trial); *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 644 (S.D. Tex. 2010) (holding that striking "the defendants' pleadings" and entering "a default judgment is not appropriate" where, "[b]etween the records the defendants did produce, the deleted records

---

[12] WeRide also seeks monetary sanctions, including " . . . an award of its attorneys' fees and costs incurred in connection with (i) this motion; (ii) all discovery related to Defendants' spoliation of evidence; (iii) the discovery motion practice before Judge Cousins related to Docket Nos. 139, 146, 149, 157, 170, 192; and (iv) WeRide's efforts to enforce compliance with the Court's orders including those filed at Docket Nos. 235, 252, 266, 273, 289, and 319." *See* Notice of Motion for Sanctions (ECF No. 330), at ii-iii. Such sanctions are not warranted here. However, if the Court determines that monetary sanctions are warranted, ZZX respectfully requests that they be reasonable and proportional in light of ZZX's self-disclosure, remediation efforts, and cooperation. *See Advantacare*, 2004 WL 1837997, at *11 (noting that the "Court is not inclined to award Plaintiff all of the monetary sanctions they seek" but, "given Defendants' egregious disregard for court orders, some exemplary award" consisting of a "total monetary sanctions of $20,000" was "appropriate").

[plaintiff] obtained from other sources, and other evidence of the contents of deleted lost records, [plaintiff] has extensive evidence it can present" in support of its claims).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, ZZX respectfully requests that the Court deny WeRide's Motion and the case-dispositive sanctions sought therein.  Rather, should the Court deem it appropriate to impose sanctions, the Court should "fashion . . . an appropriate sanctions order . . . that is mindful of the need to punish and deter intentional acts or omissions contrary to the rules of discovery, but at the same time to refrain from formulating a remedy out of all proportion to the actual harm wrought by the failure to meet those discovery obligations."  *Google Inc. v. American Blind & Wallpaper Factory, Inc*., 2007 WL 1848665, at *6 (N.D. Cal. Jun. 27, 2007).  ZZX thus respectfully proposes that the Court apply an adverse inference instruction similar to that applied by the *Rimkus* Court:  ZZX "had a duty to preserve emails and other information they knew to be relevant to anticipated and pending litigation.  If the jury finds that the defendants deleted emails to prevent their use in litigation with [plaintiff], the jury will be instructed that it may, but is not required to, infer that the content of the deleted lost emails would have been unfavorable to the defendants." *Rimkus*, 688 F. Supp. 2d at 646.

Respectfully submitted,

DATED: November 22, 2019                GREENBERG TRAURIG, LLP


By:  /s/ *Kurt A. Kappes*
    Kurt A. Kappes
    Howard Holderness
    Michael D. Lane
    Todd A. Pickles
    Alicia R. Intriago

Attorneys for Defendants ALLRIDE.AI INC. and ZHONG ZHI XING TECHNOLOGY CO. LTD.

DEFENDANTS ALLRIDE.AI INC.'S AND ZHONG ZHI XING TECHNOLOGY CO. LTD.'S
MEMORANDUM IN OPPOSITION TO THE WERIDE PLAINTIFFS' MOTION FOR SANCTIONS