KILPATRICK TOWNSEND & STOCKTON LLP
GREGORY S. GILCHRIST (State Bar No. 111536)
ggilchrist@kilpatricktownsend.com
MEHRNAZ BOROUMAND SMITH (State Bar No. 197271)
mboroumand@kilpatricktownsend.com
SUSAN W. PANGBORN (State Bar No. 282533)
spangborn@kilpatricktownsend.com
GREGORY P. FARNHAM (State Bar No. 118184)
gfarnham@kilpatricktownsend.com
SOPHY T. MANES (State Bar No. 287583)
smanes@kilpatricktownsend.com
TAYLOR J. PFINGST (State Bar No. 316516)
tpfingst@kilpatricktownsend.com
Two Embarcadero Center, Suite 1900
San Francisco, CA  94111
Telephone:     415-576-0200
Facsimile:      415-576-0300

Attorneys for Defendants
JING WANG and KAIZR, INC.

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| WERIDE Corp. f/k/a JingChi Corp.,<br>WERIDE Inc. f/k/a/ JingChi Inc.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>JING WANG, an individual, KUN HUANG,<br>an individual, ZHONG ZHI XING<br>TECHNOLOGY CO. LTD., d/b/a<br>ALLRIDE.AI, ALLRIDE.AI INC, KAIZR,<br>INC., ZKA INC., DOES 1-10,<br><br>　　　　　Defendants. | Case No. 5:18-cv-07233-EJD-NC<br><br>**DEFENDANT JING WANG'S<br>OPPOSITION TO PLAINTIFFS'<br>MOTION FOR SANCTIONS**<br><br>Date:　　　February 27, 2020<br>Time:　　　9:00 A.M.<br>Ctrm.:　　　4, 5th Floor<br>　　　　　　Hon. Edward J. Davila |



JW'S OPPOSITION TO MOTION FOR SANCTIONS
CASE NO. 18-cv-07233-EJD-NC

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................. 1

II. THE FACTS .......................................................................................................... 2

A.  WeRide has no Basis for Accusing JW of 'Spoliating' a
    Laptop That was Taken Months Before the Lawsuit was Filed. ...................... 2

B.  JW's Did Not Destroy His Email Accounts ...................................................... 3

    1.  JW Was Not Involved in the Deletion of the
        jing@allride.ai Email. ............................................................................ 4

    2.  JW Did Not Delete or Order the Deletion of the
        jack@allride.ai Email. ............................................................................ 8

    3.  JW Had No Knowledge That His ZZX Email Accounts
        Would be Deleted .................................................................................... 8

C.  Jing Wang has Fully Participated in Discovery and With the
    Spoliation Investigation and Did Not Destroy or Selectively
    Produce Emails ................................................................................................. 9

D.  DingTalk Has No Bearing On This Motion ...................................................... 11

III. LEGAL PRINCIPLES GOVERNING REQUEST FOR SANCTIONS
     AGAINST JW ....................................................................................................... 12

A.  WeRide Has Failed to Establish a Basis for Sanctions It Seeks
    Against JW. ....................................................................................................... 12

    1.  There is No Authority to Impose Sanctions Under Rule
        37(b)(2) Because JW Did Not Violate any Discovery
        Order .................................................................................................... 13

    2.  The Court's Inherent Authority Does Not Provide A
        Basis For Sanctions .............................................................................. 14

    3.  The Harsh Sanctions WeRide Seeks Require a
        Showing of Intent Under Rule 37(e)(2)—Which
        WeRide Cannot Establish ...................................................................... 16

B.  WeRide Cannot Meet The Requirements Of Rule 37(e)(2) ............................ 17

    1.  JW Did Not Act With Any Intention To Spoliate
        Evidence ................................................................................................ 17

    2.  Deletion of The Identified ESI Did Not Deprive
        WeRide Of Information Relevant To The Lawsuit ............................... 20

C.  There Is No Basis For Sanctions Against JW Under The
    Court's Inherent Authority Or Rule 37(e)(1) ................................................... 22



1

**TABLE OF CONTENTS**
(continued)

2

Page

3

IV.      CONCLUSION.............................................................................................................25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1

**TABLE OF AUTHORITIES**

2

<u>Page(s)</u>

3

**Cases**

4

*Ahcom, Ltd. v. Smeding,*

5

No. 07-1139 SC, 2011 WL 3443499 (N.D. Cal. Aug. 8, 2011) .................................................. 23

6

*Am. Home Assur. Co. v. Merck & Co.,*
386 F. Supp. 2d 501 (S.D.N.Y. 2005) ....................................................................................... 18

7

*Best Lockers, LLC v. Am. Locker Grp., Inc.,*

8

No. SACV 12-00403, 2013 WL 12131586, at *6 (C.D. Cal. Mar. 27, 2013) ............................ 22

9

*Chambers v. NASCO, Inc.,*
501 U.S. 32 (1991) .................................................................................................................. 15

10

11

*Cone v. Hankook Tire Co.,*
No. 14-1122, 2015 WL 1277060 (W.D. Tenn. Mar. 20, 2015) ................................................ 12

12

*Envy Hawaii LLC v. Volvo Car USA LLC,*

13

No. 17-00040, 2019 WL 1292288, at *2 (D. Haw. Mar. 20, 2019) ........................................... 15

14

*Fiteq Inc v. Venture Corp.,*
No. 13-cv-01946-BLF, 2016 WL 1701794 (N.D. Cal. Apr. 28, 2016) ..................................... 15

15

16

*Gaina v. Northridge Hosp. Med. Ctr.,*
No. CV 18-00177-DMG, 2018 WL 6258895 (C.D. Cal. Nov. 21, 2018) .................................. 15

17

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.,*

18

167 F.R.D. 90 (D. Colo. 1996) ............................................................................................ 23, 24

19

*Gurvey v. Fixzit Nat'l Install Servs., Inc.,*
No. CIV. 06-1779 (DRD), 2011 WL 550628 (D.N.J. Feb. 8, 2011) ......................................... 12

20

21

*Henderson v. Duncan,*
779 F.2d 1421 (9th Cir. 1986) ................................................................................................. 23

22

*Hendricks v. Smartvideo Techs., Inc.,*

23

511 F. Supp. 2d 1219 (M.D. Fla. 2007) .................................................................................... 20

24

*Hugler v. Sw. Fuel Mgmt., Inc.,*
No. 16 CV 4547-FMO, 2017 WL 8941163 (C.D. Cal. May 2, 2017) ...................................... 15

25

26

*Hynix Semiconductor Inc. v. Rambus Inc.,*
897 F. Supp. 2d 939 (N.D. Cal. 2012) ..................................................................................... 22

27

*Leon v. IDX Sys. Corp.,*

28

464 F.3d 951 (9th Cir. 2006) ................................................................................................... 17



1

**TABLE OF AUTHORITIES**
(continued)

2

<u>Page</u>

3

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
　2018 WL 1512055 (S.D.N.Y. Mar. 12, 2018) ..................................................... 16, 22

4

5

*Matthew Enter., Inc. v. Chrysler Grp. LLC*,
　No. 13-cv-04236-BLF, 2016 WL 2957133 (N.D. Cal. May 23, 2016) ...................... 15

6

*Micron Tech., Inc. v. Rambus Inc.*,
　645 F.3d 1311 (Fed. Cir. 2011) .................................................................................. 23

7

8

*In re Napster, Inc. Copyright Litig.*,
　462 F. Supp. 2d 1060 (N.D. Cal. 2006) ..................................................................... 23

9

10

*Newberry v. Cty. of San Bernardino*,
　750 F. App'x 534 (9th Cir. 2018) .............................................................................. 15

11

*Nguyen v. Lotus by Johnny Dung, Inc.*,
　No. SACV 17-1317 .................................................................................................... 14

12

13

*OmniGen Research v. Youngquiang Wang*,
　321 F.R.D. 367 (D. Or. 2017) .................................................................................... 23

14

*Pennar Software Corp. v. Fortune 500 Sys. Ltd.*,
　No. 01-01734 EDL, 2001 WL 1319162 (N.D. Cal. Oct. 25, 2001) ........................... 22

15

16

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
　657 F. Supp. 2d 878 (N.D. Ohio 2009) ...................................................................... 12

17

18

*Republic of Ecuador v. Mackay*,
　742 F.3d 860 (9th Cir. 2014) ...................................................................................... 16

19

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
　306 F.3d 99 (2d Cir.2002) .......................................................................................... 17

20

21

*Rooney v. Sierra Pac. Windows*,
　No. 10-CV-00905-LHK, 2011 WL 2149097 (N.D. Cal. June 1, 2011) ...................... 13

22

23

*Sec. Alarm Fin. Enterprises, L.P. v. Alarm Prot. Tech., LLC*,
　2016 WL 7115911 (D. Alaska Dec. 6, 2016) ........................................................ 16, 17

24

*Shepherd v. Am. Broad. Companies, Inc.*,
　62 F.3d 1469 (D.C. Cir. 1995) ................................................................................... 23

25

26

*Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*,
　357 U.S. 197 (1958) ................................................................................................... 15

27

28



JW'S OPPOSITION TO MOTION FOR SANCTIONS
CASE NO. 18-cv-07233-EJD-NC

- iv -

**TABLE OF AUTHORITIES**
(continued)

<u>Page</u>

*Spencer v. Lunada Bay Boys*,
  No. CV 16--02129-SJO, 2018 WL 839862 (C.D. Cal. Feb. 12, 2018)........................................ 14

*U.S. for Use & Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co.*,
  857 F.2d 600 (9th Cir. 1988)............................................................................ 17

*United States v. Saeteurn*,
  504 F.3d 1175 (9th Cir. 2007)........................................................................ 16

*Waymo LLC v. Uber Technologies, Inc.*,
  No. C 17-00939 WHA, 2018 WL 646701 (N.D. Cal. Jan. 29, 2018).................................... 14, 17

*Williams v. Williams*,
  No. C 07-04464 CW (LB), 2013 WL 3157910 (N.D. Cal. June 20, 2013) ................................ 13

**Other Authorities**

Fed. R. Civ. P. 37 ....................................................................................... *passim*

Fed. R. Civ. P. 37(b) ............................................................................. 12, 13, 14, 22

Fed. R. Civ. P. 37(e)................................................................................... *passim*

Rule 37(e)(2) ........................................................................................... 20



## I.     INTRODUCTION

Jing Wang ("JW") is aware that this motion must focus on the serious questions of whether any of the Defendants spoliated important evidence.  If so, the question becomes what sanctions are appropriate, if any.  WeRide makes no effort to isolate or fairly portray JW's role in discovery or any purported spoliation.  Sanctions must be determined on an individual basis, particularly when they are as severe as those sought by WeRide.  Not only does WeRide's approach mislead, it mischaracterizes the evidence it cites against JW.

WeRide's extrapolations of the evidence when applied to JW are unsupported either factually, chronologically, or legally.  JW did not destroy, or instruct anyone to destroy any documents or emails.  Yet WeRide relies on JW's ill-defined role as "visionary"/consultant for ZZX and facilitator in ZZX's collaboration with FAW (which had engaged JW as its Chief Financial Advisor) to argue that JW was in control of ZZX, including maintenance of its email. WeRide's burden is no longer merely whether "serious questions" exist about JW's culpability for being associated in some capacity with ZZX.  Rather, to obtain sanctions, WeRide must *prove* that JW was responsible for any alleged noncompliance with a discovery order or failure to preserve information by ZZX. [1]  There is no evidence that supports such an inference.

JW's affirmative conduct was to (1) give away a laptop months before he had notice of this litigation; (2) preserve information contained on his smartphone, including WeChat messages – his primary form of communicating with investors; (3) maintain his personal yahoo email going back to 1998; (4) decide he no longer wanted to use @allride email accounts for fear that it could be misused by WeRide's investor in a potential "non-compete" lawsuit; (5) provide timely discovery, including asking ZZX for emails that he did not have control over and then producing them; (6) cooperate in the investigation conducted by FTI, the Court-appointed neutral WeRide selected; (7) travel from China with his wife, Rongrong Guo, so that WeRide could depose both individuals in the United States pursuant to the Court's order; and (8) upon becoming CEO of ZZX in July 2019, mandate that all ZZX employees fully cooperate with the spoliation

[1] While nothing excuses statements that this Court has deemed "inaccurate" (Dkt. No. 342 at 3, 13), the evidence that accompanies this brief will at least explain why JW had legitimate reasons not to freely reveal the guidance he provided to ZZX

1  investigation.  Contrary to WeRide's overreaching vitriol, none of JW's conduct portrays the

2  picture of an individual intent on destroying evidence.

3       Moreover, WeRide fails to establish that the missing sources it associates with JW would

4  contain information important to its disparagement and trade secrets claims.  WeRide asserts, for

5  example, without any supporting evidence, that JW communicated with WeRide's investors using

6  the deleted @allride.ai email account.  WeRide ignores hundreds of WeChat messages JW

7  produced, including communications with investors.  As is its habit, WeRide conjectures that

8  evidence existed and was destroyed, while disregarding other available means of obtaining

9  evidence to support its claims – if such evidence exists at all.

10       Based on the evidence in the record, it would be manifestly unfair to award terminating

11  sanctions and prevent JW from defending himself.

12  **II.**  **THE FACTS**

13      **A.**  **WeRide has no Basis for Accusing JW of 'Spoliating' a Laptop That was**
   **Taken Months Before the Lawsuit was Filed.**

14

15       WeRide claims JW's failure to preserve a laptop that he stopped using before ZZX was

16  formed and was taken months before the initiation of the lawsuit constitutes spoliation. Mot. at 3.

17  WeRide's contention falls flat.  The laptop was removed from his family home in June, 2018.

18  Boroumand Smith Decl. ("MBS Decl.") Ex. 1 ("JW Depo.")[2] 153:4-18; Nov. 23, 2019 Jing Wang

19  Decl. ("JW Decl.") ¶ 3.  WeRide had not yet filed the lawsuit and JW had no reason to know that a

20  lawsuit was forthcoming.  JW Depo. 154:13-15; JW Decl. ¶ 3.  JW had no reason to keep the

21  laptop.

22       WeRide speculates that the laptop included evidence concerning the founding of ZZX and

23  JW's alleged role in its formation.  WeRide has no basis for this conjecture.  JW sporadically used

24  the laptop in early 2018 when he was taking care of his ill father to check email and send

25  attachments to WeRide regarding his separation.  JW Depo. 152:18-153:20.

26       JW did not regularly use the laptop as he relied almost entirely on his smartphone.  *Id*. at

27  147:10-20.  JW used his personal email account, jxwang@yahoo.com, which he accessed using

28

---

[2] All references to "JW Depo." are found at Exhibit 1 to the MBS Decl.



his smartphone.  JW Decl. ¶ 4.  That email account remains intact and goes back to 1998, and thousands of pages of emails have been produced from it.  JW Depo. 102:15-22, 176:4-9.  If JW had any email communications about the formation of ZZX, those communications would have existed on his jxwang@yahoo.com account as that was his only account.  JW Decl. ¶ 4; JW Depo. 87:6-10.  Nor is it possible that JW used the laptop to receive or send emails from ZZX (@alliride.ai) email accounts, because JW no longer had the laptop in his control when the ZZX email accounts were created in July, 2018.  JW Depo. 10:10-11:1, 154:13-15; Dkt. 335-121 (Landes Ex. 83[3]) at 12.

Ignoring this evidence, WeRide fabricates "contradictions" relating to the founding of ZZX, claiming without basis, that the laptop would answer any open questions regarding ZZX's formation.  Mot. at 3.  No such contradictions exist.  As JW has explained, he did not join ZZX when the founders asked him to be involved.  Dkt. 362-1 ¶¶ 9, 14.  He focused on developing an eco-system that would be supported by an artificial intelligence venture fund in Nanjing, China.  Dkt. 362-1 ¶¶ 9, 10; JW Depo. 205:9-207:9.  WeRide mischaracterizes an email from JW's counsel to assert that JW's fund "facilitate[d]" ZZX.  Mot. at 3.  In reality, JW's counsel recapitulated that JW had been "running a venture fund that was *planning* to facilitate a number of businesses related to AI and autonomous driving, one of which was ZZX."  Dkt. 335-117 (Landes Ex. 78) at 10 (emphasis added)).  As JW explained in discovery, the fund never made any investments in ZZX and finalization of its fundraising effort was disrupted by WeRide's letter-writing campaign to destroy JW's reputation.  Dkt. 335-27 (Landes Ex. 7) at 39:24-40:18; JW Depo. at 39:24-25, 210:21-211:6; Dkt. 362-1 ¶¶ 5-6; MBS Decl. Ex. 2, Rog 6 at 12:5-8.

There is no evidence supporting WeRide's speculation that documents related to ZZX's formation ever resided on JW's laptop or that he was required to preserve the device months before litigation.

**B.     JW's Did Not Destroy His Email Accounts.**

WeRide claims that JW destroyed two AllRide email accounts, jing@allride.ai and

---

[3] Although this document was filed as Exhibit 83 to the Landes Declaration, the Landes Declaration and WeRide's Motion refer to it as Exhibit 84.



jack@allride.ai.  WeRide disregards the actual evidence, omitting that JW was not aware of and had no role in the deletion of these accounts.

### 1.    JW Was Not Involved in the Deletion of the jing@allride.ai Email.

WeRide argues that "Wang instructed Allride to destroy his entire jing@allride.ai email account – and Peijian Gu obliged."  Mot. at 8:15-17.  The record shows, however, that JW (1) did not control or manage ZZX's email system; (2) began expressing unease about using the jing@allride.ai email account in October 2018, long before this lawsuit was filed and litigation hold notices were sent; and (3) had no role in the decision or actual deletion of the account.  JW Decl. ¶¶ 6, 7; JW Depo. 16:1-18, 24:16-25:1, 101:14-23.

WeRide peppers its account with innuendo that JW was "leading" ZZX, or "at least in regular communication" with ZZX, as if that would make him individually responsible for maintenance of ZZX's email.  Mot. at 8.  WeRide, however, offers no evidence of JW controlling, maintaining, or deleting ZZX's email accounts.  Nor does FTI, the Court-appointed forensic neutral.  Dkt. 335-121 (Landes Ex. 83) at 7-9, 12-13.  The evidence instead shows that these tasks were performed by ZZX's IT personnel, without JW's involvement.  MBS Decl. Ex. 16 at 54:8-24; Dkt. 335-121 (Landes Ex. 83) at 7-9, 12-13; JW Decl. ¶ 7.

As for the jing@allride.ai account, ZZX issued JW the email because it did not want to communicate company confidential information to JW's personal email.  JW Depo. 20:5-21:1.  ZZX even had JW sign a non-disclosure agreement.  Dkt. 362-1, ¶ 15, Ex. J.  JW used the jing@allride.ai account to facilitate the relationship between ZZX and FAW and ensure that key milestones and deadlines for the FAW project were being met.  Dkt. 362-1, ¶ 11; JW Decl. ¶ 5.

JW expressed concern to ZZX in late October and early November 2018 when misleading media reports began to surface about JW's role with ZZX.  JW Decl. ¶ 6; JW Depo 16:1-13, 18:4-13; Dkt. 68-3, Exs. 11-13.  The media, without knowledge of JW's plans, began openly speculating that JW was running ZZX.  JW Decl. ¶ 6, Dkt. 68-4, Ex. 11, 68-5, Ex. 12-13.  Fearful that his use of an @allride.ai email could mislead people about the nature of his role at ZZX, JW took steps to recede from the informal involvement in ZZX.  JW Decl. ¶¶ 6, 7, 16; MBS. Decl. Ex. 2:, Rog 2; JW Depo. 18:4-19:25.  By early December 2018, JW had assured himself that the FAW



collaboration was on track and told Mr. Gu that he would stop using the jing@allride.ai email account.  JW Decl. ¶ 7; JW Depo. at 24:2-20, 97:18-98:8.  Mr. Gu, in turn, told the ZZX IT Manager, Gordon Fang, to close or disable the jing@allride.ai email account.  Dkt. 335-33 (Landes Ex. 10) at 157:19-158:16, 159:12-22.  Misunderstanding the instructions, Mr. Fang irretrievably deleted the account, even though Mr. Gu had expected it to be disabled and later accessible.  *Id*.  There is no evidence suggesting that JW was involved with deleting the account.  JW Decl. ¶ 7.

WeRide claims that JW's "admitted lack of ties to FAW make [JW's] story incredible."  Mot. at 8.  It falsely asserts that JW "destroyed" FAW reports that might have proved his role, even though JW has already produced its contract with FAW.  Mot. at 8.  There is no "lack" of ties to FAW.  JW had a role with FAW before ZZX even existed.  JW Depo. 27:3-16; Dkt. 362-1 ¶¶ 11, 12, Ex. E.  It would make no sense for JW to destroy corroborating evidence of his role as the intermediary for the FAW / ZZX collaboration.  No FAW reports have been destroyed.  JW Depo. 36:11-37:4.  And there is an abundance of other evidence demonstrating JW's role with FAW, including a signed contract, meeting notes, witness testimony, media reports, promotion of events, and public affirmation of JW's relationship with the company.  Dkt. 362-1, ¶¶ 11-13, Exs. E-G; JW Depo. 27:19-28:2, 35:23-36:10, 37:13-17, 41:15-20, 57:17-22; Dkt. 188-2 (Gilchrist Decl.) Exs. C-H.

WeRide claims that JW's real reason for "order[ing] the deletion" of his email in December (for which WeRide has no supporting evidence) was that this lawsuit had been filed.  Mot. at n. 8.  The only "sinister" overtones arising from JW's decision to recede further into the background of ZZX – and to stop using an email address that connected him to ZZX – arises from WeRide's shameful lack of loyalty and fairness toward JW, demonstrated in a series of actions that would have led anyone to adopt a protective posture.  JW Decl. ¶¶ 9-16.  WeRide and its founders have from the beginning, taken liberties with JW and his generosity and loyalty, culminating in this latest litigation effort to destroy his reputation:

- Prior to forming WeRide, JW held one of the top jobs at Baidu and founded its autonomous driving unit.  Dkt. 68-1, ¶11.  JW was identified as the individual most responsible in



China for the autonomous vehicle ("AV") revolution.  Dkt. 68-1, ¶ 9, Ex. 1.

- After Baidu refused to launch an autonomous driving spin-off, JW and a few Baidu employees, along with others, formed WeRide.  Dkt. 68-1, ¶¶ 10-11; MBS Decl. Ex. 9 ("Lu Depo.")[4] at 26:8-14.  To ease the transition to WeRide, JW loaned money to one of his former Baidu colleagues, Tony Han, so that Mr. Han could buy a house in Silicon Valley.  Lu Depo 66:3-10; Jing 3 Decl.¶ 11.

- As WeRide's CEO, JW spent most of his time developing a relationship with a local Chinese government that would subsidize some of WeRide's research costs, including provision of housing and office space.  Lu Depo. 87:11-88:23.  JW successfully arranged subsidies from the government of Guangzhou, valued at 120 million RMB.  Dkt 68-1, ¶ 10; Lu Depo. 87:11-88:23, MBS Decl. Ex. 11 at WERIDE00067688, MBS Decl. Ex. 13 at ALLIANCE000000070.

- In December 2017, just before JW closed WeRide's Guangzhou deal, Baidu sued JW and WeRide.  Lu Depo. 91:15-17; Dkt. 68-1 ¶ 18; JW Decl. ¶12.  The suit alleged claims for trade secret theft and breach of a non-compete.  JW Decl. ¶ 11; Dkt. 68-1, ¶ 18; Lu Depo. 92:15-93:3.  Baidu released to the press a document Baidu extracted from JW the day before he commenced work at WeRide that indicated he could not account for an old Baidu computer and printer.  JW Decl. ¶ 12; Lu Depo. 163:10-164:3.  The only evidence before the Chinese court shows that JW did not have these devices at least two years prior to his departure.  JW Decl. ¶ 12.

- Despite WeRide's professed surprise before this Court about the Baidu lawsuit (Dkt. 34-29 ¶¶ 12-14), the record shows that JW warned WeRide's founders from the beginning that a lawsuit from Baidu was likely.  Lu Depo. at 30:19-31:1, 60:15-25, 74:13-75:1, MBS Decl. Ex. 10; Dkt. 68-1, ¶11; Dkt. 362-1, ¶ 4.

- Soon after JW closed the deal with the Guangzhou government, he received a WeChat from Qing Lu that included a "CEO Plan" that foreshadowed his termination from WeRide.  JW Decl. ¶ 14; MBS Decl. Ex. 13 at Alliance 0000070; Lu Depo. 87:11-88:23, 103:12-17, MBS Decl. Ex. 11  at WERIDE00067688.  Concerned about his future at WeRide, JW contacted Duane Kuang, the representative on WeRide's Board from investor Qiming Capital, to assess Mr.

---

[4] All references to "Lu Depo." are found at Exhibit 9 to the MBS Decl.



Kuang's level support for JW.  JW Decl. ¶ 15.  Mr. Kuang assured JW that he had Mr. Kuang's

full support.  *Id.*

- Unbeknownst to JW, Mr. Kuang and WeRide founders, Qing Lu and Tony Han,

secretly met to plan JW's ouster.  Lu Depo. 108:22-113:2, 118:16-119:2.  A few days after Mr.

Kuang expressed his full support for JW, WeRide, on the strength of Mr. Kuang's and Mr. Lu's

Board of Director votes, fired JW.[5]  Lu Depo. at 118:11-119:1; JW Decl. ¶ 15.

- After displacing JW as CEO, WeRide's remaining founders granted themselves

"golden share" voting rights and a gigantic swath of stock each, greatly increasing their stake and

reducing JW's post-termination interest in WeRide to nearly nothing.  MBS. Decl. ¶ 9 Ex. 5; Lu

Depo. at 317:13-318:3, 319:8-20; MBS Decl. Ex. 15 at WERIDE00083884.

This is the context that caused JW to have concerns that WeRide and Mr. Kuang – neither

of whom JW trusted – might try to enforce the non-compete agreement against him when

misleading Chinese press began circulating about JW's role with ZZX.  JW Decl. ¶¶ 9-16; MBS.

Decl. Ex. 2; Rog 2; JW Depo. 112:21-113:2; Dkt. 68-3, Exs. 11-13.  This, coupled with JW's

comfort in the progress of the FAW/ZZX collaboration, is why JW told Mr. Gu that he no longer

wanted to use the jing@allride.ai email account.  MBS Decl. Ex. 7 at 1.

Discovery in this case has validated JW's distrust of WeRide.  WeRide's documents have

revealed that ███████████████████████████████████████████████████████

██████████████████████████████████████.  MBS Decl. Ex. 14 at

WERIDE00057937 ("█████████████████████████████████████████████████

████████████████████); MBS Decl. Ex. 13 at ALLIANCE00000081 (██████████████

██████████████████████████████████████████████████████████████████

███); Lu Depo. 253:18-254:3.  Ms. Pan sued WeRide for forging her signature to displace her

as its legal representative in China.  MBS Decl. Ex. 13 at ALLIANCE00000081.  The Chinese

media featured Ms. Pan's forgery allegations, ████████████████████████████████

---

[5] Although WeRide told the Court it took this action because "the Baidu lawsuit . . . cast an
unnecessary 'cloud' over WeRide's future," it actually never bothered to hear JW's side of the
Baidu story and knew that the Baidu lawsuit lacked merit.  Dkt. 34-29 (Lu Decl.) ¶ 13; Lu Depo.
104:18-105:5, 119:3-8, 121:16-123:5; MBS Decl. Ex. 13 at ALLIANCE00000081.



███████    Dkt. 68-1 ¶ 36, Exs. 8 and 9; Lu Depo. 212:1-15, MBS Decl. Ex. 12 at

WANG0001098; Lu Depo. 188:21-190:7; MBS Decl. Ex. 13 at ALLIANCE00000081.

████████████████████████████████    WeRide decided to sue JW, despite the dearth

of evidence supporting its claims against JW.  Lu Depo. 188:21-190:7; MBS Decl. Ex. 13 at

ALLIANCE00000081.  According to Mr. Lu, ████████████████████████████████

█████████████████████████████████████████    Lu Depo.

202:20-203:10.  ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████    Lu Depo. at 210:15-211:12.  Putting aside the fact that there is no reason

why JW should be accountable for what the media reports about WeRide, the articles do not

support any of the alleged false statements Lu had sworn to.  JW Decl. ¶ 35, Exs. 7-9; Dkt. 34-29

(Lu Decl.) ¶ 32.  ████████████████████████████████████████

████████████████████████    Lu Depo. 273:21-274:17.

**2.    JW Did Not Delete or Order the Deletion of the jack@allride.ai Email.**

Sometime after JW stopped using the jing@allride.ai email, JW learned that Mr. Gu had

asked that a jack@allride.ai email be created and told ZZX employees that they could send emails

to JW there.  JW Decl. ¶ 17; MBS Decl. Ex. 16 at 150:19-24; JW Depo. 127:13-16.  This account

was monitored by Mr. Gu, who from time to time would share the emails with JW.  JW Depo.

123:6-16, 124:8-17; JW Decl. ¶ 17.  Like the jing@allride.ai email account, there is no evidence

that JW "ordered" the jack@allride email to be destroyed or had any other role in its deletion.  JW

Decl. ¶ 17; MBS Decl. Ex. 7 at 1.[6]

**3.    JW Had No Knowledge That His ZZX Email Accounts Would be Deleted.**

JW never instructed ZZX to delete any of the @allride.ai email accounts.  JW Decl. ¶ 7.

---

[6] Mr. Gu, to JW's understanding, had the jack@allride.ai email replaced with jwang@allride.ai once Mr. Gu thought that the non-compete had expired.  Mr. Gu hoped to persuade JW to take a leadership role with ZZX and presented him with the new email handle, jwang@allride.ai, as a gesture.  JW Decl. ¶ 19.



1   Indeed, the undisputed evidence shows that the deletion of the jing@allride.ai and jack@allride.ai

2   accounts occurred unbeknownst to JW.  JW Decl. ¶¶ 7, 17; JW Depo. 176:4-13.  JW was equally

3   unaware of any 90-day retention policy and only learned about this policy as a result of this

4   litigation. [7]  JW Decl. ¶ 8.

5   **C.    Jing Wang has Fully Participated in Discovery and With the Spoliation
        Investigation and Did Not Destroy or Selectively Produce Emails.**

6

7        Once JW received notice of the litigation, JW did not delete emails from his personal

8   Yahoo account and preserved the data on his smartphone, including WeChats, a messaging

9   application that JW frequently uses.  JW Depo. 176:4-9, 102:15-22, 210:7-22.  Thereafter, JW

10  cooperated in all aspects of discovery, including in the production of documents and the

11  investigation of any alleged spoliation.

12       WeRide lumps JW with all other Defendants when asserting that "Defendants" engaged in

13  "mass spoliation" and produced no documents in response to its requests.  Mot. at 12.  WeRide

14  omits that in response to WeRide's document requests, JW timely provided written responses and

15  shortly thereafter produced jing@allride.ai emails on June 21 and July 18.  MBS Decl. ¶ 3.  JW

16  also timely responded to WeRide's interrogatories on July 3, revealing that JW had

17  communications with ZZX and explaining the nature of those communications.  *Id.* ¶ 6; Ex. 2,

18  Rog 2.

19       Despite having received JW's two productions, WeRide that documents revealing JW's

20  allride.ai email address "still have not been produced, from Allride ***or from Wang***."  Dkt. 199-3 at

21  11:28 (emphasis added).  WeRide's reports to the Court were false (weeks before WeRide filed its

22  brief).  Now, WeRide has doubled down, arguing that "Wang requested a selective collection of

23  emails from his AllRide account, excluding emails showing his involvement with engineers …,

24  and then ordered the rest destroyed."  Mot. at 9:8-10 (citations omitted).  For these revisionist

25  accusations, WeRide cites a declaration of its own counsel (Dkt. 330-93 at ¶¶3-5) and an email

---

26  [7] WeRide also asserts that "another Wang email account, jw@kaizhe.ai, was created and later
27  destroyed."  Mot. at 10.  But it has no evidence that the email was ever used, much less by JW.  In
    reality, JW did not have access to the email account and thus never used it.  JW Decl. ¶ 20; MBS
28  Decl. Ex. 7 at 1-2 ("There was no content. Email was zero. Doesn't think he had access.  Did not
    setup password and send it out.").



JW'S OPPOSITION TO MOTION FOR SANCTIONS                                    - 9 -
CASE NO. 18-cv-07233-EJD-NC

1   from JW's counsel that do not say anything about this issue or these documents.  Dkt. 330-7, Ex.

2   78 at 10.

3        The reality is that Jing Wang could not gain access to his email account at ZZX.  Through

4   his wife, JW asked ZZX for his emails and ZZX provided with a limited number.  Guo Decl. at ¶¶

5   2-3.  From these, JW produced all the jing@allride.ai emails that Ms. Guo had received.  Guo

6   Decl. ¶ 3; MBS Decl. ¶ 4.  It is unsupportable for WeRide to claim that JW was "selective" in his

7   request to ZZX or production to WeRide or that he "then ordered the rest deleted."  Mot. at 9:10.

8   As WeRide knows, the emails JW was trying to find had been subject to a 90-day retention policy,

9   and the jing@allride.ai email account had been deleted long before JW tried to produce emails.

10  There is no evidence that any emails were destroyed after JW produced the allride.ai emails that

11  he was able to obtain from ZZX.  At the same time, ZZX and Kun Huang have been able to

12  produce many additional emails bearing jing@allride.ai email address.  WeRide's argument has

13  been invented to suit its motion.

14       JW has fully cooperated in the investigation of any alleged spoliation.  When deposing JW,

15  WeRide took the position (later ruled against by the Special Master) that it was not bound to limit

16  the scope of the deposition to spoliation and asked about a broad array of topics having to do with

17  JW's connections to ZZX and FAW, including the timing of his FAW appointment, the reporting

18  relationships, and even mundane details about how JW's car was cleared by FAW security when

19  he made his visits.  *See* JW Depo. 27-33.  WeRide also learned details about how JW enabled the

20  collaboration between FAW and ZZX and why JW was receiving ZZX's engineering summaries

21  and providing guidance as to how ZZX should better organize its efforts to meet FAW's

22  deadlines.  JW Depo. at 27:3-28:2, 30:9-14, 35:23-37:17, 39:16-23, 41:15-42:2,-51:14-24, 57:5-

23  22, 97:24-98:8.  Almost all of these questions were made possible based on the emails that had

24  been produced.  WeRide fails to mention any of this testimony, simply because it departs from

25  ZZX's narrative.

26       JW and Ms. Guo also were interviewed by FTI.  In addition to participating in the

27  interviews himself, JW – by then ZZX's CEO – demanded that all ZZX employees cooperate with

28  FTI.  FTI reported at its deposition that it had received full cooperation from ZZX.  MBS Decl.



1    Ex. 8 (Lai Depo.) at 206:18-25.

2        **D.    DingTalk Has No Bearing On This Motion**

3        WeRide makes another series of false accusations about an application called DingTalk.

4    WeRide claims that in June or July 2019, "right when AllRide finally deactivated the 90-day email

5    auto delete, ***Wang recommended*** that [ZZX] start using a new chat program called 'DingTalk.'

6    ***specifically because*** one of its features was the instantaneous destruction of communications [i.e.,

7    ephemeral messaging], and Wang did not want anyone 'peeping' at what AllRide employees were

8    saying." Mot. at 13 (emphasis in original). WeRide then goes on to assert that all of the DingTalk

9    chats among ZZX employees has been "irretrievably" destroyed. *Id.* at n. 12. None of this is true.

10       JW testified that the mayor of Nanjing recommended DingTalk in April 2019, which JW

11   passed on to ZZX. JW Depo. 185:14-19. At that time, the 90-day retention policy was unknown

12   to JW and unnoticed for several more weeks even by ZZX. Dkt. 231; JW Decl. ¶ 8. JW also did

13   not testify that he recommended DingTalk "specifically because" it offered ephemeral messaging

14   or that he was concerned about "peeping" into ZZX communications. JW identified several

15   features of DingTalk, including that it was more secure than WeChats and provided a "read"

16   notification which was useful when assigning tasks. JW Depo. 198:21-199:6. In response to

17   questioning about ephemeral messaging, JW stated that "*people in China*" liked DingTalk because

18   it offered ephemeral messaging. JW Depo. 187:20-21. He said he did not know why ZZX had

19   adopted it apart from the mayor's recommendation (JW Depo. 188:15-189:1), but WeRide did not

20   provide that page of testimony. Dkt. 330-7 (Landes Ex. 7).

21       WeRide paints a picture of a messaging app that "irretrievably" deletes ***all*** sent and

22   received messages. This is wrong. DingTalk is not limited to ephemeral messaging; DingTalk

23   also includes a standard messaging feature that does not delete messages. Examples of DingTalk

24   messages from JW's phone are contained in JW's Declaration filed with this brief. JW Decl. ¶ 24,

25   Ex. 4. JW has not produced any DingTalk messages because his counsel have been unable to

26   identify an IT consultant with capabilities to download the information available on the

27   application, with the possible exception of the vendor that WeRide is using. WeRide, however,

28   has refused to provide a waiver for JW to use that vendor. MBS Decl. ¶ 21.



JW'S OPPOSITION TO MOTION FOR SANCTIONS                                    - 11 -
CASE NO. 18-cv-07233-EJD-NC

1    In any event, WeRide has failed to indicate how any DingTalk messages relate to the

2    issues in the case.  By WeRide's own admission, ZZX was not using DingTalk until mid-2019—

3    months after WeRide asserted claims for misappropriation of trade secrets and defamation that

4    allegedly occurred in 2018.  Mot. at 13.  Since then, WeRide has not identified any trade secrets

5    that might have been obtained by ZZX after August 2018 and, by its own allegations, there have

6    been no disparaging comments by JW since approximately the same time.[8]  Accordingly, there is

7    nothing to indicate that there is anything of relevance on the DingTalk messages.

8    **III.    LEGAL PRINCIPLES GOVERNING REQUEST FOR SANCTIONS AGAINST JW**

9    WeRide attempts to attribute ZZX's self-reported and inadvertent failure to preserve

10    emails to JW.  Mot. at 8, 10-11, 17, 20, 22, 24.  The case law, however, does not support the effort

11    to attribute other defendants' actions to JW.  *Gurvey v. Fixzit Nat'l Install Servs., Inc*., No. CIV.

12    06-1779 (DRD), 2011 WL 550628, at *5 (D.N.J. Feb. 8, 2011) ("[S]poliation inferences are only

13    appropriately entered against the party that actually destroyed the evidence . . ..  Indeed, it would

14    serve no sensible purpose to punish innocent co-defendants so severely for the malfeasance of

15    others."); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 878, 887 (N.D. Ohio 2009)

16    ("[C]ourts have consistently refused to impose an adverse inference against a party where that

17    party had no fault in the destruction of evidence and the evidence was in the custody or control of

18    a third party" (citing cases)); *see also Cone v. Hankook Tire Co*., No. 14-1122, 2015 WL 1277060,

19    at *2 (W.D. Tenn. Mar. 20, 2015) ("[T]'his Court shares the skepticism and uncertainty expressed

20    by others that 'spoliation of evidence may be imputed to a [party] who did not participate in the

21    spoliation.'").  When JW's conduct alone is considered, there is no basis for the requested

22    sanctions.

23    **A.    WeRide Has Failed to Establish a Basis for Sanctions It Seeks Against JW.**

24    WeRide moves for terminating sanctions under three grounds: (1) FRCP 37(b)(2); (2) the

25    Court's inherent authority to sanction abusive litigation practices; and (3) FRCP Rule 37(e).  Mot.

26    at 16.  Neither FRCP 37(b)(2) nor the Court's inherent authority can serve as a basis for imposing

27

28    [8]  WeRide argued that documents dated after the filing of the lawsuit "ha[ve] limited, if any, probative value."  Dkt. 285 at 4.



1    sanctions against JW, while the facts do not support an award of sanctions against him under

2    FRCP Rule 37(e).

3            **1.    There is No Authority to Impose Sanctions Under Rule 37(b)(2)**
                     **Because JW Did Not Violate any Discovery Order**

4

5            The Court has authority to award sanctions under Rule 37(b)(2) "[i]f a party . . . fails to

6    obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2). A predicate to the

7    imposition of sanctions under Rule 37(b)(2) is a court order directing compliance with discovery

8    and non-compliance with that discovery order. *Williams v. Williams*, No. C 07-04464 CW (LB),

9    2013 WL 3157910, at *4 (N.D. Cal. June 20, 2013) (Rule 37(b)(2)(A) sanctions "are not available

10   unless a court's discovery order has not been obeyed . . . the Ninth Circuit also has explained that

11   'Rule 37(b)(2)'s requirement that there be some form of court order that has been disobeyed has

12   not been read out of existence; Rule 37(b)(2) has never been held to authorize sanctions for more

13   general discovery abuse'") (internal citations omitted) The moving party bears the burden to show

14   what discovery order has been violated. *See Rooney v. Sierra Pac. Windows*, No. 10-CV-00905-

15   LHK, 2011 WL 2149097, at *3 n. 2 (N.D. Cal. June 1, 2011). Failure to meet this threshold is

16   grounds to deny sanctions under Rule 37(b). *Id.*

17           Without making any distinction between the Defendants, WeRide asserts that sanctions

18   under Rule 37(b) are proper because *all* of the Defendants disobeyed the preliminary injunction

19   order. Motion at 10. That order, which was entered into on March 22, 2019, required the enjoined

20   Defendants to refrain from destroying, concealing, disposing, or deleting paper and electronic

21   materials containing WeRide's confidential information. Mot. at 9-10.

22           In fact, all of the alleged spoliation asserted by WeRide against JW occurred *before* the

23   Court entered the preliminary injunction. WeRide claims that JW gave away his laptop in June

24   2018 – long before this lawsuit even commenced. WeRide then points to evidence that JW

25   informed ZZX that he no longer wanted to use his ZZX email account in December 2018, months

26   before the issuance of the preliminary injunction order. JW Depo. 97:18-21, 122:1-8; 128:13-25.

27   Because these events took place *before* the issuance of the March 2019 preliminary injunction

28   order, they cannot be in violation of the order.



JW'S OPPOSITION TO MOTION FOR SANCTIONS                                    - 13 -
CASE NO. 18-cv-07233-EJD-NC

1    WeRide attempts to blame JW for ZZX's inadvertent failure to deactivate its auto-delete

2    policy following the issuance of the preliminary injunction order.  But WeRide cannot extend

3    ZZX's culpability, if any, to JW based on generalized assertions against "Defendants."  However,

4    the dispute about JW's role in consulting with ZZX in the Fall of 2018 is resolved, there is no

5    evidence that JW had any control over ZZX's email data or involvement in implementing the auto

6    delete policy, or any control over ZZX after the injunction was entered until he became CEO in

7    July 2019, *after* the auto-delete was turned off.

8        Because WeRide has failed to show that JW disobeyed the preliminary injunction or any

9    discovery order, sanctions under Rule 37(b) would not be available.

10                    **2.      The Court's Inherent Authority Does Not Provide A Basis For
                            Sanctions**

11

12       Rule 37(e) of the Federal Rules of Civil Procedure governs when a court may sanction a

13   party that fails to preserve electronically-stored information ("ESI").  WeRide accuses JW of

14   spoliating a laptop and three work email accounts.  Because this evidence consists of ESI, Rule

15   37(e) provides the relevant legal standard, not the Court's inherent authority.  *Nguyen v. Lotus by

16   Johnny Dung, Inc.*, 2019 WL 1950294, at *6 (C.D. Cal. Mar. 14, 2019) (noting that because the

17   remedies under Rule 37(e) "are directly applicable to the alleged conduct at issue," the court

18   cannot exercise its inherent authority to sanction); *Waymo LLC v. Uber Technologies, Inc.*, No. C

19   17-00939 WHA, 2018 WL 646701, *14 (N.D. Cal. Jan. 29, 2018) ("Because the evidence in

20   question consists of electronically-stored information, FRCP 37(e), not inherent authority, supplies

21   the controlling legal standard."); *Spencer v. Lunada Bay Boys*, No. CV 16--02129-SJO (RAOx),

22   2018 WL 839862, at *1 (C.D. Cal. Feb. 12, 2018) (same); 2015 Advisory Committee Notes for

23   amended Rule 37 ("Adv. Ctee Notes") ("the specified and very severe measures" set forth in the

24   rule are available "only on finding that the party that lost the information acted with the intent to

25   deprive another party of the information's use in the litigation," and that the new rule "is designed

26   to provide a uniform standard in federal court . . . " and "therefore forecloses reliance on inherent

27   authority or state law to determine when certain measures should be used.").

28       Multiple courts have referred to the 2015 Advisory Committee Notes when determining



JW'S OPPOSITION TO MOTION FOR SANCTIONS                                    - 14 -
CASE NO. 18-cv-07233-EJD-NC

1   the effect and scope of the new Rule 37.  *See, e.g., Envy Hawaii LLC v. Volvo Car USA LLC*, 2019

2   WL 1292288, at *2 (D. Haw. Mar. 20, 2019) ("Cases decided after the implementation of the 2015

3   amendment to Fed. R. Civ. P. 37(e) have highlighted the 2015 Advisory Committee Notes to the

4   Rule.").  Many courts, including the Ninth Circuit, have chosen to rely on Rule 37 and the Adv.

5   Ctee Notes rather than the court's inherent authority in reliance on the Advisory Committees'

6   statement.  *See, e.g., Newberry v. Cty. of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018);

7   *Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-cv-04236-BLF, 2016 WL 2957133, at *1

8   (N.D. Cal. May 23, 2016); *Fiteq Inc v. Venture Corp.*, No. 13-cv-01946-BLF, 2016 WL 1701794,

9   at *3 (N.D. Cal. Apr. 28, 2016); *Gaina v. Northridge Hosp. Med. Ctr.*, No. CV 18-00177-DMG

10   (RAOx), 2018 WL 6258895, at *3 (C.D. Cal. Nov. 21, 2018).[9]

11          WeRide tries to dismiss the authority of the Advisory Committee in a footnote.  Mot. at 16

12   n.16.  It relies on a special master's unpublished opinion for the proposition that "[i]t is an

13   irrefutable principle of law that the Supreme Court's authority cannot be limited by a body such as

14   the Advisory Committee."  *See Hugler v. Sw. Fuel Mgmt., Inc.*, No. 16 CV 4547-FMO (AGRx),

15   2017 WL 8941163, at *8 (C.D. Cal. May 2, 2017).  While that may true, it does not diminish the

16   Advisory Committee's comments and observations (authorized by the Supreme Court) when

17   discussing the effect of a new rule, nor does it suggest that a court may rely on its inherent

18   authority to disregard a Federal Rule when that rule explicitly governs the circumstances at issue.

19   Nor does it permit courts to disregard the Supreme Court's admonition in *Chambers v. NASCO,*

20   *Inc.*, 501 U.S. 32 (1991) – a case decided long before the rule change in 2015, but referenced both

21   by WeRide and the special master in *Hugler* – that "when there is bad-faith conduct in the course

22   of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely

23   on the Rules rather than the inherent power."  501 U.S. at 50.  *See Hugler*, 2017 WL 8941163, at

24   _____

25   [9] The Advisory Committee's statement that Rule 37(e) is the sole authority governing sanctions is
    hardly novel.  Long before the 2015 amendment to Rule 37, the Supreme Court stated, "[W]hether a
26   court has power to dismiss a complaint because of noncompliance with a production order depends
    exclusively upon Rule 37, which addresses itself with particularity to the consequences of a failure
27   to make discovery by listing a variety of remedies which a court may employ as well as by
    authorizing any order which is 'just.'"  *Societe Internationale Pour Participations Industrielles Et*
28   *Commerciales, S. A. v. Rogers*, 357 U.S. 197, 207 (1958).



1     *8 (same; quoting *Chambers*).[10]

2        Rule 37(e) covers this motion and WeRide must meet its requirements to obtain sanctions

3 for the alleged spoliation.

4            **3.**     **The Harsh Sanctions WeRide Seeks Require a Showing of Intent Under**
                   **Rule 37(e)(2)—Which WeRide Cannot Establish**

5

6        Before the Court can impose sanctions under Rule 37(e), the court must make three

7 findings in determining whether spoliation of ESI has occurred: (1) the ESI "should have been

8 preserved in the anticipation or conduct of litigation"; (2) the ESI "is lost because a party failed to

9 take reasonable steps to preserve it"; and (3) "[the ESI] cannot be restored or replaced through

10 additional discovery." Fed. R. Civ. P. 37(e). Only if the threshold requirements of Rule 37(e) are

11 met may a court then evaluate the appropriate spoliation sanction.

12        Rule 37(e) allows for two tiers of sanctions – each of which carries different requirements

13 and available sanctions. First, when the court finds that the loss of information has prejudiced the

14 moving party, the court may order "measures no greater than necessary to cure the prejudice."

15 Fed. R. Civ. P. 37(e)(1). This analysis "necessarily includes an evaluation of the [ESI]'s

16 importance in the litigation." Fed. R. Civ. P. 37, Adv. Comm. Note.

17        Rule 37(e)(2) reserves the harshest sanctions when the offending party "acted with the

18 intent to deprive another party of the information's use in the litigation." If the court makes a

19 finding of such intent– and only if it makes such a finding – are such sanctions available. *Sec.*

20 *Alarm Fin. Enterprises, L.P. v. Alarm Prot. Tech., LLC*, 2016 WL 7115911, at *5 (D. Alaska Dec.

21 6, 2016) (quoting Fed. R. Civ. P. 37(e)(2)); *Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018

22 WL 1512055, at *7 (S.D.N.Y. Mar. 12, 2018) ("Absent a showing of 'intent to deprive. . . ,' the

23 sanctions enumerated under subsection (2) of Rule 37(e) are not available." (internal citations

24 omitted)).

25        WeRide seeks only the most severe sanctions available under Rule 37(e)(2), namely,

26 _____

27 [10] The unique role of Advisory Committee Notes in construing the rules is explained in *Republic of Ecuador v. Mackay*, 742 F.3d 860, 865 (9th Cir. 2014). *See also United States v. Saeteurn*, 504 F.3d 1175, 1180 n. 11 (9th Cir. 2007) ("We look to Advisory Committee Notes when interpreting

28 a federal rule for 'guidance and insight.'").



1    dismissal of the action, a presumption that the lost information was unfavorable, and adverse

2    inference instructions to the jury.  Accordingly, WeRide must demonstrate not only the threshold

3    requirements of Rule 37, but also that JW acted with the intent to deprive.  *Sec. Alarm Fin.*, 2016

4    WL 7115911, at *2.  WeRide fails to meet this standard.

5         **B.**     **WeRide Cannot Meet The Requirements Of Rule 37(e)(2)**

6         Under the current Rule 37(e)(2), WeRide must show that JW "acted with the intent to

7    deprive another party of the information's use in the litigation."[11]  The sanctions permitted under

8    Rule 37(e)(2) are particularly severe and thus "[c]ourts should exercise caution" in using them."

9    Fed. R. Civ. P. 37(e), Adv. Comm. Note.  The sanction must be related to the evidence that is

10   missing and "[t]he remedy should fit the wrong."[12]  WeRide fails to demonstrate these elements

11   for any of its claims or proposed sanctions against JW.

12        **1.**     **JW Did Not Act With Any Intention To Spoliate Evidence**

13        **(a)**     **JW's Alleged Spoliation Conduct Occurred Before Any Duty to**
14                           **Preserve Evidence Arose**

15        No action is warranted under Rule 37(e) when information is lost before a duty to preserve

16   arises.  Fed. R. Civ. P. 37(e), Adv. Comm. Note.  "[P]otential litigants have a duty to preserve

17   relevant information when litigation is reasonably foreseeable."  *Waymo LLC v. Uber Techs., Inc.*,

18   No. C 17-00939 WHA, 2018 WL 646701, at *14 (N.D. Cal. Jan. 30, 2018); Fed. R. Civ. P. 37(e)

19   2015 Adv. Comm. Note.  "This standard does not trigger the duty to preserve documents from the

20   mere existence of a potential claim or the distant possibility of litigation."  *Waymo*, 2018 WL

21

22   [11] The Advisory Committee Notes state that Rule 37(e) was amended specifically to reject cases
23   such as *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir.2002),
     which authorized the imposition of terminating sanctions on a finding of negligence or gross
24   negligence.  WeRide relies on *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006)
     throughout its brief, a case that depends entirely on the court's inherent authority to impose
25   sanctions, no longer a basis for imposing sanctions.  While the conduct in *Leon* may also have
     qualified for sanctions under former Rule 37, the court's reliance on the party's "level of
26   culpability" for spoliation is precisely what was rejected by the amended Rule 37(e)(2).
27   [12] Adv. Comm. Note; *U.S. for Use & Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co.*, 857 F.2d
     600, 602–03 (9th Cir. 1988) (due process considerations require that the sanction be specifically
28   related to the particular claim which was at issue in the order to provide discovery (quotes and
     citations omitted)).



1   646701, at *15.

2          No duty to preserve evidence had attached at the time JW stopped using his laptop and

3   gave it away at his father's funeral.  That occurred months before WeRide even sent a cease and

4   desist letter.  The letter itself did not mention WeRide's purported trade secret claims or signal any

5   indication that JW would need to preserve documents  *See, e.g., Am. Home Assur. Co. v. Merck &*

6   *Co.*, 386 F. Supp. 2d 501, 512 n.5 (S.D.N.Y. 2005) (court rejected request for spoliation sanctions

7   related to the destruction of evidence when it occurred a full year before suit was filed, and thus

8   did not represent "an intentional attempt to destroy evidence").  JW nonetheless has preserved all

9   of his personal information.  JW Depo. 102:15-22, 176:4-9.

10          The events that lead to JW telling Peijan Gu that he no longer wanted to use the ZZX email

11   account began before the lawsuit was filed.  It commenced in October 2018, when there were

12   public reports that JW was ZZX's owner.  JW Decl. ¶¶ 6; JW Depo. 16:3-18.  While JW does not

13   know exactly when he told ZZX he would not use the email anymore, he knows it was by

14   December 4, 2018, when he went to FAW for a meeting.  JW Depo. 97:18-98:8.  If he was still

15   using the email at all by then, it was only a few days after the original complaint had been filed.

16   There is no evidence that JW sent any emails after November 28, the day before WeRide filed its

17   Complaint, although there were unanswered emails sent to the account until mid-December.

18          The original complaint did not include ZZX as a party.  To the extent it concerned JW, it

19   accused him of soliciting Kun Huang and of disparaging WeRide.  JW's allride.ai email account,

20   however, had not existed at the time when either Kun's employment or the purported

21   disparagement had allegedly begun.  It therefore would not have been obvious to him after the

22   lawsuit was filed that his ZZX email account contained important information relating to the

23   claims against ZZX.  JW Depo. 113:3-17; Adv. Comm. Note Fed. R. Civ. P. 37 ("Often . . . events

24   provide only limited information about . . . prospective litigation, however, so that the scope of

25   information that should be preserved may remain uncertain.  It is important not to be blinded to

26   this reality by hindsight arising from familiarity with an action as it is actually filed.").  There was

27   certainly nothing to indicate that he should not inform ZZX that he no longer wished to use the

28   email account.



JW'S OPPOSITION TO MOTION FOR SANCTIONS                                          - 18 -
CASE NO. 18-cv-07233-EJD-NC

1

              **(b)**      **JW Had No Role in Deletion of Emails**

2         JW's defensive conduct regarding his role at ZZX and his email account related solely to

3 his justifiable fear that Duane Kuang and Qiming, in concert with WeRide, would sue him for

4 violating a non-compete agreement.  His actions were limited to his decision to stop anything that

5 might add further support to an impression that he was directly competing with WeRide by virtue

6 of his informal involvement with ZZX.  He told ZZX that he was not going to be responding any

7 longer to the email that he had been using and that he would have even less of a role with the

8 company given that the FAW project was on track.

9         None of the evidence concerning ZZX email accounts suggest that Jing had any intention

10 to destroy important evidence.  JW had no role in deleting the contents of the ZZX email account;

11 he only found out that the contents had been deleted after it had happened.  JW Decl. ¶¶ 7, 8, 17.

12 During the initial months of the litigation, JW did not have significant discussions with leadership

13 at ZZX about the lawsuit or the mechanics of ZZX's document preservation and discovery

14 because of his concern about the non-compete lawsuit from Qiming.  JW Decl. ¶ 23.

15         In any event, JW would not have assumed that any loss of his emails would deprive

16 WeRide of any relevant information.  At the time he told ZZX he was no longer going to use his

17 email, JW would not have had any knowledge about American discovery or that his personal

18 email account could be in any way important.  JW Decl. ¶ 18.  "The court should be sensitive to

19 the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants,

20 particularly individual litigants, may be less familiar with preservation obligations than others who

21 have considerable experience in litigation."  Adv. Comm. Note, Rule 37(e)(2); JW Depo. 175:5-

22 19.  JW's decision to stop using his email account would not have created any problems had ZZX

23 not deleted its contents, or if ZZX had not inadvertently deleted all email older than 90 days.

24         Once the lawsuit had started and ZZX was named as a Defendant, JW had the reasonable

25 expectation that the company would preserve any relevant emails.  JW Decl. ¶ 18.  Undisputedly

26 mishaps occurred which ZZX has fully reported to the Court.  But there is no evidence that JW –

27 who was in and out of Nanjing and scaled back his presence at ZZX between December 2018 and

28 July 2019 – had control over ZZX's documents or any role in managing its preservation and



1  production duties.  JW Decl. ¶ 18.  JW's attenuated involvement is completely inconsistent with

2  any specific intention to deprive ZZX of relevant evidence.  *See, e.g., Hendricks v. Smartvideo*

3  *Techs., Inc.*, 511 F. Supp. 2d 1219, 1232 (M.D. Fla. 2007) (court refused to impose sanctions

4  because it could not find that plaintiff destroyed his old hard drive in bad faith).  Without such an

5  intention, all of the sanctions proposed by WeRide are unavailable under Rule 37(e)(2).

6          **2.      Deletion of The Identified ESI Did Not Deprive WeRide Of**
                 **Information Relevant To The Lawsuit**
7

8          Rule 37(e)(2) requires that JW have intentionally spoliated evidence that would "deprive"

9  WeRide of information it would use in the lawsuit.  Given the lack of relevance of lost emails to

10  WeRide's claims against JW, WeRide cannot satisfy this requirement.

11          **(a)      The Missing Emails Have No Bearing On The Disparagement**
                 **Related Claims.**
12

13          WeRide alleges that it ███████████████████████████████████████████████.

14  Dkt. 210 (Second Amended Complaint) ¶ 64.  It told the Court it ███████████████████

15  ██████████████████████████████████████████████████████████████████  Dkt.

16  210 (Second Amended Complaint) ¶ 65.  ██████████████████████████████████

17  ████████████████  Lu Depo. 196:25-197:25, 200:21-25.

18          WeRide also alleges that a number of specific investors accused JW of making specific

19  negative statements about WeRide.  Dkt. 210 (Second Amended Complaint) ¶¶ 65-66.  One

20  investor produced excerpts of a WeChat exchange that supposedly contained "evidence" of the

21  disparagement, while the others supposedly reported that negative statements were made in face-

22  to-face meetings.  Dkt. 34-29 (Lu Decl.) ¶ 32, Ex. I and Lu Depo. 215:15-216:11.  ████████

23  ██████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ██████  Lu Depo. 213:1-14, 214:6-9, 223:20-24, , 273:21-274:17.  ██████████████

26  ████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ██████████████████████████████  Lu Depo. 188:21-190:7, 283:3-10; MBS Decl.



Ex. 13 at ALLIANCE00000081, Ex. 14 at WERIDE00057937.

WeRide has never alleged that any of JW's purported communications with investors came through email. To the extent he communicated with investors, JW communicated through WeChats, and hundreds of such chats have been produced. JW Decl. ¶ 21; MBS Decl. ¶ 5. ███

████████████████████████████████████████████████████

████████████████████████   Lu Depo. 202:23-203:10, 209:17-212:15; Dkt. 34-29 (Lu Decl.) ¶ 32, Ex. I; Dkt. 68-1, ¶¶ 33-36, Ex. 7. All of the investors with whom JW allegedly had disparaging communications ultimately invested millions of dollars in WeRide and, if negative emails had ever existed, the investors certainly could provide them themselves. WeRide has cited no basis for concluding that deletion of emails could possibly have been conducted with an intention to deprive WeRide of the non-existent evidence of disparagement.

(b)   <b>The Missing Emails Do Not Deprive WeRide Of Substantial Evidence Supporting Its Trade Secret Claims</b>

WeRide relied on the evidence it used to persuade the Court that it was likely to succeed in showing that Kun Huang and, by extension, the other defendants had access to WeRide's confidential information. ZZX will address these issues more fully, and its discussion will not be repeated here. But it is clear JW would have no reason to believe that WeRide's case would have been affected by the loss of his email account. WeRide's complaint refers to a controversial video, Kun Huang's access to ZZX's source code, access to its own forensic evidence, and access to Kun Huang's devices. Dkt. 210 (Second Amended Complaint) ¶¶ 109-112. These were the linchpin of WeRide's allegations and its motion for preliminary injunction, and the disclosures WeRide sought from ZZX and Huang for the injunction. Dkt. 34 at i; Dkt. 34-65 at 4-5.

Emails were never the principal source of evidence relevant to WeRide's trade secrets claims. The central effort of an AV start-up is to develop source code capable of operating the company's vehicles. Email exchanges are not a significant source of evidence of the work accomplished. WeRide has yet to identify any emails that were produced, including 20,000 emails from Kun Huang, that provide any evidence of the trade secrets or their use. There is no reason to believe that emails in JW's account at ZZX could be a significant source of trade secret evidence.



1   Even if JW had hypothetically participated in the deletion of emails, he could not have done so

2   with any intention to deprive WeRide of evidence supporting its claims.

3          In any event, nothing could justify the Court adopting any of the harsh sanctions permitted

4   under Rule 37(e)(2).  Rather, courts should exercise restraint in imposing sanctions and the

5   "remedy should fit the wrong."  *Lokai Holdings LLC*, 2018 WL 1512055, at *8 (S.D.N.Y. Mar.

6   12, 2018) "An adverse-inference instruction that missing evidence may or should be presumed to

7   be unfavorable to the party who destroyed the evidence has long been considered an 'extreme'

8   sanction that 'should not be given lightly.'"  *Id.* (internal citations omitted).  "Dismissal and the

9   entry of a default judgment are even more 'drastic remed[ies],' most typically considered in the

10  context of 'extreme circumstances' warranting sanctions under Rule 37(b), where the non-moving

11  party has fail[ed] to comply with the court's discovery orders willfully, in bad faith, or through

12  fault.'"  *Id.* (alterations in original) (internal quotations omitted).  The severe sanctions listed in

13  Rule 37(e)(2) "should not be used when the information lost was relatively unimportant or lesser

14  measures . . . would be sufficient to redress the loss."  Fed. R. Civ. P. 37, Adv. Comm. Note.  The

15  important evidence relating to WeRide's trade secret claims is intact and JW should not be

16  deprived of the opportunity to defend himself on the merits.

17      **C.      There Is No Basis For Sanctions Against JW Under The Court's Inherent
                  Authority Or Rule 37(e)(1)**

18

19          Even if the Court were to pursue the question of spoliation and sanctions pursuant to its

20  inherent authority, JW still should not be sanctioned.  The Ninth Circuit requires proof of

21  intentional acts of spoliation and material prejudice in order to justify severe sanctions such as

22  termination.  For such sanctions, intent and prejudice must be proven by clear and convincing

23  evidence.  *See, e.g., Hynix Semiconductor Inc. v. Rambus Inc.*, 897 F. Supp. 2d 939, 978 (N.D.

24  Cal. 2012) ("To justify dismissal as a sanction, bad faith must be shown by clear and convincing

25  evidence."); *Pennar Software Corp. v. Fortune 500 Sys. Ltd.*, No. 01-01734 EDL, 2001 WL

26  1319162, at *5 (N.D. Cal. Oct. 25, 2001) ("There must be clear and convincing evidence of

27  misconduct [in the form of spoliation] before a punitive sanction such as a dismissal or default

28  judgment is entered."); *Best Lockers, LLC v. Am. Locker Grp., Inc.*, No. SACV 12-00403 CJC



JW'S OPPOSITION TO MOTION FOR SANCTIONS                                          - 22 -
CASE NO. 18-cv-07233-EJD-NC

1   (ANx), 2013 WL 12131586, at *6 (C.D. Cal. Mar. 27, 2013) ("Spoliation or terminating sanctions

2   are highly disfavored and must be based upon clear and specific evidence supporting the

3   imposition of such harsh sanctions."). Other Circuits agree. *See, e.g., Micron Tech., Inc. v.*

4   *Rambus Inc.*, 645 F.3d 1311, 1328–29 (Fed. Cir. 2011) ("This court agrees that such sanctions

5   should not be imposed unless there is clear and convincing evidence of both bad-faith spoliation

6   and prejudice to the opposing party."); *Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469,

7   1472 (D.C. Cir. 1995) ("[W]e hold that a district court may use its inherent power to enter a

8   default judgment only if it finds, first, by clear and convincing evidence – a preponderance is not

9   sufficient – that the abusive behavior occurred; and second, that a lesser sanction would not

10  sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the

11  merits.").

12          WeRide cites a case from the District of Oregon for the proposition that the applicable

13  standard of proof is preponderance of the evidence. *See OmniGen Research v. Youngquiang*

14  *Wang*, 321 F.R.D. 367, 372 (D. Or. 2017). The Oregon case is the latest in a chain of cases that

15  rely on *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006), an outdated

16  case from this District. Without authority regarding standard of proof at the time, the court in

17  *Napster* declined to adopt the "clear and convincing evidence" standard. *See Napster*, 462 F.

18  Supp. 2d at 1072. Subsequent and better-reasoned cases in this District and elsewhere, however,

19  have settled on requiring clear and convincing evidence before imposing termination sanctions.

20          A higher standard of proof is required because dismissal or a default judgment is a

21  particularly severe remedy, and should only be imposed in extreme circumstances. It also

22  conflicts with the powerful public policy for resolving cases on the merits. *See, e.g., Henderson v.*

23  *Duncan*, 779 F.2d 1421, 1423 (9th Cir. 1986) ("[d]ismissal is a harsh penalty and is to be imposed

24  only in extreme circumstances."); *Ahcom, Ltd. v. Smeding*, No. 07-1139 SC, 2011 WL 3443499, at

25  *8 (N.D. Cal. Aug. 8, 2011) ("[s]anctions resulting in dismissal or entry of default judgment are

26  authorized only in extreme circumstances"); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167

27  F.R.D. 90, 108 (D. Colo. 1996) (to not require proof by clear and convincing evidence "would be

28  to contravene the strong public policy which favors adjudication of cases on their merits."). As



JW'S OPPOSITION TO MOTION FOR SANCTIONS                                    - 23 -
CASE NO. 18-cv-07233-EJD-NC

1  *Gates Rubber Co.* explained, "To remove from a party the right to have a trial in the first place

2  should require much more than a mere preponderance.  Dismissal, default judgment and even

3  presumptions and orders of preclusion are sanctions which deny a party's full rights to a trial on

4  the merits.  The elimination of valued rights should not occur in the absence of a degree of proof

5  which reflects the very serious nature of the decision." *Id.*, at 108.

6          Although it spends substantial portions of its brief discussing evidence it hypothesizes

7  might exist, WeRide never addresses itself to the specifics of any likely prejudice.  The missing

8  emails at best are almost certainly redundant of the evidence that remains. Adv. Comm. Note, Fed.

9  R. Civ. P 37(e) ("Information lost through negligence may have been favorable to either party,

10  including the party that lost it, and inferring that it was unfavorable to that party may tip the

11  balance at trial in ways the lost information never would have.").

12          Although it now seeks JW's default on these claims, it is clear that there ███████

13  ██████████████████████████████████████████████████

14  ██████████████████████████████████████████████████

15  ██████████████████████████████████████████████████

16  ████████ Lu Depo. 188:21-189:11; MBS Decl. Ex. 13 at ALLIANCE00000081.  I██

17  ██████████████████████████████████████████████████

18  ██████████████████████████████████████████████████

19  ████████████ MBS Decl. Ex. 13 at ALLIANCE00000081.

20  ███████████████████████████████████████████

21  ██████████████████████████████ Lu Depo. 283:3-10;

22  Dkt. 68-1, ¶¶ 33-36, Ex. 7. ████████████████████

23  █████████████████████ Lu Depo. 213:1-14, 214:6-9, 223:20-24, 273:21-

24  274:17.

25  ██████████████████████████████████████████████

26  ██████████████████████████ Lu Depo. 283:3-10.

27          JW has denied making the alleged statements in any calls and meetings with the investors,

28  and any evidence to contravene his denials rests within WeRide and the investors' capacity to



produce.  WeRide's documents are presumably intact and would record some communication with or about the "distressed" investors.  Instead, every document points in other directions.

The loss of emails has also not prejudiced WeRide's ability to prove its trade secret claims against JW.  WeRide has used the substantial email evidence that remains to show JW's role with ZZX.  These emails fall into various categories: (i) emails forwarding summaries of engineering work; (ii) calendar invitations to meetings with Kun Huang; (iii) presentations to investors; and (iv) organization charts. *See, e.g.*, Dkt. 166-2, Exs. 5, 16, 17, 36.  WeRide also has access to approximately 20,000 emails from Kun Huang's account, the key email custodian given WeRide's allegations and theory of its case against all defendants.  From these there are numerous examples of each type of email used against JW.  The loss of a full complement of every email that passed through JW's email accounts is not likely to cause any meaningful reduction in WeRide's ability to explore each area of purported evidence of JW's role in ZZX.  As WeRide suggests with respect to FAW evidence that it inaccurately claims was destroyed, more of the day-to-day exchanges might well have assisted JW in demonstrating that he played a minimal role.  Fed. R. Civ. P 37(e) Adv. Comm. Note, ("Information lost through negligence may have been favorable to either party, including the party that lost it, and inferring that it was unfavorable to that party may tip the balance at trial in ways the lost information never would have.").

After penetrating WeRide's overstatements and mischaracterizations, it remains clear that WeRide's capable counsel have not been harmed in their ability to fully present WeRide's theories against JW.  The requested sanctions against JW, accordingly, should be refused.

## IV.   CONCLUSION

For the reasons stated above, Defendant Jing Wang respectfully requests that this Court deny Plaintiffs' motions for sanctions.



JW'S OPPOSITION TO MOTION FOR SANCTIONS                                                          - 25 -
CASE NO. 18-cv-07233-EJD-NC

1    DATED:  November 22, 2019      Respectfully submitted,

2                                    KILPATRICK TOWNSEND & STOCKTON LLP

3

4                                    By: */s/ Gregory S. Gilchrist*

5                                        GREGORY S. GILCHRIST
                                       MEHRNAZ BOROUMAND SMITH
                                       SUSAN W. PANGBORN

6                                        GREGORY P. FARNHAM
                                       SOPHY T. MANES

7                                        TAYLOR J. PFINGST

8                                    Attorneys for Defendants
                                       JING WANG and KAIZR, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

