QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Claude M. Stern (Bar No. 96737)
  claudestern@quinnemanuel.com
  William T. Pilon (Bar No. 326487)
  williampilon@quinnemanuel.com
  Michael F. LaFond (Bar No. 303131)
  michaellafond@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

  Ryan S. Landes (Bar No. 252642)
  ryanlandes@quinnemanuel.com
865 S Figueroa Street
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

*Attorneys for Plaintiffs WeRide Corp. and
WeRide Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| WERIDE CORP. f/k/a JingChi Corp.; WERIDE INC. f/k/a JingChi Inc., <br><br> Plaintiff, <br><br> vs. <br><br> JING WANG, an individual, KUN HUANG, an individual, ZHONG ZHI XING TECHNOLOGY CO. LTD. d/b/a ALLRIDE.AI, ALLRIDE.AI INC., KAIZR, INC., ZKA INC., DOES 1-10, <br><br> Defendants. | CASE NO. 5:18-cv-07233-EJD <br><br> **WERIDE'S SUR-REPLY IN SUPPORT OF ITS MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 37(B), 37(E)(1), 37(E)(2), AND THE COURT'S INHERENT POWERS** |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT .................................................................................................. 1

I.     DEFENDANTS SPOLIATED THE MOST IMPORTANT EVIDENCE ............................. 2

       A.     ZZX Destroyed (or Is Hiding) the Most Important Source Code at Issue .................. 2

              1.     The Code on Huang's Laptop Was Spoliated ................................. 2

              2.     ZZX's Pre-August 24, 2018 Code Remains Missing ................................ 3

              3.     The Code ███████████████ Remains Missing ................................. 4

              4.     The Code Developed by Wu Wei and Dongxiang Xu Remains
                     Missing; Their Laptops Were Spoliated ................................ 6

              5.     ZZX Spoliated Code in Its OneDrive Repository .............................. 7

              6.     ZZX Cannot Be Saved by Experts Who *Never* Examined Its Code ............... 9

       B.     Defendants Destroyed *Thousands* of Documents that Would Have Shed
              Some Light on the Missing Code and Are Critical to WeRide's Non-Trade-
              Secret Claims, Including Communications to and from Wang ............................. 10

II.    SPOLIATION BY ANY ONE DEFENDANT MAY BE IMPUTED TO THE
       OTHERS ............................................................................................................................ 11

III.   ZZX'S CLAIM TO HAVE BEEN "OPEN" AND "TRANSPARENT" IS FALSE ............ 13

       A.     ZZX Obstructed the Initial Investigation, Necessitating Months of Extra
              Work ............................................................................................................................ 13

       B.     ZZX's Ongoing Obstructionism Has Guaranteed That Any Investigation into
              Its Code Will Take *Months* More to Complete ......................................................... 14

       C.     ZZX Is Continuing to Withhold Non-Source Code Documents It Was Long
              Ago Ordered to Produce ............................................................................................. 15

       D.     ZZX Fails to Explain How a Comparison of the Non-Deleted Code Could
              Ever Resolve WeRide's Claims ................................................................................. 16

IV.    HUANG'S "EVIDENTIARY OBJECTIONS" ARE MERITLESS ................................... 18

CONCLUSION ......................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
   399 F. Supp. 2d 1064 (N.D. Cal. 2005) ...................................................16, 18

*Andreoli v. Youngevity Int'l, Inc.*,
   2019 WL 2492491 (S.D. Cal. June 14, 2019) ...................................................20

*Columbia Pictures, Inc. v. Bunnell*,
   2007 WL 4877701 (C.D. Cal. Dec. 13, 2007) .............................................4, 6, 9

*Commc'ns Ctr., Inc. v. Hewitt*,
   2005 WL 3277983 (E.D. Cal. Apr. 5, 2005) ...................................................17

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,
   482 F.3d 1091 (9th Cir. 2007)...........................................................................1

*Defs. of Wildlife v. U.S. Fish*,
   2016 WL 4382604 (N.D. Cal. Aug. 17, 2016) ...................................................19

*Gemsa Enterprises, LLC v. Specialty Foods of Alabama, Inc.*,
   2015 WL 12746220 (C.D. Cal. Feb. 10, 2015) ...................................................12

*Georges v. Novartis Pharm. Corp.*,
   2012 WL 9064768 (C.D. Cal. Nov. 2, 2012) ...................................................20

*Hodges v. Hertz Corp.*,
   351 F. Supp. 3d 1227 (N.D. Cal. 2018) ...................................................19

*In re Hitachi Television Optical Block Cases*,
   2011 WL 3563781 (S.D. Cal. Aug. 12, 2011) ...................................................12

*Leon v. IDX Sys. Corp.*,
   464 F.3d 951 (9th Cir. 2006).......................................................................3, 4, 9

*OmniGen Research v. Yongqiang Wang*,
   321 F.R.D. 367 (D. Or. 2017) .......................................................3, 7, 8, 17

*Peerless Indus., Inc. v. Crimson AV LLC*,
   2014 WL 3497697 (N.D. Ill. July 14, 2014) ...................................................11, 17

*Ramos v. Swatzell*,
   2017 WL 2857523 (C.D. Cal. June 5, 2017) ...................................................12

*SkinMedica, Inc. v. Histogen Inc.*,
   869 F. Supp. 2d 1176 (S.D. Cal. 2012) ...................................................16

*The Sunrider Corp. v. Bountiful Biotech Corp.*,
   2010 WL 4589156 (C.D. Cal. Nov. 3, 2010) .............................................6, 9

*Waymo LLC v. Uber Techs., Inc.*,
   2017 WL 2123560 (N.D. Cal. May 15, 2017) ...................................................16, 18

*Woods v. Scissons*,
   2019 WL 3816727 (D. Ariz. Aug. 14, 2019) ...................................................12

### <u>Statutes</u>

Fed. R. Evid. 702.........................................................................................20

### <u>Other Authorities</u>

Restatement (Third) Of Agency § 1.04 (2006) at Illustrations 5 & 6 ...............................12

1

## PRELIMINARY STATEMENT

2    "The most critical factor to be considered in case-dispositive sanctions is whether 'a party's

3    discovery violations make it impossible for a court to be confident that the parties will ever have access

4    to the true facts.'" *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097

5    (9th Cir. 2007).   "There is no point to a lawsuit, if it merely applies law to lies." *Id*.   Now, after a

6    months-long investigation, it is abundantly clear that Defendants have effectively destroyed all of the

7    source code, emails, supporting corporate documents, and other evidence necessary for WeRide, the

8    Court, and the factfinder to gain "access to the true facts."

9    A critical part of this case is determining how ZZX developed the code used during its October

10   22, 2018 marketing presentation (*see* Dkt. 116 at 14-16), and what WeRide source code remained or

11   remains in Defendants' possession. *Id*. at 12-14.   But ZZX has either systematically destroyed—or

12   simply hidden—all of that evidence.   In fact, the longer this investigation goes on, the more it becomes

13   clear that ZZX's spoliation of direct and circumstantial evidence has been so extensive as to render

14   impossible a true determination of what happened.   ZZX either affirmatively spoliated—or else just

15   failed to produce—code from the pre-October 22, 2018 period (including all code from before August

16   24, 2018); source code on Huang's laptop; source code on other repositories; source code developed by

17   the engineers primarily responsible for two advanced capabilities; contemporaneous weekly technical

18   reports of what source code was being developed; and thousands of emails from August, September,

19   and October 2018, which might have otherwise shed light on what ZZX was developing.

20   ZZX repeatedly argues that the Court should evaluate the merits based on the thin surviving

21   evidence alone, and that the only question should be, effectively, whether there is a "copy and paste" of

22   WeRide's source code into ZZX's *surviving* codebase.   This argument fundamentally misunderstands

23   the nature of trade secret misappropriation, and the extreme harm that spoliation does to the judicial

24   process.   On a full record, WeRide could establish misappropriation in any number of ways, even if not

25   a single line of WeRide's code ever made it into ZZX's codebase.   Misappropriation could include, for

26   example, studying WeRide's code as instructional material, or reviewing and discussing WeRide's code

27   in engineering meetings, or analyzing WeRide's code to chart out a development path, or any number of

28   other uses that do not require literal copying.   ZZX has destroyed all of the evidence that would reflect

these improper uses, and has also destroyed all of the evidence that might corroborate ZZX's ever-shifting, post-hoc, excuses and explanations.  ZZX has also destroyed the most critical evidence that would prove WeRide's non-trade-secret claims (e.g., breach of the duty of loyalty, intentional interference), a point that ZZX almost entirely ignores.  If ZZX is permitted to profit from this strategy of destroying broad swaths of evidence and then litigating based only on its self-serving denials and the evidence it allowed to survive, then ZZX will have written the hornbook on strategic spoliation.

ZZX's (and the other Defendants') arguments also fail on their merits.  First, ZZX points to the testimony of its multiple code experts.  But all of them either failed to review ZZX's code (an approach this Court already rejected), or made no effort to determine whether the surviving code is consistent with other evidence (it is not), or both.  Second, ZZX asserts that it has "given [WeRide] access to . . . sources of data for forensic imaging."  This ignores that ZZX fought tooth and nail to avoid providing anything at all—WeRide had to obtain two additional orders to enforce its right to imaging—and even to this day ZZX has not provided everything it was ordered to.  ZZX has violated essentially every order entered against it in this litigation, including two preliminary injunctions and multiple discovery orders.  Third, Huang submits purported "evidentiary objections" that ask the Court to shut its eyes to the evidence revealed through the investigation that Defendants themselves have fought to obstruct. Defendants had every opportunity to respond to the evidence of spoliation, but they did not respond.

After five months of investigation, it is clear that Defendants' mass destruction of evidence goes well beyond the "inadvertent" deletion of emails they admitted in August 2018.  Defendants intentionally wiped multiple laptops (both in a targeted fashion and as a matter of corporate policy), deleted whole email accounts, spoliated code from numerous sources after being ordered to preserve and surrender it, and much more.  Striking Defendants' answers, entering a default, and awarding WeRide its substantial fees to investigate this rampant spoliation is the only appropriate sanction.

## I.   DEFENDANTS SPOLIATED THE MOST IMPORTANT EVIDENCE

### A.   ZZX Destroyed (or Is Hiding) the Most Important Source Code at Issue

#### 1.   The Code on Huang's Laptop Was Spoliated

On March 22, 2019, the Court ordered Huang to surrender his laptop to WeRide by no later than March 26.  Dkt. 116 at 26.  It is undisputed that when Huang surrendered his laptop: (i) the timestamps

on *over 3000* directories which included the name "AllRide" had been changed on either March 24 or March 25 (i.e. between the Court's order and the date of surrender) (Dkt. 387-2 ¶5, Declaration of Mike Kunkel), and (ii) when Huang surrendered his laptop, the code located on it was, to quote *ZZX's* expert, no longer "an arrangement of code a programmer would use." Landes Ex. 45 ¶12; *see also* Landes Ex. 44 ¶¶9-10 (WeRide's expert concurring that, at the time Huang surrendered his laptop, the code on it contained nonfunctional "nonsense" files).[1] These two facts—each highly suspicious on its own, and fatal in combination—point directly to spoliation. And because Defendants have never offered a germane explanation, willful destruction remains the only logical conclusion on the table.

Huang hired *three* forensic experts, but *none* of them dispute the testimony of WeRide's forensic expert, Mike Kunkel. *See* Dkt. 370-5 (Collins); 370-7 (Harris); 370-9 (Zhang). Instead, Huang himself submitted a declaration that stated he "do[es] not understand why this is so, or know why these folders or files are appearing with such timestamps on March 24 and 25, 2019." Dkt. 370-1 at ¶17. Nor has Huang ever explained why he—a senior engineer at ZZX—would maintain a laptop with "nonsense" code that is not "an arrangement of code a programmer would use." When Kunkel replied to Huang's declaration and rebutted each of Huang's improper lay opinions, Huang responded only with meritless legal argument styled as "evidentiary objections." *See infra* Section IV. The spoliation of Huang's laptop is grounds for terminating sanctions. *See, e.g. Leon v. IDX Sys. Corp*., 464 F.3d 951, 959 (9th Cir. 2006) (terminating sanctions appropriate following selective spoliation of highly relevant files on a single laptop); *OmniGen Research v. Yongqiang Wang*, 321 F.R.D. 367, 376 (D. Or. 2017).

### 2.    ZZX's Pre-August 24, 2018 Code Remains Missing

As explained in WeRide's second spoliation brief, Huang and Dr. Liu (ZZX's corporate representative) both testified that ███████████████████████████████████ ████████████ (*see* Dkt. 387 at 9; LaFond Ex. 3 (6/25/19 Huang Depo. Tr.) at 142:14-144:7; Ex. 1 (6/6/19 Liu Depo. Tr.) at 100:8-14, 104:10-13; Dkt. 70-1 (Huang's declaration) at ¶25). However, it is undisputed that the code base ZZX produced contains no code uploaded prior to August 24, 2018. *See*

---

[1]  References to "Landes" refer to the October 22, 2018 Declaration of Ryan Landes, filed at Dkt. 330-7.  References to "LaFond" refer to the December 13, 2019 Declaration of Michael LaFond, filed at Dkt. 387-3.  Finally, references to "LaFond Reply" refer to the January 13, 2020 Declaration of Michael LaFond filed concurrently with this brief.

1    Dkt. 387 at 9; *see also* Dkt. 400 at 10 (admitting no code checked in before August 24, 2018).[2]

2           In response, ZZX claims that the pre-August 24 code is a "red herring" because Huang allegedly

3    "began working at ZZX sometime after August 13, 2018—nine [*sic*] days or less before the code was

4    checked in." Dkt. 400 at 10. As an initial matter, this argument is factually incorrect because WeRide's

5    investigation has uncovered evidence that Huang began working for ZZX no later than ████████

6    ██████████████████████████████████████ and on which date Huang logged into

7    one of those accounts shortly after accessing WeRide's source code—as averred to by Huang's own

8    expert. *See* Landes Ex. 41; LaFond Ex. 22; Dkt. 335-7 (Kunkel) ¶12; *see also* Dkt. 370-5 (Collins) ¶8.

9    Thus it appears that all of the code from Huang's ██████ at ZZX ██████████ is missing.

10          More fundamentally, Huang and Dr. Liu both testified that ████████████████

11   ████████████  *See* Dkt. 387 at 9. In fact, this was Huang's primary defense to WeRide's

12   original motion for a preliminary injunction: that he allegedly "joined an existing team of engineers at

13   ZZX that were already developing the technology." Dkt. 70-1 ¶25. Likewise, Dr. Liu testified—as

14   ZZX's corporate representative—that ████████████████████████████████

15   ██  *See* LaFond Ex. 1 (6/6/19 Liu Depo. Tr.) at 100:8-14, 104:10-13. Whatever Huang's start date

16   was, it provides no explanation as to why code from before August 24 is missing. This missing code is

17   from an absolutely critical period when Huang was shifting his allegiances from WeRide to ZZX, just

18   weeks before ZZX's marketing video was prepared. As the Court explained, "[t]he implausibly fast

19   development of technology can contribute to finding misappropriation," and thus the missing July and

20   August code is key to this case. Dkt. 116 at 15. This is grounds for terminating sanctions. *See*

21   *Columbia Pictures, Inc. v. Bunnell*, 2007 WL 4877701, at *3 (C.D. Cal. Dec. 13, 2007) (terminating

22   sanctions appropriate where the defendant could not, or would not, produce relevant documents, but its

23   employees testified that the documents existed); *see also Leon*, 464 at 959.

24          3.    The Code ██████████████████ Remains Missing

25          Dr. Liu's code testimony has already been the subject of multiple rounds of briefing. In sum:

26

27   ────────────────────────
     [2]  Even then, the August 24, 2018 upload is only ███████████████████████—another
     fact pointed out in WeRide's briefing (Dkt. 387 at 9; Dkt. 387-1 ¶17(a)) and not disputed by ZZX. *See*
28   Dkt. 400. Thus even the August 24 upload contains ████████████████████████.

during Dr. Liu's deposition as ZZX's corporate representative in June 2019, he testified in detail about how ZZX's source code was capable of performing the capabilities seen in ZZX's October 2018 marketing video: ████████████████████████████████████████ *See* Dkt. 387 at 8-9.  WeRide submitted declarations from Dr. Walter explaining as much (*see* Landes Exs. 44, 50; *see also* Dkt. 335-5 at ¶¶9-23).  In response, Dr. Liu ***changed his testimony***, and admitted that Dr. Walter was correct: ████████████████████████████████

████████████████ *See, e.g.* Landes Ex. 47 (Declaration of Dr. Liu) at ¶20 ███████████

████████████████████████████████████████████████████████████████ (emphasis added); ¶22 ███████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████ (emphasis added).[3]

Dr. Liu's changed testimony now claims that the entire October 22 video was faked using "████████"—██████████████████████████████████ (i.e., there is nothing "autonomous" about it).  *See* Landes Ex. 47 ¶25 ███████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ ").  As Dr. Walter explained, this new ████████ story is wholly inconsistent with all of Dr. Liu's prior testimony at the most fundamental level—akin to changing the story from "Here's how I spent 12 hours cooking a gourmet meal from scratch" to "I don't know how to cook; I ordered takeout."  Dkt. 335-5 at ¶¶24-31 (cooking analogy); *see also id.* at ¶¶9-23 (step by step technical analysis supporting the analogy).  ZZX ***never*** responds to this point.  Neither Dr. Liu, nor any of ZZX's ***four*** software experts[4] ever testified that the use of ████████ is consistent with Dr. Liu's June deposition, or provided any other explanation for why Dr. Liu would offer such detailed testimony about code ██████████████████.  And Dr. Liu admits that the very ████████ files he now claims were key to ZZX's development "were not stored by ZZX," and thus cannot be examined to

---

[3]  Dr. Liu's repeated admissions that Dr. Walter's analysis was correct completely undermines ZZX's argument that "Dr. Walter was simply wrong about some of the code he claimed was missing" (Dkt. 400 at 8).

[4]  Jeffery Miller (Dkt. 369-11), Marco Pavone (Dkt.185-02), Matthew Ohlman (Dkt. 369-03.1), and Daniel Watzenig (Dkt. 369-05).

1    either corroborate or disprove Dr. Liu's changed story.  *See* Landes Ex. 47 ¶26.  Two days of Dr. Liu's

2    deposition testimony explaining the functionality of ZZX's ███████████ has vanished into the

3    memory hole; ZZX acts as if the testimony does not exist.  The code Dr. Liu described in his June

4    deposition is ████, as are the ████████ files, emails, or any other documents that might establish which

5    version of Dr. Liu's story is true.  This is grounds for terminating sanctions.  *See The Sunrider Corp. v.*

6    *Bountiful Biotech Corp.*, 2010 WL 4589156, at *8 (C.D. Cal. Nov. 3, 2010) (terminating sanctions

7    appropriate where contradictory testimony makes it impossible to determine "whether some of the

8    withheld documents existed"); *see also Columbia Pictures*, 2007 WL 4877701, at *3.

9            4.   <u>The Code Developed by Wu Wei and Dongxiang Xu Remains Missing; Their</u>

10                 <u>Laptops Were Spoliated</u>

11        Wu Wei and Dongxiang Xu were the two ZZX individuals primarily responsible for pedestrian

12   detection, one of the Advanced Capabilities at issue.  During the course of WeRide's investigation,

13   ZZX was forced to admit that it intentionally wiped their laptops at some point ***after*** February 23, 2019,

14   and December 31, 2018, respectively—long after the duty to preserve arose.  *See* Dkt. 383 at ¶¶2-5; *see*

15   *also* Dkt. 387 at 8 (citing Landes Exs. 13-15; LaFond Ex. 4 (9/13/2019 Huang Depo. Tr.) at 95:12-96:8.

16   ZZX's spoliation of these laptops is particularly prejudicial because it is undisputed that ZZX has not

17   produced any code related to ████████████ that can be attributed to either Wu or Dongxiang.  *See*

18   Dkt. 387-1 at ¶17b.  ZZX's attempts to minimize this spoliation fall flat.

19        First, ZZX argues that Dr. Liu also worked on ████████████, and WeRide can

20   review the code Dr. Liu wrote. Dkt. 400 at 9.  But it is undisputed that Dr. Liu's ████████████

21   ████████████████████████████  Specifically, Dr. Walter averred that he could not

22   locate ████████████████████████ (*see* Landes Ex.

23   46 ¶¶19-20), and in reply ZZX's corporate representative, Dr. Liu, ***agreed with Dr. Walter*** and averred

24   that the alleged "October 2018 code" could only handle ████████████ using

25   contradicting his prior deposition testimony.  *See* Landes Ex. 47 ¶¶25 ("████████████

26   ████████████████████████████████████████████

27   ████████████████████████") (emphasis added).  By arguing that Dr. Liu also

28

1   worked on ██████████, ZZX has actually identified even more missing code.[5]

2        Second, even assuming Dr. Liu's ██████████ code is available (and it is not), that does

3   not change the fact that ZZX spoliated Wu and Dongxiang's ██████████ code—and ZZX

4   provides no evidence whatsoever demonstrating that Dr. Liu's code incorporated, or would be at all

5   similar to, Wu and Dongxiang's code.  *Id*.

6        Third, ZZX attempts to confuse the issue by pointing out that Dr. Walter identified a single

7   substantive code change written by Wu Wei ██████████  Dkt. 400 at 9.

8   That mischaracterizes Dr. Walter's testimony, which was only that the substantive change in question

9   ████████████████████████████████████████████████████████

10  ██████████  Dkt. 387-1 ¶17b n. 18.  It also ignores that Dr. Walter expressly

11  averred that he could not find functional changes to ██████████ ZZX's brief speaks only in

12  the more generalized term ██████████ (which is different).  *See* 400 at 9.  Between missing

13  code in ZZX's production and ZZX's affirmative destruction of engineer laptops, the record of ZZX's

14  "development" of this Advanced Capability is lost as well.  This is grounds for terminating sanctions.

15  *OmniGen*, 321 F.R.D. at 375 (terminating sanctions appropriate where destruction of evidence left the

16  record "unclear [a]s to what extent Bioshen misappropriated any of the plaintiffs' trade secrets").

17        5.   <u>ZZX Spoliated Code in Its OneDrive Repository</u>

18        WeRide presented evidence that on August 30, 2019, ZZX deleted a file named

19  ██████████ from its ██████████ server, and that this file name was

20  consistent with the file containing an entire code repository.  *See* Dkt. 387 at 7-8.  In response, ZZX

21  spends an entire page of briefing waxing poetic about the "volume of data" it has produced (Dkt. 400 at

22  2) before ultimately admitting: (i) the file named ██████████ did in fact

23  contain code, and (ii) that file can no longer be found on the ██████████ server (implying deletion).  *See*

24

---

25  [5] ZZX's misplaced reliance on even more missing code is just the latest example of ZZX "making it up as they go along."  For example, ZZX previously argued that spoliation was limited to emails and no
26  code was missing at all (*see* Dkt. 368 at 12), only to admit that, at a minimum, pre-August 24, 2018 code is missing, along with the purported ██████████ that would allegedly corroborate Dr. Liu's
27  changing tales.  *See* Dkt. 400 at 10 (admitting pre-August 24 code is missing); Dkt. 368 at 5 n.2 (admitting ██████████ files were destroyed).  Rather than conducting a necessary investigation and
28  reporting the truth, ZZX just reports what it wishes to be true, and then begs forgiveness later.

Dkt. 400 at 3-4.  The deletion of a complete code repository in August 2019 long post-dated the Court's preliminary injunction against "[d]estroying, concealing, disposing, deleting, removing or altering any and all documentation of any kind . . . relating in any way to source code written, developed, edited, reviewed, or used by Defendants" (Dkt. 116 at 24-25), not to mention ZZX's independent preservation obligations.  ZZX attempts to moot this point by making two arguments.

First, ZZX claims that a **_different_** file with the same name allegedly contains the "same code" as the deleted file, even though ZZX admits this "other file" is missing important non-code pieces of the repository.  _See_ Dkt. 400 at 4 ("This file contains the same code as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **_but without the git logs_**.") (emphasis added).  Second, ZZX claims that this is the same file it allegedly provided to its code expert, Dr. Miller, in July 2019 in order to facilitate a code comparison, and on that basis argues that the code has not been lost.  _Id_.  The trouble is that Dr. Liu averred he exported files for Dr. Miller ▮▮▮▮▮▮▮▮ (Landes Ex. 47 at ¶9) but file name ▮▮▮▮▮▮▮▮▮▮ indicates it was created more than a week later, on July 12, 2019 (_i.e._ 2019.07.12).

Moreover, ZZX's only "evidence" that the file it deleted on August 30, 2019, is similar to (but not the same as) other files it has produced is the testimony of Dr. Liu (_see_ Dkt. 400-7), a self-interested witness who previously testified as ZZX's corporate representative.  _See, e.g._ Landes Ex. 1.  This is convenient for ZZX, because the file is unrecoverable, so Dr. Liu's testimony cannot be corroborated.  _See_ LaFond Ex. 11 (Lai Depo. Tr.) at 80:9-22 (testimony of forensic neutral that files deleted from ▮▮▮▮ cannot be recovered).  WeRide has already provided authority that Defendants are prohibited from presenting testimony about the contents of files they irretrievably destroyed, _see_ Dkt. 387 at 14-15 (citing, _inter alia_ Fed. R. Evid. 1002; Fed. R. Evid. 1004), but ZZX never addresses that authority.  Numerous courts have rejected attempts by spoliators to provide self-serving testimony about the alleged contents of highly relevant destroyed documents.  _See, e.g. OmniGen_, 321 F.R.D. 377.[6]  ZZX deleted a code repository and may not now testify that its contents were "wholly duplicative" of non-

---

[6]  For the same reason, the self-serving testimony of ZZX's witness that he "does not believe" he ever successfully uploaded the repository to ▮▮▮▮ also fails.  _See_ Dkt. 400-7 ¶5.  ZZX is hardly the first party to respond to forensic evidence of deleted documents with testimony stating that they are "unsure" as to whether the deleted document existed in the first place. _OmniGen_, 321 F.R.D. at 377.

1   deleted files.  This is grounds for terminating sanctions.  *See Leon*, 464 F.3d at 959; *see also Columbia*

2   *Pictures*, 2007 WL 4877701, at *3; *Sunrider Corp.*, 2010 WL 4589156, at *8.

6.   <u>ZZX Cannot Be Saved by Experts Who ***Never*** Examined Its Code</u>

4         Confronted with all of this independent evidence pointing in the same direction, ZZX resorts

5   again to presenting the testimony of an expert who "did not analyze whether the October 2018 Source

6   Code could perform the Advanced Capabilities that the [] Defendants claim that it can."  Dkt. 342 at 12

7   (Court order rejecting this exact gimmick).  ZZX points, over and over again, to the Declaration of its

8   code expert Matthew Ohlman.  *See* Dkt. 400 at 7-8.  But ZZX ignores that "Ohlman does not appear to

9   have taken any steps to verify that he was examining the correct code base or repository in the first

10  instance."  Dkt. 387-1 at ¶¶28-34.  As with ZZX's prior experts, Ohlman never testifies about the

11  capabilities of ZZX's code, nor does he reconcile the code he reviewed with any of ZZX's witness

12  testimony or related documents.  *Id*.  Ohlman ***never*** explains: (i) why Huang's laptop contained only

13  gibberish code and forensic evidence of modification before surrender; (ii) where the pre-August 24,

14  2018 code can be found (Ohlman admits he never saw any such code, Dkt. 368-2 ¶¶22, 23); (iii) where

15  the code ███████████████████████ can be found; (iv) where the ██████████████████

16  written by Wu Wei and Dongxiang Xu before November 4, 2018 can be found; or (v) that the code

17  deleted from ████████ is, in fact, identical to other code produced by ZZX.  *See generally* Dkt. 368-2.

18  In short, all Ohlman avers is that there exists a single repository location within ZZX which was not

19  spoliated between August 24 and October 22, 2018—Ohlman never considers, let alone avers, whether

20  that code is capable of performing the functions ZZX claims (it is not), whether it is consistent with

21  other evidence in the case (it is not), and whether the existence of that one repository precludes the

22  possibility that the misappropriated code was stored elsewhere or used in a manner other than literal

23  copying (it does not).  To extend the earlier analogy about cooking, Ohlman's testimony is, in effect,

24  that he looked at the takeout menus, and he believes no one tampered with them, but cannot comment

25  on why there is prior inconsistent testimony about not ordering takeout at all.[7]

---

27  [7]   ZZX's other code experts fare no better.  Dr. Watzenig did not consider what ZZX's code was
28  actually capable of doing—a point raised by WeRide (Dkt. 387 at 12-13) and completely ignored by
ZZX.  *See* Dkt. 400.  Nor did Dr. Pavone consider what ZZX's code was actually capable of doing—

1    The only expert retained by ZZX who actually examined the functions of ZZX code was

2   Dr. Miller, who merely avers that the code produced by ZZX could have performed the capabilities seen

3   in ZZX's marketing video ███████████████████████████████████████████████████████

4   Landes Ex. 49 ¶12.  Of course, Dr. Liu testified in June 2019 that ZZX was actually performing these

5   functions in earnest ████████████████████████████████████   *see* Dkt. 335-5 at

6   ¶¶9-23, and Dr. Miller *never* addresses this point.  None of Dr. Miller's declarations aver that the use of

7   ██████  is consistent with Dr. Liu's deposition testimony.  *See* Landes Exs. 45, 49; Dkt. 368-1.

8   ZZX's code experts do nothing to refute the overwhelming evidence of code spoliation.

9    **B.     Defendants Destroyed *Thousands* of Documents that Would Have Shed Some**

10    **Light on the Missing Code and Are Critical to WeRide's Non-Trade-Secret**

11    **Claims, Including Communications to and from Wang**

12    In its opening papers, WeRide demonstrated that ZZX destroyed *thousands* of emails which

13   could have shed some light on the missing code—including key documents, such as ████████████

14   █████  sent to Huang and Wang which were known to disclose █████████████████████

15   ████████████   *See* Dkt. 330 at 5, 11-12.  In response, ZZX made two arguments: (i) that ZZX

16   had produced thousands of other, unrelated (and often irrelevant) files, and (ii) WeRide could discern

17   the same information found in the █████████████████ from the code logs ZZX's expert Ohlman

18   examined.  *See* Dkt. 369-2 at 7, 22.  In reply, WeRide pointed out that (i) ZZX only actually produced

19   348 emails from the relevant period of July 1 through October 22, 2018 (*see* Dkt. 387 at 14), and

20   (ii) Ohlman only examined a single code base, which omitted code as explained in detail above.  *See,*

21   *supra* at 8-9.  ZZX's latest brief does not respond to any of this.  *See* Dkt. 400.  In the absence of any

22   rebuttal, it appears that the documents ZZX claims would "make up" for the deleted ██████████

23   (as well as the *thousands* of additional emails which no doubt would have contained typical "work

24   chatter" also revealing information about ZZX's development or use of WeRide's code) are themselves

25   deleted, missing, or unproduced.  ZZX's spoliation has completely undermined this litigation.

26

27   ───────────────────

another point raised in prior briefing by WeRide (Dkt. 199-3 at 16 ("Dr. Pavone did *not* examine
28   AllRide's code (or any code)") and not addressed by ZZX.  *See* Dkt. 400.

1    Defendants' latest brief also never truly addresses WeRide's arguments about the non-trade

2    secret claims—such as how Wang's destruction of multiple email accounts eliminated evidence of

3    defamatory emails, or how ZZX's destruction of Huang's "test@allride.ai" email account eliminated

4    evidence of Huang's breach of his employment contract and breach of fiduciary duty.  *Compare* Dkt.

5    400 (Defendant's only sur-reply, filed by ZZX, which fails to address these issues) *with* Dkt. 330 at 19-

6    21 (explaining how spoliation has prejudiced WeRide's other claims).  While there has been an intense

7    focus on code—driven largely by ZZX's misplaced insistence that all of its spoliation is harmless given

8    the purported survival of a single code repository—WeRide is significantly prejudiced because

9    spoliation has impacted **all** of its claims.

10   **II.      SPOLIATION BY ANY ONE DEFENDANT MAY BE IMPUTED TO THE OTHERS**

11   Defendants continue to finger-point about who is to blame for the extensive spoliation; it seems

12   someone else is always at fault.  *See* Dkts. 370 at 14 & 372 at 4-8.  Those arguments should be rejected

13   out-of-hand as nothing more than an attempt by the Defendants to further benefit from their own

14   spoliation. For example, Wang's argument that he "didn't know" about the deletion of multiple of his

15   own email accounts—including email accounts using **fake names**—(*see* Dkt. 372 at 4-8) conveniently

16   cannot be corroborated because the corroborating emails were **also deleted** along with the accounts

17   themselves.  *See* Dkt. 330 at 8-9.  Thus, the argument that WeRide "lacks evidence" of whether Wang

18   or someone else actually "pulled the trigger," is nothing more than another attempt by Wang to benefit

19   from the spoliation.  The other Defendants follow a similar pattern.  Huang claims to have "no idea"

20   why the @allride.ai email accounts created for him and accessed by him **while he still worked at**

21   **WeRide** have since been deleted, and he has no idea how or why his laptop was modified after he was

22   ordered to surrender it (Dkt. 387 at 24); Huang claims it must have been ZZX's doing (Dkt. 370 at 14),

23   but the corroborating evidence is gone.  ZZX has no idea who set up its 90-day auto-delete email policy

24   that persisted until June 2019 (and then was concealed for another two months); it must have been the

25   "external contractor intern" who conveniently can no longer be contacted and interviewed by the

26   forensic neutral.  LaFond Reply Ex. 1 (Lai Depo. Tr.) at 88:20-90:25.  There are countless other

27   examples, and they all underscore why spoliation is so pernicious and grounds for severe sanctions.

28   *See, e.g. Peerless Indus., Inc. v. Crimson AV LLC*, 2014 WL 3497697, at *5 (N.D. Ill. July 14, 2014)

("[Defendants] contend, inter alia, that they could not have used any of [WeRide's] alleged trade secrets . . . [but] these arguments miss the operative point, which is that defendants did not properly retain and produce all relevant documents, rendering [WeRide's] task of proving that [Defendants] used its trade secrets very difficult if not impossible.").

Regardless, these transparent attempts to shift the buck are wrong on the law. Spoliation by ZZX may be imputed to either Huang or Wang, and vice versa. *See, e.g. In re Hitachi Television Optical Block Cases*, 2011 WL 3563781, at *16 (S.D. Cal. Aug. 12, 2011) ("[An employer] is responsible for its employee's spoliation."). In the Ninth Circuit, "spoliation of evidence may be imputed to a party who did not engage in spoliation" in two circumstances. *Ramos v. Swatzell*, 2017 WL 2857523, at *6 (C.D. Cal. June 5, 2017). ***First***, even if we assume (against substantial evidence) that Wang and Huang had no role in the spoliation, ZZX's spoliation can be imputed to them if ZZX is "an interested third party that controlled [the spoliated] file[s] and had access to [the files], and [] is also providing [the non-spoliating party's] legal defense." *Id.* at *6; *see also Woods v. Scissons*, 2019 WL 3816727, at *4 (D. Ariz. Aug. 14, 2019). Here, there is no question that ZZX is an interested third party (it is a codefendant), that had control of and access to the spoliated emails, email accounts, documents, and code (indeed, Wang and Huang expressly argue that ZZX had control, *see* Dkts. 370 at 14 & 372 at 4-8). And ZZX is, at a minimum, ███████████████ . *See* LaFond Reply Ex. 2 (9/18/2019 Huang Depo. Tr.) at 521:6-522:2. Imputation of ZZX's spoliation to Huang and Wang is appropriate.

***Second***, and most relevant to Wang, "spoliation of evidence may be imputed to a [party] who did not participate in the spoliation . . . where the destroying party is the 'agent' of that party." *Gemsa Enterprises, LLC v. Specialty Foods of Alabama, Inc.*, 2015 WL 12746220, at *9 (C.D. Cal. Feb. 10, 2015). As the Court already found, "WeRide has sufficiently shown that—contrary to his representations to the court—Wang actually controls the AllRide Defendants[.]" Dkt. 342 at 13; *see also* Dkt. 166 at16-19 (summarizing evidence of Wang's control over the corporate defendants). Accordingly, employees of ZZX act at Wang's direction, and are agents of Wang when doing so. *See* Restatement (Third) Of Agency § 1.04 (2006) at Illustrations 5 & 6 ("E is the Chief Financial Officer of P Corporation. E hires S to work as E's executive assistant . . . E asks S to fill out a form reporting a loss due to fire at E's residence. In filling out the form, S acts as E's agent.").

1    All of the Defendants are to blame for their own repeated acts of spoliation, and for each other's

2    coordinated spoliation as well.

3    **III.    ZZX'S CLAIM TO HAVE BEEN "OPEN" AND "TRANSPARENT" IS FALSE**

4    **A.    ZZX Obstructed the Initial Investigation, Necessitating Months of Extra Work**

5    ZZX has taken every step within its power to delay, hamper, or otherwise obstruct WeRide and

6    the forensic neutral's ("FTI's") investigation into ZZX's extended mass spoliation of evidence.  From

7    the outset, ZZX fought to limit the scope of investigation to emails alone and refused to collect or turn

8    over non-email document repositories to FTI.  *Compare* Dkt. 260 at ¶3 (WeRide's proposed forensic

9    neural order, permitting the forensic neutral to decide which locations to image) *with* Dkt. 262 ¶3

10   (ZZX's proposed forensic neutral order, limiting the investigation to "images" collected at ZZX's

11   discretion).   Indeed, notwithstanding the Court's order directing an investigation of ***any***  potential

12   spoliation from ***any*** source, FTI testified that it was limited to investigating only email because that was

13   the only source ZZX made available for FTI's review.  *See* LaFond Ex. 11 (Lai Depo. Tr.) at 18:7-

14   21:22.  Meanwhile, ZZX failed to even ***begin*** document collection or preservation in earnest until

15   ████████████████████ after WeRide filed suit.  *See* Dkt. 330 at 9.  Having failed to take even basic

16   document preservation measures, it is no surprise that ZZX spoliated code and wiped laptops (*see*,

17   *supra* at 2-9) in addition to its mass deletion of emails.  *See* Dkt. 231 (ZZX's letter to the Court

18   admitting to mass email spoliation).  The true extent of what has been lost will never be known, because

19   ***even to this day*** ZZX remains in open violation of the Court's August 22, 2019 order requiring ZZX to

20   "apply [its] search terms to all available sources, including but not limited to email servers, personal

21   devices (phones, tablets, laptops, etc.), online accounts, network or share drives, and other similar

22   sources." Dkt. 252 at 5.  ZZX has only collected and searched a small set of (surviving) email accounts

23   and laptops, despite the Court's order to conduct a broader collection and search.[8]

24   ZZX apparently realized the folly of its email-only strategy when FTI testified at deposition that

25

---

26   [8]  As explained in Special Master Order No. 4, the code imaging process does not allow for WeRide to
     review documents in the locations it has been given leave to image; instead, WeRide is only allowed to
27   identify code files for export by ZZX.  *See* Dkt. 363 at 3-4.  Thus, ZZX must collect these locations and
     run search terms (as ordered by the Court, *see* Dkt. 252) to identify responsive documents ZZX was
28   ordered to produce.

it could not confirm ZZX's document preservation or the integrity of ZZX's code because ZZX had failed to produce the relevant evidence to FTI (despite the Court's order that ZZX facilitate a broader investigation).  *See* Dkt. 387 at 3; LaFond Ex. 11 (Lai Depo. Tr.) at 18:7-21:22.  ZZX admitted as much when it requested an "extension" of the sanctions motion briefing because, in the words of ZZX's counsel: "[WeRide] elicited testimony that made clear both that FTI had the power to examine what you claim are source code destruction issues and that it did not do that work.  We would support [delaying the briefing schedule and] having FTI do that work[.]"  LaFond Reply Ex. 3 at 3.  WeRide objected, because no delay would be necessary if ZZX had complied earlier, and because the months-long delay imposed significant costs on WeRide, *id.* at 1-2, but ZZX took the issue up with the Special Master, who ultimately ordered an extension of the briefing schedule to permit more investigation.  *See* LaFond Reply Ex. 4 at 2.  But ZZX delayed and obstructed that investigation as well.

**B.**     **ZZX's Ongoing Obstructionism Has Guaranteed That Any Investigation into Its Code Will Take *Months* More to Complete**

As soon as ZZX got its extended briefing schedule, it went back to more obstruction—ensuring that neither WeRide nor FTI could complete any investigation before the extended sanctions briefing closed.  On October 28, 2019, this Court issued an order mandating that ZZX make "available to WeRide's counsel of record ***for full-disk forensic imaging and data preservation by WeRide***, for WeRide's counsel's review subject to the Protective Order, ***any*** computers, servers, or cloud computing accounts that serve as code repositories[.]"  *Id.* (emphasis added).  ZZX fought hard to evade this order.

First, ZZX took the position that, despite the plain language of the order calling for "full-disk forensic imaging . . . by WeRide," ZZX did not actually need to provide WeRide with access to any of its code repositories or make anything available for imaging; ZZX claimed it was only required to set up remote source code review for two cloud repositories (and no review at all for anything else).  Consistent with that position, when WeRide's vendor arrived in China to image the source code repositories on the Court-ordered deadline, ZZX shut the door in their faces.  Angotti ¶¶5-6.  WeRide was forced to secure an order from the Special Master just to be able to image ZZX's cloud repositories.  *See* Dkt. 363 (Special Master's Order No. 4).

Even then, ZZX persisted in arguing that WeRide was not entitled to review any source code

repositories except for ZZX's designated cloud repositories.  Once again, WeRide was forced to get an order from the Special Master compelling ZZX to actually comply with the Court's order of October 28.  *See* Dkt. 364 (Special Master's Order No. 5).  However, by the time WeRide secured that order, it was already November 19 (*see id.*) and the Special Master ordered compliance "within seven (7) business days," prompting ZZX to take the position that, because of the Thanksgiving holiday, "seven business days" from November 19 was December 3.  *See* Lafond Reply Ex. 5 at 2.  Accordingly, although this Court ordered ZZX to make "any" code repositories fully available for imaging by November 12, ZZX did not even attempt to comply with that order until December 3 at the earliest. Notwithstanding a Court order and two Special Master Orders, ZZX delayed further—including by providing limited access credentials that did not permit imaging, or by failing to activate certain "inactive" repositories.  Angotti ¶¶7-20.  WeRide did not receive a full set of working credentials—and thus was not able to ***begin*** complete source code imaging—until December 20, 2018, more than a month after the ordered deadline, and only after obtaining two additional orders mandating compliance with this Court's original order.  *Id.* at ¶20.[9]  ZZX has not been cooperative in the least.

**C.**  **ZZX Is Continuing to Withhold Non-Source Code Documents It Was Long Ago Ordered to Produce**

ZZX has also refused to comply with Court orders—and engaged in blatant obstructionism— related to ***non***-code files.  As explained in WeRide's opening papers, ZZX's source code repositories were just a few of the "more than a dozen other locations [containing ESI] . . . [that] have never been imaged at all," despite a Court order instructing ZZX to image all available ESI storage locations.  *See* Dkt. 252 at 5 ¶6 (Court order instructing ZZX to collect and search all ESI locations); *see also* Landes Ex. 11 (9/20/2019 Barce Depo. Tr.) at 91:14-98:7 (30(b)(6) testimony admitting dozens of locations were not collected or searched by ZZX).  ***None*** of the Defendants have ever responded to this argument.

Worse, ZZX has fully admitted to WeRide that it is in non-compliance with the order compelling it to search all ESI locations.  Specifically, WeRide has sent meet and confer letters to ZZX,

---

[9]  As explained by WeRide's vendor, detection of spoliation in source code repositories hosted on cloud computing services requires imaging the underlying virtual machines ("VMs").  *See* Angotti ¶9. Accordingly, even ZZX's cloud repositories could not be adequately collected, for the purposes of a spoliation investigation, until ZZX finally provided VM credentials in late December.  *Id.* ¶21.

1   and engaged in substantial efforts to try and bring ZZX into compliance, only to have ZZX promise

2   "updates" on its document searches and collections which **never** materialize.  *See* Dkt. 398-1 (LaFond

3   Decl.) at ¶¶14-20 & Exs. E, F (communications between counsel wherein ZZX does not dispute its non-

4   compliance).  ZZX cannot simply ignore Court orders to collect and search documents, and then argue

5   in its briefing that it has produced an "unprecedented" amount of data, been "transparent" in discovery,

6   and that Court-ordered investigations which have only barely begun somehow vindicate ZZX's

7   substantive defenses.  Forcing WeRide to continue this charade for months more, at great expense,

8   would only reward ZZX for its destruction of evidence and concerted efforts to delay or outright block

9   investigation of that spoliation and the underlying merits.  Severe sanctions must issue.

10       **D.**    **ZZX Fails to Explain How a Comparison of the Non-Deleted Code Could Ever**

11                       **Resolve WeRide's Claims**

12         As noted above, the underlying refrain from Defendants is that there is no harm done because a

13   simple code comparison between WeRide's code and the surviving ZZX code can provide a full

14   resolution on the merits.  Beyond the fact that there is extensive, unrebutted evidence that highly-

15   relevant ZZX code is lost forever, ZZX's argument fundamentally misapprehends the nature of trade

16   secret misappropriation.

17         WeRide has presented ample authority standing for the proposition that "in the context of trade

18   secret misappropriation, information may be improperly 'used' in that it is unlawfully acquired and then

19   built upon or modified before being disclosed or benefit derived." *SkinMedica, Inc. v. Histogen Inc.*,

20   869 F. Supp. 2d 1176, 1197 (S.D. Cal. 2012); *02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc*., 399 F.

21   Supp. 2d 1064, 1072 (N.D. Cal. 2005); *see also* Dkt. 387 at 10.  WeRide may succeed on a trade secret

22   misappropriation claim, even if none of its code is ever found on ZZX's servers.  *See, e.g. Waymo LLC*

23   *v. Uber Techs., Inc*., 2017 WL 2123560, at *5 (N.D. Cal. May 15, 2017) (finding Waymo likely to

24   succeed on a trade secret misappropriation claim even if "Waymo's files never crossed over to Uber's

25   servers or devices . . . [because] it remains entirely possible that Uber knowingly left [the trade secret

26   thief] free to keep that treasure trove of files as handy as he wished (so long as he kept it on his own

27   personal devices)[.]").  Accordingly, in light of the extensive evidence that ZZX spoliated (or simply

28   withheld contrary to Court orders), such as code, wiped laptops, and deleted emails (*see*, *supra* at 2-9),

1   no comparison of the ***surviving*** code could ever resolve this litigation, because it would remain entirely

2   possible that ZZX "derived a benefit" from WeRide's code before deleting it all.

3   ZZX's only response is a ***footnote*** that argues those cases are distinguishable because those

4   plaintiffs had proof of actual benefits derived. *See* Dkt. 400 at 6 n. 1.  As an initial matter, ZZX is

5   ignoring WeRide's circumstantial evidence of misappropriation, which the Court already found to be

6   sufficient to demonstrate WeRide was likely to succeed on the merits.  *See* Dkt. 116 at 12-16.  But,

7   ZZX also is putting the cart before the horse by ignoring the impact of its own spoliation.  To

8   paraphrase another line of cases cited by WeRide (and ignored by ZZX): "[Defendants] contend, *inter*

9   *alia*, that they could not have used any of [WeRide's] alleged trade secrets . . . [but] these arguments

10   miss the operative point, which is that defendants did not properly retain and produce all relevant

11   documents, rendering [WeRide's] task of proving that [Defendants] used its trade secrets very difficult

12   if not impossible." *Peerless Indus., Inc. v. Crimson AV LLC*, 2014 WL 3497697, at *5 (N.D. Ill. July

13   14, 2014); *see also Commc'ns Ctr., Inc. v. Hewitt*, 2005 WL 3277983, at *3 (E.D. Cal. Apr. 5, 2005);

14   *OmniGen*, 321 F.R.D. at 375 (spoliation justified terminating sanctions even though it was "unclear []

15   to what extent Bioshen misappropriated any of the plaintiffs' trade secrets").

16   The facts underpinning this spoliation motion demonstrate the insidious nature of ZZX's "just

17   examine the surviving code" argument.  As explained, *supra* at 2-4, the following sequence of events is

18   undisputed:  (1) On July 24, 2018, when Huang still worked for WeRide, he accessed WeRide's code

19   repository, then hours later, accessed ZZX's email server ████████████████

20   ████████████████   None of the Defendants has any explanation, other than "I don't know" for this

21   occurrence, and any corroborating evidence is gone because ████████████████

22   ████████   When Huang left WeRide several weeks later, he destroyed evidence on three of his laptops,

23   in whole or in part.  (2) After the Court ordered Huang to surrender his surviving laptop, but before

24   Huang actually surrendered it, whole directories of code found on that laptop were modified such that

25   the only remaining code was non-functional nonsense that no Defendant has been able to explain.

26   These facts indicate spoliation, and they are just a small example of the full record of spoliation.  *See*

27   Dkt. 330 at 10; Dkt. 330-2 ¶10.  These facts also mean that Huang may have been in possession of

28   WeRide's code—and free to refer to it any time he wished—until at least March 24, 2019, when he

1   modified his laptop before surrendering it.  *Id*.  That would demonstrate trade secret misappropriation

2   (*Waymo*, 2017 WL 2123560, at *5), but neither WeRide nor the Court can ever know, because Huang

3   spoliated the code the moment he was ordered to surrender it, and ZZX and Wang spoliated the

4   corporate emails and email accounts from around that time frame that might speak to the issue.

5        Likewise, if Wu Wei and Dongxiang Xu built ZZX's ████████████ by referencing

6   WeRide's code (even if they did not literally copy it), or even if they just gave pointers to other

7   engineers based on their examination of WeRide's code, that is a misappropriation of WeRide's trade

8   secrets.  *See, e.g.*, *02 Micro*, 399 F. Supp. 2d at 1072.  But again, neither WeRide nor the Court will

9   ever know because ZZX wiped Wu and Dongxiang's laptops after the lawsuit began, none of the

10  relevant code they created is available, and ZZX deleted ***thousands*** of emails from this timeframe.

11       Defendants' attempt to rewrite the definition of misappropriation, and then to limit the analysis

12  to only the surviving evidence, is a prime example of a spoliators trying to benefit from their own

13  destruction of evidence.  The Court must not accept this tactic.

14  **IV.   HUANG'S "EVIDENTIARY OBJECTIONS" ARE MERITLESS**

15       Rather than filing a responsive brief on January 6, 2019—as he was permitted to, *see* Dkt. 353—

16  Huang elected to file a series of meritless purported "evidentiary objections" to WeRide's Reply Brief.

17  *See* Dkt. 391.[10]  Specifically, Huang argues that "[t]he Court permitted WeRide's reply brief to 'raise

18  issues and present evidence regarding Plaintiffs' analysis of the code repositories,'" and Huang claims

19  that any other argument or evidence was off limits.  *See* Dkt. 391 at 1.

20       But Huang intentionally omitted the full language of the Parties' stipulation, which reads in full:

21  "Plaintiffs shall file reply briefs, if any, on or before December 13, 2019, ***in reply to Defendants'***

22  ***opposition briefs and which may also*** raise issues and present evidence regarding Plaintiffs' analysis of

23  the code repositories produced by defendant Zhong Zhi Xing Technology Co. Ltd."  Dkt. 353 ¶2

24  (emphasis added to indicate language Huang omits).  It is black letter law that the Court may consider

25  "new evidence presented on reply, particularly if the new evidence appears to be a reasonable response

---

[10]  Wang was also permitted to file a responsive brief on January 6, 2019, but he did not file anything at all.  He apparently has been more preoccupied with a purely harassing subpoena to WeRide's trial counsel.  *See* Dkt. 406.

1   to the opposition." *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1249 (N.D. Cal. 2018); *Defs. of*

2   *Wildlife v. U.S. Fish*, 2016 WL 4382604, at *10 (N.D. Cal. Aug. 17, 2016) (the court may consider

3   reply "evidence [] offered in direct response to [a] brief in opposition to the instant motion").  WeRide

4   was permitted to file an ordinary reply brief that ***replied*** to Defendants' opposition briefing (Dkt. 353

5   ¶2), and such a brief may raise arguments and present new evidence in direct response to Defendants'

6   oppositions.  *Hodges*, 351 F. Supp. 3d at 1249.  All of the argument and evidence that Huang complains

7   about was raised in direct reply to points in Huang's opposition.

8       **First**, Huang complains that WeRide raised the destruction of the test@allride.ai email account

9   for the first time in reply.  But WeRide did so in direct response to Huang's argument that the

10  test@allride.ai email account █████████████████████████████████████████████████████████

11  ███████████  was the only account Huang accessed when he was still an executive at WeRide in July

12  2018—as though this is somehow vindicating.  *See* Dkt. 370 at 9.  Tellingly, Huang had no substantive

13  response to the actual point WeRide made in its motion, which is that while Huang still worked for

14  WeRide, he accessed a ZZX email account just hours after accessing WeRide's source code repository,

15  and then the ZZX email account and all of its contents were subsequently spoliated.  *Compare* Dkt. 330

16  at 4 ("Forensic analysis of Huang's laptop reveals that he accessed AllRide's Microsoft Office account

17  on July 24, 2018—hours after accessing WeRide's source code.") *with* Dkt. 370 (no response).  WeRide

18  was permitted to respond to Huang's non-argument by pointing out that the test@allride.ai email

19  account was spoliated, just like ███████████████████████████████

20      **Second**, Huang complains about the Reply Declaration of Michael Kunkel as purportedly

21  containing "reply evidence," (Dkt. 391 at 3); but Kunkel's Reply declaration only responded to the

22  declarations Huang filed in opposition.  *See* Dkt. 387-2 at ¶¶4-7 (Kunkel Reply stating that he is

23  replying to the declarations of Huang, Zhang, and Collins).  Huang fails to identify any argument or

24  evidence from WeRide's reply papers, in Kunkel's declaration or elsewhere, which did not respond to

25  Huang's opposition.  That failure defeats Huang's objections.  *Hodges*, 351 F. Supp. 3d at 1249.

26      Separately, Huang attempts to submit a *Daubert*-style objection to Kunkel's declaration by

27  claiming, in wholly conclusory terms, that Kunkel's testimony is nothing more than "speculat[ion],

28  without any evidence or explanation[.]"  Dkt. 391 at 3-5.  This is nonsense: Kunkel is offering expert

testimony interpreting the timestamps on Huang's surrendered laptop, using his experience and professional knowledge—this expert testimony *is* a "form[] of evidence." *See Georges v. Novartis Pharm. Corp.*, 2012 WL 9064768, at *3 (C.D. Cal. Nov. 2, 2012). Kunkel is a highly qualified forensic expert with impeccable training who other courts have repeatedly relied on for computer forensic investigations. *See* Dkt. 335-7 at ¶¶2-3 & Ex. A (setting forth Kunkel's credentials, certifications, and training); *see also Andreoli v. Youngevity Int'l, Inc.*, 2019 WL 2492491, at *3 (S.D. Cal. June 14, 2019) (awarding Rule 37 sanctions based, in part, on "the declaration of Michael Kunkel, the Director of Investigative Services of Setec Security Technologies, Inc."). Huang does not (and cannot) challenge any of these qualifications. *See* Dkt. 391. As stated in his declaration, Kunkel is *not* "speculating," but is drawing on his training and experience to interpret the forensic evidence—which is clearly proper expert testimony. *See* Fed. R. Evid. 702. The fact that all of Huang's experts declined to rebut Kunkel does not render Kunkel's expert testimony somehow "not evidence."

More practically, none of the concerns that justify limitations on reply evidence are present here. The Parties' stipulation allowed Huang to file another brief on January 6, 2020, further responding to WeRide's reply. *See* Dkt. 353 ¶3. Huang was free to have one of his three retained forensic experts rebut Kunkel, or explain why Kunkel's declaration was faulty. Huang failed to do so, and wants to substitute attorney argument for evidence. The Court should see through this ruse, overrule Huang's objections, and issue terminating sanctions.

## **CONCLUSION**

For the foregoing reasons, the Court should sanction the Defendants in a manner consistent with the proposed order filed by WeRide on October 22, 2019. *See* Dkt. 330.

DATED:  January 13, 2020          Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By _/s/ Ryan S. Landes_____
    Claude M. Stern
    Ryan S. Landes
    William T. Pilon
    Michael F. LaFond
    *Attorneys for Plaintiffs WeRide Corp. and WeRide Inc.*